No. 22-3772

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

_____

ALLSTATES REFRACTORY CONTRACTORS, LLC,
*Plaintiff-Appellant*,

v.

MARTIN WALSH, et al.,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of Ohio (Western Division) (Zouhary, J.)
District Court Case No. 3:21-cv-1864

_____

## BRIEF OF APPELLANT ALLSTATES REFRACTORY CONTRACTORS, LLC

_____

Christopher M. McLaughlin
JONES DAY
North Point, 901 Lakeside Ave.
Cleveland, OH 44114
(216) 586-3939
cmmclaughlin@jonesday.com

J. Benjamin Aguiñaga
JONES DAY
2727 N. Harwood St.
Dallas, TX 75201
(214) 220-3939
jbaguinaga@jonesday.com

Donald F. McGahn II
Brett A. Shumate
John M. Gore
Anthony J. Dick
Brinton Lucas
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
(202) 879-3939
bshumate@jonesday.com

*Counsel for Appellant Allstates Refractory Contractors, LLC*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 22-3772                    Case Name: Allstates Refractory Contractors v. Walsh

Name of counsel:  Brett A. Shumate

Pursuant to 6th Cir. R. 26.1, Plaintiff-Appellant Allstates Refractory Contractors, LLC
                                                    *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on _____ November 8, 2022 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Brett A. Shumate

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT REGARDING ORAL ARGUMENT ............................... x

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 5

STATEMENT OF THE ISSUE ............................................................. 5

STATEMENT OF THE CASE ............................................................... 6

    A.   Statutory and Regulatory Background ..................................... 6

    B.   The Present Controversy ...................................................... 11

SUMMARY OF ARGUMENT .............................................................. 14

STANDARD OF REVIEW .................................................................. 16

ARGUMENT ...................................................................................... 16

I.   THE SAFETY-STANDARD DELEGATION VIOLATES THE ORIGINAL
    MEANING OF ARTICLE I ............................................................. 16

    A.   The Authority To Write "Reasonably Necessary or
        Appropriate" Safety Standards Is "Legislative Power" ......... 16

    B.   Precedent Should Not Be Extended To Authorize
        This Sweeping Delegation of Legislative Power .................... 23

II.   THE SAFETY-STANDARD DELEGATION VIOLATES THE
    CONSTITUTION UNDER THE INTELLIGIBLE PRINCIPLE TEST ............. 31

    A.   The Safety-Standard Delegation Lacks
        an Intelligible Principle ....................................................... 32

        1.   *The Act's text contains no intelligible principle* ............... 32

        2.   *OSHA's changing positions on the delegation
            confirm that it lacks an intelligible principle* .................. 39

    B.   The District Court's Contrary Analysis Is Flawed ................. 45

        1.   *The Act does not constrain OSHA's discretion* ................ 46

# TABLE OF CONTENTS
## (continued)

**Page**

2. *The precedents cited by the district court do not support the standardless delegation here* .................. 52

3. *Policy considerations cannot sustain the decision below* ............................................. 60

CONCLUSION ....................................................... 65

CERTIFICATE OF COMPLIANCE ...................... 66

CERTIFICATE OF SERVICE ............................... 67

DESIGNATION OF DISTRICT COURT RECORD ............................ 68

STATUTORY ADDENDUM ................................. 69

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.L.A. Schechter Poultry Corp. v. United States,*
   295 U.S. 495 (1935)................................................................ *passim*

*Am. Petroleum Inst. v. EPA,*
   684 F.3d 1342 (D.C. Cir. 2012)........................................................55

*Am. Textile Mfrs. Inst. v. Donovan,*
   452 U.S. 490 (1981)................................................................ *passim*

*Am. Trucking Ass'ns v. EPA,*
   175 F.3d 1027 (D.C. Cir. 1999)................................................53, 54

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022)..............................................................63

*Blocksom & Co. v. Marshall,*
   582 F.2d 1122 (7th Cir. 1978) ......................................................59, 60

*Bowsher v. Synar,*
   478 U.S. 714 (1986)........................................................................17, 33

*Dep't of Transp. v. Ass'n of Am. R.Rs.,*
   575 U.S. 43 (2015) ............................................................19, 53, 57

*Free Enter. Fund v. PCAOB,*
   537 F.3d 667 (D.C. Cir. 2008)................................................... *passim*

*Free Enterprise Fund v. PCAOB,*
   561 U.S. 477 (2010)................................................................. *passim*

*Freeman v. Quicken Loans, Inc.,*
   566 U.S. 624 (2012)............................................................................51

*Gundy v. United States,*
   139 S. Ct. 2116 (2019) ........................................................... *passim*

*Humphrey's Executor v. United States,*
   295 U.S. 602 (1935).....................................................28, 29, 30

*ICC v. Cincinnati, New Orleans & Tex. Pac. Ry. Co.,*
   167 U.S. 479 (1897)............................................................................57

iv

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re MCP No. 165*,
   20 F.4th 264 (6th Cir. 2021) .......................................................... 9, 34

*In re MCP No. 165*,
   21 F.4th 357 (6th Cir. 2021) ................................................ 3, 6, 34, 47

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
   448 U.S. 607 (1980).................................................................. *passim*

*Int'l Union v. OSHA*,
   37 F.3d 665 (D.C. Cir. 1994)........................................................ 43, 50

*Int'l Union v. OSHA*,
   938 F.2d 1310 (D.C. Cir. 1991)................................................... *passim*

*J.W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928).................................................................... 25, 26

*Kelly Springfield Tire Co. v. Donovan*,
   729 F.2d 317 (5th Cir. 1984) ............................................................ 41

*Lichter v. United States*,
   334 U.S. 742 (1948)............................................................................ 58

*Loving v. United States*,
   517 U.S. 748 (1996)............................................................................ 26

*Michigan v. EPA*,
   213 F.3d 663 (D.C. Cir. 2000)........................................................... 53

*Michigan v. EPA*,
   576 U.S. 743 (2015)..................................................................... 34, 35

*Morrison v. Olson*,
   487 U.S. 654 (1988)..................................................................... 28, 29

*N.Y. Cent. Sec. Corp. v. United States*,
   287 U.S. 12 (1932) ............................................................................ 56

*Nat'l Mar. Safety Ass'n v. OSHA*,
   649 F.3d 743 (D.C. Cir. 2011)........................................................... 59

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*NBC v. United States*,
319 U.S. 190 (1943)................................................................ 56, 57, 59

*NFIB v. Dep't of Lab.*,
142 S. Ct. 661 (2022) ...................................................................... 2, 3

*Nixon v. Kent Cnty.*,
76 F.3d 1381 (6th Cir. 1996) ............................................................ 59

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935)............................................................... 24, 25, 47

*Paul v. United States*,
140 S. Ct. 342 (2019) ..................................................... 20, 21, 22, 27

*PHH Corp. v. CFPB*,
881 F.3d 75 (D.C. Cir. 2018)............................................................ 30

*SeaWorld of Fla., LLC v. Perez*,
748 F.3d 1202 (D.C. Cir. 2014)......................................................... 2

*Seila Law LLC v. CFPB*,
140 S. Ct. 2183 (2020) ......................................................... 28, 29, 30

*Skinner v. Mid-America Pipeline Co.*,
490 U.S. 212 (1989)........................................................................ 26

*Synar v. United States*,
626 F. Supp. 1374 (D.D.C. 1986)..................................................... 32

*Tanzin v. Tanvir*,
141 S. Ct. 486 (2020) ...................................................................... 35

*Texas v. Rettig*,
993 F.3d 408 (5th Cir. 2021) ........................................................... 30

*Tiger Lily, LLC v. HUD*,
5 F.4th 666 (6th Cir. 2021)................................................... 17, 18, 63

*Tomaszczuk v. Whitaker*,
909 F.3d 159 (6th Cir. 2018) ........................................................... 16

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Touby v. United States,*
  500 U.S. 160 (1991) ............................................................. 32

*Wayman v. Southard,*
  23 U.S. (10 Wheat.) 1 (1825) ............................................. 20

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ........................................... 20, 21, 22

*Whitman v. Am. Trucking Assn's,*
  531 U.S. 457 (2001) ................................................... *passim*

*Yakus v. United States,*
  321 U.S. 414 (1944) ............................................... 38, 58, 59

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

U.S. Const. art. I ........................................................ *passim*

28 U.S.C. § 1291 ................................................................ 5

28 U.S.C. § 1331 ........................................................... 5, 13

28 U.S.C. § 2461 .............................................................. 10

29 U.S.C. § 651 ........................................................... 49, 51

29 U.S.C. § 652 ......................................................... *passim*

29 U.S.C. § 654 ............................................................. 8, 9

29 U.S.C. § 655 ......................................................... *passim*

29 U.S.C. § 666 ......................................................... 10, 33

29 U.S.C. § 667 ................................................................ 9

29 U.S.C. § 668 ................................................................ 9

29 U.S.C. § 672 ................................................................ 9

42 U.S.C. § 7409 ............................................................. 52

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

OTHER AUTHORITIES

29 C.F.R. § 1910.132 ............................................................................ 10

29 C.F.R. § 1910.147 ............................................................................ 10

29 C.F.R. § 1975.4 .................................................................................. 9

Amy Coney Barrett, *Suspension and Delegation*,
  99 CORNELL L. REV. 251 (2014) ...................................................... 27

*Control of Hazardous Energy Sources (Lockout/Tagout)*,
  54 Fed. Reg. 36,644 (Sept. 1, 1989)................................................ 42

*Control of Hazardous Energy Sources (Lockout/Tagout)*,
  58 Fed. Reg. 16,612 (Mar. 30, 1993) .............................................. 43

*Delegation of Authority and Assignment of Responsibility to the
  Assistant Secretary for Occupational Safety and Health*,
  85 Fed. Reg. 58,393 (Sept. 18, 2020)................................................ 6

Fed. R. App. P. 4.................................................................................... 5

Gov't Accountability Office, *Workplace Safety and Health:
  Multiple Challenges Lengthen OSHA's Standard Setting*,
  GAO-12-330 (2012) ......................................................................... 62

*Heat Injury and Illness Prevention in Outdoor and Indoor
  Work Settings*, 86 Fed. Reg. 59,309 (Oct. 27, 2021) ..................... 12

Steven C. Kahn et al., *Legal Guide to Human Resources* § 11:9
  (Nov. 2022 update)..................................................................... 61, 62

Mark A. Rothstein, *Occupational Safety and Health Law* § 5:35
  (2022 ed.)......................................................................................... 61

*Sec'y of Lab. v. Dun-Par Engineered Form Co.*,
  12 O.S.H. Cas. (BNA) ¶ 2053 (O.S.H.R.C. Sept. 3, 1986) ............... 61

Antonin Scalia, *A Note on the Benzene Case*,
  REG., July/Aug. 1980 ........................................................... 41, 63, 64

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Antonin Scalia, *Responsibilities of Regulatory Agencies Under Environmental Laws*, 24 HOUS. L. REV. 97 (1987) ............... 54

Cass. R. Sunstein, *Is OSHA Unconstitutional?*, 94 VA. L. REV. 1407 (2008) ................................................. 4, 36, 55, 63

The White House, *FACT SHEET: Biden Administration Mobilizes to Protect Workers and Communities from Extreme Heat* (Sept. 20, 2021) ............................................................ 12

U.S. Dep't of Lab., OSHA, *Industry Profile for OSHA Standard ALL* ....................................................................... 10

U.S. Dep't of Lab., OSHA, *OSHA Penalties* ......................................... 10

U.S. Dep't of Lab., OSHA, *QuickTakes DYK?* (May 20, 2021) ............ 48

U.S. Dep't of Lab., OSHA, Standard Interpretations, *Request for OSHA National Policy Banning Guns from the Workplace and OSHA Enforcement Policy Regarding Workplace Violence* (Sept. 13, 2006) ................................................. 48

U.S. Dep't of Lab., OSHA, *State Plans* ................................................... 9

U.S. Dep't of Lab., OSHA, *Top 10 Most Frequently Cited Standards for Fiscal Year 2021* ....................................................... 10

U.S. Dep't of Lab., OSHA, *Workplace Violence* ................................... 48

*Walking-Working Surfaces and Personal Protective Equipment (Fall Protection Systems)*, 81 Fed. Reg. 82,494 (2016) ............................................................ 22

Ilan Wurman, *Nondelegation at the Founding*, 130 YALE L.J. 1490 (2021) ................................................................. 20

## STATEMENT REGARDING ORAL ARGUMENT

Allstates requests oral argument. This case raises important questions about Congress's unconstitutional delegation of legislative power to the Executive Branch. Oral argument would materially assist the Court in resolving these questions.

