**No. 22-3772**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**
_____

ALLSTATES REFRACTORY CONTRACTORS, LLC,
*Plaintiff-Appellant*,

v.

MARTIN WALSH, et al.,
*Defendants-Appellees.*
_____

On Appeal from the United States District Court
for the Northern District of Ohio, Western Division (Zouhary, J.)
No. 3:21-cv-1864
_____

**BRIEF OF THE NATIONAL ASSOCIATION OF HOME BUILDERS
AND NATIONAL FEDERATION OF INDEPENDENT BUSINESS
AS AMICI CURIAE IN SUPPORT OF APPELLANT AND REVERSAL**
_____

Timothy S. Bishop
Brett E. Legner
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606
(312) 782-0600
tbishop@mayerbrown.com

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 22-3772      Case Name: Allstates Refractory Contractors v. Walsh

Name of counsel: Timothy S. Bishop

Pursuant to 6th Cir. R. 26.1, Nat'l Ass'n of Home Builders & Nat'l Fed. of Indep. Business
<em>Name of Party</em>

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

---

### CERTIFICATE OF SERVICE

I certify that on      November 15, 2022      the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Timothy S. Bishop
Mayer Brown LLP
71 S. Wacker Drive, Chicago IL 60606

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF THE AMICI CURIAE ....................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................3

ARGUMENT ..................................................................................6

I.    Core constitutional attributes require the application of a strong nondelegation rule. .......................................................................6

    A.    The Constitutional text ....................................................7

    B.    The separation of powers principle ...................................8

    C.    The political philosophy embodied in the Constitution ..................10

    D.    Invocation of the nondelegation rule by founding era Congress .......12

    E.    The long-acknowledged need for judicial intervention ....................13

    F.    A strong nondelegation analysis does not unduly impede government. ........................................................................15

II.    OSHA's workplace safety rules are an unconstitutional delegation of the legislative powers. ......................................................18

CONCLUSION ................................................................................21

CERTIFICATE OF COMPLIANCE.......................................................22

CERTIFICATE OF FILING AND SERVICE .......................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935)......................................................................................7, 21

*Buckley v. Valeo*,
424 U.S. 1 (1976)....................................................................................9

*Clinton v. City of New York*,
524 U.S. 417 (1998)................................................................................9

*Dep't of Transp. v. Ass'n of Am. Railroads*,
575 U.S. 43 (2015)..................................................................................7

*Duncan v. McCall*,
139 U.S. 449 (1891)...............................................................................10

*Field v. Clark*,
143 U.S. 649 (1892)...............................................................................13

*Gundy v. United States*,
139 S. Ct. 2116 (2019)............................................5, 8, 14, 15, 20, 21

*I.N.S. v. Chadha*,
462 U.S. 919 (1983)................................................................................9

*J.W. Hampton, Jr. & Co. v. United States*,
276 U.S. 394 (1928)....................................................................7, 15, 19

*Luther v. Borden*,
48 U.S. (7 How.) 1 (1849) .....................................................................11

*Mistretta v. United States*,
488 U.S. 361 (1989)...........................................................................10, 19

*National Cable Television Ass'n v. United States*,
415 U.S. 336 (1974)................................................................................7

*NFIB v. Dep't of Lab.*,
   142 S. Ct. 661 (2022) ..........................................................................6

*Paul v. United States*,
   140 S. Ct. 342 (2019) ..........................................................................5

*Rucho v. Common Cause*,
   139 S. Ct. 2484 (2019) ........................................................................4

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020) ........................................................................9

*Wayman v. Southard*,
   23 U.S. 1 (1825) ................................................................................13

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ................................................................5, 6, 15

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ....................................................................7, 8, 14

**Statutes**

U.S. Const. art. I, § 1 ............................................................................3, 7, 8

U.S. Const. art. I, § 8 ..................................................................................8

U.S. Const. art. I, § 8, cl. 3 .......................................................................18

U.S. Const. art. I, § 8, cl. 7 .......................................................................13

U.S. Const. art. IV, § 4 ...............................................................................4

