No. 22-3772

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

ALLSTATES REFRACTORY CONTRACTORS LLC,

*Plaintiff-Appellant*,

v.

MARTIN WALSH,

in his official capacity as
Secretary of Labor, *et al.*,

*Defendants-Appellees.*

———————

On Appeal from the United States District Court
for the Southern District of Ohio (Zouhary, J.)
Case No.: 3:21-cv-01864

———————

**BRIEF OF THE NEW CIVIL LIBERTIES ALLIANCE
AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT**

———————

SHENG LI
RICHARD A. SAMP
MARK CHENOWETH
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
Sheng.Li@NCLA.legal

*Counsel for* Amicus Curiae

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 22-3772_____    Case Name: Allstates Refractory Contractors v. Walsh

Name of counsel:  Sheng Li_____

Pursuant to 6th Cir. R. 26.1, New Civil Liberties Alliance_____
*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on _____ November 15, 2022 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Sheng Li_____
New Civil Liberteis Alliance_____
1225 19th Street NW, Washington DC_____

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel states that *amicus curiae* New Civil Liberties Alliance is a nonprofit organization under the laws of the District of Columbia. It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

*/s/ Sheng Li*
Sheng Li

Counsel for Amicus Curiae

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF CONTENTS .............................................................................................. ii

TABLE OF AUTHORITIES ....................................................................................... iii

STATEMENT OF INTEREST ..................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 2

ARGUMENT .................................................................................................................. 4

I.  CONGRESS MAY NOT DIVEST ITSELF OF LEGISLATIVE POWER THAT
    THE CONSTITUTION VESTS IN IT ................................................................. 4

    A.  The Constitution Forbids All Legislative Delegation ................................. 4

    B.  Transfer of Legislative Powers Undermines Consent Needed for
        Legitimate Self-Government ....................................................................... 7

II.  THE 'NONDELEGATION' DOCTRINE IS MISLEADINGLY NAMED AND,
     AT LEAST AS APPLIED BY THE DISTRICT COURT, INADEQUATELY
     SAFEGUARDS INDIVIDUAL LIBERTY ....................................................... 11

    A.  The Term 'Delegation' Falsely Implies an Easily Revocable
        Transfer ....................................................................................................... 12

    B.  The Doctrine Rests on Indefensible Legal Fictions ................................ 13

III.  SECTION 652(8) IS UNCONSTITUTIONAL EVEN UNDER THE SUPREME
      COURT'S PERMISSIVE NONDELEGATION PRECEDENT ..................................... 17

    A.  The Court's Precedent Forbids Standardless Delegations Like §
        652(8) ........................................................................................................... 17

    B.  The District Court Failed to Apply Precedent Requiring
        Intelligible Principles to Be Judicially Administrable ............................... 21

CONCLUSION ............................................................................................................. 25

CERTIFICATE OF SERVICE .................................................................................... 26

CERTIFICATE OF COMPLIANCE ........................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935)...................................................................................18, 19

*Am. Power & Light Co. v. SEC,*
329 U.S. 90 (1946) ........................................................................................3, 24

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
452 U.S. 490 (1981) ..........................................................................................23

*Batterton v. Francis,*
432 U.S. 416 (1977) ..........................................................................................14

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979) ..........................................................................................14

*City of Arlington v. FCC,*
569 U.S. 290 (2013) ..........................................................................................10

*Dep't of Transp. v. Ass'n of Am. R.Rs.,*
575 U.S. 43 (2015)......................................................................................3, 8, 11

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,*
559 U.S. 280 (2010) ..........................................................................................15

*Gundy v. United States,*
139 S. Ct. 2116 (2019)....................................................................2, 11, 15, 16

*I.N.S. v. Chadha,*
462 U.S. 919 (1983) ............................................................................................9

*Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.,*
448 U.S. 607 (1980)...................................................................................2, 10, 23

*Int'l Union v. OSHA,*
37 F.3d 665 (D.C. Cir. 1994) ..........................................................................24

*Int'l Union v. OSHA,*
938 F.2d 1310 (D.C. Cir. 1991) ...................................................................3, 24

*J.W. Hampton, Jr. & Co. v. United States,*
276 U.S. 394 (1928)............................................................................................7

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) ...........................................................................21

*Marshall Field & Co. v. Clark*,
    143 U.S. 649 (1892) ................................................................. 18

*Michigan v. EPA*,
    576 U.S. 743 (2015) ................................................................. 24

*N.Y. Cent. Sec. Corp. v. United States*,
    287 U.S. 12 (1932) ............................................................21, 22, 23

*NBC v. United States*,
    319 U.S. 190 (1943) ..........................................................21, 22, 23

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935) ................................................................. 20

*Tiger Lily, LLC v. HUD*,
    5 F.4th 666 (6th Cir. 2021) ..................................................8, 10, 11

*United States v. Grimaud*,
    220 U.S. 506 (1911) ................................................................. 15

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ..............................................................2, 7, 23

