No. 22-3772

_____

United States Court of Appeals
for the Sixth Circuit

_____

ALLSTATES REFRACTORY CONTRACTORS, LLC,

*Plaintiff-Appellant,*

v.

MARTIN WALSH, et al.,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Northern District of Ohio
Case No. 3:21-cv-1864

_____

**BRIEF OF *AMICUS CURIAE* LIBERTY JUSTICE CENTER
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL OF
THE DISTRICT COURT**

_____

Jeffrey D. Jennings
James M. McQuaid
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
(312) 637-2280
jjennings@libertyjusticecenter.org
jmcquaid@libertyjusticecenter.org

*Attorneys for Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 22-3772      Case Name: Allstates Refractory Contractors LLC v. Walsh

Name of counsel: Jeffrey D. Jennings

Pursuant to 6th Cir. R. 26.1, Liberty Justice Center
*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

---

CERTIFICATE OF SERVICE

I certify that on _____11/15/2022_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Jeffrey D. Jennings

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Disclosure of Corporate Affiliations and Financial Interest .................. ii

Table of Authorities ...............................................................................iv

Interest of Amicus Curiae.........................................................................1

Introduction and Summary of the Argument..........................................2

Argument ..................................................................................................3

I.    The historical underpinnings of nondelegation underscore its
      indispensable role in maintaining the separation of powers.............3

II.   The safety-standard provision violates the
      nondelegation doctrine....................................................................12

      A.   The safety-standard provision is not mere fact finding
           that is appropriately constrained.............................................12

      B.   The safety-standard provision is not "filling in details" that
           are premised upon meaningful constraints and guidance
           provided by Congress. ............................................................16

      C.   The safety-standard provision raises nondelegation
           concerns because it lacks a limiting principle.........................20

Conclusion...............................................................................................27

Certificate of Compliance.......................................................................28

Certificate of Service..............................................................................29

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935) ................................................................... 7, 8, 14

*BST Holdings, L.L.C. v. OSHA*,
    17 F.4th 604 (5th Cir. 2021) ................................................................ 26

*Gundy v. United States*,
    139 S. Ct. 2116 (2019) ......................................... 5, 6, 8, 9, 12, 16, 24

*Janus v. AFSCME*,
    138 S. Ct. 2448 (2018) .......................................................................... 1

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) ................................................................ 11

*J.W. Hampton Jr. & Co. v. United States*,
    276 U.S. 394 (1928) .................................................................... 2, 7, 12

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) ............................................. 11, 20, 23, 24

*Marshall Field & Co. v. Clark*,
    143 U.S. 649 (1892) ............................................................................... 5

*Mistretta v. United States*,
    488 U.S. 361 (1989) ..................................................................... 12, 17

*Nat'l Mar. Safety Ass'n v. OSHA*,
    649 F.3d 743 (D.C. Cir. 2011) ............................................................ 18

*NFIB v. OSHA*,
    142 S. Ct. 661 (2022) ................................................... 9, 10, 22, 25, 26

*Panama Refining Co. v. Ryan,*
    293 U.S. 388 (1935) ................................................................. 2, 7, 12

*The Aurora,*
    11 U.S. (7 Cranch) 382 (1813) ...................................................... 6

*Tiger Lily, LLC v. HUD* (*Tiger Lily I*),
    992 F.3d 518 (6th Cir. 2021)................................................. 10, 20, 22

*Tiger Lily, LLC v. HUD* (*Tiger Lily II*),
    5 F.4th 666 (6th Cir. 2021) ...................................... 10, 12, 20, 21, 22

*Touby v. United States,*
    500 U.S. 160 (1991) .......................................... 12, 13, 15, 16

*United States v. Lopez,*
    514 U.S. 549 (1995) ................................................................. 24, 25

*United States v. Shreveport Grain & Elevator Co.,*
    287 U.S. 77 (1932) ..................................................................... 6

*United States v. St. Paul & Pac. R.R. Co.,*
    282 U.S. 311 (1931) ..................................................................... 6

*Wayman v. Southard,*
    23 U.S. (10 Wheat.) 1 (1825) ................................................... 6, 12, 17

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ..................................................................... 9

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) .......................................... 18, 19, 20, 21

*Yakus v. United States,*
    321 U.S. 414 (1944) .......................................... 13, 14, 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ...............................................................................3

## Constitutional provisions

U.S. Const. art. I, § 1 ...............................................................................5