## INTRODUCTION

This appeal concerns an extraordinary delegation of legislative power to one of the most consequential federal agencies in the modern era. In 1970, Congress gave the newly created Occupational Safety and Health Administration (OSHA) the power to write "any occupational safety or health standard" regulating virtually every business in the United States. 29 U.S.C. § 655(b). When it comes to workplace-safety standards, the *only* purported limit on that broad rulemaking authority in the Occupational Safety and Health Act (the Act) is that these rules must be "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." *Id.* § 652(8).

That is no limit at all. Congress offered no guidance on what makes a rule "reasonably necessary or appropriate." Instead, it left that weighty policy question entirely to the agency. The government has been quite candid about this, explaining that "[t]he phrase 'reasonably necessary or appropriate' is not a limitation on [its] powers or a substantive standard of any sort." Br. for Fed. Parties at 43, *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 (1980) (Nos. 78-911, 78-1036), 1979 WL 199556 (*Indus. Union* Br.).

The Act therefore gives OSHA the power to make whatever safety rules it thinks appropriate, based on nothing more than its own subjective judgment. Armed with this limitless authority, the agency has enacted a variety of safety standards governing the nation's workplaces in striking detail. Alongside writing this burdensome code, OSHA aggressively enforces it against businesses across the country, including Allstates Refractory Contractors, with penalties reaching as high as $145,000-plus per infraction.

OSHA's power to make and enforce its own rules has frequently proved abusive. For example, after this Court declined to stay the agency's COVID-19 vaccine mandate, the Supreme Court stayed the rule because it was a "significant encroachment into the lives—and health—of a vast number of employees" that fell "beyond the agency's legitimate reach." *NFIB v. Dep't of Lab.*, 142 S. Ct. 661, 665-66 (2022); *see also SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202, 1218 (D.C. Cir. 2014) (Kavanaugh, J., dissenting) (noting that OSHA's "unprecedented assertion of authority to proscribe SeaWorld's whale show is triply flawed"). And that mandate was issued under a separate delegation— not challenged here—governed by a framework "more demanding than

the 'reasonably necessary or appropriate' standard" at issue in this case. *In re MCP No. 165*, 21 F.4th 357, 380 (6th Cir. 2021), *stay granted sub. nom. NFIB*, 142 S. Ct. 661. Given OSHA's track record with *narrower* grants of authority, there is little reason for optimism with respect to the far broader delegation here.

The district court nevertheless upheld this sweeping transfer of lawmaking authority to OSHA as constitutional. In doing so, the court made no effort to reconcile the safety-standard delegation in 29 U.S.C. § 655(b) with the original meaning of Article I, which vests "[a]ll legislative Powers" in Congress alone. U.S. Const. art. I, § 1. Nor did it dispute that the Supreme Court "has not yet addressed the meaning of 'reasonably necessary or appropriate,'" let alone upheld this grant of authority against a nondelegation challenge. Op., R.30, PageID#374. And it did not deny that a majority of the current Supreme Court has expressed a willingness to invalidate overbroad delegations of legislative power. Instead, the court deemed Section 655(b) sufficiently similar to delegations the Supreme Court previously had blessed.

This Court should reverse. No precedent requires upholding a grant of authority to write "appropriate" rules for nearly the entire

American workforce. To the contrary, when it comes to extant delegations of power, Section 655(b) stands alone: "No other federal regulatory statute confers so much discretion on federal administrators, at least in any area with such broad scope, and it is not difficult to distinguish OSHA from statutes the Court has upheld." Cass. R. Sunstein, *Is OSHA Unconstitutional?*, 94 VA. L. REV. 1407, 1448 (2008).

To rule for the government, the district court thus had to *extend* precedents blessing delegations conferring *less power* and creating *more constraints* to the singular grant of authority here. But while lower courts are bound by Supreme Court precedent, they "should resolve questions about the scope of those precedents in light of and in the direction of the constitutional text and constitutional history." *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 698 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *aff'd in part, rev'd in part and remanded*, 561 U.S. 477 (2010). This Court should therefore hold, consistent with both original meaning and binding precedent, that under our Constitution, Congress cannot authorize the Executive Branch both to decide what safety rules are "appropriate" for almost every American business and then to enforce them on pain of six-figure penalties.

## JURISDICTIONAL STATEMENT

Relying on Article I's Vesting Clause, Allstates brought a facial constitutional challenge to Congress's delegation of authority to OSHA to promulgate "reasonably necessary or appropriate" workplace-safety standards. 29 U.S.C. §§ 652(8), 655(b); Compl., R.1, PageID#4. The district court had jurisdiction under 28 U.S.C. § 1331.

On September 2, 2022, the district court denied Allstates' motion for summary judgment and granted the government's cross-motion for summary judgment. Op., R.30, PageID#377; Judgment, R.31, PageID#378. Allstates timely appealed on September 9, 2022. Notice of Appeal, R.32, PageID#379; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether a statutory delegation of authority to OSHA to issue "any occupational safety or health standard" that is "reasonably necessary or appropriate to provide safe or healthful employment and places of employment" for virtually every business in the United States violates Article I's Vesting Clause. 29 U.S.C. §§ 652(8), 655(b).

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

**1.**    Enacted in 1970, the Occupational Safety and Health Act empowers the Secretary of Labor to "promulgate, modify, or revoke any occupational safety or health standard." 29 U.S.C. § 655(b). The Secretary delegated that power to OSHA, an agency created by the Act to ensure workplace safety. *Delegation of Authority and Assignment of Responsibility to the Assistant Secretary for Occupational Safety and Health*, 85 Fed. Reg. 58,393 (Sept. 18, 2020).

The Act authorizes OSHA to issue "three different kinds of standards—national consensus standards, permanent standards, and temporary emergency standards." *Indus. Union*, 448 U.S. at 640 n.45 (plurality). This case does not concern national consensus (and established federal) standards, 29 U.S.C. § 655(a), or emergency temporary standards, *id.* § 655(c), which flow from "more demanding" delegations that allow for less discretion in rulemaking, *MCP No. 165*, 21 F.4th at 380   This case instead concerns a subset of so-called "permanent standards," which stem from OSHA's authority to promulgate "any occupational safety or health standard," *id.* § 655(b).

6

Permanent standards can be roughly bifurcated into (1) "'health' standards" dealing with "latent hazards, such as carcinogens" and (2) "'safety' standards" addressing "hazards that cause immediately visible physical harm." *Int'l Union v. OSHA*, 938 F.2d 1310, 1313 (D.C. Cir. 1991). This case does not involve health standards, which deal with "toxic materials or harmful physical agents." 29 U.S.C. § 655(b)(5). In that context, the Act requires OSHA to "set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life." *Id*. The Supreme Court has read this provision to require OSHA to "enact the most protective standard possible to eliminate a significant risk of material health impairment, subject to the constraints of economic and technological feasibility," with no room for "any further balancing" of costs and benefits. *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 495, 513 (1981); *see id*. at 509.

Rather, this case involves OSHA's authority to enact safety standards—*i.e.*, "permanent standards other than those dealing with

toxic materials and harmful physical agents." *Indus. Union*, 448 U.S. at 640 n.45 (plurality). Unlike with respect to the standards discussed above, the Act does not provide any guidance on the content of safety standards, such as what issues they should cover, what substantive provisions they should contain, or what considerations they should take into account. Instead, the "only substantive criteria" for safety standards comes from the Act's "definitions" section, *id.*, which defines an "occupational safety and health standard" as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment," 29 U.S.C. § 652(8).

2.    Alongside that capacious delegation, Congress gave OSHA authority over virtually every business in America. The Act mandates that every "employer" must "comply with occupational safety and health standards" written by OSHA, 29 U.S.C. § 654(a)(2), and defines an "employer" as any "person engaged in a business affecting commerce who has employees," *id.* § 652(5). According to OSHA, that definition includes "[a]ny employer employing one or more employees," with a

narrow exception for a "farm employer" that employs only "immediate family." 29 C.F.R. § 1975.4(a), (b)(2). The agency also maintains "[c]hurches or religious organizations" are covered if "they employ one or more persons in secular activities." *Id.* § 1975.4(c).

OSHA's domain does not stop at the private sector. The Act requires all federal agencies—save for the Postal Service, which is treated as a private employer—to create their own occupational safety and health programs that are "consistent with the standards promulgated" by OSHA. 29 U.S.C. § 668(a); *see id.* § 652(5). And while "Congress did not require state and local governments to adhere to the Act, it used its spending power to encourage States to accept federal funding—up to 50% of the total cost of each state plan—in return for adopting an OSHA-approved state plan," which "must be at least as effective as the federal standards required by the Secretary." *In re MCP No. 165*, 20 F.4th 264, 270-71 (6th Cir. 2021) (Sutton, J., dissenting from denial of initial hearing en banc); *see* 29 U.S.C. §§ 652(5), 654(a)(2), 667(b), (c)(2), 672(g).  Consistent with these incentives, a majority of States have adopted an OSHA-approved plan. U.S. Dep't of Lab., OSHA, *State Plans*, https://bit.ly/3srbEHY (last visited Nov. 7, 2022).

**3.**    Employers who violate OSHA's standards face penalties ranging up to $14,502 for any violation, with willful or repeated offenses triggering sanctions up to $145,027. 29 U.S.C. § 666(a), (c); *see* 28 U.S.C. § 2461 note; U.S. Dep't of Lab., OSHA, *OSHA Penalties*, https://bit.ly/3N4WTUz (last visited Nov. 7, 2022) (setting forth current penalties). In addition, willful violations resulting in an employee's death can lead to a year of imprisonment. 29 U.S.C. § 666(e). OSHA has not been shy about visiting these sanctions upon employers. In the last year alone, the agency conducted over 14,000 inspections, issued over 37,000 citations, and imposed over $162 million in penalties. U.S. Dep't of Lab., OSHA, *Industry Profile for OSHA Standard ALL*, https://bit.ly/3VXXrzx (last visited Nov. 7, 2022).

The story is the same when it comes to OSHA's safety standards, which cover matters from electrical safety to personal protective equipment. 29 C.F.R. § 1910.132, 1910.147. Indeed, some of the ten most frequently cited OSHA standards are ones promulgated under Section 655(b). *See* U.S. Dep't of Lab., OSHA, *Top 10 Most Frequently Cited Standards for Fiscal Year 2021*, https://bit.ly/3fcuEGZ (last visited Nov. 7, 2022).

### B.   The Present Controversy

**1.**   One of the many American businesses significantly burdened by OSHA's safety standards is Allstates, a Toledo-based general contractor that provides furnace services to the glass, metals, and petrochemical industries. Boothe Decl., R.23-2, PageID#258. Allstates prides itself on its commitment to worker safety. *Id.*, PageID#259. Over the past 200,000 hours worked by its employees—an amount that takes the company years to accumulate given that it employs only four full-time workers—Allstates has not experienced a single OSHA-recordable work-related injury. *Id.* In addition, Allstates' experience modification rate—a statistic that measures the likelihood a business will experience a worker's compensation claim—is well below 1.0, making it safer than most other businesses in the industry. *Id.*

While Allstates is dedicated to protecting its workers, a number of OSHA standards have proven unnecessarily burdensome or dangerous for the company. Every year, Allstates spends thousands on training its employees to comply with OSHA standards as well as adhering to these rules. *Id.*, PageID##260-263. The company incurs these costs even when its own safety measures would be just as effective as the ones mandated

by OSHA, if not more so. *Id.*, PageID#263. And Allstates is forced to comply with OSHA's rules even when doing so is *more dangerous* than following its own safety measures. *Id.*, PageID##264-265. For example, OSHA standards governing fall protection and confined spaces are unsafe in the high-heat environments in which Allstates works because they do not allow employees to move quickly enough to avoid injury from heat exposure. *Id.* But OSHA nevertheless requires Allstates to adhere to these dangerous rules on pain of substantial penalties.