29 U.S.C. § 652(8) ................................................................................4, 19

29 U.S.C. § 652(9) ..............................................................................19, 20

29 U.S.C. § 655(a) .....................................................................................19

29 U.S.C. § 655(b) .......................................................................................2

42 U.S.C. § 3604 .......................................................................................17

42 U.S.C. § 7412 .......................................................................................16

iv

42 U.S.C. § 7412(b)(1)..........................................................................16

42 U.S.C. § 7412(b)(2)..........................................................................16

**Other Authorities**

3 Annals of Congress 229-39 (1791) (Joseph Gales ed., 1849) ..............13

James Burgh, *Political Disquisitions*, in 1 Founders' Constitution:
Major Themes 61 (Philip B. Kurland & Ralph Lerner eds., 1987)....................11

Gabriel Clark, *The Weak Nondelegation Doctrine and American
Trucking Associations v. EPA*,
2000 B.Y.U.L. Rev. 627 (2000) ..........................................................9

John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review*
(1980)..............................................................................................12

Edward J. Erler, *From Subject to Citizens: The Social Compact
Origins of American Citizenship*, in The American Founding and
The Social Compact 163 (Ronald J. Pestritto & Thomas G. West
eds., 2003)......................................................................................10

The Federalist No. 10 (Madison) (Jacob E. Cooke ed., 1961) ................11

The Federalist No. 47 (Madison) (Jacob E. Cooke ed., 1961) ................9

The Federalist No. 48 (Madison) (Jacob E. Cooke ed., 1961) ................9

The Federalist No. 52 (Madison) (Jacob E. Cooke ed., 1961) ................12

The Federalist No. 9 (Hamilton) (Jacob E. Cooke ed., 1961) ................11

Elena Kagan, *Presidential Administration*,
114 Harvard L. Rev. 2245 (2001).......................................................3

John Locke, *Second Treatise of Government* (C.B. McPherson ed.,
1980) ..............................................................................................11

NAHB, *Safety 365*, https://nahb.org/advocacy/industry-issues/safety-
and-health/safety-365 (last visited Nov. 14, 2022)..............................1

Joseph Postell, *"The People Surrender Nothing": Social Compact
  Theory, Republicanism, and the Modern Administrative State*, 81
  Mo. L. Rev. 1003 (2016) ......................................................................10, 11, 12

Nathan Richardson, *Deference is Dead (Long Live* Chevron*)*, 73
  Rutgers U.L.R. 441 (2021) .................................................................14

Antonin Scalia, *A Note on the Benzene Case*, 4 Regul. 25 (July/Aug.
  1980) ...................................................................................................14

Chad Squitieri, *Towards Nondelegation Doctrines*, 86 Mo. L. Rev.
  1239 (2021) .........................................................................................13

## STATEMENT OF THE AMICI CURIAE[1]

Amicus curiae National Association of Home Builders (NAHB) is a trade association whose mission is to enhance the climate for housing and the building industry. NAHB seeks to provide and expand opportunities for safe, decent, and affordable housing. Founded in 1942, NAHB is a federation of more than 700 state and local associations. About one-third of NAHB's approximately 120,000 members are home builders or remodelers, who construct 80% of all homes in the United States. The remaining members are associates working in closely related fields within the housing industry, such as environmental consulting, mortgage finance and building products and services. Among other things, NAHB provides educational resources to its members, including the International Builders' Show, which is the world's largest show for the residential and light commercial construction industry and features more than 100 education sessions. Further, NAHB provides a robust array of educational resources, safety training materials, and other content to educate employers and employees about workplace safety, including the Safety 365 initiative to keep construction workers safe.[2]

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the amici curiae, their members, or their counsel made such a monetary contribution. Amici curiae have requested leave of this Court to file this brief, and the parties do not oppose amici's motion for leave.

[2] NAHB, *Safety 365*, https://nahb.org/advocacy/industry-issues/safety-and-health/safety-365 (last visited Nov. 14, 2022).