*Yakus v. United States*,
    321 U.S. 414 (1944) ................................................................ 3, 24

**Statutes**

29 U.S.C. § 652 ........................................................................passim

29 U.S.C. § 655 ....................................................................2, 3, 15

**Other Authorities**

2 Kenneth Culp Davis, Administrative Law Treatise (2d ed. 1979) ............................ 14

Cass R. Sunstein, *Is OSHA Unconstitutional?*,
    94 Va. L. Rev. 1407 (2008) ...................................................19, 20

David Schoenbrod, Power Without Responsibility (Yale U. Press 1993) ..............10, 16

Eric A. Posner & Adrian Vermeule, *Interring the Nondelegation Doctrine*,
    69 U. Chi. L. Rev. 1721 (2002) ................................................. 14

Federalist No. 62 (J. Madison) (J. Cooke ed. 1961) ........................................ 9

Federalist No. 63 (J. Madison) (J. Cooke ed. 1961) ........................................ 9

James M. Landis, The Administrative Process (1938) .................................. 14

*Madison's Notes, in* 1 The Records of the Federal Convention of 1787
    (Max Farrand, ed. 1911) ......................................................... 4

Philip Hamburger, *Nondelegation Blues*,
   91 Geo. Wash. L. Rev. __ (forthcoming 2023) .............................................. 7

Resolutions of the Boston Town Meeting (Sept. 13, 1768), *in* A Report of the Record
   Commissioners of the City of Boston, Containing the Boston Town Records, 1758
   to 1769 (Boston: Rockwell & Churchill, 1886) .............................................. 8

Resp. Br., *Nat'l Maritime Safety Ass'n v. OSHA*, 649 F.3d 743 (D.C. Cir. 2011)
   (No. 09-1050), 2010 WL 3564765 ................................................................... 23

St. George Tucker, Law Lectures, vol. 2, Tucker-Coleman Papers, Mss. 39.1 T79, Box
   62, Special Collections Research Center, Earl Gregg Swem Library, College of
   William and Mary ............................................................................................. 6

**Regulations**

29 C.F.R. § 1910.22 ................................................................................................. 19

**Constitutional Provisions**

U.S. Const. art. I ...........................................................................................passim

U.S. Const. art. II .................................................................................................... 6

U.S. Const. art. III ................................................................................................... 6

## STATEMENT OF INTEREST

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil rights organization devoted to defending constitutional freedoms from violations by the administrative state.[1] The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as jury trial, due process of law, the right to be tried in front of an impartial and independent judge, and the right to have laws made by the nation's elected lawmakers through constitutionally prescribed channels (*i.e.*, the right to self-government). These selfsame civil rights are also very contemporary—and in dire need of renewed vindication—precisely because Congress, Presidents, federal administrative agencies, and even sometimes the Judiciary, have neglected them for so long.

NCLA aims to defend civil liberties—primarily by asserting constitutional constraints on the administrative state. Although Americans still enjoy the shell of their Republic, there has developed within it a different sort of government—a type, in fact, the Constitution was designed to prevent. This unconstitutional administrative state within the Constitution's United States is the focus of NCLA's concern.

Section 6(b) of the Occupational Safety and Health ("OSH") Act of 1970 authorizes the Secretary of Labor ("Secretary") to "by rule promulgate, modify, or

---

[1] No counsel for a party authored this brief in whole or in part; and no person or entity, other than NCLA and its counsel, made a monetary contribution intended to fund the preparation and submission of this brief. All parties have consented to the filing of the brief.

revoke any occupational safety … standard." 29 U.S.C. § 655(b). "The only substantive critera for … permanent standards for safety hazards … are set forth in § 3" of the OSH Act, *Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.*, 448 U.S. 607, 641 n.45 (1980) (plurality), which defines a safety standard as "a standard which requires conditions, or the adoption or use of one or more practices … reasonably necessary or appropriate to provide safe or healthful employment and places of employment," 29 U.S.C. § 652(8). This all-encompassing definition enables the Secretary to impose whatever standards he deems "reasonably necessary or appropriate," thereby delegating to the Executive Branch unchecked legislative authority to enact workplace safety laws. NCLA is concerned that if this standardless delegation of lawmaking powers survives scrutiny, then Article I's grant of "[a]ll legislative Powers" to Congress and Congress alone will be rendered a nullity.

## INTRODUCTION AND SUMMARY OF ARGUMENT

"Article I, § 1, of the Constitution vests all legislative powers herein granted … in a Congress of the United States. This text permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (cleaned up). Accordingly, "Congress … may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). Despite repeatedly reaffirming the Constitution's prohibition against the delegation of legislative powers, the so-called intelligible-principle "test [that courts] have applied to distinguish

legislative from executive power largely abdicates [the judiciary's] duty to enforce that prohibition." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 77 (2015) (Thomas, J., concurring).