## Regulations

COVID–19 Vaccination and Testing; Emergency Temporary Standard
    86 Fed. Reg. 61,402 (Nov. 5, 2021)......................................................26

## Rules

Federal Rule of Appellate Procedure 29(a)..............................................1

## Statutes

29 U.S.C. § 655(b) ...................................................................................2

29 U.S.C. § 652(8) ......................................................................3, 18, 22

## Other

Adrian Vermeule, *There is no conservative legal movement*,
    Wash. Post (July 7, 2022), https://www.washingtonpost.com/outlook
    /2022/07/06/epa-roberts-conservative-court-libertarian/.....................4

Br. for the Inst. for Justice, p. 3, *Gundy v. United States*,
    139 S. Ct. 2116 (2019) ..........................................................................4

Cass R. Sunstein, *Nondelegation Canons*,
    67 U. Chi. L. Rev. 315 (2000) ...............................................................8

Clyde Wayne Crews Jr., *How Many Rules and Regulations Do Federal
    Agencies Issue?*, Forbes (Aug. 15, 2017), https://www.forbes.com/sites/
    waynecrews/2017/08/15/how-many-rules-and-regulations-do-federal-
    agencies-issue/?sh=3192b9021e64 ...................................................3, 4

David French, *The Constitution Isn't Working*,
 The Atlantic (July 12, 2022), https://newsletters.theatlantic.com/the-
 third-rail/email/dc2cba7f-fe77-411c-8e11-47d4cadb8266/ ................11

Gary Lawson, *Delegation and Original Meaning*,
 88 Va. L. Rev. 327, (2002) ......................................................................8

John Locke, Second Treatise § 141 ...........................................................4

The Federalist No. 33 (Alexander Hamilton) ...........................................5

The Federalist No. 47 (James Madison) ....................................................5

The Federalist No. 51 (James Madison) ....................................................5

Twitter.com: @CrimeADay ........................................................................3

## INTEREST OF AMICUS CURIAE

The Liberty Justice Center is a nonprofit, nonpartisan, public-interest litigation firm that pursues strategic, precedent-setting litigation to revitalize constitutional restraints on government power and protections for individual rights. *See, e.g. Janus v. AFSCME*, 138 S. Ct. 2448 (2018).

This case interests *amicus* because it involves the nondelegation doctrine which is a separation of power principle that protects the individual rights that LJC defends. LJC also represents the Plaintiffs-Appellants in *Livingston Educational Service Agency v. Becerra*, No. 22-1257, which is currently pending before this Court and which also involves the nondelegation doctrine.

LJC files this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and all parties to the appeal have consented to the filing of this brief. No counsel for any party authored any part of this brief, and no person or entity other than amicus funded its preparation or submission.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Congress may delegate some legislative powers to agencies, "there are limits of delegation which there is no constitutional authority to transcend." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935). The standard for determining when this line has been crossed has been the intelligible principle test. "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." *J.W. Hampton Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). Permissible delegations of legislative power delegate fact-finding or authorize agencies to fill in the details where Congress has set out general provisions to guide and direct the agencies in exercising their authority. But agencies cannot be granted unfettered authority to exercise legislative power without violating the nondelegation doctrine.

Here, the Occupational Safety and Health Act ("Act") delegates to the Secretary of Labor and the Occupational Safety and Health Administration the power to set permanent safety standards for almost every business in the nation. 29 U.S.C. § 655(b). Yet the only principle the Act gives OSHA is that the standard be "reasonably necessary or appropriate to provide safe or

healthful employment and places of employment." *Id.* at § 652(8). This does not amount to an intelligible principle because it does not amount to simply filling up the details of a regulatory scheme or engaging in fact-finding for whether a situation triggers a statute. It also lacks a limiting principle and lets OSHA do whatever it wants. Thus, it violates the nondelegation doctrine and should be declared unconstitutional. The district court below should be reversed.

## ARGUMENT

### I. The historical underpinnings of nondelegation underscore its indispensable role in maintaining the separation of powers.

In the early years of the republic, Congress had unchallenged plenary power over lawmaking. The President had a comparatively trivial role in issuing statutes beyond "recommendation and veto." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952) (Jackson, J., concurring). Yet today, executive agencies are the primary federal criminal lawgivers. *See* Twitter.com: @CrimeADay. Congress has effectively given away much of its lawmaking power and the administrative state now promulgates over twenty times more rules than the number of laws that Congress passes. Clyde Wayne Crews Jr., *How Many Rules and Regulations Do Federal Agencies*

*Issue?*, Forbes (Aug. 15, 2017).[1] "Congressional delegations have resulted in over 300,000 regulatory crimes, criminalizing everything from mislabeled marbles to misshapen meatloaf." Br. for the Inst. for Justice, p. 3, *Gundy v. United States*, 139 S. Ct. 2116 (2019).