The threat of penalties is real. *Id.*, PageID##263-264. In 2019, for example, OSHA fined Allstates over $10,000 for violating its standards governing falling-object protection and cited the company for violating its standards governing hand and power tools. *Id.* Moreover, the White House recently announced that OSHA will step up enforcement on employers, like Allstates, that work in high-heat environments, and the agency has initiated rulemaking in this area as well. *See Heat Injury and Illness Prevention in Outdoor and Indoor Work Settings*, 86 Fed. Reg. 59,309 (Oct. 27, 2021); The White House, *FACT SHEET: Biden Administration Mobilizes to Protect Workers and Communities from Extreme Heat* (Sept. 20, 2021), https://bit.ly/3vJU1DS.

**2.**    In 2021, Allstates brought a facial constitutional challenge to the Act's delegation to write "reasonably necessary or appropriate" workplace-safety standards. Compl., R.1, PageID##1-32. Following cross-motions for summary-judgment, the district court granted judgment in OSHA's favor. Op., R.30, PageID##367-377.

As a threshold matter, the court rejected the government's argument that Congress had implicitly stripped the court of its jurisdiction under 28 U.S.C. § 1331 by enacting 29 U.S.C. § 655(f), which provides that a party "may" challenge an OSHA "standard" directly in the courts of appeals. 29 U.S.C. § 655(f); *see* Op., R.30, PageID##369-71. Relying on *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), the court ruled that it retained jurisdiction under § 1331 because "Allstates challenges the constitutionality of the underlying statute—not any particular safety standard" issued by OSHA. Op., R.30, PageID#371.

Turning to the merits, the court upheld the safety-standard delegation on the premise that it set forth "an intelligible principle." *Id.*, PageID#373. In doing so, it conceded the Supreme Court "has not yet addressed the meaning of 'reasonably necessary or appropriate.'" *Id.*, PageID#374. And the district court made no attempt to provide any

definition itself. *Id.*, PageID#372-76. Instead, it thought it was "enough" under Supreme Court precedent that "Congress delegated" to OSHA "the discretion to determine the adequate level of public safety, and then set standards based on that determination." *Id.*, PageID#375. The court also pointed to other "provisions" it believed "provide guidance to construe" the safety-standard delegation. *Id.*, PageID#376. Finally, the court noted that it was not inclined to "enjoin OSHA from enforcing" a "broad range" of safety standards covering "dozens of workplace concerns" against "all employers nationwide." *Id.*, PageID#377.

## SUMMARY OF ARGUMENT

**I.A.** Congress's delegation to OSHA to write "reasonably necessary or appropriate" workplace-safety standards defies the original meaning of Article I. All agree the Constitution bars Congress from delegating "legislative power," and at the time of the Founding, that meant the power to adopt generally applicable rules governing future private conduct. At a minimum, it covered the power to decide major policy questions. The authority to write "reasonably necessary or appropriate" workplace-safety rules governing virtually every private employer in the United States easily qualifies under either definition.

**B.**    The Supreme Court has never upheld the extraordinary delegation of legislative authority in 29 U.S.C. § 655(b). And while the Court's modern precedents have arguably permitted delegations of "legislative power" as that term was originally understood, this Court should not extend those precedents to sustain a more sweeping delegation. That is how the Supreme Court has approached violations of Article II in the context of restrictions on the President's authority to remove officers exercising executive power. There is no reason for this Court to chart a different course when it comes to Article I.

**II.A.** In all events, the delegation here flunks the intelligible principle test set forth in modern Supreme Court precedent. Under that framework, Congress must meaningfully constrain executive officers by providing clear guidance on how they must exercise their rulemaking authority. And where, as here, the scope of delegated power covers virtually every business in America, that guidance must be even more precise. The grant of authority at issue, which allows OSHA to write "appropriate" workplace-safety standards for nearly all private employers in the country, provides no intelligible principle on what kind of standards are appropriate. Confirming the point, both the Executive

and Judicial Branches have struggled for decades to settle on a meaning for this vacuous generality. If this blank-check delegation of rulemaking authority contains an intelligible principle, then anything does.

**B.**    While the district court relied on a variety of contextual, precedential, and policy arguments to uphold the delegation challenged here, none can withstand scrutiny. Statutory context raises more questions than answers, the Supreme Court has never upheld a delegation of so much power with so little guidance, and policy concerns about disruption are both irrelevant and overblown.

## STANDARD OF REVIEW

"This Court reviews challenges to the constitutionality of a statute *de novo*." *Tomaszczuk v. Whitaker*, 909 F.3d 159, 164 (6th Cir. 2018).

## ARGUMENT

I.    **THE SAFETY-STANDARD DELEGATION VIOLATES THE ORIGINAL MEANING OF ARTICLE I.**

A.    **The Authority To Write "Reasonably Necessary or Appropriate" Safety Standards Is "Legislative Power."**

**1.**    The Act's delegation to OSHA to promulgate "reasonably necessary or appropriate" safety standards cannot be squared with the text and original meaning of the Constitution. Under Article I, "[a]ll

legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. "This text permits no delegation of those powers," *Whitman v. Am. Trucking Assn's*, 531 U.S. 457, 472 (2001), meaning "Congress … may not transfer to another branch 'powers which are strictly and exclusively legislative,'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality). This bar on passing off legislative power, often called the nondelegation doctrine, advances individual liberty and government accountability.

As to liberty, allowing a single branch to both write and enforce the law invites arbitrary rule. Preventing the Executive from wielding legislative power thus heeds "the famous warning of Montesquieu, quoted by James Madison in The Federalist No. 47, that 'there can be no liberty where the legislative and executive powers are united in the same person.'" *Bowsher v. Synar*, 478 U.S. 714, 721-22 (1986) (cleaned up); *accord Gundy*, 139 S. Ct. at 2135 (Gorsuch, J., dissenting).

As to accountability, the framers designed the Constitution to ensure legislative choices would be made by Congress, the branch "most responsive to the will of the people." *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring). Members of Congress

know that if they enact unpopular laws, they can be held accountable at the ballot box. To avoid that fate, they have every "incentive to insulate [themselves] from the consequences of hard choices" by delegating broad authority to obscure agencies, thereby "shifting responsibility to a less accountable branch." *Id.* For example, "[l]egislators might seek to take credit for addressing a pressing social problem by sending it to the executive for resolution, while at the same time blaming the executive for the problems that attend whatever measures he chooses to pursue." *Gundy*, 139 S. Ct. at 2135 (Gorsuch, J., dissenting). That is exactly what Article I is designed to prevent, by keeping the legislative power in the hands of elected lawmakers and out of the hands of unelected law-enforcers.

**2.**    The framers understood the term "legislative power" in Article I "to mean the power to adopt generally applicable rules of conduct governing future actions by private persons." *Id.* at 2133; *see id.* 2133-35 (discussing original understanding). Of course, so long as Congress "prescribes the rule governing private conduct," it may (1) "authorize another branch to 'fill up the details'"; (2) "make the application of that rule depend on executive fact-finding"; or (3) "assign

the executive … branch[] certain non-legislative responsibilities." *Id.* at 2136-37. But the "power to make 'law'" in the "sense of generally applicable rules of private conduct" was "the core of the legislative power that the Framers sought to protect from consolidation with the executive." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 76 (2015) (Thomas, J., concurring in the judgment); *see id.* at 70-76 (discussing original understanding).

Congress's delegation to OSHA in 29 U.S.C. § 655(b) flunks this test. Rather than give OSHA the power to fill in the *details* of the rules set by Congress, Section 655(b) grants the agency wholesale legislative power to decide what *rules* are "appropriate" in the first place. Nor can the "policy decisions" necessary to write such rules be framed as "fact-finding" or "non-legislative" tasks. *Gundy*, 139 S. Ct. at 2139 (Gorsuch, J., dissenting). Instead, the Act assigns to OSHA the authority to enact a code of generally applicable "appropriate" safety standards governing the future conduct of private employers throughout the country. 29 U.S.C. § 652(8); *see id.* § 655(b). That is "the core of legislative power" as that term was understood at the Founding. *Ass'n of Am. R.Rs.*, 575 U.S. at 76 (Thomas, J., concurring in the judgment).

**3.**    At a minimum, Article I forbids "congressional delegations to agencies of authority to decide major policy questions." *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting denial of certiorari) (suggesting a willingness to enforce this aspect of the nondelegation doctrine). Consistent with a "Founding-era history … of a nondelegation doctrine whereby Congress could not delegate to the Executive decisions over 'important subjects,'" Ilan Wurman, *Nondelegation at the Founding*, 130 YALE L.J. 1490, 1497 (2021), the Supreme Court early on drew a line between "those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act … to fill up the details," *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825) (Marshall, C.J.). In other words, Article I sets forth the constitutional version of the "major questions doctrine"—the statutory-construction rule requiring "'clear congressional authorization'" before a court can conclude that Congress delegated a "'major policy decision[]'" to an agency. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).

The "nondelegation principle for major questions" just goes a step further than its "statutory" cousin by forbidding "an agency to exercise regulatory authority over a major policy question of great economic and political importance … even if Congress expressly and specifically delegates that authority." *Paul*, 140 S. Ct. at 342 (Kavanaugh, J., statement respecting denial of certiorari). That makes sense. Given that the *statutory* major questions doctrine is rooted in "separation of powers principles," it would be odd for those principles to vanish when the *constitutional* issue is directly presented. *West Virginia*, 142 S. Ct. at 2609. That would be akin to applying the presumption against retroactivity when construing statutes but upholding laws that flout the *Ex Post Facto* Clause. *See id.* at 2616-19 (Gorsuch, J., concurring).

The power to write "appropriate" workplace-safety rules governing virtually every business in America easily qualifies as a delegation of "authority to decide major policy questions." *Paul*, 140 S. Ct. at 342 (Kavanaugh, J., statement respecting denial of certiorari). In fact, in identifying support for "a nondelegation principle for major questions," Justice Kavanaugh pointed to then-Justice Rehnquist's conclusion in *Industrial Union* that the delegation to OSHA to write

health standards—a *narrower* grant of authority than the one here—violated the separation of powers. *Id.*; *see* 29 U.S.C. § 655(b)(5).

What then-Justice Rehnquist said about the Act's more detailed requirements for health standards applies with at least the same force to safety standards: the task of "balancing statistical lives and industrial resources" in the workplace—setting rules that trade off the safety of employees versus economic prosperity in almost every business around the country—undoubtedly qualifies as one of those "important choices of social policy" that must be "made by Congress." *Indus. Union*, 448 U.S. at 685-86 (Rehnquist, J., concurring in the judgment). For example, in issuing just one recent workplace-safety standard, OSHA determined the rule would likely save 29 lives each year at the cost of $305 million annually, which evidently rendered it "reasonably necessary or appropriate" in the agency's view. *Walking-Working Surfaces and Personal Protective Equipment (Fall Protection Systems)*, 81 Fed. Reg. 82,494, 82,497, 82,677 (2016). "The basic and consequential tradeoffs involved in such a choice are ones that Congress" should have decided for itself, instead of passing the buck to bureaucrats in the Labor Department. *West Virginia*, 142 S. Ct. at 2613.

### B.    Precedent Should Not Be Extended To Authorize This Sweeping Delegation of Legislative Power.

No precedent of the Supreme Court or this Court has ever upheld the sweeping delegation of legislative power in 29 U.S.C. § 655(b), which gives an agency the standardless discretion to make "appropriate" rules across a major area of nationwide economic activity. While the Supreme Court may have blessed some different delegations of legislative power that would violate the original meaning of Article I, those precedents are easily distinguishable and should not be extended. When "given a choice between drawing the line at the holdings" of those cases or "extending those cases to authorize novel" delegations that defy the Constitution's original meaning, this Court "should opt for the former." *Free Enter. Fund*, 537 F.3d at 698 (Kavanaugh, J., dissenting).

**1.**    For much of our history, the judicial application of Article I adhered to that provision's original meaning. "Before the 1930s, federal statutes granting authority to the executive were comparatively modest and usually easily upheld." *Gundy*, 139 S. Ct. at 2137 (Gorsuch, J., dissenting). And when Congress began to test Article I's bounds during that decade, the Supreme Court held two such grants unconstitutional.