Amicus curiae the National Federation of Independent Business (NFIB) is the nation's leading small business association. Its membership spans the spectrum of business operations, ranging from sole proprietor enterprises to firms with hundreds of employees. Founded in 1943 as a nonprofit, nonpartisan organization, NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. The NFIB Small Business Legal Center is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses.

Thousands of NAHB's and NFIB's members are employers who are subject to permanent workplace-safety standards issued by the Occupational Safety and Health Administration (OSHA) under the Occupational Safety and Health Act (the Act), 29 U.S.C. § 655(b). The district court's judgment rejecting the challenge to OSHA's authority to issue workplace-safety standards brought by Plaintiff-Appellant Allstates Refractory Contractors, LLC, directly impacts NAHB's and NFIB's members' interests that the legislative workplace-safety rules to which they are subject are validly enacted.

NAHB and NFIB each proactively participates as a party litigant and amicus where litigation involves issues that impact their members' interests. To that end,

amici offer insights to aid this Court's resolution of the Plaintiff's challenge to OSHA's workplace-safety rules.

## INTRODUCTION AND SUMMARY OF ARGUMENT

NAHB and NFIB submit this brief to help explain the importance of applying a strong nondelegation doctrine. The nondelegation doctrine has seemingly evolved to a point where it is a virtual dead letter, as then-Professor Kagan wrote. Elena Kagan, *Presidential Administration*, 114 Harvard L. Rev. 2245, 2364 (2001) ("It is … a commonplace that the nondelegation doctrine is no doctrine at all"). But serious application of the nondelegation doctrine is necessary to safeguard multiple aspects of the Framers' constitutional design.

First, the text of the Constitution vests the "legislative powers" *exclusively* in the legislature. U.S. Const. art. I, § 1. Accordingly, the Framers' plain language requires meaningful scrutiny to determine whether another branch of government is improperly undertaking legislative tasks.

Second, protection of the broader separation of powers principle, which does not appear explicitly in the constitutional text but unquestionably defines the shape of our government, similarly necessitates a meaningful look at whether Congress has impermissibly authorized another branch of government to exercise legislative powers.

Third, the Constitution embodies the Framers' understanding of the social compact and their intention to create a republican form of government that vests all power in the people, who may delegate that power to the legislative branch. But this form of American government does not authorize the people's agent—Congress— to then sub-delegate that power to another branch of government. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2511 (2019) (Kagan, J., dissenting) ("Republican liberty demands not only, that all power should be derived from the people; but that those entrusted with it should be kept in dependence on the people") (alterations, quotation marks, and citation omitted). Congressional delegation of the legislative power, thus, threatens the republican form of government guaranteed by the Constitution. *See* U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government").

The Supreme Court's jurisprudence currently requires Congress to provide an "intelligible principle" to govern an agency's exercise of discretion in performing its delegated duties. As Allstates Refractory has shown in its opening brief (at 32-45), 29 U.S.C. § 652(8) does not supply an intelligible principle to guide OSHA in its promulgation of safety standards. Far from it: the unbounded and sweeping delegation to OSHA of the powers both to create workplace-safety standards—a legislative function—and then to enforce those rules against countless employers cannot be tolerated under existing precedent.

But in any event, the malleable and often laxly applied "intelligible principle" approach to assessing the constitutionality of a delegation by Congress has proved to be inadequate protection for core constitutional values, such that a majority of the Supreme Court has recognized that it is ripe for reconsideration. *See Gundy v. United States*, 139 S. Ct. 2116, 2140 (2019) (Gorsuch, J., dissenting) (joined by Roberts, C.J., and Thomas, J.) (discussing "the abused 'intelligible principle' doctrine"); *id.* at 2031 (Alito, J., concurring) ("If a majority of this Court were willing to reconsider the approach we have taken [with regard to the nondelegation doctrine] for the past 84 years, I would support that effort"); *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (statement of Kavanaugh, J., respecting denial of certiorari) ("Justice Gorsuch's scholarly analysis of the Constitution's nondelegation doctrine in his *Gundy* dissent may warrant further consideration in future cases").