Such abdication is laid bare in the OSH Act, which authorizes the Secretary to "by rule promulgate, modify, or revoke any occupational safety … standard" he deems "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. §§ 652(8), 655(b). The district court's conclusion that this obvious transfer of lawmaking power to an executive agency passes the nondelegation doctrine's intelligible-principle test, *see* Doc. # 30 at 9-10, does not demonstrate that the OSH Act is constitutional, but that the test—at least as applied by the district court—is not faithful to the commands of Article I, § 1.

The district court's conclusion is wrong because even the intelligible-principle test requires delegations of lawmaking power to be guided by objective and judicially administrable standards. *Yakus v. United States*, 321 U.S. 414, 426 (1944) (delegation would be unconstitutional if "it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed"); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) (delegation must allow "the courts to test" whether agency is following Congress's legislative guidance). The "reasonably necessary or appropriate" criterion under § 652(b), however, is entirely subjective and therefore fails even the excessively permissive intelligible-principle test. *See Int'l Union v. OSHA*, 938 F.2d 1310, 1321 (D.C. Cir. 1991) ("*Int'l Union I*") ("Accordingly, in light of

[plaintiff]'s nondelegation claim we reject OSHA's view that under § [652(8)] it may impose any restriction it chooses so long as it is 'feasible[.]'").

## ARGUMENT

### I.    CONGRESS MAY NOT DIVEST ITSELF OF LEGISLATIVE POWER THAT THE CONSTITUTION VESTS IN IT

The Constitution grants Congress—and Congress alone—the power to legislate, most centrally the power to make binding rules that limit the liberty that citizens would otherwise enjoy. U.S. Const. art. I, § 1. The location of this power in Congress is essential to a fundamental principle of self-government: citizens must consent, through their elected representatives, to all legal limits on their liberty. But it is not only this underlying principle that that should guide this Court in barring any relocation of legislative power. Both the drafting debates and the Constitution's text make clear that legislative power cannot be shared or otherwise transferred to an executive agency.

### A.    The Constitution Forbids All Legislative Delegation

During the Constitutional Convention, James Madison urged that the Constitution explicitly grant the Executive the power to execute congressionally delegated powers. His initial suggestion along these lines provoked General Charles Pinckney to express concern that "improper powers" might be delegated.[2] Madison proposed limiting the Executive's delegated powers to those that were not legislative or

---

[2] *Madison's Notes*, *in* 1 The Records of the Federal Convention of 1787 64, 67 (Max Farrand, ed. 1911).

4

judicial, *i.e.*, that the Executive be established "with power to carry into effect the national laws, to appoint to offices in cases not otherwise provided for, and to execute such other powers not Legislative nor Judiciary in their nature, as may from time to time be delegated by the national Legislature."[3] In other words, the Executive could exercise such *executive* powers as delegated by Congress.

But General Pinckney successfully struck the phrase: "and to execute such other powers not Legislative nor Judiciary in their nature, as may from time to time be delegated."[4] He explained that such delegated powers "were unnecessary, the object of them being included in the 'power to carry into effect the national laws.'"[5] That is, because the Constitution already vested in the Executive all executive power, there was no need for the Executive to get more delegated power from Congress. The Convention agreed.[6]

The Framers thus rejected *any* congressional delegation. It was beyond dispute that there should be no delegation of powers that were neither "Legislative nor Judiciary in their nature." And the Framers repudiated even delegation of additional power that could be characterized as executive. The delegation of power was to be done solely by

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

the people in the Constitution, not by Congress. So, it is difficult to understand how Congress—for example, in § 652(8)—could delegate binding lawmaking power to executive agencies. This point rests not merely on underlying principles, nor on the debates in Philadelphia, but on the text.

The Constitution says each of its tripartite powers "shall be vested" in its own branch of government. U.S. Const. art. I, § 1, art. II, § 1, art. III, § 1. If it had used the word "vested" as one might in grant of property, saying merely that the legislative powers *are hereby vested* in Congress, then there arguably could be a transfer of powers between branches. But in declaring that its powers "shall be vested," the Constitution not only vests legislative, executive, and judicial power in respective branches, but says where such powers "shall," and thus must, be located. This separation-of-powers requirement was made clear in the earliest surviving academic lectures on the Constitution, which were given in 1791 by the Virginian Judge St. George Tucker at the College of William and Mary. He explained that "all the powers granted by the Constitution are either legislative, executive, or judicial; and to keep them forever separate and distinct, except in the Cases positively enumerated, has been uniformly the policy, and constitutes one of the fundamental principles of the American Government."[7]

---

[7] St. George Tucker, Law Lectures, p. 4 of four loose pages inserted in volume 2, Tucker-Coleman Papers, Mss. 39.1 T79, Box 62, Special Collections Research Center, Earl Gregg Swem Library, College of William and Mary.