To be sure, some have claimed that notions of nondelegation were nonexistent during the founding era and that it is an "invented tradition." Adrian Vermeule, *There is no conservative legal movement*, Wash. Post (July 7, 2022).[2] Nothing could be further from the truth. Like many of the ideas enshrined in our Constitution, nondelegation originated in the disquisitions of preeminent Enlightenment political theorists like Baron de Montesquieu and John Locke. In his Second Treatise, Locke wrote the legislature "cannot transfer the power of making laws to any other hands; for it being but a delegated power from the people, they who have it cannot pass it over to others." John Locke, Second Treatise § 141, at 71. He concluded: "when the people have said we will submit to rules, and be governed by laws made by such men, and in such forms, nobody else can say other men shall make laws

---

[1] https://www.forbes.com/sites/waynecrews/2017/08/15/how-many-rules-and-regulations-do-federal-agencies-issue/?sh=3192b9021e64.

[2] https://www.washingtonpost.com/outlook/2022/07/06/epa-roberts-conservative-court-libertarian/.

for them; nor can the people be bound by any laws but such as are enacted by those whom they have chosen and authorized to make laws for them." *Id.*

This desire for democratic accountability and a robust separation of powers directly impacted the Constitution's design. The Legislative Vesting Clause, the first substantive command in the Constitution, requires that "all legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. Subsequent clauses grant the President exclusive control over executive powers and the judiciary sole dominion of judicial power. Thus, the Constitution created clear delineations between the three branches of government. *See, e.g.*, The Federalist Nos. 47, 51 (James Madison).

Regarding legislative power, Alexander Hamilton stated that it is the "power of making laws," which are "rules which those to whom it is prescribed are bound to observe." The Federalist No. 33 (Alexander Hamilton). Thus, those who helped shepherd the Constitution's ratification understood that if Congress could simply proclaim indeterminate objectives and then delegate the role of specific rulemaking to other entities, it would undermine the system of government. *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892); *see Gundy v. United States*, 139 S. Ct. 2116, 2134-35

(2019) (Gorsuch, J., dissenting). Chief Justice John Marshall recognized this, declaring that Congress may not "delegate . . . powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42 (1825).

Despite the original public meaning of Article I's vesting clause, the delegation of legislative power to the executive branch has been a slow and creeping process. An initial exception for the delegation of fact-finding to the executive was recognized in the 1813 forfeiture case, *The Aurora*, 11 U.S. (7 Cranch) 382, 388 (1813). Next, the Supreme Court sanctioned the delegation of rulemaking authority where the regulations complemented Congressional directives. This type of delegation warrants the executive branch to determine "reasonable variations, tolerances, and exemptions, which, because of their variety and need of detailed statement, it was impracticable for Congress to prescribe." *See United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 85 (1932). The Court also acknowledged that the two exemptions for fact-finding and filling up the details entail legislative discretion but preserved them despite these concerns. *See United States v. St. Paul & Pac. R.R. Co.*, 282 U.S. 311, 324 (1931).

In *J.W. Hampton, Jr., & Co.*, the Court permitted the delegation of the power to regulate common carriers, entities open to the general public that transports people or goods, to the executive branch. 276 U.S. at 409. In doing so, the Court articulated the "intelligible principle" test that eventually became the modern tool for courts to assess the constitutionality of congressional delegations. *Id.* "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." *See id.* at 409.

This test was used to invalidate a statute in *Panama Refining Co.* 293 U.S. at 430. There, the Supreme Court held that the National Industrial Recovery Act exceeded Congress's capacity to delegate in authorizing the executive branch to establish "reasonable" rates for oil transportation. *Id.* at 416, 430. Later that year, in *A.L.A. Schechter Poultry Corp. v. United States*, the Court underscored that Congress had not laid out any principle for the executive branch to follow. 295 U.S. 495, 542 (1935). The majority clarified that Congress could not relinquish or transfer essential legislative functions. While acknowledging the necessity of delegating increasingly complex legislative duties to administrators in the executive branch, the Court made

clear that the instrumentalities in the making of subordinate rules must be subject to limitations if separation of powers is to be preserved. *Id.* at 541-42. Since the National Industrial Recovery Act, no statute has been struck down by the Supreme Court on nondelegation grounds. *See* Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 322 (2000) ("The nondelegation doctrine has had one good year, and 211 bad ones (and counting)."); Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 328–29 (2002) ("After 1935, the Court has steadfastly maintained that Congress need only provide an 'intelligible principle' to guide decisionmaking, and it has steadfastly found intelligible principles where less discerning readers find gibberish.").