First, in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), the Court confronted a provision of the National Industrial Recovery Act that gave the President the power, if he deemed it appropriate, to ban the interstate transportation of "'hot oil'"—*i.e.*, petroleum "'produced or withdrawn from storage in excess of the amount permitted'" under state law. *Id.* at 406, 418. The Court held that this provision violated Article I because Congress was trying to abdicate its responsibility for making the difficult policy choice about whether to enact such a ban. The law "did not declare in what circumstances that transportation should be forbidden," and thereby "left the matter to the President without standard or rule, to be dealt with as he pleased." *Id.* at 418.

The Court took the same approach several months later in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), with respect to another delegation in the National Industrial Recovery Act. This time, Congress had empowered the President, if he deemed it appropriate, to enact "'codes of fair competition'" written by trade associations. *Id.* at 521 n.4. Although the law expressly conditioned the President's authority on certain findings—including that the codes "will tend to effectuate the policy of" the statute (as described in its

declaration of purposes)—the Court was unmoved. *Id.* As it explained, given "the scope of that broad declaration and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered." *Id.* at 541-42. Justice Cardozo, who had dissented in *Panama Refining*, concurred, noting the President's rulemaking power was "as wide as the field of industrial regulation" and hence "delegation running riot." *Id.* at 553 (Cardozo, J., concurring).

While the Supreme Court has not held another delegation to the Executive Branch unconstitutional since then, a number of applications of its modern "'intelligible principle' doctrine" are "consistent with more traditional" approaches to Article I. *Gundy*, 139 S. Ct. at 2140 (Gorsuch, J., dissenting). That doctrine, derived from a case seeking "only to explain the operation of" the Court's "traditional" framework, *id.* at 2139, provides that "Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform'" to satisfy Article I, *Whitman*, 531 U.S. at 472 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409

25

(1928)) (cleaned up). The theory is that so long as Congress has enacted a sufficiently clear principle, it has "already … exercised" the "legislative power" and left the Executive Branch to merely handle "the details" of the statute's "execution." *J.W. Hampton*, 276 U.S. at 406-07.

Given that modest background, various applications of the "'intelligible principle'" rubric by the Supreme Court unsurprisingly can be described as "consistent with" the original understanding of Article I. *Gundy*, 139 S. Ct. at 2140 (Gorsuch, J., dissenting). For example, some decisions "involved laws that specified rules governing private conduct but conditioned the application of those rules on fact-finding— a practice … long associated with the executive function." *Id.* (discussing *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 215, 219-20 (1989)). Others involved delegations implicating the President's "inherent Article II authority," such as the exercise of his "independent commander-in-chief authority" to "prescribe aggravating factors that permit a military court-martial to impose the death penalty on a member of the Armed Forces convicted of murder." *Id.* (discussing *Loving v. United States*, 517 U.S. 748, 771-74 (1996)).

**2.** Still, there have been exceptions. The "'intelligible principle'" test "has been abused to permit delegations of legislative power that on any other conceivable account should be held unconstitutional." *Id.* A majority of the Supreme Court has therefore suggested reconsidering this approach. Justice Gorsuch, joined by the Chief Justice and Justice Thomas, has explained the "mutated version of the 'intelligible principle' remark has no basis in the original meaning of the Constitution," and has urged revisiting this "understanding of the Constitution at war with its text and history." *Id.* at 2131, 2139. Justice Alito has announced he "would support" an effort "to reconsider" the intelligible principle test, which allows delegations to "agencies to adopt important rules pursuant to extraordinarily capacious standards." *Id.* at 2130-31 (Alito, J., concurring in the judgment). Justice Kavanaugh has praised "Justice Gorsuch's thoughtful *Gundy* opinion" as raising "important points that may warrant further consideration." *Paul*, 140 S. Ct. at 342 (Kavanaugh, J., statement respecting denial of certiorari). And Justice Barrett has described the "intelligible principle' test" as "notoriously lax," Amy Coney Barrett, *Suspension and Delegation*, 99 CORNELL L. REV. 251, 318 (2014)—not exactly high praise.

Indeed, if even a delegation to write "appropriate" safety standards for nearly every U.S. business is sufficient to satisfy the intelligible principle test, that is a surefire sign this doctrine needs to be replaced with an approach that hews more closely to the Constitution. Allstates makes these points to preserve that issue for further review.

**3.** For present purposes, this Court cannot revisit the validity of the intelligible principle test. It should, however, "hold the line and not allow encroachments on the" separation of powers "beyond what" Supreme Court precedents "already permit." *Free Enter. Fund*, 537 F.3d at 698 (Kavanaugh, J., dissenting). That is how the Supreme Court has addressed another recurring separation-of-powers violation—statutory restrictions on the President's power to remove officers wielding executive power. In *Free Enterprise Fund*, 561 U.S. 477, and *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), the Court explained that while it had previously tolerated such restrictions in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Morrison v. Olson*, 487 U.S. 654 (1988), it would not "extend" those "exceptions" to "'situation[s] not yet encountered by the Court.'" *Seila Law*, 140 S. Ct. at 2198 (quoting *Free Enter. Fund*, 561 U.S. at 483).

Then-Judge Kavanaugh took the same approach while on the D.C. Circuit. In *Free Enterprise Fund*, which concerned an officer insulated by two layers of removal restrictions, he recognized that while *Humphrey's Executor* and *Morrison* remained "binding precedents" for lower courts, they "authorize a significant intrusion on the President's Article II authority" and "have been long been criticized by many as inconsistent with the text of the Constitution, with the understanding of the text that largely prevailed from 1789 through 1935, and with prior precedents." 537 F.3d at 696 (Kavanaugh, J., dissenting). So while "*Humphrey's Executor and Morrison* represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power," lower courts "should resolve questions about the scope of those precedents in light of and in the direction of the constitutional text and constitutional history." *Id.* at 698. He was soon vindicated by the Supreme Court. 561 U.S. at 484.

Later faced with the question ultimately presented in *Seila Law*— whether an independent agency exercising significant executive power could be run by a single individual shielded from removal—then-Judge Kavanaugh rejected the idea that "vertical stare decisis" required lower

courts to bless this separation-of-powers violation. *PHH Corp. v. CFPB*, 881 F.3d 75, 193 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting), *abrogated by Seila Law*, 140 S. Ct. 2183. Again, he explained that while "it is not our job to decide whether to overrule *Humphrey's Executor*," it "is emphatically our job to apply *Humphrey's Executor* in a manner consistent with settled historical practice, the Constitution's protection of individual liberty, and Article II's assignment of executive authority to the President." *Id.* at 194 n.18. And again, he was promptly vindicated. *See Seila Law*, 140 S. Ct. at 2192.

There is no reason for this Court to take a different approach when it comes to Article I's vesting of the "legislative Powers" exclusively in Congress, U.S. Const. art. I, § 1, as opposed to "Article II's vesting of the 'executive Power' in the President" alone, *Seila Law*, 140 S. Ct. at 2205; *see Texas v. Rettig*, 993 F.3d 408, 409 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc) (explaining lower courts should "decide every case faithful to the text and original understanding of the Constitution, to the maximum extent permitted by a faithful reading of binding precedent," including in nondelegation challenges). So while this Court must apply the Supreme Court's intelligible principle

precedents, it "should resolve questions about the scope of those precedents" with an eye toward the original understanding of Article I. *Free Enter. Fund*, 537 F.3d at 698 (Kavanaugh, J., dissenting). And given that the Supreme Court has never upheld a standardless delegation for an agency to make "appropriate" rules governing a major nationwide policy issue like workplace-safety standards for nearly all U.S. businesses, this Court should not do so now.

## II. THE SAFETY-STANDARD DELEGATION VIOLATES THE CONSTITUTION UNDER THE INTELLIGIBLE PRINCIPLE TEST.

In invoking the Supreme Court's intelligible principle precedents, the district court admitted "[t]he Court has not yet addressed the meaning of 'reasonably necessary or appropriate'" or whether that phrase supplies an intelligible principle to guide OSHA in writing workplace-safety standards. Op., R.30, PageID#374. Neither has this Court. Instead, the district court *extended* the holdings of Supreme Court cases that it found "instructive" to uphold the delegation here. *Id.*, PageID#375; *see id.*, PageID#376. That is not the appropriate framework, *see supra* Pt. I, and in any event, the district court's analysis fails on its own terms.

### A.    The Safety-Standard Delegation Lacks an Intelligible Principle.

#### 1.    *The Act's text contains no intelligible principle.*

To supply an intelligible principle, Congress must "meaningfully constrain[]" the relevant executive officer through "specific restrictions" on his "discretion," *Touby v. United States*, 500 U.S. 160, 166-67 (1991), and make "clear … the boundaries of his authority," *Gundy*, 139 S. Ct. at 2129 (plurality) (cleaned up). The delegation to OSHA to write "reasonably necessary or appropriate" workplace-safety standards does nothing of the sort. Because the delegation is written in the disjunctive, it allows the agency to make any workplace-safety standard that it deems "appropriate," with no intelligible guidance or limitation. If that sort of standardless rulemaking power does not violate the intelligible-principle test, then nothing does.

**a.**    Under Supreme Court precedents, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. "When the scope increases to immense proportions (as in *Schechter*) the standards must be correspondingly more precise." *Synar v. United States*, 626 F. Supp.

1374, 1386 (D.D.C. 1986), *aff'd sub nom. Bowsher*, 478 U.S. 714. Here, "[a]s was true of the standard upset in *Schechter*, the scope" of authority delegated to OSHA "is immense, encompassing all American enterprise." *Int'l Union*, 938 F.2d at 1316-17. Indeed, OSHA's safety standards apply to virtually every business in the country on pain of significant civil and criminal penalties. *See* 29 U.S.C. §§ 652(5), 666; *supra* at 8-10. Because OSHA's safety standards govern "the entire national economy," Congress must "provide substantial guidance" about what type of workplace-safety rules are allowed. *Whitman*, 531 U.S. at 475.

It failed to do so. When it comes to OSHA's delegated authority to "promulgate, modify, or revoke any occupational safety or health standard" not addressing "toxic materials or harmful physical agents," 29 U.S.C. § 655(b), "the only evident source of constraints" in the statute is the "exceedingly vague" "defin[ition]" of "an 'occupational safety and health standard,'" *Int'l Union*, 938 F.2d at 1316; *accord Indus. Union*, 448 U.S. at 641 n.45 (plurality). Specifically, the Act defines a safety standard as one that "requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, *reasonably necessary or appropriate* to provide safe or healthful employment and

33

places of employment." 29 U.S.C. § 652(8) (emphasis added). In other words, the delegation here entails the power to make any workplace-safety rule that OSHA itself deems "appropriate"—even if the rule is not "reasonably necessary." "One does not need to open up a dictionary in order to realize the capaciousness of this phrase." *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (addressing "appropriate and necessary").

Take "reasonably necessary" first. "The term 'necessary' has one of two meanings, either 'useful' or 'indispensable'/'essential.'" *MCP No. 165*, 20 F.4th at 276 (Sutton, J., dissenting from denial of initial hearing en banc). When contrasted with the delegation to issue emergency standards, which limits OSHA's discretion to "'necessary'" standards—*i.e.*, "indispensable or essential measures"—this delegation likely refers "to whatever the Secretary determines is useful or beneficial." *Id.* at 277; *see MCP No. 165*, 21 F.4th at 380 (contrasting the two delegations); *id.* at 392 (Larsen, J., dissenting) (same). But settling on that definition of "reasonably necessary" only compounds the problem, as the phrase offers no indication how OSHA is to determine what is "useful or beneficial" or how courts are to go about reviewing those determinations.

34

Likewise, the word "'appropriate' is 'the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors.'" *Michigan*, 576 U.S at 752. This term, which "means specially fitted or suitable, proper," is "open-ended on its face" and "inherently context dependent." *Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020) (cleaned up). But here, no context reveals how OSHA might determine what safety rules are "proper."

Making matters worse, Congress phrased this provision in the disjunctive, allowing OSHA to issue standards that are "reasonably necessary *or* appropriate." 29 U.S.C. § 652(8) (emphasis added). So even if a standard would not qualify as "reasonably necessary" (whatever that means), OSHA could still issue it so long as it were "appropriate" (whatever that means). Or vice versa.

In short, Congress told OSHA to write whatever safety rules it deems "beneficial" or "proper," without leaving the agency any clues as to how to apply those words in practice. For example, Congress did not "reference any pre-existing common law" governing workplace safety "that might have supplied guidance." *Gundy*, 139 S. Ct. at 2137 (Gorsuch, J., dissenting). Nor is there any "discussion in the legislative

history of the meaning of the phrase 'reasonably necessary or appropriate.'" *Am. Textile,* 452 U.S. at 515 n.33. Congress might as well as have told OSHA: "Do what you think best." Sunstein, *supra*, 1407.