The common defense of the lax approach to delegation is that the much greater complexity of modern society compared to the United States of the late Eighteenth Century means that Congress must have latitude to alienate its legislative powers to specialist agencies because it lacks the knowledge itself to legislate clear standards for agencies to follow. But the Framers intended the passage of legislation to be a difficult task carefully undertaken by the branch of government most directly responsive to the will of the people. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2618 (2022) (Alito, J., concurring) ("[T]he framers deliberately sought to make

5

lawmaking difficult by insisting that two houses of Congress must agree to any new law and the President must concur or a legislative supermajority must override his veto"). And Congress has been able to enact many complex statutes that confer specific enough guidance to agencies, along with a permissible amount of executive discretion to implement that guidance, without violating the nondelegation principle of Article I. In short, Congress is certainly up to the tough tasks the Constitution assigns it of being the sole source of federal legislation.

## ARGUMENT

### I.    Core constitutional attributes require the application of a strong nondelegation rule.

A strong nondelegation standard is necessary to safeguard multiple keystone features of our Constitution. The decades-long judicial path towards the application of a watered-down and weak version of the nondelegation test is inconsistent with the exclusive reservation of the legislative power to Congress—the branch of government most responsive to the political will—and with the role of the people as the ultimate source of that legislative power.

In the absence of a rigorous nondelegation doctrine, the courts have developed substitutes that seek to narrow ambiguous statutory delegations or more directly curtail agency discretion. Doctrines like "void for vagueness," the rule of lenity, and a host of clear statement rules, including the "major questions" doctrine (*see NFIB v. Dep't of Lab.*, 142 S. Ct. 661 (2022); *West Virginia v. EPA*, 142 S. Ct. 2587

6

(2022)), fill in for some of the functions of the nondelegation principle. So does the principle that statutes will be read narrowly to avoid constitutional problems. E.g., *National Cable Television Ass'n v. United States*, 415 U.S. 336, 342 (1974) ("Whether the present Act meets the [nondelegation] requirement of *Schechter* and *Hampton* is a question we do not reach. But the hurdles revealed in those decisions lead us to read the Act narrowly to avoid constitutional questions"). None of these approaches, however, fully serve the constitutional principles we now discuss.

### A.    The Constitutional text

The Vesting Clause of Article I provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1. Elsewhere, Article I enumerates some of the specific powers of Congress, including the authority to present legislation to the President (but only after the bill has passed both houses), to override the President's veto, and to regulate commerce. *Id*., §§ 7-8.

By its plain text, Article I's Vesting Clause contains an *exclusive* grant of authority to Congress to exercise the "legislative powers" of government. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). Indeed, the text "permits no delegation of those powers." *Id*. Simply, "[w]hen the Government is called upon to perform a function that requires an exercise of legislative … power, only the vested recipient of that power can perform it." *Dep't of Transp. v. Ass'n of Am. Railroads*,

575 U.S. 43, 68 (2015) (Thomas, J., concurring). And "[n]o one, not even Congress, ha[s] the right to alter that arrangement." *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting). Accordingly, the sometimes-floated idea that an agency can correct an insufficiently specific delegation by adopting its own narrowing set of operating constraints is wrong: as the Supreme Court said in *Whitman*, "[w]e have never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute." 531 U.S. at 472.

Article I also provides Congress with the power to "make all Laws which shall be necessary and proper for carrying into execution the foregoing Powers" and all other powers vested in the government by the Constitution. U.S. Const. art. I, § 8. This Necessary and Proper Clause reinforces that legislative power lies with Congress alone, because it broadly authorizes Congress to enact provisions that task another branch of government to assist with the *execution* of the law. In that way the plain text of Article I's Vesting and Necessary and Proper Clauses draws a jurisdictional distinction between legislative and executive powers.

### B.    The separation of powers principle

Article I, § 1 parallels separate executive and judicial Vesting Clauses in Article II, § 1 ("The executive Power shall be vested in a President of the United States of America") and Article III, § 1 ("The judicial power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress

may from time to time ordain and establish"). Together, those clauses articulate the separation of powers principle embedded in Constitution. *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2229 (2020) (Kagan, J., concurring in part) (the separation of powers principle is "carved into the Constitution's text" in the "first three articles").