> When the Constitution says the legislative powers *shall be vested in* Congress, it requires them to be there, not elsewhere. That is, when legislative powers are shared with the Executive, they are no longer vested merely in Congress, and the sharing thus violates the Constitution's injunction that they *shall be vested* in Congress. The Constitution does not say that the legislative powers "shall be vested in a Congress of the United States *and anyone with whom Congress shares them.*"

Philip Hamburger, *Nondelegation Blues*, 91 Geo. Wash. L. Rev. __, § IX.C (forthcoming 2023).[8]

The phrase "shall be vested" thus reinforces what already should be clear, that "the Constitution's vesting of powers is not just an initial distribution—like an initial dealing out of cards." *Id.* Rather than merely vest all legislative powers in Congress, the Constitution further mandates that all such powers may not be delegated to another branch. *Whitman*, 531 U.S. at 473 (confirming that the Constitution's "text permits no delegation of [legislative] powers"); *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928) ("[I]n carrying out that constitutional division into three branches it is a breach of the national fundamental law if Congress gives up its legislative power and transfers it to the President[.]").

## B.    Transfer of Legislative Powers Undermines Consent Needed for Legitimate Self-Government

The Constitution's prohibition against delegating legislative power is not only necessary to protect one branch of government from intrusion by another, but "[t]he

---

[8] Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3990247 (last visited Nov. 15, 2022).

structural principles secured by the separation of powers protect the individual as well." *Ass'n of Am. R.Rs.*, 575 U.S. at 43 (quoting *Bond v. United States*, 564 U.S. 211, 222 (2011)). That is because legislative delegation collides with the Constitution's most important principle: consent of the people. Without consent, a government would be illegitimate, and its laws would be without obligation. The consent of the people was essential not only for the adoption of the Constitution but also for the enactment of statutes. Such consent must come through the election of representatives to the legislature—the body vested with legislative power. As American colonists declared: "the first Principle in Civil Society, founded in Nature and Reason, that no Law of the Society can be binding on any Individual[], without his Consent, given by himself in Person, or by his Representative of his own free Election[.]"[9] The displacement of legislative power to administrative agencies, not least in § 652(8), threatens this self-governance. It deprives Americans of their freedom to rule themselves through their elected representatives.

Judge Thapar recently explained that the Framers designed "Congress [to be] the [branch] most responsive to the will of the people … for a reason: Congress wields the formidable power of 'prescrib[ing] the rules by which the duties and rights of every citizen are to be regulated.' If legislators misused this power, the people could respond, and respond swiftly." *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar,

---

[9] Resolutions of the Boston Town Meeting (Sept. 13, 1768), *in* A Report of the Record Commissioners of the City of Boston, Containing the Boston Town Records, 1758 to 1769, at 261 (Boston: Rockwell & Churchill, 1886).

J., concurring) (quoting Federalist No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). In other words, legislative power is vested solely in the Congress precisely because Congress is politically accountable, and thus laws it enacts are premised on the consent of the governed. *See I.N.S. v. Chadha*, 462 U.S. 919, 966 (1983) (Powell, J., concurring in the judgment) ("The only effective constraint on Congress's power is political[.]").

The transfer of legislative powers to a less accountable branch necessarily undermines consent. To be sure, the dislocation of legislative power does not deny anyone's right to cast a ballot. But shifting legislative power out of the legislature and into agencies diminishes the value of suffrage. The form remains, but the reality is to debase the currency of voting. And if violations of voting rights are worrisome even at a retail level, there should be at least as much concern about wholesale assault presented by transferring lawmaking power from elected representatives to unelected bureaucrats.

The transfer of legislative powers to agencies also weakens accountability by allowing an evasion of bicameralism and presentment. Bicameralism makes lawmaking difficult by design—to limit corruption and unjust passions and encourage prudence. Federalist No. 62, at 418-19 (J. Madison) (J. Cooke ed. 1961);Federalist No. 63, at 423-25 (J. Madison) (J. Cooke ed. 1961). Presentment ensures that laws are subject to the possibility of a veto. Together, the requirements ensure that lawmaking responsibilities reside in the two elected legislative bodies and in an elected president—all of whom are personally accountable to the people.

However, "Congress has an incentive to insulate itself from the consequences of hard choices" by "transfer[ring] … hard choices from Congress to the executive branch." *Tiger Lily*, 5 F.4th at 674 (Thapar, J., concurring). In *American Petroleum*, Justice Rehnquist explained that "[i]t is difficult to imagine a more obvious example [than the OSH Act] of Congress simply avoiding a choice which was both fundamental for purposes of the statute and yet politically so divisive that the necessary decision or compromise was difficult, if not impossible, to hammer out in the legislative forge." 448 U.S. at 687 (Rehnquist, J., concurring in the judgment). Workplace safety laws require hard choices that "balanc[e] statistical lives and industrial resources." *Id.* at 685. Instead of making these "important choices of social policy"—and thus risk being held accountable by voters—Congress evaded the democratic bicameralism-and-presentment process and "improperly delegated th[ose] choice[s] to the Secretary of Labor[.]" *Id.* at 672, 685.