But the revival of the nondelegation doctrine in recent cases cannot be ignored. In *Gundy*, the majority recognized that if "the Attorney General had plenary power to determine the Sex Offender Registration and Notification Act's applicability to pre-Act offenders—to require them to register, or not, as she sees fit, and to change her policy for any reason and at any time," it would constitute an unconstitutional delegation of legislative prerogatives. *Gundy*, 139 S. Ct. at 2123 (cleaned up). While the Court ultimately upheld SORNA, the dissent noted that the intelligible principle test had become so

expansive that it now permits excessive delegations of congressional authority. Allowing the attorney general to write criminal laws in the manner that SORNA permits "would serve only to accelerate the flight of power from the legislative to the executive branch, turning the latter into a vortex of authority that was constitutionally reserved for the people's representatives in order to protect their liberties." *Gundy*, 139 S. Ct. at 2142 (Gorsuch, J., dissenting).

And this summer, in *West Virginia v. EPA*, the Court ruled that Congress did not give the EPA the power to develop emissions caps in Section 111(d) of the Clean Air Act. 142 S. Ct. 2587, 2616 (2022). The majority rooted its decision in the major questions doctrine. *Id.* at 2610. The major questions doctrine asserts that courts cannot construe statutes to authorize executive agencies to make policy determinations of significant power beyond what Congress could have reasonably been understood to have granted. *Id.* at 2608.

*West Virginia* is yet another milestone in the nondelegation doctrine's revival because the "major questions doctrine is closely related to . . . the nondelegation doctrine." *NFIB v. OSHA*, 142 S. Ct. 661, 668 (2022) (Gorsuch, J., concurring). "Both are designed to protect the separation of powers and

ensure that any new laws governing the lives of Americans are subject to the robust democratic processes the Constitution demands." *Id.* at 668-69. "The nondelegation doctrine ensures democratic accountability by preventing Congress from intentionally delegating its legislative powers to unelected officials." *Id.* at 669. "The major questions doctrine serves a similar function by guarding against unintentional, oblique, or otherwise unlikely delegations of the legislative power." *Id.* Accordingly, "for decades courts have cited the nondelegation doctrine as a reason to apply the major questions doctrine." *Id.* at 668. Thus, the rise of the major questions doctrine also reflects the mood of the law shifting in favor of rigorous enforcement of the nondelegation doctrine.

And this Court is following that cue. In *Tiger Lily, LLC v. HUD* (*Tiger Lily I*), this Court granted an emergency motion to stay the CDC's nationwide rental eviction moratorium because the nondelegation doctrine counsels against interpreting the CDC's statute as authorizing it. 992 F.3d 518, 523 (6th Cir. 2021). When this Court later considered the merits, it reiterated that such an interpretation "could raise a nondelegation problem." *Tiger Lily, LLC v. HUD* (*Tiger Lily II*), 5 F.4th 666, 672 (6th Cir. 2021). Likewise, when this Court considered the mandate that federal contractors take the COVID-

19 vaccine, it raised the nondelegation doctrine as a reason not to adopt the government's interpretation of the procurement statute. *Kentucky v. Biden*, 23 F.4th 585, 607 n.14 (6th Cir. 2022).

Other courts are also taking the Supreme Court's cue. In *Jarkesy v. SEC*, the SEC claimed its statute allowed it to choose whether to prosecute securities fraud in one of its internal tribunals or an Article III court. 34 F.4th 446, 459 (5th Cir. 2022). The Court held that the discretion of whether to afford a defendant "certain legal processes" or not was a legislative power and that the statute "offered no guidance whatsoever" on making that choice. *Id.*

Still, opponents of the nondelegation doctrine contend that modern government's dependence on legislative delegations since the advent of the administrative state belies the necessity and prudence of restoring the original conception of separation of powers. David French, *The Constitution Isn't Working*, The Atlantic (July 12, 2022).[3] But this does not negate the original public meaning of the Constitution as explained above. Congress' continual prioritization of partisan imperatives over its institutional responsibilities is no justification for placing political expediency above the

---

[3] https://newsletters.theatlantic.com/the-third-rail/email/dc2cba7f-fe77-411c-8e11-47d4cadb8266/.