**b.**    The sweeping nature of this language was almost certainly a deliberate attempt by Congress to abdicate its responsibility to make hard decisions about what types of workplace-safety rules are appropriate—and to escape being held politically accountable for those decisions. Indeed, as then-Justice Rehnquist recognized, "[i]t is difficult to imagine a more obvious example of Congress simply avoiding a choice that was both fundamental for purposes of the statute and yet politically so divisive that the necessary decision or compromise was difficult, if not impossible, to hammer out in the legislative forge." *Indus. Union*, 448 U.S. at 687 (Rehnquist, J., concurring in the judgment) (addressing the more detailed health-standard delegation).

Writing nationwide workplace-safety regulations necessarily involves "balancing statistical lives and industrial resources," *id.* at 685, and therefore requires hard policy choices. For example, should "the statistical possibility of future deaths … ever be disregarded in light of the economic costs of preventing those deaths"? *Id.* at 672. If so, how is

a decisionmaker to go about balancing the lives of workers against economic harms? If a safety rule will save a hundred lives but cost ten thousand jobs, should it be enacted?

These are exactly the type of difficult policy questions that Article I requires to be made by elected representatives accountable to the voters—not faceless bureaucrats insulated from the will of the people. Instead of making these "important choices of social policy," Congress chose to punt them to an unelected and unaccountable agency. *Id.* at 685. By enacting such a broad delegation of rulemaking power to OSHA—with no intelligible principle for determining what counts as an "appropriate" safety standard—Congress ripped that policy decision out of the democratic process and gave it "to the Secretary of Labor and, derivatively, to th[e] Court[s]." *Id.* at 672.

Telling OSHA to write "reasonably necessary or appropriate" workplace-safety rules is a complete abdication of Congress's legislative responsibility to decide what makes a safety rule necessary or appropriate. Rather than requiring the agency "to make judgments of degree," the delegation here invites it to engage in "the prescription of the standard that Congress ha[s] omitted." *Whitman*, 531 U.S. at 473,

475. And that leaves courts with no way to "ascertain whether the will of Congress has been obeyed," *Yakus v. United States*, 321 U.S. 414, 425 (1944), as it is unclear how any judge could begin to assess whether a given OSHA safety standard is "reasonably necessary or appropriate."

The delegation here is thus materially indistinguishable from the one in *Schechter Poultry*. Here, as there, Congress gave the Executive "virtually unfettered" discretion to write "laws for the government of trade and industry throughout the country"—all backed by the threat of criminal sanctions. *Schechter Poultry*, 295 U.S. at 542; *see id.* at 529. Yet despite the staggering breadth of that authority, the only instruction given to the Executive is to write workplace-safety regulations that are "reasonably necessary or appropriate," 29 U.S.C. § 652(8)—which is "no more precise a standard than stimulating the economy by assuring 'fair competition,'" *Whitman*, 531 U.S. at 474 (discussing *Schechter Poultry*).

### 2. OSHA's changing positions on the delegation confirm that it lacks an intelligible principle.

Even putting aside the clear lack of guidance in the text, OSHA's shifting views on the meaning of its delegated authority confirm that the statute lacks any intelligible principle.

**a.** Initially, the government followed the text and recognized that "[t]he phrase 'reasonably necessary or appropriate' is not a limitation on the Secretary's powers or a substantive standard of any sort." *Indus. Union* Br. 43. If it has any "substantive meaning" at all, the government argued, the text "permits the Secretary to issue any standard that he rationally concludes is appropriate for the protection of the health and safety of employees under the substantive provisions of the Act." *Id.* at 43, 46. That, the government noted, was how Congress understood "the phrase 'reasonably necessary or appropriate'" in an earlier statute—namely, as telling the Executive "to impose certain requirements 'as in his opinion are necessary to effectuate the [law's] purposes.'" Reply Br. for Fed. Parties at 20 n.15, *Indus. Union*, 448 U.S. 607 (Nos. 78-911, 78-1036), 1979 WL 199559. It is hard to imagine a more candid admission of a standardless delegation of legislative power.

39

In *Industrial Union*, the Supreme Court fractured 4-1-4 on whether OSHA's reading was correct. A four-Justice plurality—Justice Stevens, joined by Chief Justice Burger and Justices Stewart and Powell—rejected OSHA's broad position. These four Justices concluded that before the agency can write a workplace-safety standard, it must make "a threshold finding that a place of employment is unsafe—in the sense that significant risks are present." 448 U.S. at 642 (plurality). The plurality thus voted to affirm a remand of the standard at issue to OSHA because the agency had made no such finding. *Id*. at 659, 662.

By contrast, the four dissenting Justices—Justices Marshall, Brennan, White, and Blackmun—agreed with OSHA's broad reading of its authority. They thought the significant-risk requirement could not "be plausibly derived from the 'reasonably necessary or appropriate' clause," which in their view was merely a "general proviso[] that regulatory actions must bear a reasonable relation to those statutory purposes set forth in the statute's substantive provisions." *Id*. at 708 (Marshall, J., dissenting). These four justices thus voted to uphold the health standard as within OSHA's authority. *See id*. at 688.

Justice Rehnquist wrote a solo concurrence. He agreed with the dissenters that the statute did not constrain OSHA's authority, but he voted to invalidate the health standard at issue on the ground that the Act violated the nondelegation doctrine. *Id.* at 687-88 (Rehnquist, J., concurring in the judgment). As he explained, the "reasonably necessary or appropriate" provision created no "general check" or "limitation" on OSHA's lawmaking authority. *Id.* at 681. He thus concluded that the Act's narrower delegation to write health standards violated Article I, and he explained that courts should not "shy away from our judicial duty to invalidate [such] unconstitutional delegations." *Id.* at 686.

Thus, as the lineup of votes in *Industrial Union* makes clear, "a majority of the Court disagree[d]" with the position that OSHA's authority was limited by any "significant risk standard." *Kelly Springfield Tire Co. v. Donovan*, 729 F.2d 317, 323 n.9 (5th Cir. 1984). As then-Professor Scalia observed, it was "not only the four dissenters but also [Justice] Rehnquist" who concluded that the statute did not contain any such limitation. Antonin Scalia, *A Note on the Benzene Case*, REG., July/Aug. 1980, at 26 (Scalia Note).

41

**b.** Following the Supreme Court's decision in *Industrial Union*, OSHA adopted the position of the plurality and argued that there were only "two boundaries" limiting its authority to write safety standards, *Int'l Union*, 938 F.2d at 1317; *see Control of Hazardous Energy Sources (Lockout/Tagout)*, 54 Fed. Reg. 36,644 (Sept. 1, 1989). *First*, the agency embraced the plurality's view that the Act requires OSHA to make a threshold finding of a "significant risk." 54 Fed. Reg. at 36,652-53; *see Indus. Union*, 448 U.S. at 639 (plurality). *Second*, pointing to dicta from *American Textile*, OSHA maintained that any permanent standard must also be "technologically and economically feasible." 54 Fed. Reg. at 36,656; *see Am. Textile*, 452 U.S. at 513 n.31 (relying on "legislative history" to suggest that "'Congress does not appear to have intended to protect employees by putting their employers out of business'").

But even with these two limits, the D.C. Circuit explained, the safety-standard delegation would pose "a serious nondelegation issue." *Int'l Union*, 938 F.2d at 1317. As it observed, "on the agency's reading, feasibility work[ed] only as a ceiling," and not "as a floor." *Id.* As a result, OSHA still had unfettered discretion "to require precautions that take the industry to the verge of economic ruin (so long as the

increment reduces a significant risk), or to do nothing at all." *Id.*
(internal citation omitted). Because this understanding of the safety-
standard delegation would give the agency "untrammeled power to
dictate the vitality and even survival of whatever segments of American
business it might choose," the D.C. Circuit remanded the matter to
OSHA to reconsider whether its authority might be more limited. *Id.* at
1318; *see id.* at 1326.

    **c.**    OSHA then changed its position again. On remand, the
agency determined that it could not refuse to act upon "find[ing] a
significant risk to worker safety." *Control of Hazardous Energy Sources
(Lockout/Tagout)*, 58 Fed. Reg. 16,612, 16,615 (Mar. 30, 1993). Instead,
OSHA argued that cost considerations allowed it to "deviate only
modestly" from whatever rules are required to eliminate workplace
health hazards. *Int'l Union v. OSHA*, 37 F.3d 665, 669 (D.C. Cir. 1994)
(*Int'l Union II*). With that limit in place, the D.C. Circuit held that the
agency's authority satisfied the nondelegation doctrine. *Id.*

    **d.**    A few years later, however, the Supreme Court rejected the
premise that "an agency can cure an unlawful delegation of legislative
power by adopting in its discretion a limiting construction of the

statute." *Whitman*, 531 U.S. at 472. In the wake of *Whitman*, OSHA therefore pivoted to arguing the Act itself—as opposed to the agency's self-imposed limits on its discretion—compels the same reading of Section 655(b) as the one it offered before. In the proceedings below, for instance, the agency maintained that the Act "substantively cabin[s] its discretion when promulgating safety standards" by "requiring findings that the standard would materially reduce a significant risk of serious physical harm, be economically and technologically feasible, and provide a high degree of protection (*i.e.*, one that approaches the limits of feasibility)." Govt. Reply, R.26, PageID#354 n.7.

These purported "statutory" limits on OSHA's authority have no basis in the actual statute. By its plain text, the Act gives the agency the power to enact whatever safety rules it deems "appropriate," based on any relevant considerations. That is indistinguishable from a grant of lawmaking power to a legislature, allowing it to enact whatever laws it deems reasonably necessary or appropriate within the defined sphere. For example, Article I gives Congress the power to make any laws that are "necessary and proper" to ensuring the collection of taxes for the "general Welfare of the United States," but nobody thinks Congress is

required to impose the most stringent tax burdens feasible. U.S. Const. art. I, § 8, cls. 1, 18. Even more clearly here, the *disjunctive* power to make "reasonably necessary *or* appropriate" safety rules does not impose any maximum-stringency requirement.

In sum, that both OSHA and the Judiciary have struggled for decades to pour content into the safety-standard delegation underscores that Congress, rather than making the difficult policy choice of how to balance "the statistical possibility of future deaths" with "the economic costs of preventing those deaths," "improperly delegated that choice to the Secretary of Labor and, derivatively, to th[e] Court[s]." *Indus. Union*, 448 U.S. at 672 (Rehnquist, J., concurring in the judgment).

## B.    The District Court's Contrary Analysis Is Flawed.

In the face of all this, the district court ruled that the Act's delegation to write "reasonably necessary or appropriate" safety standards contained an intelligible principle to guide the agency's discretion. In doing so, however, the court never tried to explain how the statutory text could yield such a principle. Instead, it offered a series of arguments from context, precedent, and policy for upholding OSHA's open-ended grant of authority. All of these points lack merit.

### 1.   *The Act does not constrain OSHA's discretion.*

Starting with statutory "[c]ontext," the district court thought that three aspects of the Act "provide guidance" on what makes a safety standard "reasonably necessary or appropriate." Op., R.30, PageID##375-376. But the court never explained how any of this purported guidance has a substantive basis in the statute. And for good reason: the statute contains no meaningful limit on the agency's power to impose any safety standard it might deem "appropriate."

**a.**   Relying on the premise "the Act requires a threshold finding of significant risk," the district court ruled that Section 655(b) provides "enough guidance to overcome the non-delegation challenge." *Id.*, PageID#375. That is doubly wrong.

First, the Act itself does not remotely require a finding of "significant risk." The statutory text says nothing about this requirement at all, and five Justices of the Supreme Court rejected that reading in *Industrial Union. See supra* Pt II.A.2.a. Moreover, contrary to the district court's statement, Allstates never "concede[d] the Act requires a threshold finding of significant risk." Op., R.30, PageID#375. Rather, Allstates merely observed that a "Supreme Court plurality has

read" the statute that way. Allstates Summ. J. Br., R.23-1, PageID#234. And while OSHA has now adopted that reading, *see MCP No. 165*, 21 F.4th at 376, the Supreme Court has squarely held that an agency cannot "cure an unlawful delegation" through this type of self-restraint. *Whitman*, 531 U.S. at 472.