Thus, separation of powers "'[is] not simply an abstract generalization in the minds of the Framers: it was woven into the documents that they drafted in Philadelphia in the summer of 1787.'" *I.N.S. v. Chadha*, 462 U.S. 919, 946 (1983) (quoting *Buckley v. Valeo*, 424 U.S. 1, 124 (1976)). As James Madison wrote, the necessity of separating the three branches of government prevents concentration of too much power in the hands of any one branch. The Federalist No. 47, at 324-31 (Madison) (Jacob E. Cooke ed., 1961). And the system of checks and balances— illustrated for instance in the Presentment Clause of Article I, § 7, requiring all laws to be presented by Congress to the President for signature or veto—"reinforces the principle that one branch should not exercise another branch's powers." Gabriel Clark, *The Weak Nondelegation Doctrine and American Trucking Associations v. EPA*, 2000 B.Y.U.L. Rev. 627, 631 (2000) (citing The Federalist No. 48 (Madison) (Jacob E. Cooke ed., 1961)); *see Clinton v. City of New York*, 524 U.S. 417, 448 (1998) (striking down the Line Item Veto Act because it delegated legislative power to the President, circumventing the Presentment Clause).

The Supreme Court has properly recognized the separation of powers doctrine as the root of the nondelegation doctrine. *See, e.g., Mistretta v. United States*, 488 U.S. 361, 371 (1989) ("The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government").

### C.    The political philosophy embodied in the Constitution

The Framers adhered to the concept of a social compact under which the people possess the sole "power to create and establish governments and to vest them with power." Joseph Postell, *"The People Surrender Nothing": Social Compact Theory, Republicanism, and the Modern Administrative State*, 81 Mo. L. Rev. 1003, 1012 (2016) (citing Edward J. Erler, *From Subject to Citizens: The Social Compact Origins of American Citizenship*, in The American Founding and The Social Compact, 163, 163 (Ronald J. Pestritto & Thomas G. West eds., 2003)).

Understanding the social compact this way, the people have the inalienable right of sovereignty and, though the people may vest government with the power to govern them, they are merely delegating and not alienating or giving away their power. Postell, *supra,* at 1012-13. *See*, *e.g.*, *Duncan v. McCall*, 139 U.S. 449, 461 (1891) ("the people are the source of all political power, but that, as the exercise of governmental powers immediately by the people themselves is impracticable, they must be exercised by representatives of the people;" "the basis of representation is

suffrage") (paraphrasing Daniel Webster's "masterly statement of the American system of government" in *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849)).

Because only the people possess the political power, only they may delegate it. Postell, *supra,* at 1013. The people's representatives, such as Congress, cannot delegate the power vested in it. As John Locke explained, when considering "a delegated power from the people," a fundamental principle is that "they who have it cannot pass it over to others." John Locke, *Second Treatise of Government* 141 (C.B. McPherson ed., 1980). Founding-era commentators agreed with this view: "When we elect persons to represent us in parliament … we must not be supposed to depart from the smallest right which we have deposited with them. We make a lodgement, not a gift; we entrust, but part with nothing." James Burgh, *Political Disquisitions*, in 1 Founders' Constitution: Major Themes 61, 62 (Philip B. Kurland & Ralph Lerner eds., 1987) (original emphases omitted).

Additionally, the Framers' understanding of the republican form of government requires that the legislative powers be exercised only by the legislative branch. James Madison defined a "republic" as "a Government in which the scheme of representation takes place," which in turn means that the Government is conducted by "a small number of citizens elected by the rest." The Federalist No. 10 at 62 (Madison) (Jacob E. Cooke ed., 1961); *see* The Federalist No. 9 at 51

11

(Hamilton) (Jacob E. Cooke ed., 1961). "In short, elected representation in the legislature characterizes republican governments." Postell, *supra*, at 1019.