When Congress transfers its legislative power to an administrative agency, "the people lose control over the laws that govern them. … The public loses the right to have both its elected representatives *and* its elected president take personal responsibility for the law." David Schoenbrod, Power Without Responsibility 99–105 (Yale U. Press 1993). Indeed, "the citizen … can perhaps be excused for thinking that it is the agency really doing the legislating." *City of Arlington v. FCC*, 569 U.S. 290, 315 (2013) (Roberts, C.J., dissenting).

"By shifting responsibility [to enact workplace safety laws] to a less accountable branch, Congress protects itself from political censure—and deprives the people of the say the framers intended them to have." *Tiger Lily*, 5 F.4th at 674 (Thapar, J., concurring). Because this unconstitutional shift is the product of collusion between Legislative and Executive Branches, the people must rely on the Judicial Branch to prevent unconstitutional delegation of legislative power. The so-called nondelegation doctrine that the judiciary has employed, however, has proven inadequate to fulfill this constitutional duty.

## II.    THE 'NONDELEGATION' DOCTRINE IS MISLEADINGLY NAMED AND, AT LEAST AS APPLIED BY THE DISTRICT COURT, INADEQUATELY SAFEGUARDS INDIVIDUAL LIBERTY

A person who says he will do one thing but in fact does the opposite is dishonest. A legal doctrine is no different. The nondelegation doctrine purports to bar Congress from delegating legislative power. In fact, it notoriously permits the wholesale transfer of such power. *See Gundy*, 139 S. Ct. at 2139-40 (Gorsuch, J., dissenting); *Ass'n of Am. R.Rs.*, 575 U.S. at 77 (Thomas, J., concurring). By saying one thing and doing another, the nondelegation doctrine amounts to judicial doublespeak. It tells Americans that courts are barring delegations of legislative power even while promiscuously permitting them. The very notion of nondelegation is also misleading in suggesting that what limits

11

congressional transfers of legislative power is the malleable court-created intelligible-principle test, as opposed to a strict prohibition based on the Constitution's clear text.

### A.    The Term 'Delegation' Falsely Implies an Easily Revocable Transfer

When a political or governmental entity "delegates" its powers, it retains the authority to unilaterally revoke that delegation. The Secretary of Labor who "delegates" statutorily authorized powers to subordinates, for example, has the right to terminate that arrangement at any time, for any reason, and without any need to secure the assent of the subordinates.

That is not the case when a statute transfers lawmaking powers to executive or agency officials. Although Congress may revoke this arrangement, it may do so only by repealing or amending the statute through bicameralism-and-presentment. The President is empowered to veto any effort to withdraw powers that a statute transferred to an agency, and he will nearly always use that veto to protect agencies under his control. Thus, Congress cannot unilaterally revoke a transfer of authority that a predecessor Congress made via statute. It must instead obtain the President's assent, or it must secure veto-proof supermajorities in both houses of Congress, before any previous transfer of authority can be unwound. Delegation thus permits a current Congress to tie the hands of a future Congress by making difficult the recall of the transferred power. A statutory transfer of legislative power does not merely delegate legislative power, for it limits Congress's freedom to reassert its legislative prerogative.

Indeed, it is widely accepted that one Congress cannot bind a future Congress except by passing a statute (or ratifying a treaty). So, for example, neither House of Congress can pass a rule that forces a future Congress to follow certain procedures. Yet permitting delegation to the executive allows this forbidden outcome. By transferring legislative power to an executive or agency official like the Secretary of Labor, a current Congress can get that official to enact workplace standards without undergoing bicameralism and presentment—legal requirements that a future Congress cannot reverse without taking those difficult steps. It is therefore highly misleading for any court to discuss transfers of legislative power in terms of "delegation." That is not what is at stake. Rather, at issue is which political branch will be empowered to legislate.

By enacting the OSH Act, the 1970 Congress has authorized the Secretary in 2022 to promulgate whatever workplace safety standards he deems "reasonably necessary or appropriate," and the 2022 Congress may not disturb the Secretary's choices. Put simply, the power to enact workplace safety laws no longer resides in Congress but rather in the Secretary of Labor.

**B.    The Doctrine Rests on Indefensible Legal Fictions**

The nondelegation doctrine has been construed and defended on the basis of a series of fictitious assumptions that deny the reality of agency lawmaking and thereby give a patina of constitutional legitimacy to this wayward practice.

One such fiction is that agencies are "executing" the law whenever they regulate pursuant to congressional authorization—even when the underlying statute gives the

agency vast discretionary power to enact formal rules that carry the force of law. *See, e.g.*, Eric A. Posner & Adrian Vermeule, *Interring the Nondelegation Doctrine*, 69 U. Chi. L. Rev. 1721, 1723 (2002) ("[A]gents acting within the terms of such a statutory grant are exercising executive power, not legislative power."). Not even James Landis, the leading expositor and defender of administrative power during the twentieth century, believed this fiction. Landis wrote that "[i]t is obvious that the resort to the administrative process is not, as some suppose, simply an extension of executive power" and that "[c]onfused observers have sought to liken this development to a pervasive use of executive power." James M. Landis, The Administrative Process 15 (1938).