Constitution. *See Mistretta v. United States,* 488 U.S. 361, 416 (1989) (Scalia, J., dissenting).

## II.  The safety-standard provision violates the nondelegation doctrine.

While there are some permissible forms of delegations of legislative power, the OSHA statute's safety provision is not one of them. For a legislative delegation to be constitutionally valid, a statute authorizing such legislative power must communicate an "intelligible principle." *J.W. Hampton, Jr., & Co.*, 276 U.S. at 394. The "intelligible principle" rule articulates the concept that permissible delegations of legislative power assign the duty to merely "determine specific facts" or "to fill up the details under the general provisions made by the Legislature." *Panama*, 293 U.S. at 426 (cleaned up); *see also e.g.*, *Wayman*, 23 U.S. at 43; *Gundy*, 139 S. Ct. at 2136 (Gorsuch, J. dissenting). But the safety-standard provision falls in neither of these buckets. And it lacks a limiting principle, which is a telltale sign that it violates the nondelegation doctrine. *Tiger Lily II*, 5 F.4th at 672.

### A.  The safety-standard provision is not mere fact finding that is appropriately constrained.

The Supreme Court has examined various instances of permissible delegations of legislative power which delegate fact-finding to the executive but that still meaningfully constrain its actions. *See, e.g., Touby v. United*

*States*, 500 U.S. 160, 166 (1991); *Yakus v. United States*, 321 U.S. 414, 424 (1944).

The safety-standard provision is unlike the fact-finding function the Court affirmed in *Yakus*. There, Congress passed a statute authorizing an agency to set price controls for commodities "as a temporary wartime measure." 321 U.S. at 419. The statute declared that its "purposes," included preventing "profiteering, hoarding, manipulation, speculation, and other disruptive practices." *Id.* at 420. It then laid out several standards to guide the agency in fixing prices. *Id.* Some were broad, such as authorizing the agency to promulgate regulations "which 'in [its] judgment will be generally fair and equitable and will effectuate the purposes of this Act' when, in [its] judgment, their prices 'have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act.'" *Id.* But others were specific. The statute directed the agency to "give due consideration to the prices prevailing between October 1 and October 15, 1941." *Id.* at 421. It then directed the agency to adjust prices based on factors, such as: "'Speculative fluctuations, general increases or decreases in costs of production, distribution, and transportation, and general increases or decreases in profits earned by sellers

of the commodity or commodities, during and subsequent to the year ended October 1, 1941.'" *Id.* (citation omitted).

The Court upheld the statute against a nondelegation challenge. *Id.* at 423. It explained that what is important is that Congress determines "the legislative policy" and "promulgates" "a defined and binding rule of conduct." *Id.* at 424 (cleaned up). The Court concluded that the statute did that because Congress specified the "fact[s] upon whose existence or occurrence, ascertained from relevant data by a designated administrative agency" makes its "statutory command . . . effective." *Id.* at 424-25. The Court also explained that Congress could direct the agency to "ascertain the conditions which Congress has made prerequisite to the operation of its legislative command." *Id.* at 425. The Court distinguished *Schechter Corp.* where the National Industrial Recovery Act provided "no method of attaining" its end to "rehabilitate industry" other than codes of fair competition. But provided "no standards to which those codes were to conform." *Id.* at 424 (distinguishing 295 U.S. 495).

Here, the safety-standard provision has not provided OSHA any specific factors to consider in promulgating rules other than saying that they must be "reasonably necessary or appropriate" for worker safety. This is a far cry from

14

the statute in *Yakus* directing the agency there to look at "general increases or decreases in costs of production" for example. Nor does it simply delegate to OSHA the power to ascertain the conditions and facts for setting safety rules based on the standards that Congress set. Instead of serving a fact-finding role, OSHA gets to set the standards for what a safety-standard should look like.