More fundamentally, even if the Act did require a significant risk as a precondition to creating a workplace-safety standard, that still would not supply an intelligible principle for what makes a standard "reasonably necessary or appropriate." At best it would limit *when* the agency can exercise that standardless lawmaking power, but would say nothing about what standard would be "appropriate" to address a significant safety risk.  And that would be a "grant to the Executive of [a] roving commission to inquire into evils and then, upon discovering them, do anything he pleases." *Panama Refining*, 293 U.S. at 435 (Cardozo, J., dissenting).

This problem is especially acute because the statute does not specify what qualifies as "safe," much less what counts as a "risk" or when it becomes "significant." For example, are workplaces where bullying, harassment, or offensive speech occur "safe … places of

employment" under the Act? 29 U.S.C. § 652(8); *see* U.S. Dep't of Lab., OSHA, *Workplace Violence*, https://bit.ly/3gZKrtx (last visited Nov. 7, 2022) (defining "workplace violence" to include "any act" of "harassment [or] intimidation"). What about high-stress environments threatening employees' mental health? *See* U.S. Dep't of Lab., OSHA, *QuickTakes DYK?* (May 20, 2021), https://bit.ly/3DQhklf ("Work-related stress can have severe negative effects on mental health."). Or could OSHA create "a nationally binding policy that would ban guns from American workplaces"? U.S. Dep't of Lab., OSHA, Standard Interpretations, *Request for OSHA National Policy Banning Guns from the Workplace and OSHA Enforcement Policy Regarding Workplace Violence* (Sept. 13, 2006) (not taking definitive position), https://bit.ly/3DKPcyT. Congress did not say.

And even if the universe of relevant risks were defined, OSHA's "determination that a particular level of risk is 'significant' will be based largely on policy considerations." *Indus. Union*, 448 U.S. at 655 n.62 (plurality). Indeed, the significant-risk requirement is itself a delegation to make the legislative call regarding whether a particular "'risk is tolerable.'" *Id.* As the district court put it, OSHA has "discretion

to determine the adequate level of public safety, and then set standards based on that determination." Op., R.30, PageID#375. "The upshot is an asserted power, once significant risk is found, to require precautions that take the industry to the verge of economic ruin (so long as the increment reduces a significant risk), or to do nothing at all"—a power that "raise[s] a serious nondelegation issue." *Int'l Union*, 938 F.2d at 1317 (internal citation omitted). By way of analogy, the threshold statutory requirement that the President make certain findings before adopting a fair-competition code did not save the delegation of power in *Schechter Poultry*, when those "restrictions le[ft] virtually untouched" the "wide field of legislative possibilities" open to the President. 295 U.S. at 538. So too here.

**b.** The district court next pointed to the Act's prefatory declaration of Congress's "purpose" to, among other things, "assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b); *see* Op., R.30, PageID#376. But that is no more helpful than the National Industrial Recovery Act's "broad declaration" setting forth "the general aims of rehabilitation, correction, and expansion." *Schechter Poultry*, 295 U.S.

at 541. In fact, not even OSHA reads this particular declaration in the Act for all it is worth, as it maintains that the Act allows it "to deviate" (even if "modestly") from the requirement to ensure workplace safety to the point of economic and technological feasibility. *Int'l Union II*, 37 F.3d at 669; *see* Govt. Summ. J. Br. R.24-1, PageID#312 (asserting that safety standards should "approach[] the limits of feasibility").

Indeed, if the Act's declaration of purpose created a substantive test, then Congress's different criteria for health standards, 29 U.S.C. § 655(b)(5), and safety standards, *id.* § 652(8), would be meaningless. Regardless of what type of standard was involved, OSHA would have to adopt the most protective rule possible. But whatever "reasonably necessary or appropriate" means, "Congress specifically chose in [Section 655(b)(5)] to impose separate and additional requirements for issuance of a subcategory of occupational safety and health standards dealing with toxic materials and harmful physical agents." *Am. Textile*, 452 U.S. at 512. After all, "Congress could reasonably have concluded that *health* standards should be subject to different criteria than *safety* standards because of the special problems presented in regulating them." *Id.*; *see Indus. Union*, 448 U.S. at 649 n.54 (plurality) (stating

that "Congress enacted" Section 655(b)(5) because when it comes to safety standards, "the risks are generally immediate and obvious," whereas in the context of health standards, "the risks may not be evident until a worker has been exposed for long periods of time to particular substances").

This problem with the court's reasoning "drive[s] home a broader point": Whatever a statute's "declaration of purpose" says, "no legislation pursues its purposes at all costs," and every statute thus must specify "not only [its] ends, but also [how] to achieve them by particular means." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012) (cleaned up). So while the Act may declare its purpose is "to assure so far as possible … safe and healthful working conditions," 29 U.S.C. § 651(b), its actual grants of regulatory authority are separately defined. And when it comes to safety standards, the Act authorizes OSHA to serve the vaguely defined purpose of workplace safety through any rule it deems "reasonably necessary or appropriate." *Id.* § 652(8).

**c.**   Finally, the court observed that under 29 U.S.C. § 655(b)(8), "OSHA may only promulgate permanent standards that 'differ[] substantially from an existing national standard' if the agency explains

why the new standard 'will better effectuate the purposes' of the Act."
Op., R.30, PageID#376. But that *procedural* requirement merely
underscores that OSHA has free rein to differ substantially from any
national consensus standards, so long as it explains why it is doing so.
That is no *substantive* limit on OSHA's discretion at all.

### 2. The precedents cited by the district court do not support the standardless delegation here.

With the rest of the Act failing to constrain OSHA's discretion, the
district court resorted to a grab-bag of nondelegation precedents. Not
one can save the Act's safety-standard delegation.

**a.** To start, the court relied heavily on *Whitman*, which upheld
a provision of the Clean Air Act requiring "the EPA to set 'ambient air
quality standards the attainment and maintenance of which in the
judgment of the Administrator, based on the criteria documents of § 108
and allowing an adequate margin of safety, are requisite to protect the
public health.'" 531 U.S. at 472 (quoting 42 U.S.C. § 7409(b)(1))
(brackets omitted). That provision is nothing like the delegation here.

*First*, the provision in *Whitman* gave the EPA far less *power* than
OSHA has under the safety-standard delegation. "Unlike OSHA,"
which under the safety-standard delegation "has authority to reach into

every workplace to dictate what is safe, to impose extensive civil and criminal penalties, and 'to decide which firms will live and which will die,' EPA regulates primarily by setting standards for states to develop their own plans." *Am. Trucking Ass'ns v. EPA*, 175 F.3d 1027, 1061 (D.C. Cir. 1999) (Tatel, J., dissenting), *aff'd in part, rev'd in part sub nom. Whitman*, 531 U.S. 457. The EPA's air quality standards therefore "regulate" private parties "only indirectly—that is, insofar as they affect the planning decision of the States." *Michigan v. EPA*, 213 F.3d 663, 689 (D.C. Cir. 2000). The same cannot be said for OSHA, which uses the safety-standard delegation to wield "the core of the legislative power that the Framers sought to protect from consolidation with the executive"—"the power to make 'law' in the Blackstonian sense of generally applicable rules of private conduct." *Ass'n of Am. R.Rs.*, 575 U.S. at 76 (Thomas, J., concurring in the judgment).

*Second*, the EPA has far less *discretion* under this provision than OSHA has in writing "reasonably necessary or appropriate" workplace-safety standards. OSHA's disjunctive grant of authority allows the agency to make whatever safety rules it deems "appropriate." By contrast, the Clean Air Act "requir[es] the EPA to set air quality

standards at the level that is 'requisite,' that is, not lower or higher than is necessary—to protect the public health with an adequate margin of safety." *Whitman*, 531 U.S. at 475-76. Unlike OSHA, the EPA thus does not have "authority to do whatever is '*reasonably* necessary or appropriate' to protect public health." *Am. Trucking*, 175 F.3d at 1058 (Tatel, J., dissenting). Rather, the EPA must set standards "at levels *necessary* to protect the public health, whether 'reasonable' or not, whether 'appropriate' or not." *Id.*

Relatedly, the delegation in *Whitman* "unambiguously bars cost considerations," an "'absolute'" requirement that significantly limits the EPA's discretion. 531 U.S. at 471; *see* Antonin Scalia, *Responsibilities of Regulatory Agencies Under Environmental Laws*, 24 Hous. L. Rev. 97, 102 (1987) (noting "environmental laws … are probably among those conferring the least" "amount of discretion" because "in some areas even cost-benefit analysis is excluded"). "[E]ven then-Justice Rehnquist" would have upheld the *health*-standard delegation to OSHA "if, like the statute" in *Whitman*, "it did not permit economic costs to be considered." 531 U.S. at 473-74 (citing *Am. Textile*, 452 U.S. at 545 (Rehnquist, J., dissenting)). The "'reasonably necessary or appropriate' clause," by

contrast, "seems to allow" OSHA "to use some form of cost-benefit analysis as a rule of decision." *Sunstein*, *supra*, at 1431. Indeed, OSHA itself maintains the Act requires it to consider costs in determining whether a safety standard would be "'economically … feasible.'" Govt. Reply, R.26, PageID#354 n.7. It is thus "easy to distinguish" *Whitman*— there, "Congress instructed the agency to engage in a cost-blind analysis of how much protection is 'requisite,' whereas" when it came to "OSHA, Congress left the agency at sea." *Sunstein*, *supra*, at 1431.

In response to all this, the district court seized on the Clean Air Act's reference to "'an *adequate* margin of safety'" to contend that "Congress delegated to the EPA the discretion to determine the adequate level of public safety." Op., R.30, PageID#375. But those "modest words" do not even allow the EPA "to pad health effects with cost concerns," *Whitman*, 531 U.S. at 468, much less give the agency *carte blanche* to decide what "level of public safety" is "adequate," Op., R.30, PageID#375. Rather, this phrase merely "means the agency is to 'err on the side of caution'" in setting air quality standards. *Am. Petroleum Inst. v. EPA*, 684 F.3d 1342, 1352 (D.C. Cir. 2012). That is a far cry from the delegation here, which gives OSHA the freedom to

55

"roam between" issuing standards of such "rigor" that they could bring an "industry to the verge of economic ruin" or doing "nothing at all," *Int'l Union*, 938 F.2d at 1317.

Rather, the closest delegation to the one challenged here is the provision "upset in *Schechter*," *id.*, a case the district court mentioned only in passing. *See* Op., R.30, PageID#373. Indeed, the court went so far as to fault Allstates for having "no binding or persuasive authority supporting its argument," without even attempting to distinguish *Schechter Poultry*—a case that continues to bind this Court. *Id.*, PageID#377.

**b.** The district court's remaining three Supreme Court decisions, *see* Op., R.30, PageID#376, are even further afield.

Two involved statutes authorizing the Executive Branch to grant licenses for scarce public radio spectrum or to approve individual railroad acquisitions when doing either would be in the "public interest." *NBC v. United States*, 319 U.S. 190, 216 (1943) (public radio); *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 25 (1932) (railroad acquisitions). Both cases thus addressed narrow "delegations governing a single industry," whereas the grant here "encompass[es] all American

56

enterprise." *Int'l Union*, 938 F.2d at 1317. And as the district court noted, both decisions relied on statutory context to limit the meaning of "public interest" in those confined areas. Op., R.30, PageID#376. The Act offers no comparable guidance here. *See supra* Pt. II.B.1.

Moreover, granting licenses to use public resources and approving specific railroad transactions do not raise the same concerns about delegating legislative power because they do not involve prescribing "generally applicable rules of conduct governing future actions by private persons." *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting). As for *NBC*, "the Government's setting rules by which individuals might … avail themselves of resources belonging to the Government" does "not involve the Government's reaching out to regulate private conduct." *Ass'n of Am. R.Rs.*, 575 U.S. at 83 n.7 (Thomas, J., concurring in the judgment) (distinguishing another nondelegation precedent). As for *New York Central*, approving a particular railroad acquisition to be in the "public interest" is not akin to writing general rules governing what railroads can do in the future. *See ICC v. Cincinnati, New Orleans & Tex. Pac. Ry. Co.*, 167 U.S. 479, 499 (1897) (explaining that the power "to prescribe rates which shall be charged in the future … is a legislative

act" that is "entirely different" from determining "whether the rates which have been charged and collected are reasonable").