To the Framers, the legislature must have "an immediate dependence on, & an intimate sympathy with the people. Frequent elections are unquestionably the only policy by which this dependence and sympathy can be effectually secured." The Federalist No. 52 at 355 (Madison) (Jacob E. Cooke ed., 1961). Delegation of legislative power to an unelected administrative bureaucracy would therefore remove the legislative function from the "immediate dependence on" and the "intimate sympathy with" the people that Madison declared essential to our political system. *Id*.; *see also* Postell, *supra*, at 1021. As John Hart Ely explained, "by refusing to legislate" in favor of passing the buck to unelected agencies, "our legislators are escaping the sort of accountability that is crucial to the intelligible functioning of a democratic republic." John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 132 (1980).

### D.    Invocation of the nondelegation rule by founding era Congress

These fundamental points—based on constitutional text, context, structure, and underlying framing-era political philosophy—all point to the necessity of engaging in a searching inquiry to determine whether Congress delegated its legislative powers in a particular instance. The early Congresses shared this understanding. For instance, one of the specifically enumerated legislative powers

is the authority to "establish post offices and post roads." U.S. Const. art. I, § 8, cl. 7. During the Second Congress, the House considered a bill to establish the national post office that also detailed specific "post routes." Chad Squitieri, *Towards Nondelegation Doctrines*, 86 Mo. L. Rev. 1239, 1253-54 (2021). Representative Sedgwick introduced an amendment that replaced the detailed routes with a provision that allowed the President to establish the particular post roads as he saw fit. *Id*. at 1254. In rejecting the amendment, several congressmen invoked the nondelegation rule. Representative Livermore stated that Congress could not "with propriety delegate that power, which they were themselves appointed to exercise." *Id.* Representative Hartley agreed, arguing that Congress "ought not to delegate the power to any other person." *Id.* And Madison stated that "there did not appear to be any necessity for alienating the powers of the House, and that if this should take place, it would be a violation of the Constitution." *Id*. (citing 3 Annals of Congress 229-39 (1791) (Joseph Gales ed., 1849)). Congress has since expressly delegated to the Postal Service the power to structure postal routes to meet its statutory universal service obligation, but the debate during the Second Congress shows how seriously the Framers' generation took the nondelegation rule.

> **E.    The long-acknowledged need for judicial intervention**

The Court long ago recognized the need for judicial enforcement of the nondelegation doctrine. *See Field v. Clark*, 143 U.S. 649, 692 (1892); *Wayman v.*

*Southard*, 23 U.S. 1, 43 (1825). Otherwise, as then-Professor Scalia pointed out, it would ultimately be courts, not Congress, that upon reviewing agency action have to supply the legislative content that Congress failed to adopt. See Allstates Br. 64 (citing Antonin Scalia, *A Note on the Benzene Case*, 4 Regul. 25 (July/Aug. 1980). And that constitutional difficulty is all the more severe now that the doctrine of *Chevron* deference to agency interpretations of ambiguous statutes is in decline, if not already completely dead. *See*, *e.g.*, Nathan Richardson, *Deference is Dead (Long Live* Chevron*)*, 73 Rutgers U.L.R. 441, 485 (2021) (charting the recent "total collapse of deference to agency statutory interpretations at the Supreme Court level"). Absent deference, the buck passed by Congress falls ultimately on the courts, though they are designated by Article III to exercise only the judicial and not the legislative power. *See Whitman*, 531 U.S. at 473 (observing that for judges to supply "the prescription of the standard that Congress had omitted" is "an exercise of the forbidden legislative authority").

The best way out of this bind is for courts to enforce the nondelegation doctrine. As Justice Gorsuch has stated, "[t]he framers knew" that "the job of keeping the legislative power confined to the legislative branch couldn't be trusted to self-policing by Congress; often enough, legislators will face rational incentives to pass problems to the executive branch." *Gundy*, 139 S. Ct. at 2135 (Gorsuch, J., dissenting). Therefore, meaningful judicial enforcement of the nondelegation

doctrine is necessary to "respect[] the people's sovereign choice to vest the legislative power in Congress alone. And it's about safeguarding a structure designed to protect [the people's] liberties, minority rights, fair notice, and the rule of law." *Id*. Neither executive agencies nor courts should be legislating; enforcing the nondelegation doctrine will ensure they do not do so.