Landis is right. The notion that an agency is merely "executing" the law when making binding rules is a transparent fiction. Agencies act as lawmakers when issuing rules that bind the public, which is why courts and commentators describe their work product as "legislative rules." *See, e.g.*, *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) ("We described a substantive rule—or a 'legislative-type rule'—as one 'affecting individual rights and obligations.'" (citation omitted)); *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977) ("Legislative, or substantive, regulations are issued by an agency pursuant to statutory authority … Such rules have the force and effect of law." (cleaned up)); 2 Kenneth Culp Davis, Administrative Law Treatise § 7:8, at 36 (2d ed. 1979) ("A legislative rule is the product of an exercise of delegated legislative power to make law through rules. … Valid legislative rules have about the same effect as valid statutes; they are binding on courts."). The Supreme Court tellingly does not describe agency's

rulemaking powers as "executive" but rather as "legislative or quasi-legislative activities." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010).

A second fiction is the idea that agency lawmaking is merely "specifying" or "filling in the details" of a statutory requirement. *See, e.g., United States v. Grimaud*, 220 U.S. 506, 517 (1911) ("[W]hen Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations[.]"). That fiction is laid bare here. Under the OSH Act, "[t]he Secretary may by rule promulgate, modify, or revoke any occupational safety … standard," 29 U.S.C. § 655(b), which "means a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment," *Id.* § 652(8). In other words, the so-called details to be filled in occupy the entire field of workplace safety.

Even where authorizing statutes offer objective governing standards, agencies often are not merely specifying or filling in details. As is widely understood, such statutes frequently leave the most difficult legislative questions to the agencies—indeed, members of Congress notoriously use such statutes precisely to avoid making difficult legislative decisions. *See Gundy*, 139 S. Ct. at 2144 (Gorsuch, J., dissenting) ("Because Congress could not achieve the consensus necessary to solve the hard problems … it passed the potato" to an agency, "freed from the need to assemble a broad

supermajority for [its] views"); Schoenbrod, *supra*, at 9–19, 55–59, 72–94, 102–05, 157–59.

A third fiction is that an agency does not exercise legislative power if Congress has provided an "intelligible principle" to inform the agency's discretion. Justice Gorsuch has accurately recounted how courts have gradually expanded this standard with repeated use to the point that, like a worn-out elastic band, it no longer imposes any meaningful constraints on Congress's divestment of its legislative powers:

> This mutated version of the "intelligible principle" remark has no basis in the original meaning of the Constitution, in history, or even in the decision from which it was plucked. Judges and scholars representing a wide and diverse range of views have condemned it as resting on "misunderst[ood] historical foundations." They have explained, too, that it has been abused to permit delegations of legislative power that on any other conceivable account should be held unconstitutional. Indeed, where some have claimed to see "intelligible principles" many "less discerning readers [have been able only to] find gibberish." Even Justice Douglas, one of the fathers of the administrative state, came to criticize excessive congressional delegations in the period when the intelligible principle "test" began to take hold.

*Gundy*, 139 S. Ct. at 2139–40 (Gorsuch, J., dissenting) (citations omitted).

The validity of acts of lawmaking and legislation does not depend on whether or not some other entity has supplied an "intelligible principle" that purports to guide the legislative decision. Every lawmaking entity holds powers that were authorized or vested in it by somebody, and there is almost always some semblance of an "intelligible principle" that defines the boundaries of those powers. But that does not change the forbidden legislative character of the resulting edict.

16

Every Act of Congress, for example, is ostensibly guided and controlled by an "intelligible principle" supplied by the Constitution's enumerated powers. Congress must always act within the scope of one or more of those "intelligible principles" that define and limit what Congress may do. But Congress is most assuredly "legislating" when it enacts statutes, even though it does so pursuant to a grant of power that limits and controls Congress with a series of "intelligible principles."

The result is no different when an agency issues an edict under a statute that confers powers defined by an "intelligible principle"—such as an instruction to "regulate in the public interest." The existence of what some courts call an "intelligible principle" does not save agency rulemaking from being legislative. And current doctrine is fictional in suggesting otherwise. But even if that were not so, § 652(8) would still be an unconstitutional delegation of legislative power because its "reasonably necessary or appropriate" language fails to satisfy even the excessively permissive intelligible-principle test.

## III.  SECTION 652(8) IS UNCONSTITUTIONAL EVEN UNDER THE SUPREME COURT'S PERMISSIVE NONDELEGATION PRECEDENT

### A. The Court's Precedent Forbids Standardless Delegations Like § 652(8)

The Supreme Court has repeatedly affirmed that the Constitution forbids Congress from giving lawmaking powers to executive or agency officials—even as the

"nondelegation doctrine" moniker has misdescribed and downplayed the offense to the Constitution.