That the safety-standard provision is not simply about fact-finding also distinguishes this case from *Touby*. There, a statute either banned or regulated various drugs depending on what "schedule" they were in. 500 U.S. at 162. The statute authorized the Attorney General to add drugs temporarily to a schedule that banned them. *Id.* But to "schedule a drug temporarily," the statute required the Attorney General to "find that doing so is 'necessary to avoid an imminent hazard to the public safety.'" *Id.* at 166. The statute also required the Attorney General "'to consider' three factors: the drug's 'history and current pattern of abuse;' 'the scope, duration, and significance of abuse;' and 'what, if any, risk there is to the public health.'" *Id.* To schedule a drug for the strictest regulations, the statute required the Attorney General to "find that it 'has a high potential for abuse,' that it 'has no currently accepted

medical use in treatment in the United States,' and that 'there is a lack of accepted safety for use of the drug . . . under medical supervision.'" *Id.* at 167.

Accordingly, the Court concluded that Congress "placed multiple specific restrictions on the Attorney General's discretion to define criminal conduct" and that "[t]hese restrictions satisfy the constitutional requirements of the nondelegation doctrine." *Id.* at 167. Thus, "[i]n approving the statute, the Court stressed all these constraints on the Attorney General's discretion and, in doing so, seemed to indicate that the statute supplied an 'intelligible principle' because it assigned an essentially fact-finding responsibility to the executive." *Gundy*, 139 S. Ct. at 2141 (Gorsuch, J., dissenting).

Applied here, *Touby* shows that OSHA is not engaging in mere fact-finding. OSHA is not deciding which workplace conditions meet certain criteria that Congress codified in the statute for determining when those conditions should be banned. Instead, OSHA establishes the criteria for what should be banned or not banned. That is not fact-finding and does not satisfy the nondelegation doctrine.

**B.  The safety-standard provision is not "filling in details" that are premised upon meaningful constraints and guidance provided by Congress.**

It is a permissible delegation of legislative power for the legislature to make general provisions and assign the duty of "fill up the details" to an agency or commission. *Wayman,* 23 U.S. at 43; *see also Mistretta*, 488 U.S. at 377.

An example of an agency simply filling up the details is the sentencing commission in *Mistretta*. There, the sentencing commission passed scrutiny because Congress provided sufficient guidance to the commission, which then filled in the details according to the prescribed boundaries. 488 U.S. at 377. The Court reasoned that Congress "legislated a full hierarchy of punishment—from near maximum imprisonment, to substantial imprisonment, to some imprisonment, to alternatives—and stipulated the most important offense and offender characteristics to place defendants within these categories." *Id.* The Court concluded that "[d]eveloping proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders is precisely the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate." *Id.* at 379.

*Mistretta's* reasoning shows that the safety-standard provisions are not equivalent to filling in the intricate or labor-intensive details of a complex regulatory scheme. Congress has not told OSHA the "most important . . .

characteristics" of what a safety standard should look like and then asked it to use that criteria to promulgate specific rules. Instead, Congress has only told OSHA that the standard must be "reasonably necessary or appropriate" to workplace safety. 29 U.S.C. § 652(8).

To be sure, the court below says OSHA's statute forecloses it from regulating unless it makes "'a threshold finding that a place of employment is unsafe—in the sense that significant risks are present and can be eliminated or lessened by a change in practices.'" Op., R.30, PageID#372 (quoting *Nat'l Mar. Safety Ass'n v. OSHA*, 649 F.3d 743, 750 (D.C. Cir. 2011)). But at most that would only supply OSHA the "*when*" for regulating and not the "*how*." Thus, even under this interpretation of the safety-standard provision, OSHA is not just filling up the details on how it may regulate. It is making major policy decisions.

Still, the court below concluded that *Whitman v. American Trucking Ass'ns* shows that an agency can determine "'how much of the regulated harm is too much,'" but the delegation there involved less power and less discretion. Op., R.30, PageID#375 (applying 531 U.S. 457, 475 (2001)). In *Whitman*, the

Court considered a nondelegation challenge to the Clean Air Act, which required the EPA to "set 'ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on [the] criteria [documents of § 108] and allowing an adequate margin of safety, are requisite to protect the public health.'" *Id.* at 471.

The Court held that this language provided sufficient guidance to the agency. *Id.* at 473. The Court acknowledged that the "degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Id.* at 475. The Court interpreted "'requisite'" and "'adequate margin of safety'" as not allowing the EPA to "consider costs in setting the [air quality] standards." *Id.* at 468. The Court also reasoned that the statute was limited to a "'discrete set of pollutants.'" *Id.* at 473 (citation omitted). The standards must also "reflect the latest scientific knowledge." *Id.* (citation omitted). And "[r]equisite" has a limiting principle because it means "not lower or higher than is necessary -- to protect the public health with an *adequate* margin of safety." *Id.* at 475-76 (citation omitted). The Court concluded that "these limits" on the EPA's "discretion" satisfied the nondelegation doctrine. *Id.* at 473.