That leaves *Yakus*, which upheld an agency's authority to set "fair and equitable" prices for wartime commodities. 321 U.S. at 420. But *Yakus* cannot render "the delegation claimed by OSHA defensible" because that case involved a delegation "of 'war' powers." *Int'l Union*, 938 F.2d at 1318. Because that delegation "at least arguably[] implicated the president's inherent Article II authority" to take wartime measures even without legislative authorization, it was not necessarily improper. *Gundy*, 139 S. Ct. at 2137, 2140 (Gorsuch, J., dissenting); *see Lichter v. United States*, 334 U.S. 742, 778-79 (1948) (noting that the delegation of "constitutional war powers" permits "the exercise of broad discretion"). And again, the Executive Branch's discretion was far more confined than it is here. For example, the statute directed the Executive Branch "to give due consideration, so far as practicable, to prevailing prices during the designated base period"—two weeks in October 1941—"with prescribed administrative adjustments to compensate for enumerated disturbing factors affecting prices." *Yakus*, 321 U.S. at 423; *see id.* at 421.

58

**c.**     Finally, the district court noted that the D.C. Circuit and Seventh Circuit had rejected nondelegation challenges to the grant of authority to OSHA to write safety standards. Op., R.30, PageID#374-375; *see Nat'l Mar. Safety Ass'n v. OSHA*, 649 F.3d 743, 755-56 (D.C. Cir. 2011); *Blocksom & Co. v. Marshall*, 582 F.2d 1122, 1125-26 (7th Cir. 1978). But while this Court does "not take lightly disagreement with the views of [its] sister circuits," it is "not constrained to follow them" when "they are based upon an incomplete or incorrect analysis." *Nixon v. Kent Cnty.*, 76 F.3d 1381, 1388 (6th Cir. 1996) (en banc).

That is the case here. Each decision engaged in a cursory discussion of the nondelegation issue without even attempting to define the meaning of "reasonably necessary or appropriate," let alone grapple with the arguments here. The D.C. Circuit simply pointed to other cases involving broadly worded provisions, such as *NBC* and *Yakus*, without considering why they are distinguishable. *Nat'l Mar.*, 649 F.3d at 755-56; *see supra* Pt. II.B.2.b. And the Seventh Circuit—which appeared to reject a nondelegation challenge to the *entire* Act, rather than the safety-standard delegation alone—largely just parroted the statutory language and conceded that "no one could necessarily predict from the

statutory scheme exactly what regulations would be promulgated in any given industry." *Blocksom & Co.*, 582 F.2d at 1126.

### 3.    *Policy considerations cannot sustain the decision below.*

The district court also pointed to policy considerations in rejecting Allstates' nondelegation challenge. According to the court, OSHA's "safety standards cover dozens of workplace concerns," and it was reluctant "to enjoin OSHA from enforcing this broad range of standards against all employers nationwide." Op. R.30, PageID#377. But such considerations are beside the point: "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution, for convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government." *Free Enter. Fund*, 561 U.S. at 499 (cleaned up).

In any event, the court's concerns about disruption are overblown. To start, a ruling that the safety-standard delegation violates the separation of powers would leave the vast majority of OSHA's standards intact. Two of the "three different kinds of standards—national

consensus standards … and temporary emergency standards," would remain untouched, as would all of OSHA's permanent health standards. *Indus. Union*, 448 U.S. at 640 n.45 (plurality); *see supra* at 6-7.

In fact, most permanent safety standards would remain in force as well, as the "'overwhelming majority of safety standards'" are in fact "national consensus standards" issued under the separate delegation in 29 U.S.C. § 655(a). *Sec'y of Lab. v. Dun-Par Engineered Form Co.*, 12 O.S.H. Cas. (BNA) ¶ 2053 (O.S.H.R.C. Sept. 3, 1986); *accord* Mark A. Rothstein, *Occupational Safety and Health Law* § 5:35 (2022 ed.). Specifically, Congress required OSHA to issue national consensus standards (and established federal standards) within two years of the Act's effective date. 29 U.S.C. § 655(a). To facilitate this gush of rulemaking, Congress exempted the agency from the procedural requirements of both the Occupational Safety and Health Act and the Administrative Procedure Act with respect to these standards, the notice-and-comment process included. *Id.*

"Under this start-up authority, OSHA promulgated most of its safety standards and some of the basic health standards." Steven C. Kahn et al., *Legal Guide to Human Resources* § 11:9 (Nov. 2022 update);

*see id.* (noting "[t]he vast majority of" OSHA's "standards have been promulgated as a result of th[is] authority"). Indeed, "hundreds of requirements in current OSHA standards" can be traced to "about 200 consensus standards," the "vast majority" of which "have not changed since originally adopted." Gov't Accountability Office, *Workplace Safety and Health: Multiple Challenges Lengthen OSHA's Standard Setting*, GAO-12-330, at 6 (2012), https://bit.ly/3DuULRB.

Thus, while the district court asserted that OSHA's "safety standards cover dozens of workplace concerns," Op. R.30, PageID#377, it never identified whether the standards it had in mind were issued solely under the "reasonably necessary or appropriate" delegation challenged here or pursuant to another grant of authority as well, such as the one for national consensus standards in 29 U.S.C. § 655(a). Nor has the government ever tried to define the universe of safety standards that would be affected by a ruling in favor of Allstates. And as far as Allstates can tell, that set of standards would be a small one.

As for the number of employers covered by an injunction, the district court has made clear it would be reluctant to issue a nationwide injunction, as have members of this Court. Op. R.30, PageID#377; *see,*

*e.g.*, *Arizona v. Biden*, 40 F.4th 375, 394-98 (6th Cir. 2022) (Sutton, J., concurring). Allstates would therefore accept a party-specific injunction were it to prevail on the merits.

Ultimately, vindicating Article I here "would be less radical than it might seem," as "[n]o other federal regulatory statute confers so much discretion on federal administrators, at least in any area with such broad scope." Sunstein, *supra*, at 1448. Indeed, a reversal would "have a democracy-forcing function, one that would spur a degree of national deliberation about how best to protect American workers" and likely "produce a greatly improved statute." *Id.* at 1447-48. And unlike other constitutional commands that serve as "an absolute impediment to governmental action," the nondelegation doctrine "merely requires the action to be taken in a different fashion." Scalia Note 28. OSHA's various workplace-safety standards, "instead of being framed as rules, would have to be proposed as legislation—which could then be enacted by the Congress." *Id.* The main difference is that "[r]egardless of who came up with the idea, the sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow." *Tiger Lily*, 5 F.4th at 675 (Thapar, J., concurring) (cleaned up).

In fact, applying the nondelegation doctrine here would be the more restrained approach. As then-Professor Scalia explained, "judicial invocation of the unconstitutional delegation doctrine is a *self*-denying ordinance—forbidding the transfer of legislative power not to the agencies, but to the courts themselves." Scalia Note 28. "For now that judicial review of agency action is virtually routine, it is the courts, rather than the agencies, that can ultimately determine the content of standardless legislation." *Id.* And if the "alternative" to applying the nondelegation doctrine is to "giv[e] content to a law which in fact says no more than that OSHA should ensure 'safe places of employment' (whatever that means)," then the Judiciary will be "doing legislator's work," meaning that "government by bureaucracy" will replaced with "government by courts." *Id.* In other words, for courts to invent a "limiting construction of the statute" merely to avoid a nondelegation problem—"that is to say, the prescription of the standard that Congress had omitted—would *itself* be an exercise of the forbidden legislative authority." *Whitman*, 531 U.S. at 472-73.

## CONCLUSION

This Court should reverse the district court's judgment and remand with instructions to enter judgment in favor of Allstates.

Date: November 8, 2022      Respectfully submitted,

/s/ Brett A. Shumate

Christopher M. McLaughlin    Donald F. McGahn II
JONES DAY    Brett A. Shumate
North Point, 901 Lakeside Ave.    John M. Gore
Cleveland, OH 44114    Anthony J. Dick
(216) 586-3939    Brinton Lucas
cmmclaughlin@jonesday.com    JONES DAY
    51 Louisiana Ave., N.W.
J. Benjamin Aguiñaga    Washington, DC 20001
JONES DAY    (202) 879-3939
2727 N. Harwood St.    bshumate@jonesday.com
Dallas, TX 75201
(214) 220-3939
jbaguinaga@jonesday.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,417 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1), as counted using the word-count function on Microsoft Word 2016 software.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016, in Century Schoolbook Standard style, 14 point font.

November 8, 2022                    /s/ Brett A. Shumate
                                    Brett A. Shumate

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2022, I electronically filed the original of the foregoing brief with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

/s/ Brett A. Shumate
Brett A. Shumate

## DESIGNATION OF DISTRICT COURT RECORD

Appellant, pursuant to Sixth Circuit Rule 30(g), designates the

following filings from the district court's electronic records:

### *Allstates Refractory Contractors, LLC v. Walsh*, No. 3:21-cv-1864

| R. No. | Description | PageID# |
|--------|-------------|---------|
| R.1 | Complaint | 1-32 |
| R.23 | Motion for Summary Judgment | 220-222 |
| R.23-1 | Summary Judgment Brief | 223-257 |
| R.23-2 | Boothe Declaration | 258-277 |
| R.24 | Government's Cross-Motion for Summary Judgment and Motion to Dismiss | 278-279 |
| R.24-1 | Government's Summary Judgment Brief | 280-314 |
| R.25 | Reply in Support of Motion for Summary Judgment | 315-335 |
| R.26 | Government's Reply in Support of Cross-Motion for Summary Judgment and Motion to Dismiss | 336-355 |
| R.30 | Opinion | 367-377 |
| R.31 | Judgment | 378 |
| R.32 | Notice of Appeal | 379-381 |

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

**Page**

29 U.S.C. § 651.................................................................1a

29 U.S.C. § 652.................................................................3a

29 U.S.C. § 654.................................................................5a

29 U.S.C. § 655.................................................................6a

29 U.S.C. § 651
Congressional statement of findings
and declaration of purpose and policy

**(a)** The Congress finds that personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments.

**(b)** The Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce among the several States and with foreign nations and to provide for the general welfare, to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources—

**(1)** by encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment, and to stimulate employers and employees to institute new and to perfect existing programs for providing safe and healthful working conditions;

**(2)** by providing that employers and employees have separate but dependent responsibilities and rights with respect to achieving safe and healthful working conditions;

**(3)** by authorizing the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce, and by creating an Occupational Safety and Health Review Commission for carrying out adjudicatory functions under this chapter;

**(4)** by building upon advances already made through employer and employee initiative for providing safe and healthful working conditions;

**(5)** by providing for research in the field of occupational safety and health, including the psychological factors involved, and by developing innovative methods, techniques, and approaches for dealing with occupational safety and health problems;

**(6)** by exploring ways to discover latent diseases, establishing causal connections between diseases and work in environmental conditions, and conducting other research relating to health

1a

problems, in recognition of the fact that occupational health standards present problems often different from those involved in occupational safety;

**(7)** by providing medical criteria which will assure insofar as practicable that no employee will suffer diminished health, functional capacity, or life expectancy as a result of his work experience;

**(8)** by providing for training programs to increase the number and competence of personnel engaged in the field of occupational safety and health;

**(9)** by providing for the development and promulgation of occupational safety and health standards;

**(10)** by providing an effective enforcement program which shall include a prohibition against giving advance notice of any inspection and sanctions for any individual violating this prohibition;

**(11)** by encouraging the States to assume the fullest responsibility for the administration and enforcement of their occupational safety and health laws by providing grants to the States to assist in identifying their needs and responsibilities in the area of occupational safety and health, to develop plans in accordance with the provisions of this chapter, to improve the administration and enforcement of State occupational safety and health laws, and to conduct experimental and demonstration projects in connection therewith;

**(12)** by providing for appropriate reporting procedures with respect to occupational safety and health which procedures will help achieve the objectives of this chapter and accurately describe the nature of the occupational safety and health problem;

**(13)** by encouraging joint labor-management efforts to reduce injuries and disease arising out of employment.

29 U.S.C. § 652
Definitions

For the purposes of this chapter—

**(1)**   The term "Secretary" mean[1] the Secretary of Labor.

**(2)**   The term "Commission" means the Occupational Safety and Health Review Commission established under this chapter.