### F.     A strong nondelegation analysis does not unduly impede government.

Critics suggest that the imposition of restrictive bounds on Congress's ability to delegate tasks to executive agencies through strong judicial policing of legislative delegations is inconsistent with the increasingly complex demands of modern society. To be sure, the Court has recognized that "common sense and the inherent necessities of the governmental co-ordination" require Congress to delegate discretion in the implementation of its policies. *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928). But even the increasing complexities of the modern world do not permit Congress to shift its prerogative to set policy through the enactment of laws to an executive administrative apparatus. Madison acknowledged that the constitutional design—requiring bicameral support for legislation and then approval of the chief executive—makes it difficult to pass laws. *See West Virginia v. EPA*, 142 S. Ct. at 2618 (Alito, J., concurring). But that is a feature of the constitutional system, not a flaw.

Further, Congress understands how, and is able, to cabin agency discretion with regard to health and safety by providing sufficient statutory guidance even in technically complex areas. For instance, Congress in the Clean Air Act authorized the EPA to regulate certain sources of hazardous air pollutants, which are defined in 42 U.S.C. § 7412. Section 7412(b)(1) lists specific pollutants, while § 7412(b)(2) allows the EPA to add additional pollutants. But the latter provision provides specific, detailed guidance on what pollutants may be added by the agency: "pollutants which present, or may present, through inhalation or other routes of exposure, a threat of adverse human health effects (including, but not limited to, substances which are known to be, or may reasonably be anticipated to be, carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic) or adverse environmental effects whether through ambient concentrations, bioaccumulation, deposition, or otherwise." 42 U.S.C. § 7412(b)(2). "Adverse environmental effect" is further defined in the statute as "any significant and widespread adverse effect, which may reasonably be anticipated, to wildlife, aquatic life, or other natural resources, including adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas." *Id.*, § 7412(a)(7). And Congress expressly adopted the criteria EPA had set forth in its

"Guidelines for Carcinogenic Risk Assessment," permitting the agency to revise them "subject to notice and opportunity for comment." *Id.*, § 7412(a)(11).

Another example is the design and construction requirements that Congress set forth in the antidiscrimination provisions of the Fair Housing Act, 42 U.S.C. § 3604, which closely guide the Department of Housing and Urban Development's implementing regulations. Those provisions, which apply to multi-family housing, require that in covered housing "the public use and common use portions" are "readily accessible to and usable by handicapped persons"; "all the doors designed to allow passage into and within all premises" are "sufficiently wide" to allow passage by wheelchairs; and that apartments contain "an accessible route into and through the dwelling," "light switches, electrical outlets, thermostats, and other environmental controls in accessible locations," "reinforcements in bathroom walls to allow later installation of grab bars," and wheelchair-maneuverable "kitchens and bathrooms." *Id.* § 3604(f)(3)(C). And it provides that "[c]ompliance with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as 'ANSI A117.1')" satisfies the requirements for accessible dwellings. *Id.*, § 3604(f)(4).

These are examples of how Congress may retain its policy-setting power and pass a law that allows an executive agency to make relevant fact-findings and to

assist with the execution of the statute. They also illustrate that Congress is capable of availing itself of the expertise of an agency and adopting its considered recommendations (such as the EPA's cancer risk guidelines) into law, and of looking to standards developed by industry experts and approved by organizations such as the American National Standards Institute. A strong nondelegation doctrine thus would not unduly impede Congress or prevent it from carrying out its constitutionally mandated duties in technically complicated areas.