In *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892), the Court observed "[t]hat congress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution." The Court has further held—repeatedly and in an unbroken line of cases—that statutes that empower the executive to act without supplying any standard to guide his discretion, and without at least gesturing toward a congressional policy goal that will inform the executive's use of this discretion, violate Article I's vesting clause by improperly conferring legislative power on executive or agency officials.

In *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), the Court unanimously and emphatically rejected a statutory scheme that empowered the President to impose "codes of fair competition" whenever he made formal findings that the industry-proposed codes would not "promote monopolies" and that the organizations proposing such codes were "truly representative" of the affected trade or industry. *Id.* at 522–23; *see also id.* at 534 ("[T]he approval of a code by the President is conditioned on his finding that it 'will tend to effectuate the policy of this title.'"). The Court quoted Article I, § 1 and declared that it forbids Congress to "abdicate or to transfer to others the essential legislative functions with which it is thus vested." *Id.* at 529. And it pronounced the statute unconstitutional because it "supplies no standards"

for guiding the President's discretion. *Id.* at 541. In the words of the Court: "Congress cannot delegate legislative power to the President to exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable for the rehabilitation and expansion of trade or industry." *Id.* at 537-38. The Supreme Court "has not overruled or even questioned its decision in the *Schechter Poultry* case, striking down the National Industrial Recovery Act." Cass R. Sunstein, *Is OSHA Unconstitutional?*, 94 Va. L. Rev. 1407 (2008) (collecting cases).

The OSH Act presents an even graver offense to the Vesting Clause. Not only does § 652(8) "suppl[y] no standards" to guide the Secretary's discretion, it allows him to exercise unfettered discretion based on threadbare findings, making this statute even worse than the statutory scheme that this Court unanimously disapproved in *Schechter*. The only threshold finding that the Secretary arguably needs to make is that "a place of employment is unsafe" before exercising unfettered discretion to impose safety standards. *Am. Petrol. Inst.*, 448 U.S. at 642 (plurality opinion). The "unsafe" finding presents no meaningful barrier to regulations because there are always some safety risks in every workplace—*e.g.*, an employee could trip while walking. *See* 29 C.F.R. § 1910.22 (OSHA safety standard for walking surfaces). Against such everyday safety risks, the statute quite literally tells the Secretary to do whatever he believes is "reasonably necessary or appropriate." 29 U.S.C. § 652(8). A statute of this sort cannot logically co-exist with the holding of *Schechter*—nor can it co-exist with a Constitution that "vests" legislative power in Congress rather than in the executive or its agencies. *See* Sunstein,

*supra*, at 1407 ("[T]he core provision of … the Occupational Safety and Health Act … is not easy to distinguish from [an unconstitutional] hypothesized statute" wherein "Congress instructs the agency: *Do what you believe is best. Act reasonably and appropriately. Adopt the legal standard that you prefer, all things considered.*")

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), reaffirmed that statutes empowering the executive must provide some semblance of criteria or factual findings to guide the executive's discretion—otherwise the statute becomes a forbidden transfer of lawmaking power. *Panama Refining* disapproved a statute that authorized the President to prohibit the transportation of petroleum goods produced in excess of state quotas, but that failed to provide any standard or guideline to the President regarding whether or to what extent he should use this power. In the Court's words, the statute "gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit." *Id.* at 415.

So too here, § 652(8) says nothing about when the Secretary may address a workplace safety risk by promulgating a legal requirement or what criteria such a requirement must follow. Like the statute in *Panama Refining*, it "establishes no criterion to govern the [Secretary's] course," and it "does not require any finding [other than the existence of a safety risk] … as a condition of his action." *Id.* at 415. If a statute of this sort can pass constitutional muster, it is hard to imagine a statute that would violate the Vesting Clause of Article I. The only way that courts could sustain this statute is to throw up their hands and carve out a separation-of-powers exception to "the duty of

the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

### B.    The District Court Failed to Apply Precedent Requiring Intelligible Principles to Be Judicially Administrable

For the reasons explained above, a statute does not avoid administrative lawmaking by setting out some minimally intelligible principle to guide Executive Branch conduct. While the intelligible-principle test has been improperly defanged, it is not completely toothless. The Supreme Court explained that, at the very least, Congress must supply objective principles that allow "the courts to test" whether the agency has faithfully executed the legislative command. *Am. Power & Light*, 329 U.S. at 105; *see also Yakus*, 321 U.S. at 426.

The district court's decision below was based on a misreading of Supreme Court precedent holding that delegations of lawmaking power to "regulate in the 'public interest' w[ere] sufficient to provide an intelligible principle." Doc. # 30 at 10 (first quoting *NBC v. United States*, 319 U.S. 190 (1943); and then citing *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 25 (1932)). According to the district court, if a broad concept like "public interest" suffices as an intelligible principle, then surely anything goes. *Id.* But while the "public interest" criteria in *NBC* and *New York Central* were broad, the Supreme Court interpreted them to incorporate objective and administrable standards that are missing from the OSH Act's "reasonably necessary and appropriate" language.