These limits make *Whitman* inapposite. The safety-standard provision

applies to all safety situations and is not focused on a "discrete set" of

situations. It is thus a broader power than being able to regulate a "'discrete

set of pollutants.'" *Id.* at 473 (citation omitted). Not only that, OSHA's statute

does not require it to follow the latest scientific knowledge. And the

"reasonably necessary or appropriate" language is unqualified. It does not

foreclose OSHA from considering costs. It instead allows OSHA to balance

the tradeoffs between economic costs and worker safety, which is a major

policy question. The EPA by contrast lacked that policy role. And it provides

more discretion than the "requisite" language in *Whitman* that Congress

qualified with "*adequate* margin of safety." Thus, under *Whitman's* reasoning,

OSHA's broader power requires more guidance for the "agency'[s] discretion"

in filling up details than what its statute provides here.

## C. The safety-standard provision raises nondelegation concerns because it lacks a limiting principle.

What is more, the safety-standard provision lacks a limiting principle. A

statute so broad that it lacks a limiting principle is an unconstitutional

delegation of power. *Tiger Lily II*, 5 F.4th at 672; *Tiger Lily I*, 992 F.3d at

523; *Kentucky*, 23 F.4th 585 at n.14.

The safety-standard delegation mirrors the government's broad reading of the delegation in *Tiger Lily II*. There, this Court considered whether a statute permitting the CDC to combat disease through actions like "fumigation" authorized a rental eviction moratorium based on the statute also saying the CDC could take "other measures, as in [its] judgment may be necessary." *Tiger Lily II*, 5 F.4th at 668.

This Court held that interpreting this language as permitting the moratorium "could raise a nondelegation problem." *Id.* at 672. It reasoned that such an interpretation would mean "that the CDC can do anything it can conceive of to prevent the spread of disease." *Id.* The court explained that "[i]n applying the' nondelegation doctrine, the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred.'" *Id.* (quoting *Whitman*, 531 U.S. at 475). The court concluded that "[s]uch unfettered power would likely require greater guidance than 'such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases.'" *Id.* (internal citations omitted).

So too here. OSHA's power over the American economy is vast as seen by its failed attempt to impose a COVID-19 vaccine mandate on 84 million

workers. *NFIB*, 142 S. Ct. at 665. Thus, under *Tiger Lilly II's* reasoning this vast scope of power requires a great degree of guidance. But instead, the only guidance the safety-standard provision offers OSHA is to promulgate regulations that are "reasonably necessary or appropriate." 29 U.S.C. § 652(8). *Tiger Lily II* shows that amounts to "unfettered power" given the similarity that language bears to the "such regulations as in [its] judgment are necessary" language there.

*Tiger Lily I* bolsters this conclusion. It reasoned that the nondelegation doctrine foreclosed interpreting the public health act to "impose any number of regulatory actions, provided the [CDC] believes those actions will help prevent the spread of disease, regardless of whether they are in any way tethered to" the specific actions the act mentions like "fumigation" and "sanitation." 992 F.3d at 523.

Here, the safety-standard provision does not mention any specific guidance for OSHA to tether its safety regulations to. So under *Tiger Lily I's* logic, it is an unconstitutional delegation because it allows OSHA to impose any number of regulatory actions, provided it believes those actions are reasonably necessary or appropriate for workplace safety. That cannot be the law.

*Kentucky* strengthens this conclusion. There, this Court considered the President's power to impose a COVID-19 vaccine mandate on federal contractors. 23 F.4th at 589. He relied on the federal procurement statute's "statement-of-purpose section" that says the statute is designed "to facilitate the 'economical and efficient' purchase of goods and services on behalf of the federal government." *Id.* at 604 (citation omitted). He also pointed to the statute saying the "'[t]he President may prescribe policies and directives that the President considers necessary to carry out this subtitle.'" *Id.* at 606 (citation omitted). He then concluded that this authorized the mandate because it will reduce worker "absenteeism," and, therefore make procurement more "'economical and efficient.'" *Id.* at 604 (citation omitted).