**(3)**   The term "commerce" means trade, traffic, commerce, transportation, or communication among the several States, or between a State and any place outside thereof, or within the District of Columbia, or a possession of the United States (other than the Trust Territory of the Pacific Islands), or between points in the same State but through a point outside thereof.

**(4)**   The term "person" means one or more individuals, partnerships, associations, corporations, business trusts, legal representatives, or any organized group of persons.

**(5)**   The term "employer" means a person engaged in a business affecting commerce who has employees, but does not include the United States (not including the United States Postal Service) or any State or political subdivision of a State.

**(6)**   The term "employee" means an employee of an employer who is employed in a business of his employer which affects commerce.

**(7)**   The term "State" includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Trust Territory of the Pacific Islands.

**(8)**   The term "occupational safety and health standard" means a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment.

**(9)**   The term "national consensus standard" means any occupational safety and health standard or modification thereof which (1),[2] has been adopted and promulgated by a nationally

---

[1]    So in original. Probably should be "means".

[2]    So in original. The comma probably should not appear.

recognized standards-producing organization under procedures whereby it can be determined by the Secretary that persons interested and affected by the scope or provisions of the standard have reached substantial agreement on its adoption, (2) was formulated in a manner which afforded an opportunity for diverse views to be considered and (3) has been designated as such a standard by the Secretary, after consultation with other appropriate Federal agencies.

**(10)** The term "established Federal standard" means any operative occupational safety and health standard established by any agency of the United States and presently in effect, or contained in any Act of Congress in force on December 29, 1970.

**(11)** The term "Committee" means the National Advisory Committee on Occupational Safety and Health established under this chapter.

**(12)** The term "Director" means the Director of the National Institute for Occupational Safety and Health.

**(13)** The term "Institute" means the National Institute for Occupational Safety and Health established under this chapter.

**(14)** The term "Workmen's Compensation Commission" means the National Commission on State Workmen's Compensation Laws established under this chapter.

29 U.S.C. § 654
Duties of employers and employees

**(a)** Each employer—

**(1)** shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

**(2)** shall comply with occupational safety and health standards promulgated under this chapter.

**(b)** Each employee shall comply with occupational safety and health standards and all rules, regulations, and orders issued pursuant to this chapter which are applicable to his own actions and conduct.

29 U.S.C. § 655
Standards

## (a) Promulgation by Secretary of national consensus standards and established Federal standards; time for promulgation; conflicting standards

Without regard to chapter 5 of Title 5 or to the other subsections of this section, the Secretary shall, as soon as practicable during the period beginning with the effective date of this chapter and ending two years after such date, by rule promulgate as an occupational safety or health standard any national consensus standard, and any established Federal standard, unless he determines that the promulgation of such a standard would not result in improved safety or health for specifically designated employees. In the event of conflict among any such standards, the Secretary shall promulgate the standard which assures the greatest protection of the safety or health of the affected employees.

## (b) Procedure for promulgation, modification, or revocation of standards

The Secretary may by rule promulgate, modify, or revoke any occupational safety or health standard in the following manner:

(1) Whenever the Secretary, upon the basis of information submitted to him in writing by an interested person, a representative of any organization of employers or employees, a nationally recognized standards-producing organization, the Secretary of Health and Human Services, the National Institute for Occupational Safety and Health, or a State or political subdivision, or on the basis of information developed by the Secretary or otherwise available to him, determines that a rule should be promulgated in order to serve the objectives of this chapter, the Secretary may request the recommendations of an advisory committee appointed under section 656 of this title. The Secretary shall provide such an advisory committee with any proposals of his own or of the Secretary of Health and Human Services, together with all pertinent factual information developed by the Secretary or the Secretary of Health and Human Services, or otherwise available, including the results of research, demonstrations, and experiments. An advisory committee shall submit to the Secretary its recommendations regarding the rule to

be promulgated within ninety days from the date of its appointment or within such longer or shorter period as may be prescribed by the Secretary, but in no event for a period which is longer than two hundred and seventy days.

**(2)** The Secretary shall publish a proposed rule promulgating, modifying, or revoking an occupational safety or health standard in the Federal Register and shall afford interested persons a period of thirty days after publication to submit written data or comments. Where an advisory committee is appointed and the Secretary determines that a rule should be issued, he shall publish the proposed rule within sixty days after the submission of the advisory committee's recommendations or the expiration of the period prescribed by the Secretary for such submission.

**(3)** On or before the last day of the period provided for the submission of written data or comments under paragraph (2), any interested person may file with the Secretary written objections to the proposed rule, stating the grounds therefor and requesting a public hearing on such objections. Within thirty days after the last day for filing such objections, the Secretary shall publish in the Federal Register a notice specifying the occupational safety or health standard to which objections have been filed and a hearing requested, and specifying a time and place for such hearing.

**(4)** Within sixty days after the expiration of the period provided for the submission of written data or comments under paragraph (2), or within sixty days after the completion of any hearing held under paragraph (3), the Secretary shall issue a rule promulgating, modifying, or revoking an occupational safety or health standard or make a determination that a rule should not be issued. Such a rule may contain a provision delaying its effective date for such period (not in excess of ninety days) as the Secretary determines may be necessary to insure that affected employers and employees will be informed of the existence of the standard and of its terms and that employers affected are given an opportunity to familiarize themselves and their employees with the existence of the requirements of the standard.

**(5)** The Secretary, in promulgating standards dealing with toxic materials or harmful physical agents under this subsection, shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life. Development of standards under this subsection shall be based upon research, demonstrations, experiments, and such other information as may be appropriate. In addition to the attainment of the highest degree of health and safety protection for the employee, other considerations shall be the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws. Whenever practicable, the standard promulgated shall be expressed in terms of objective criteria and of the performance desired.

**(6)(A)** Any employer may apply to the Secretary for a temporary order granting a variance from a standard or any provision thereof promulgated under this section. Such temporary order shall be granted only if the employer files an application which meets the requirements of clause (B) and establishes that (i) he is unable to comply with a standard by its effective date because of unavailability of professional or technical personnel or of materials and equipment needed to come into compliance with the standard or because necessary construction or alteration of facilities cannot be completed by the effective date, (ii) he is taking all available steps to safeguard his employees against the hazards covered by the standard, and (iii) he has an effective program for coming into compliance with the standard as quickly as practicable. Any temporary order issued under this paragraph shall prescribe the practices, means, methods, operations, and processes which the employer must adopt and use while the order is in effect and state in detail his program for coming into compliance with the standard. Such a temporary order may be granted only after notice to employees and an opportunity for a hearing: *Provided,* That the Secretary may issue one interim order to be effective until a decision is made on the basis of the hearing. No temporary order may be in effect for longer than the period needed by the employer to achieve compliance with the standard or one year,

whichever is shorter, except that such an order may be renewed not more than twice (I) so long as the requirements of this paragraph are met and (II) if an application for renewal is filed at least 90 days prior to the expiration date of the order. No interim renewal of an order may remain in effect for longer than 180 days.

**(B)** An application for a temporary order under this paragraph (6) shall contain:

> **(i)** a specification of the standard or portion thereof from which the employer seeks a variance,

> **(ii)** a representation by the employer, supported by representations from qualified persons having firsthand knowledge of the facts represented, that he is unable to comply with the standard or portion thereof and a detailed statement of the reasons therefor,

> **(iii)** a statement of the steps he has taken and will take (with specific dates) to protect employees against the hazard covered by the standard,

> **(iv)** a statement of when he expects to be able to comply with the standard and what steps he has taken and what steps he will take (with dates specified) to come into compliance with the standard, and

> **(v)** a certification that he has informed his employees of the application by giving a copy thereof to their authorized representative, posting a statement giving a summary of the application and specifying where a copy may be examined at the place or places where notices to employees are normally posted, and by other appropriate means.

> A description of how employees have been informed shall be contained in the certification. The information to employees shall also inform them of their right to petition the Secretary for a hearing.

**(C)** The Secretary is authorized to grant a variance from any standard or portion thereof whenever he determines, or the Secretary of Health and Human Services certifies, that such variance is necessary to permit an employer to participate in an experiment

approved by him or the Secretary of Health and Human Services designed to demonstrate or validate new and improved techniques to safeguard the health or safety of workers.

**(7)** Any standard promulgated under this subsection shall prescribe the use of labels or other appropriate forms of warning as are necessary to insure that employees are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions of safe use or exposure. Where appropriate, such standard shall also prescribe suitable protective equipment and control or technological procedures to be used in connection with such hazards and shall provide for monitoring or measuring employee exposure at such locations and intervals, and in such manner as may be necessary for the protection of employees. In addition, where appropriate, any such standard shall prescribe the type and frequency of medical examinations or other tests which shall be made available, by the employer or at his cost, to employees exposed to such hazards in order to most effectively determine whether the health of such employees is adversely affected by such exposure. In the event such medical examinations are in the nature of research, as determined by the Secretary of Health and Human Services, such examinations may be furnished at the expense of the Secretary of Health and Human Services. The results of such examinations or tests shall be furnished only to the Secretary or the Secretary of Health and Human Services, and, at the request of the employee, to his physician. The Secretary, in consultation with the Secretary of Health and Human Services, may by rule promulgated pursuant to section 553 of Title 5, make appropriate modifications in the foregoing requirements relating to the use of labels or other forms of warning, monitoring or measuring, and medical examinations, as may be warranted by experience, information, or medical or technological developments acquired subsequent to the promulgation of the relevant standard.

**(8)** Whenever a rule promulgated by the Secretary differs substantially from an existing national consensus standard, the Secretary shall, at the same time, publish in the Federal Register a statement of the reasons why the rule as adopted will better

effectuate the purposes of this chapter than the national consensus standard.

**(c)  Emergency temporary standards**

**(1)**  The Secretary shall provide, without regard to the requirements of chapter 5 of Title 5, for an emergency temporary standard to take immediate effect upon publication in the Federal Register if he determines (A) that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards, and (B) that such emergency standard is necessary to protect employees from such danger.

**(2)**  Such standard shall be effective until superseded by a standard promulgated in accordance with the procedures prescribed in paragraph (3) of this subsection.

**(3)**  Upon publication of such standard in the Federal Register the Secretary shall commence a proceeding in accordance with subsection (b), and the standard as published shall also serve as a proposed rule for the proceeding. The Secretary shall promulgate a standard under this paragraph no later than six months after publication of the emergency standard as provided in paragraph (2) of this subsection.

**(d)  Variances from standards; procedure**

Any affected employer may apply to the Secretary for a rule or order for a variance from a standard promulgated under this section. Affected employees shall be given notice of each such application and an opportunity to participate in a hearing. The Secretary shall issue such rule or order if he determines on the record, after opportunity for an inspection where appropriate and a hearing, that the proponent of the variance has demonstrated by a preponderance of the evidence that the conditions, practices, means, methods, operations, or processes used or proposed to be used by an employer will provide employment and places of employment to his employees which are as safe and healthful as those which would prevail if he complied with the standard. The rule or order so issued shall prescribe the conditions the employer must maintain, and the practices, means, methods, operations, and processes which he must adopt and utilize to the extent they differ from the standard in question. Such a rule or order may be modified or revoked upon application by an employer, employees, or by the Secretary on his own motion, in the

manner prescribed for its issuance under this subsection at any time after six months from its issuance.

**(e) Statement of reasons for Secretary's determinations; publication in Federal Register**

Whenever the Secretary promulgates any standard, makes any rule, order, or decision, grants any exemption or extension of time, or compromises, mitigates, or settles any penalty assessed under this chapter, he shall include a statement of the reasons for such action, which shall be published in the Federal Register.

**(f)  Judicial review**

Any person who may be adversely affected by a standard issued under this section may at any time prior to the sixtieth day after such standard is promulgated file a petition challenging the validity of such standard with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for a judicial review of such standard. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Secretary. The filing of such petition shall not, unless otherwise ordered by the court, operate as a stay of the standard. The determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole.

**(g)  Priority for establishment of standards**

In determining the priority for establishing standards under this section, the Secretary shall give due regard to the urgency of the need for mandatory safety and health standards for particular industries, trades, crafts, occupations, businesses, workplaces or work environments. The Secretary shall also give due regard to the recommendations of the Secretary of Health and Human Services regarding the need for mandatory standards in determining the priority for establishing such standards.