## II.    OSHA's workplace safety rules are an unconstitutional delegation of the legislative powers.

Amici agree with Plaintiff's thorough analysis showing that the essentially standardless grant of discretion to create workplace-safety rules is an unconstitutional delegation by Congress of its legislative powers to an executive branch agency. As discussed above, the Framers intended that *only* Congress could make laws, including the broad authority to regulate commerce. U.S. Const. art. I, § 8, cl. 3. Further, the Framers expressly provided Congress with the authority to enact statutes that were necessary and property to execute those laws. *Id*., § 8, cl. 18. But instead of passing such laws, Congress impermissibly abdicated its duties and directed OSHA to both enact and execute workplace-safety laws.

Though the subject of recent calls from a majority of the Justices to revisit the Supreme Court's nondelegation jurisprudence (*see* page 5, *supra*), the Court's current precedent holds that the nondelegation doctrine "does not prevent Congress

from obtaining the assistance of its coordinate Branches" so long as it "'shall lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform.'" *Mistretta*, 488 U.S. at 372 (alteration omitted) (quoting *J.W. Hampton,* 276 U.S. at 409). For the reasons described in Part I, this Court should rigorously apply that standard and find that Congress failed to provide a sufficiently definite and discernible intelligible principle for creation of workplace safety regulations in the Act.

Rigorous application of the nondelegation principle to strike down Congress's delegation of power to OSHA to adopt any safety standard it deems "reasonably necessary or appropriate to provide safe or healthful employment and places of employment" (29 U.S.C. § 652(8)) would not result in the elimination of such standards generally. To begin with, Plaintiff here seeks only an injunction limited to the parties (Allstates Brief at 61). Furthermore, 29 U.S.C. § 655(a) provides for safety rules based not on a vague direction to OSHA to do what it deems "appropriate," but on "any national consensus standard." And 29 U.S.C. § 652(9) defines that term in a concrete manner to mean a standard that "has been adopted and promulgated by a nationally recognized standards-producing organization under procedures whereby it can be determined by the Secretary that persons interested and affected by the scope or provisions of the standard have reached substantial agreement on its adoption" (subject to certain procedural safeguards). There is no

reason to believe that any significant number of safety standards would fall as a result of following the Constitution's mandate.

Certainly, amici do not advocate the elimination of workplace-safety rules. To the contrary, workplace safety is a critical part of NAHB's mission and NAHB devotes significant resources to providing employers and employees with training and tools to safeguard construction workers and others in the workplace. But the sources of those rules must be the subject matter experts in the industry, who unquestionably have the most knowledge about the operation of housing construction sites, as Congress recognized in § 652(9). Or the source must be Congress itself through duly enacted legislation that provides more specific direction to OSHA.

As pointed out by Plaintiff, a broad delegation of policy-making power to an administrative agency to set such rules is not only irreconcilable with the principles upon which the American government rests but also may be contrary to the best-practices employers have developed from experience for their own industry and work sites. In any event, employers and employees alike should desire adherence to the basic principle that Congress, as the people's agent directly subject to the people's will, is the only branch of federal government that can create laws, leaving agencies like OSHA to implement them. As Justice Gorsuch observed in dissent in *Gundy*, "while Congress can enlist considerable assistance from the executive

branch in filling up details and finding facts, it may never hand off to the nation's chief prosecutor the power to write his own criminal code. That 'is delegation running riot.'" 139 S. Ct. at 2148 (quoting *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 553 (1935) (Cardozo, J., concurring)).

## CONCLUSION

For the foregoing reasons, amici curiae National Association of Home Builders and National Federation of Independent Business request that this Court reverse the judgment of the district court.

November 15, 2023

Respectfully submitted,

<u>*s/ Timothy S. Bishop*</u>
Timothy S. Bishop
Brett E. Legner
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606
(312) 782-0600
tbishop@mayerbrown.com
*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(i)    complies with the type-volume limitation of Rule 32(a)(7) because it contains 4,756 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f ); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6).

Dated: November 15, 2022

/s/ *Timothy S. Bishop*
Timothy S. Bishop
*Counsel for Amici Curiae*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on November 15, 2022. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Timothy S. Bishop*
Timothy S. Bishop
*Counsel for Amici Curiae*