In *NBC*, 319 U.S. at 225-26, plaintiffs claimed that the "standard of 'public interest' governing the exercise of the powers delegated to the [FCC] by [the Communications Act of 1934] is so vague and indefinite that, if it be construed as comprehensively as the words alone permit, the delegation of legislative authority is unconstitutional." The Court disagreed because the phrase "public interest" could not be interpreted in a vacuum to "confer an unlimited power," as plaintiffs claimed. *Id.* at 216. Rather, it must "be interpreted by its context, by the nature of radio transmissions and reception, by the scope, character and quality of services." *Id.* In that context, the Court held "[t]he 'public interest' to be served under the Communications Act is thus the interest of the listening public in 'the larger and more effective use of radio'." *Id.* (quoting 47 U.S.C. § 303(g)). While broad, the mandate to promote "larger and more effective use of radio" is at least an objective and discernible standard that courts may test.

In *New York Central*, 287 U.S. at 24-25, the plaintiff argued that the delegation to the Interstate Commerce Commission under the Transportation Act of 1920 to regulate railroads in the "public interest" was "invalid because the stated criterion is uncertain." *Id.* at 24. The Court disagreed because the term "public interest," when interpreted in the proper statutory context, meant "adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities." *Id.* at 25. Again, these are objective and testable standards. A

reviewing court can determine whether, for example, a railroad regulation is economically efficient or promotes the "best use of transportation facilities."

In short, while the "public interest" criteria at issue in *NBC* and *New York Central* arguably conferred unfettered lawmaking discretion, those criteria survived nondelegation challenges because they incorporated objective and judicially administrable standards. By contrast, the OSH Act's "reasonably necessary or appropriate" criterion at § 652(8) is wholly subjective. The Department of Labor's own statements confirmed this when it argued in *American Petroleum* that § 652(8) "has no legal significance or at best merely requires that a standard not be totally irrational." 448 U.S. at 639 (plurality opinion).[10]

The Supreme Court has since stated in *dicta* that the OSH Act's legislative history indicates "any standard that was not economically or technologically feasible would … not be 'reasonably necessary or appropriate.'" *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 513 n.31 (1981). But feasibility would still leave unfettered discretion "to choose freely among levels of stringency, from adopting no standard at all to adopting

---

[10] More recently, the Department of Labor has interpreted § 652(8) to require it to issue safety standards that "eliminate [workplace] risk to the extent that it is technologically and economically feasible to do so." Resp. Br. at 48-49, *Nat'l Maritime Safety Ass'n v. OSHA*, 649 F.3d 743 (D.C. Cir. 2011) (No. 09-1050), 2010 WL 3564765. In other words, DOL somehow construes the "reasonably necessary or appropriate" criterion to provide no discretion whatsoever—it must promulgate the strictest feasible standards. This interpretation is patently incongruous with plain language. And in any event, "an agency can[not] cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute." *Whitman*, 531 U.S. at 472.

the most stringent standard feasible." *Int'l Union v. OSHA*, 37 F.3d 665, 668 (D.C. Cir. 1994) ("*Int'l Union II*"). Thus, when the D.C. Circuit was forced to interpret § 652(8)'s "reasonably necessary or appropriate" criterion, it declared "the [feasibility] interpretation offered by the Secretary is, in light of nondelegation principles, so broad as to be unreasonable." *Int'l Union I*, 938 F.2d at 1321. Moreover, the OSH Act imposes no limitations whatsoever on OSHA's authority to decide what constitutes "safety hazards."

When addressing the phrase "appropriate and necessary" in the Clean Air Act, the Supreme Court explained that "[o]ne does not need to open up a dictionary in order to realize the capaciousness of this phrase." *Michigan v. EPA*, 576 U.S. 743, 752 (2015). Section 652(8)'s "reasonably necessary or appropriate" criterion is even more capacious because it is framed in the disjunctive and is modified by "reasonable." But more than that, it is entirely subjective and therefore impervious to being tested by courts to determine whether the Secretary has followed Congress's command. *Am. Power & Light*, 329 U.S. at 105. Indeed, "it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed" under § 652(8)'s "reasonably necessary and appropriate" standard. *Yakus*, 321 U.S. at 426. As such, it fails even the reigning permissive version of the intelligible-principle test and thus amounts to an unconstitutional transfer of legislative power.

## CONCLUSION

For the foregoing reasons, the Court should reverse the decision below.

Respectfully submitted,

/s/ Sheng Li
Sheng Li
Richard A. Samp
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
Sheng.Li@NCLA.Legal

*Counsel for* Amicus Curiae

November 15, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022, an electronic copy of the foregoing brief *amicus curiae* was filed with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF filing system and that service upon counsel for the parties will be accomplished using the CM/ECF system.

*/s/ Sheng Li*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,119 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in 14-point Garamond, a proportionally spaced typeface.

*/s/ Sheng Li*