This Court held that the mandate was unauthorized. *Id.* at 610. The Court rejected the government's interpretation because "statements-of-purpose" are not "operative provisions" that grant any power. *Id.* at 604. But the Court held that even if they were, the government's interpretation was still flawed because the "'economical and efficient'" language referred to the system of procuring goods and not the contractors themselves. *Id.*

The Court also applied the "major-questions canon" given that the mandate "sweeps in *at least* one-fifth of the American workforce." *Id.* at 606.

The Court concluded that the lack of a "limiting principle" for what the President could do also showed that the statute did not provide a clear statement authorizing the mandate. *Id.* at 608.

The Court also noted that there would be "non-delegation concerns" if the "government's interpretation were correct—that the President can do essentially whatever he wants so long as he determines it necessary to make federal contractors more 'economical and efficient.'" *Id.* at 607 n.14. But it held that those concerns were not present because the procurement act "instead grants the President specific, enumerated powers to achieve specific, enumerated goals in administering the federal procurement system." *Id.*

Applied here, Congress granting OSHA the power to promulgate safety standards lacks a limiting principle. It allows OSHA to do essentially whatever it wants so long as it determines the standard is "reasonably necessary or appropriate." *Kentucky's* reasoning shows that such a broad delegation untethered to specific powers or goals is unconstitutional.

To be sure, the district court cited *Gundy* for the proposition that "[T]he [Supreme] Court has over and over upheld even very broad delegations," but that does not mean this Court should go further. Op., R.30, PageID#376 (discussing 139 S. Ct. at 2117). *United States v. Lopez* cautioned against

extending precedents further when they conflict with the original public meaning of the Constitution. 514 U.S. 549, 567 (1995). It noted that to uphold a statute regulating firearm possession in schools would amount to saying that Congress has "general police power of the sort retained by the States." *Id.* It acknowledged "some of our prior cases have taken long steps down that road, giving great deference to congressional action." *Id.* The Court continued: "[t]he broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further." *Id.*

So too here. That prior cases have upheld broad delegations does not mean that this Court should accept OSHA's invitation for it to go further and uphold the even broader delegation found in the safety-standard provision.

Another reason to decline OSHA's invitation is the risk for the President to usurp broad lawmaking powers based on the safety-standard provision's broad nature. That risk is not unfounded given the President and OSHA's use of the emergency temporary standard provision in *NFIB*. There, they claimed that the provision gave OSHA "'almost unlimited discretion' to mandate new nationwide rules in response to the pandemic so long as those rules are 'reasonably related' to workplace safety." *Id.* at 668 (Gorsuch, J.,

concurring) (quoting 86 Fed. Reg. 61,402, 61,405 (2021)). They then promulgated the nationwide COVID-19 vaccine mandate that would have covered "84.2 million employees." *NFIB*, 142 S. Ct. at 664.

The Supreme Court chastised OSHA for interpreting language allowing it to set "'occupational safety and health standards'" as meaning it could promulgate "broad public health measures." *Id.* at 665. The Court explained that the mandate was "a significant encroachment into the lives—and health—of a vast number of employees." *Id.* And three justices filed a concurrence agreeing with the Fifth Circuit that the mandate was "a legislative 'work-around'" of Congress failing to give federal agencies the authority to impose a nationwide vaccine mandates. *Id.* at 668 (Gorsuch, J., concurring) (quoting *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 668 (5th Cir. 2021)). While *NFIB* involved a different provision of OSHA's statute, it shows the dangers of the safety-standard provision lacking a limiting principle. Accordingly, that provision should be held unconstitutional so that Congress can amend it and provide standards to guide and limit OSHA's discretion.

## CONCLUSION

This Court should reverse the district court's denial of relief for Plaintiff-Appellant.

Dated: November 15, 2022               Respectfully Submitted,

/s/ Jeffrey D. Jennings
Jeffrey D. Jennings
James M. McQuaid
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Telephone: 312-637-2280
jjennings@libertyjusticecenter.org
jmcquaid@libertyjusticecenter.org

*Attorney for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 5,249 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f), which is less than the 5,217 word limit.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook font.

Date: November 15, 2022      /s/ Jeffrey D. Jennings
                             Attorney for Amicus Curiae Liberty Justice
                             Center

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing through the Court's

CM/ECF system, which will send a notification of such filing to counsel of

record.

Dated: November 15, 2022     /s/ Jeffrey D. Jennings
                             Jeffrey D. Jennings