No. 22-3772

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

ALLSTATES REFRACTORY CONTRACTORS, LLC,

*Appellant,*

v.

MARTIN J. WALSH, in his official capacity as Secretary of Labor, et al.

*Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of Ohio, Western Division
(No. 3:21-cv-1864, Hon. Jack Zouhary)

_____

## BRIEF OF *AMICUS CURIAE*
## THE BUCKEYE INSTITUTE  IN SUPPORT OF APPELLANT
## ALLSTATES REFRACTORY CONTRACTORS, LLC AND REVERSAL

_____

David C. Tryon
   *Counsel of Record*
Jay Carson
THE BUCKEYE INSTITUTE
88 East Broad Street, Ste. 1300
Columbus, Ohio 43215
(614) 224-4422
d.tryon@buckeyeinstitute.org
j.carson@buckeyeinstitute.org


Counsel for *Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: _22-3772_____          Case Name: ALLSTATES REFRACTORY, LLC  v. MARTIN
                                                    WALSH, et al.
Name of counsel: _David C. Tryon_____

Pursuant to 6th Cir. R. 26.1, _The Buckeye Institute_____
                                                    *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
      identity of the parent corporation or affiliate and the relationship between it and the named
      party:

| |
|---|
| No. |

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
      in the outcome?  If yes, list the identity of such corporation and the nature of the financial
      interest:

| |
|---|
| No. |

| CERTIFICATE OF SERVICE |
|---|
| I certify that on _____11/15/2022_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record. <br><br> s/ David C. Tryon_____ <br> The Buckeye Institute_____ <br> _____ |

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08                                                                                    Page 1 of 2

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a)  **Parties Required to Make Disclosure.**  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed.**

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure.**  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ............................................................................................ iii

TABLE OF AUTHORITIES .............................................................. iv

INTERESTS OF THE *AMICUS CURIAE* ........................................... 1

SUMMARY OF THE ARGUMENT ..................................................... 2

ARGUMENT...................................................................................... 5

   I.   Congressionally Mandated Safety Regulations Have Evolved Beyond Constitutional Authority. ............................................................. 5

   II.   If this Court Strikes Down Part of OSHA's Regulatory Scheme, Protected Employees Will Still Be Protected Through Other Government And Non-Governmental Means........................................................... 7

     1.  State workers compensation laws protect workers. . ................................ 8

     2.  Beyond workers compensation, employers need to avoid intentional tort claims for unsafe working conditions.. ........................................... 10

     3.  Most industries, especially those where safety is particularly important, have industry safety standards. .................................................. 11

     4.  Perhaps most importantly, the business managers and owners themselves promote safety................................................................. 12

     5.  States provide significant work-place safety laws and regulations. .......... 13

     6.  OSHA can and does use safety programs aside from the challenged blunt enforcement safety mechanisms. 14

     7.  OSHA also operates a Voluntary Protection Program.   The OSHA Voluntary Protection ...................................................... 16

     8.  Federal law provides other safety protections. .......................... 17

   III.   OSHA Has Not Significantly Improved Worker Safety. .......................... 18

   IV.   OSHA Regulations Come At A High Cost. ............................... 19

   V.  OSHA Safety Regulations Violate The Nondelegation Doctrine ................ 22

   VI.   OSHA Safety Regulations Violate The Major Questions Doctrine. .......... 26

CONCLUSION ................................................................................ 29

CERTIFICATE OF COMPLIANCE.................................................... 29

CERTIFICATE OF SERVICE............................................................. 31

# TABLE OF AUTHORITIES

**Cases**

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Occupational Safety & Health Admin.*, 938 F.2d 1310 (D.C. Cir. 1991)............25

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).................24

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 142 S. Ct. 661 (2022)..................................................................22, 24, 27

*W. Va. v. Env't Prot. Agency*, 142 S. Ct. 2587 (2022)....................................26, 27

*Whitman v. Am. Trucking Associations*, 531 U.S. 457 (2001) ..............................25

**Statutes**

§ 651(11) ................................................................................................14

§ 651(13) ................................................................................................14

16 U.S.C. § 824c......................................................................................23

29 U.S.C. § 651 ....................................................................................... 7

29 U.S.C. § 651(5)....................................................................................14

29 U.S.C. § 651(b)(3)................................................................................ 8

29 U.S.C. § 651(b)(6)................................................................................ 3

29 U.S.C. § 652(8)................................................................. 3, 4, 14, 23

29 U.S.C. § 654(a)(2)..........................................................................3, 22

29 U.S.C. § 655(b)....................................................................................22

29 U.S.C. § 671 ......................................................................................17

40 U.S.C. § 333 ...................................................................................... 6

42 U.S.C. § 1760......................................................................................23

5 U.S.C. § 1705 ......................................................................................23

**Other Authorities**

Occupational Safety & Health Admin., U.S. Dep't of Labor, DCSP FS-3645, OSHA Fact Sheet: The OSHA Alliance Program (2020)...................................14

1870 Pa. Laws 6-9 https://tinyurl.com/258uzpws (last visited Nov. 3, 2022) ......... 5

*2022 Small Business Profile Ohio*, U.S. Small Business Admin., https://tinyurl.com/4594zh9t (last visited Nov. 14, 2022) .................................20

*2022 Small Business Profile United States*, U.S. Small Business Admin., https://tinyurl.com/yvu6vfpc (last visited Nov. 14, 2022) .................................20

*About NIOSH*, U.S. Dep't of Health & Hum. Servs., https://tinyurl.com/ms3zzc9n (last visited Nov. 3, 2022)..................................................................17

*All About VPP*, U.S. Dep't of Labor, www.osha.gov/vpp/all-about-vpp (last visited Nov. 4, 2022)..................................................................................16

*Alliance Program Participants Developed Products*, U.S. Dep't of Labor, www.osha.gov/alliances/products (last visited Nov. 4, 2022) ............................15

American National Standards Institute, *Publisher Collections*, ANSI Webstore, https://webstore.ansi.org/Info/Sdolist (last visited Nov. 4, 2022)......................12

An Act to Establish in the Department of the Interior a Bureau of Mines, Pub. L. No 61-179, 36 Stat. 369 (1910) ........................................................................ 5

Andrew Wimer, National Federation of Independent Businesses, *Small Businesses Will Pay a Big Price for New Silica Rule*, NFIB (Mar. 24, 2016),  https://tinyurl.com/2uv2ywve ............................................................20

*Annual Report on the Alliance Program (2020)*, U.S. Dep't of Labor, https://www.osha.gov/alliances/alliance-successes (last visited Nov. 4, 2022) ..15

*Annual Report*, U.S. Dep't of Labor, www.osha.gov/laws-regs/oshact/section_26 (last visited Nov. 4, 2022)....................................................................................19

*ASSP Fact Sheet*, American Society of Safety Professionals, www.assp.org/about/assp-fact-sheet (last visited Nov. 4, 2022) ........................11

*Calculating Rates*, Ohio Bureau of Workers' Compensation, https://perma.cc/E9D4-NZNU (last visited Nov. 14, 2022)................................10

Cato Institute, *Cato Handbook for Congress: Policy Recommendations for the 106th Congress* 356 (1999.................................................................................18

Courtney Malveaux, OSHA Enforcement of the "As Effective As" Standard for State Plans: Serving Process or People?, 46 U. Rich. L. Rev. 323 (2011)..........13

*Experience-Rated Employers*, Ohio Bureau of Workers' Compensation, https://perma.cc/3BYH-N4PJ (last visited Nov. 14, 2022)................................10

Federal Coal Mine Safety Act, Pub. L. No. 82-552, 66 Stat. 692 (1952)................ 5

Griffin Murphy et al., *Workers Compensation: Benefits, Coverage, and Costs (2019 Data)*, National Academy of Social Insurance, Oct. 2021........................ 9

*History of ASSP*, American Society of Safety Professionals, www.assp.org/about/history (last visited Nov. 4, 2022)....................................11

*Industries in VPP Federal and State Plans*, U.S. Dep't of Labor (Updated Sept. 21, 2022), www.osha.gov/vpp/bynaics ................................................................16

Institute of Medicine, *Safe Work in the 21st Century: Education and Training Needs for the Next Decade's Occupational Safety and Health Professionals* 236 (2000), https://tinyurl.com/bdf6jbcb ........................................................11

John Howard, *NIOSH: A Short History*, 110 Am. J. Pub. Health 629 (2020)........17

Judson MacLaury, *The Job Safety Law of 1970: Its Passage Was Perilous*, U.S. Dep't of Labor, https://www.dol.gov/general/aboutdol/history/osha# (last visited Nov. 3, 2022)................................................................................6, 27

Laura Walter, *House Hearing Criticizes OSHA's Impact on Jobs, Business*, EHS Today (Feb. 16, 2011), https://tinyurl.com/mwb29c8j ......................................20

Michael Moore & W. Kip Viscusi, Promoting Safety Through Workers' Compensation: The Efficiency and Net Wage Costs of Injury Insurance, 20 RAND J. Economics 499, 513 (1989)................................................................. 8

v

Nathan Hale & John Leeth, *Evaluating OSHA's Effectiveness and Suggestions for Reform*, Mercatus Center, https://tinyurl.com/3bn9ehnt (last visited Nov. 4, 2022) ......................................................................................................................18

National Safety Council, *About the National Safety Council*, NSC, https://www.nsc.org/company (last visited Nov. 4, 2022)...................................11

National Safety Council, *Safety Regulations Cost Country Billions, Manufacturers Group Says*, Safety+Health (Sept. 10, 2014), https://perma.cc/Z3R9-5UNP....... 4

*Necessary*, Merriam-Webster, www.merriam-webster.com/dictionary/necessary (last visited Nov. 4, 2022).................................................................................23

Occupational Safety & Health Admin., U.S. Dep't of Labor, CSP 04-01-003, OSHA Instruction 2 (2020)...................................................................................15

Occupational Safety & Health Admin., U.S. Dep't of Labor, DOL-OSHA-DEP-2021-001, 2021 Annual Adjustments to OSHA Civil Penalties (2021)..............21

Occupational Safety & Health Admin., U.S. Dep't of Labor, OSHA Fact Sheet: Voluntary Protection Programs 1 (2009) ............................................................16

Occupational Safety & Health Admin., U.S. Dep't of Labor, Regulatory Review of 29 CFR 1926, Subpart P: Excavations 7 (2007)................................................ 6

Office of Inspector Gen., U.S. Dep't of Labor, No. 02-16-201-10-105, OSHA Does Not Know if Special Emphasis Programs Have Long-Term Industry Effect (2016).................................................................................................................19

Raymond Keating, *Warning: OSHA Can Be Hazardous to Your Health*, Foundation for Economic Freedom (Mar. 1, 1996), fee.org/articles/warning-osha-can-be-hazardous-to-your-health/.....................................................................13

Robert Asher, Organized Labor and the Origins of the Occupational Safety and Health Act, 24 New Solutions 279, 284 (2014)................................................. 8

State Occupational Safety & Health Surveillance Program, U.S. Dep't of Health & Hum. Servs., www.cdc.gov/niosh/oep/statesurv.html (last visited Nov. 4, 2022) .............................................................................................................................14

State Plans, U.S. Dep't of Labor, https://www.osha.gov/stateplans/ (last visited Nov. 4, 2022)........................................................................................................14

*The Occupational Safety and Health Act at 50–A Labor Perspective*, 110 Am. J. Pub. Health 621, 642 (2020)............................................................................... 4

*Voluntary Protection Programs Annual Evaluation of Calendar Year 2020 Injury and Illness Rates*, U.S. Dep't of Labor, https://tinyurl.com/yn9e789h (last visited Nov. 4, 2022)........................................................................................................17

Wanda Wakefield, *Employer's Tort Liability to Worker for Concealing Workplace Hazard of Nature or Extent of Injury*, 9 A.L.R. 778 (Originally published in 1981) ..................................................................................................................10

*Workers Compensation Coverage*, Ohio Bureau of Workers' Compensation, https://perma.cc/PV9E-FCHR (last visited Nov. 14, 2022)................................ 9

## INTERESTS OF THE *AMICUS CURIAE*

*Amicus curiae* The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—whose mission is to advance free-market public policy in the states.[1]    The staff at The Buckeye Institute accomplishes the organization's mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policy solutions, and marketing those policy solutions for implementation in Ohio and replication throughout the country.   The Buckeye Institute is a nonpartisan, non-profit, tax-exempt organization as defined by I.R.C. section 501(c)(3). The Buckeye Institute's Legal Center files and joins amicus briefs that are consistent with its mission and goals.

Consistent with its mission, The Buckeye Institute seeks to protect individual liberties, especially those liberties guaranteed by the Constitution of the United States, against government overreach. More and more often, that government overreach comes in the form of agency rules and regulations imposed by unelected bureaucrats. The result is the insulation of important public policy decisions from political or judicial accountability. This is incompatible with the representative

---

[1] Pursuant to Federal Rules of Appellate Procedure, Rule 29, The Buckeye Institute states that it has obtained written consent to file this amicus brief from all parties in the case. Further, no counsel for any party has authored this brief in whole or in part and no person other than the amicus has made any monetary contribution to this brief's preparation or submission.

democracy guaranteed by the Constitution. More specifically, the expansive regulatory authority that the District Court decision permits the Occupational Safety and Health Administration ("OSHA") to exercise upon virtually all employers in the State of Ohio without adequate statutory guidance and without any voter voice in the process is of great concern to The Buckeye Institute.

## SUMMARY OF THE ARGUMENT

Everyone wants a safe workplace. Both employees and employers do. Insurers, shareholders and industry groups do, too. Even politicians do. In fact, workplaces are far safer now than ever before. But, contrary to common belief, the Occupational Safety and Health Administration ("OSHA") has had only a minimal impact on worker safety. Rather, other stakeholders have both a stronger incentive for a safe workplace and more technical expertise to create and maintain that safety.

Some may assume that "OSHA" makes workplaces safe and that without "OSHA," workplaces will be unsafe. While Congress intended the Occupational Safety and Health Act of 1970 (the "OSH Act") to improve workplace safety and health, the OSH Act is not the only—or even best—mechanism to achieve that safety. Since 1970, OSHA, like most government agencies, has grown in size and power—not through subsequent power bequeathments from Congress—but by its own mission creep and industry acquiescence.

The OSH Act treats health and safety standards differently.  The difference in the wording of the statute is subtle, but meaningful.  The OSH Act defines the term "occupational safety and health standard" as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8).  In this section, safety and health are treated the same—contemplating actions that are "reasonably necessary or appropriate." *Id.* But Congress explicitly recognized "the fact that occupational health standards present problems that are often different from those involved in occupational safety." 29 U.S.C. § 651(b)(6).  As to health standards, i.e. "toxic materials or physical agents," Congress added somewhat intelligible direction by providing details, inapplicable to safety regulations, on how to regulate those "agents." 29 U.S.C. § 655(b)(5), (7).

By contrast, Congress gave no direction or clarification on what is "reasonably necessary or appropriate" to provide a "safe" "employment or place of employment." 29 U.S.C. § 652(8).  It simply ordered employers "to comply with occupational safety . . . . standards promulgated under this [act]." 29 U.S.C. § 654(a)(2).  What "reasonably necessary or appropriate" means in this context is anyone's guess, including the regulators' guesses.  It is no overstatement to characterize the regulators' actions as "guesses" because—although the regulators

have conducted studies, attempted to balance the costs and benefits, consulted with industry and even sought comments under the Administrative Procedures Act—they still can only guess what Congress meant when it told them to decide what is "reasonably necessary or appropriate." 29 U.S.C. § 652(8).

These guesses affect millions of workers, Margaret Seminario, *The Occupational Safety and Health Act at 50–A Labor Perspective*, 110 Am. J. Pub. Health 621, 642 (2020), and "cost employers about $71 billion each year," National Safety Council, *Safety Regulations Cost Country Billions, Manufacturers Group Says*, Safety+Health (Sept. 10, 2014), https://perma.cc/Z3R9-5UNP. And whether or not one agrees with those guesses or finds the compliance costs and the fines reasonable, Congress cannot delegate its authority in a way that forces the regulators to guess what Congress wanted them to do without running afoul of the nondelegation doctrine or the major questions doctrine.

Importantly, striking all OSHA safety regulations does not leave workers without safety protections. Workers and workplaces are protected and governed in many other ways, which will remain in place while Congress determines the statutory guidance necessary for OSHA to do its job without guessing.

Accordingly, the Court should reverse the decision of the district court.

## ARGUMENT

## I.    Congressionally Mandated Safety Regulations Have Evolved Beyond Constitutional Authority.

Both States and the federal government have enacted worker safety laws for many years, but for most of the nation's history, those detailed laws have been focused on the most dangerous work environments.  States passed workplace safety laws as early as 1870.  *E.g.*, 1870 Pa. Laws 6-9 https://tinyurl.com/258uzpws (last visited Nov. 3, 2022) (establishing Pennsylvania regulations of coal mines).

Initially, the federal government stayed well within its lane and regulated specific industries, in specific ways.  When Congress did pass safety regulations, it supplemented the States' laws, but limited the federal government's enforcement role.  *See, e.g.*, Federal Coal Mine Safety Act, Pub. L. No. 82-552, 66 Stat. 692 (1952).  In 1910, Congress created the Bureau of Mines within the Department of the Interior.  An Act to Establish in the Department of the Interior a Bureau of Mines, Pub. L. No 61-179, 36 Stat. 369 (1910).  The Bureau's safety and health role was limited to research and investigation, without inspection authority.  *Id.*  1952 brought the Federal Coal Mine Safety Act, allowing federal inspectors to enter coal mines and for penalties for failure to allow an inspector into a mine, but not allowing enforcement penalties.  §§ 202-203, 66 Stat. at 694-95.

In other instances, Congress addressed issues not addressed by the States.  For example, in 1893, Congress passed "the 'coupler bill' which banned the notoriously

dangerous link-and-pin method of coupling railroad cars."  Judson MacLaury, *The Job Safety Law of 1970: Its Passage Was Perilous*, U.S. Dep't of Labor, https://www.dol.gov/general/aboutdol/history/osha# (last visited Nov. 3, 2022).

As time went on Congress sought to regulate more industries and tried to delegate more authority to the executive branch. In 1969, Congress added a new section to the Contract Work Hours Standards Act (40 U.S.C. § 333) "to provide employees in the construction industry with a safer work environment and to reduce the frequency and severity of construction accidents and injuries."  Occupational Safety & Health Admin., U.S. Dep't of Labor, Regulatory Review of 29 CFR 1926, Subpart P: Excavations 7 (2007).   The amendment "significantly strengthened employee protection by requiring the promulgation of occupational safety and health standards for employees of the building trades and construction industry working on federally-financed or federally-assisted construction projects."  *Id.* Accordingly, the Secretary of Labor issued safety and health regulations for construction pursuant to section 107 of the Contract Work Hours and Safety Standards Act.  *Id.*

It was not until 1970 that a comprehensive federal statute was enacted which regulated health and safety in the workplace.  MacLaury, *supra*.  Until then, States had regulated health and safety generally and the federal government had regulated specific industries in specific ways—and even then the federal government often only acted in an advisory role as opposed to a mandatory role with enforcement

powers. However, with the OSH Act, Congress did not directly regulate health and safety. Instead, it created a new agency to do Congress' work for it. *See* 29 U.S.C. § 651. Indeed, the OSH Act does not provide a single health or safety standard. *See id*.

One might respond that Congress has created numerous agencies for this very purpose—to take over Congress' work of enacting detailed regulations—and some consider this normal and acceptable. But what is definitely not acceptable (or constitutional) is delegating broad quasi-legislative power to the agencies without clear direction, including constraints or limitations, manifesting specific congressional intent on how to regulate. Directing OSHA to promulgate safety regulations that are "reasonably necessary or appropriate" is just as vague—and unconstitutional—as telling OSHA to "make the country safe." Regulations promulgated under that scheme must be stricken, but doing so will not affect other safety rules and regulations.

## II.    If this Court Strikes Down Part of OSHA's Regulatory Scheme, Protected Employees Will Still Be Protected Through Other Government And Non-Governmental Means.

While conventional wisdom provides that OSHA is the overseer that keeps workers safe in the workplace, the reality is quite different. Historically, when a specific issue with workplace safety arose, state legislatures and (where necessary) Congress have addressed them with specificity and clarity. However, the OSH Act

went too far and transferred Congress' responsibility for workplace safety issues to OSHA without as an intelligible guiding or limiting principle. *See* 29 U.S.C. § 651(b)(3). But many other stakeholders participate in keeping workers safe. There are other federal agencies regulating safety as well as state and local regulators. Some rules and regulations are mandatory and some are advisory. Many rules and regulations are promulgated by industry groups.

1. <u>State workers compensation laws protect workers</u>. Early in the workplace safety movement, workers' compensation laws began to incentivize employers to implement workplace safety. "It appears that many large firms in the years between 1910 and the Depression responded to the advent of [workers'] compensation [laws] by installing more safety appliances on their machinery. Many companies also established safety training programs for workers and managers." Robert Asher, Organized Labor and the Origins of the Occupational Safety and Health Act, 24 New Solutions 279, 284 (2014). Indeed, a full decade after the passage of the OSH Act, at least one study concluded "[w]orkers' compensation represents by far the most influential governmental program for reducing workplace fatalities." Michael Moore & W. Kip Viscusi, Promoting Safety Through Workers' Compensation: The Efficiency and Net Wage Costs of Injury Insurance, 20 RAND J. Economics 499, 513 (1989).

Today, workers compensation laws continue to provide a useful safety net for workers who are injured on the job. "In 2019, workers' compensation covered an estimated 144.4 million U.S. jobs, a 1.2 percent increase from the previous year." Griffin Murphy et al., *Workers Compensation: Benefits, Coverage, and Costs (2019 Data)*, National Academy of Social Insurance, Oct. 2021, at 11. "In 21 states, some (or all) employers obtain workers' compensation insurance through a state workers' compensation insurance fund." *Id.* at 7.  Four states had exclusive state funds. *Id.* at 8.

> In 2019, private insurers continued to dominate the workers' compensation insurance market, accounting for $35.1 billion in benefits paid (55.6% of total benefits paid). Self insured employers were the next largest payer, $15.8 billion in benefits paid (25.0% of total). State funds paid $8.8 billion (14.0%) and the federal government the remaining $3.4 billion (5.4%) of benefits.

*Id.* at 18.  "[E]mployers paid $10.8 billion in benefits under deductible policies, or 17.6 percent of total benefits paid." *Id.*

And the system of workers' compensation insurance does more than compensate injured employees after injuries occurs—it also prevents accidents.  In Ohio, like many states, "all employers with one or more employees must, by law, have workers' compensation coverage or risk paying out of pocket for workplace injuries." *Workers Compensation Coverage*, Ohio Bureau of Workers' Compensation, https://perma.cc/PV9E-FCHR (last visited Nov. 14, 2022).  A poor safety record will increase workers compensation premiums significantly while a

good safety record will decrease the premiums. For example, in Ohio, while rates are first based on industry classification. *Calculating Rates*, Ohio Bureau of Workers' Compensation, https://perma.cc/E9D4-NZNU (last visited Nov. 14, 2022). The Ohio Bureau of Workers' Compensation then computes an "experience modification, which is the percentage of credit or debit [the Bureau applies] to the base rate to determine the employer's premium." *Experience-Rated Employers*, Ohio Bureau of Workers' Compensation, https://perma.cc/3BYH-N4PJ (last visited Nov. 14, 2022). Accordingly, the workers' compensation creates significant incentives for workplaces to engage in safety measures.

2. <u>Beyond workers compensation, employers need to avoid intentional tort claims for unsafe working conditions</u>. Most state workers' compensation laws provide that the insurance proceeds under those laws are the exclusive remedy for injury on the job. Wanda Wakefield, *Employer's Tort Liability to Worker for Concealing Workplace Hazard of Nature or Extent of Injury*, 9 A.L.R. 778 (Originally published in 1981). But those same statutes often include an exception for "intentional torts" and where the statute does not allow for such claims, courts have allowed them despite those statutory prohibitions. *Id*. This threat of litigation and damages—likely to include punitive damages where applicable—is yet another incentive for a safe workplace.

3.  <u>Most industries, especially those where safety is particularly important,</u> <u>have industry safety standards</u>.  Industry organizations are likely more effective in addressing worker safety than any government agency.  They create safety standards, educate the industry on the standards, and advocate for specific safety laws. In 1911, the United Association of Casualty Inspectors, renamed the American Society of Safety Professionals in 2018, was established.  *History of ASSP*, American Society of Safety Professionals, www.assp.org/about/history (last visited Nov. 4, 2022).  The Society includes 36,000 safety professionals who provide education, standards development, and advocacy.  *ASSP Fact Sheet*, American Society of Safety Professionals, www.assp.org/about/assp-fact-sheet (last visited Nov. 4, 2022).

In 1912, the National Council for Industrial Safety was established.  Institute of Medicine, *Safe Work in the 21st Century: Education and Training Needs for the Next Decade's Occupational Safety and Health Professionals* 236 (2000), https://tinyurl.com/bdf6jbcb.  Originally organized to collect data and promote accident prevention programs, it became the National Safety Council in 1913.  *Id.* The Council provides consulting, research, and workplace training.  *See* National Safety Council, *About the National Safety Council*, NSC, https://www.nsc.org/company (last visited Nov. 4, 2022).

11

In 1918, the American Standards Association was founded. Institute for Medicine, *supra,* at 236. Today it is known as the American National Standards Institute, commonly known as ANSI. *Id*. The Association is responsible for the development of many voluntary safety standards, some of which become laws. *Id*. ANSI publishes standards for over 140 associations or groups, including well known associations such as the National Fire Protection Association and Underwriters Laboratories. American National Standards Institute, *Publisher Collections*, ANSI Webstore, https://webstore.ansi.org/Info/Sdolist (last visited Nov. 4, 2022). Separately and together, these organizations enforce worker safety—with or without OSHA's safety standards.

4. Perhaps most importantly, the business managers and owners themselves promote safety. In many instances, those who run or manage businesses and the specialized machines and equipment used in businesses are better qualified than outsiders (such as OSHA inspectors) to spot and correct safety issues. OSHA inspectors know paperwork and written standards. But they often do not have expertise in the industry or business they inspect. For example, Vitas M. Plioplys— safety services manager at R.R. Donnelly & Sons Company, the world's largest commercial printer—explained:

> Any time an OSHA inspector comes into one of our facilities, it is probably the first time they have ever seen a large commercial printing press. In our plants where the presses are 100 feet long and three stories high, the OSHA inspector doesn't know where to start. In every case the inspector will

12

invariably find a guard off, or some other minor, readily apparent violation, but will pass by process equipment which, if it failed, could blow up our facility. Because they are not experts in the industry they cannot know the critical issues we deal with on a daily basis. . . . Our informal conferences end up being training sessions on safety in the printing industry to the local OSHA offices. They do not know our industry, yet try to cite us as if they do.

Raymond Keating, *Warning: OSHA Can Be Hazardous to Your Health*, Foundation for Economic Freedom (Mar. 1, 1996), fee.org/articles/warning-osha-can-be-hazardous-to-your-health/.

Even with OSHA in place, there are only so many OSHA inspectors, and they cannot be in all places at all times. Ultimately it is up to the business owners and managers to create and maintain a safe workplace—and most do it well. The potential loss of OSHA inspectors who make occasional visits is unlikely to have a significant adverse effect on workplace safety. *See* Sec. III, *infra*.

5. <u>States provide significant work-place safety laws and regulations</u>. "The OSH Act provides matching funds and oversight for states choosing to operate their own programs on the condition that participating states operate a regime that is 'at least as effective as'" that of federal OSHA. Courtney Malveaux, OSHA Enforcement of the "As Effective As" Standard for State Plans: Serving Process or People?, 46 U. Rich. L. Rev. 323 (2011). "There are currently 22 OSHA-approved State Plans covering both private sector and state and local government workers, and seven State Plans covering only state and local government workers." State Plans,

13

U.S. Dep't of Labor, https://www.osha.gov/stateplans/ (last visited Nov. 4, 2022). And of course, States can establish their own—independent—OSHA-type regulations if they have not done so. Furthermore, the National Institute for Occupational Safety and Health ("NIOSH") provides extensive research and guidelines for States if OSHA declines to regulate or is legally unable to regulate. State Occupational Safety & Health Surveillance Program, U.S. Dep't of Health & Hum. Servs., www.cdc.gov/niosh/oep/statesurv.html (last visited Nov. 4, 2022).

6. OSHA can and does use safety programs aside from the challenged blunt enforcement safety mechanisms. The OSH Act directs OSHA to: provide occupational safety research, 29 U.S.C. § 651(5), provide training programs, *id*. § 651(8), "encourag[e] the States to assume the fullest responsibility" for their respective OSHA-type laws, *id.* § 651(11), and encourage joint labor-management safety efforts, *id*. § 651(13). None of these programs is affected by the challenged provision. For example, OSHA operates the Alliance Program through which OSHA "establishes formal relationships with groups committed to worker safety and health, and collaborates with them to prevent workplace fatalities, injuries, and illnesses. These groups include trade and professional associations, labor unions, educational institutions, community and faith-based groups, and government agencies." Occupational Safety & Health Admin., U.S. Dep't of Labor, DCSP FS-3645, OSHA Fact Sheet: The OSHA Alliance Program (2020). "OSHA works with

14

Alliance participants to share information with workers and employers, and educate workers and employers about their rights and responsibilities." Occupational Safety & Health Admin., U.S. Dep't of Labor, CSP 04-01-003, OSHA Instruction 2 (2020). OSHA uses the Alliance Program to better understand industry specific issues. *Id*. "Each year, OSHA's Alliances reach millions of employers and workers, providing them with safety and health information, tools, and resources through newsletters, social media posts, presentations at conferences and meetings, training, and other projects." *Annual Report on the Alliance Program (2020)*, U.S. Dep't of Labor, https://www.osha.gov/alliances/alliance-successes (last visited Nov. 4, 2022). As of 2020, there were 232 OSHA Alliances/Ambassadors. *Id*. The Alliance Program has produced hundreds, if not thousands of brochures, fact sheets, guidelines, reference guides, "toolbox talks," and training programs on subjects from Arial Devices and Elevating Equipment to Window Cleaning. *Alliance Program Participants Developed Products*, U.S. Dep't of Labor, www.osha.gov/alliances/products (last visited Nov. 4, 2022).

7.   <u>OSHA also operates a Voluntary Protection Program</u>.    The OSHA Voluntary Protection Program ("VPP") recognizes companies with a high level of safety performance.  Occupational Safety & Health Admin., U.S. Dep't of Labor, OSHA Fact Sheet: Voluntary Protection Programs 1 (2009).  In order to "focus its inspection resources on higher-risk establishments," OSHA allows certain employers to voluntarily manage their safety plans.  *Id.* "OSHA believes an effective safety and health management system is the best way to prevent occupational illnesses and injuries. . . . Management leadership and employee participation, in addition to company self-evaluations, are key elements of this process." *Id.*

OHSA formally announced the VPP program in 1982. *All About VPP*, U.S. Dep't of Labor, www.osha.gov/vpp/all-about-vpp (last visited Nov. 4, 2022).  It has grown to 1,996 participants in 2022.  *Industries in VPP Federal and State Plans*, U.S. Dep't of Labor (Updated Sept. 21, 2022), www.osha.gov/vpp/bynaics.  "All states with approved occupational safety and health programs offer VPP programs." OSHA Fact Sheet: Voluntary Protection Program, *supra*.  During 2020, "[o]n average, rates for site-based non-construction VPP participants [were] 55 percent below the Bureau of Labor and Statistics (BLS) Total Case Incident Rate (TCIR) and 53 percent below the BLS Days Away from Work, Restricted Work Activity, or Job Transfer (DART) rate for their respective industries."  *Voluntary Protection Programs Annual Evaluation of Calendar Year 2020 Injury and Illness Rates*, U.S.

Dep't of Labor, https://tinyurl.com/yn9e789h (last visited Nov. 4, 2022). "[S]ite-based construction and mobile workforce VPP participants [were] 74 percent below the BLS TCIR rate and 60 percent below the BLS DART rate for their respective industries." *Id*. These voluntary industry programs provide significant protection.

8. <u>Federal law provides other safety protections.</u>  Independent from OSHA, the National Institute for Occupational Safety and Health ("NIOSH") is "a research agency focused on the study of worker safety and health, and empowering employers and workers to create safe and healthy workplaces." *About NIOSH*, U.S. Dep't of Health & Hum. Servs., https://tinyurl.com/ms3zzc9n (last visited Nov. 3, 2022).  Its mandate is "to assure 'every man and woman in the Nation safe and healthful working conditions and to preserve our human resources.'" *Id*.  Indeed, "NIOSH is to produce research that can enable [OSHA] to formulate safety and health standards." John Howard, *NIOSH: A Short History*, 110 Am. J. Pub. Health 629 (2020).  NIOSH is to investigate workplace safety issues and create reports on such issues.  *Id*.  Not only does NIOSH's research assist OSHA, it enables the state legislatures and Congress to properly enact health and safety laws, rather than delegate that role to an unaccountable federal agency.  The removal of OSHA's legislative authority to mandate and enforce workplace safety rules would not alter NIOSH's mission.  *See* 29 U.S.C. § 671.

### III.    OSHA Has Not Significantly Improved Worker Safety.

The point of OSHA's safety regulations is to improve worker safety.  But, at least as of 1999, "the vast majority of studies ha[d] found no statistically significant reduction in the rate of workplace fatalities or injuries due to OSHA. . . . Even using the most optimistic estimates, OSHA would be responsible for lowering workplace injuries in the United States by no more than 5 percent." Cato Institute, *Cato Handbook for Congress: Policy Recommendations for the 106th Congress* 356 (1999).

> That conclusion was reaffirmed in 2013.

> During the 40 years of its existence, workplace fatalities and nonfatal injuries and illnesses have fallen, but OSHA is not the major cause of this decline. Since the OSH Act was passed, workplace fatalities have fallen substantially, as can be seen in Figure 1 on the next page, but this decrease is a continuation of a trend that began long before 1970. Empirical studies that control for the other influences causing worker safety to improve over time generally find OSHA having only a modest impact on worker safety.

Nathan Hale & John Leeth, *Evaluating OSHA's Effectiveness and Suggestions for Reform*, Mercatus Center, https://tinyurl.com/3bn9ehnt (last visited Nov. 4, 2022). Indeed, "OSHA's inspection efforts have reduced worker injuries by a modest four percent." *Id.*

As recently as 2016, the U.S. Department of Labor's Office of Inspector General, concluded that "OSHA could not demonstrate whether its [special emphasis programs] were effective in improving safety and health conditions for

workers in high-hazard industries and occupations. "Office of Inspector Gen., U.S. Dep't of Labor, No. 02-16-201-10-105, OSHA Does Not Know if Special Emphasis Programs Have Long-Term Industry Effect (2016). Even OSHA's own website, while providing reams of rules and regulations, provides no information on the impact of its regulations on worker safety. One would expect that if OSHA even claimed that it had improved worker safety, it would say so and provide data to support that. But OSHA no longer even submits the previously required annual report to Congress which was to report "the progress toward achievement of the purpose of [the OSH] Act." *Sec. 26. Annual Report*, U.S. Dep't of Labor, www.osha.gov/laws-regs/oshact/section_26 (last visited Nov. 4, 2022).

If OSHA is not able to show the efficacy of its regulations, then OSHA cannot effectively argue that the invalidation of the safety enforcement portion of the OSH Act will undermine worker safety. And if OSHA no longer reports any metrics to measure what worker safety it has facilitated, it cannot demonstrate that any of its safety regulations have been—or indeed will be—"reasonably necessary or appropriate" to keep workers safe.

## IV.   OSHA Regulations Come At A High Cost.

While OSHA regulations are not without value, neither are they free. OSHA's regulatory costs come in two flavors: (1) the cost to businesses to comply with the regulations and (2) fines. Both are often undervalued or misunderstood in the

regulatory analysis.  For example, the U.S. Chamber of Commerce explained that "proposals like OSHA's occupational noise interpretation 'reflect a troubling pattern of efforts by the agency to impose substantial burdens on American businesses without regard to the cost of those efforts.'" Laura Walter, *House Hearing Criticizes OSHA's Impact on Jobs, Business*, EHS Today (Feb. 16, 2011), https://tinyurl.com/mwb29c8j.  For example, OSHA ignored the concerns of small businesses and promulgated a silica regulation even though it would "cost the economy $7.2 billion a year and 27,000 jobs over ten years."  Andrew Wimer, National Federation of Independent Businesses, *Small Businesses Will Pay a Big Price for New Silica Rule*, NFIB (Mar. 24, 2016), https://tinyurl.com/2uv2ywve.

While OSHA is required to estimate the impact of its regulations on businesses, it does not conduct any *ex ante* analysis to determine the actual impacts, especially on small businesses.  Small businesses make up 99.9 percent of businesses in the US and employ 46.4 percent of the nation's employees.  *2022 Small Business Profile United States*, U.S. Small Business Admin., https://tinyurl.com/yvu6vfpc (last visited Nov. 14, 2022).  For example, Ohio has nearly 1,000,000 small businesses—or 99.6 percent of Ohio businesses—employing 2.2 million workers—constituting 44.7 percent of Ohio employees.  *2022 Small Business Profile Ohio*, U.S. Small Business Admin., https://tinyurl.com/4594zh9t (last visited Nov. 14, 2022).  Over 900,000 of these businesses have fewer than 20 employees.  *Id.*  These

are small companies that can be put out of business by onerous and costly regulations. They do not have the time to read and draft comments on the proposed regulations and cannot afford lobbyists. In 2005, the Office of Advocacy, U.S. Small Business Administration (SBA) explained the high cost of regulations on small business, noting that "occupational safety and health regulations alone accounted for 53 percent of the compliance costs of all workplace regulations in the 2005 study. These were by far the largest element within the workplace regulations category." Nicole Crain & W. Mark Crain, U.S. Small Business Admin., The Impact of Regulatory Costs on Small Firms (2010) (internal citations omitted).

Second, OSHA's fines can be arbitrary in practice. While OSHA has guidelines for penalties, the over 1,800 inspectors have a wide latitude in the amount of the penalty. They vary between $0 and $13,653 per "nonserious" violation. Occupational Safety & Health Admin., U.S. Dep't of Labor, DOL-OSHA-DEP-2021-001, 2021 Annual Adjustments to OSHA Civil Penalties (2021). Each paperwork error, each employee mistake, each employer safety oversight—no matter how slight or inadvertent—can be an infraction. And every day of unabated infractions can trigger the same fine over and over again. The fines can quickly add up and become exorbitant.

### V.    OSHA Safety Regulations Violate The Nondelegation Doctrine

"The nondelegation doctrine ensures democratic accountability by preventing Congress from intentionally delegating its legislative powers to unelected officials." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 142 S. Ct. 661, 669 (2022) (Gorsuch, J., concurring) ("NFIB").  And "[i]f Congress could hand off all its legislative powers to unelected agency officials, it 'would dash the whole scheme' of our Constitution and enable intrusions into the private lives and freedoms of Americans by bare edict rather than only with the consent of their elected representatives." *Id.* (Gorsuch, J., concurring) (quoting *Dep't of Transp.* v. *Assoc. of Am. R.Rs.*, 575 U.S. 43, 61 (2015)).

The challenged portion of the OSH Act authorizing OSHA to promulgate any standards which are "reasonably necessary or appropriate" for workplace safety violates the non-delegation doctrine.   The OSH Act mandates that employers "shall comply with *occupational safety and health standards* promulgated under this [act]."   29 U.S.C. § 654(a)(2) (emphasis added).   "The Secretary may by rule promulgate, modify, or revoke any occupational safety or health standard . . . ." 29 U.S.C. § 655(b).   "The term 'occupational safety and health standard' means a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment."   29 U.S.C. §

652(8). What exactly, though, does "reasonably necessary or appropriate" mean? It is anyone's guess, and OSHA has been guessing for decades now. We all know that "necessary" means something that is essential or absolutely needed. *Necessary*, Merriam-Webster, www.merriam-webster.com/dictionary/necessary (last visited Nov. 4, 2022). Directing OSHA to promulgate necessary regulations provides an intelligible principal. Adding "reasonably" to describe "necessary" makes it unintelligible.

OSHA and the courts have pretended that this language provides an intelligible metric or standard. But affected parties, as well as the courts, cannot agree on its meaning and for good reason: the language is simply too vague and broad to provide any intelligible principle. And Congress added an additional layer of vagueness to OSHA standards by adding "or appropriate" to the definition. 29 U.S.C. § 652(8). What can that possibly mean in this context? There simply is no guiding or intelligible principle as to what Congress would view as an "appropriate" standard to "provide a safe" place of employment. And that is likely why, outside of the OSH Act, Congress has almost never used that modifier in directing agencies how to regulate. There are only three other instances of Congress using "reasonably necessary or appropriate" in a statute. *See* 15 U.S.C. § 1705; 16 U.S.C. § 824c; 42 U.S.C. § 1760.

By allowing OSHA to issue any "appropriate" safety standards, Congress has

made OSHA into a "roving commission to inquire into evils and upon discovery correct them." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 551 (1935) (Cardozo, J., concurring).   OSHA, having been emboldened by years of unbridled expansion into every aspect of the workplace as it deems "appropriate," even tried to mandate that employers enforce OSHA's COVID vaccine requirement. *NFIB*, 142 S. Ct. at 663-664.  In response, the Supreme Court, relying on the major questions doctrine, stayed OSHA's vaccine mandate because the agency lacked the authority to issue the vaccine mandate, and at least one member of the Supreme Court recognized that the non-delegation doctrine is alive.  *Id.* at 668-669 (Gorsuch, J., concurring).   As in *NFIB*, the statutory addition of "or appropriate" "certainly impose[s] no 'specific restrictions' that 'meaningfully constrai[n]' the agency."  *Id.* at 669 (Gorsuch, J., concurring) (quoting *Touby* v. *United States*, 500 U.S. 160, 166-167 (1991)).

To its credit, OSHA seems to recognize the impossible position in which Congress has put it.  So, it tries to justify its regulations not by interpreting the amorphous language, but by impressing upon the definition another limiting mechanism.   In 1991, the D.C. Circuit—anxious to avoid the nondelegation doctrine—imposed upon the words "reasonably necessary and appropriate" the concept of weighing benefits to society vs. costs to society. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Occupational Safety &*

*Health Admin.*, 938 F.2d 1310, 1321 (D.C. Cir. 1991), *supplemented*, No. 89-1559, 1991 WL 223770 (D.C. Cir. 1991).

But there are two problems with using the benefits versus costs to society approach. First, the court was simply impressing the terms of Executive Order No. 12,291 upon the statute. *Id.* at 1321. But Congress did not supply such a directive and it never approved the President's separate order—which did not refer to the OSH Act itself, let alone the OSH Act's specific language of "reasonably necessary or appropriate." Second, the court's opinion suggests that the statute is directed solely to what is necessary and appropriate "to society." *Id.* The statute is not written that way—it is directed to the safety of the workplace—not general societal benefits.

Further, the Supreme Court has not allowed agencies to correct statutory infirmities by adding additional requirements. The Court has "never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001). "The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory." *Id.* at 473.

A statute is unconstitutional if it "has delegated legislative power to the agency." *Id.* at 472. The text of Article I, § 1, of the Constitution "permits no delegation of those powers . . ." *Id.* (citing *Loving v. United States*, 517 U.S. 748,

771, (1996)).  If Congress confers decision making authority upon agencies it must "'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'"  *Id.* (quoting *J.W. Hampton, Jr., & Co.* v. *United States*, 276 U.S. 394, 409 (1928)).

While *UAW* attempted to imprint a cost-benefit analysis upon the statute, Congress provided no "intelligible principle" to interpret "reasonably necessary or appropriate."  Accordingly, the subject provision fails the test.

## VI.    OSHA Safety Regulations Violate The Major Questions Doctrine.

The major questions doctrine works "to protect the Constitution's separation of powers."  *W. Va. v. Env't Prot. Agency*, 142 S. Ct. 2587, 2617 (2022) (Gorsuch, J., concurring).  "'[I]mportant subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'"  *Id.* at 2671 (Gorsuch, J., concurring) (quoting *Wayman* v. *Southard*, 23 U.S. 1, 43 (1825)).

There is little doubt that Congress regarded worker safety as an important subject when passing the OSH Act, but the scope of what is "reasonably necessary or appropriate" is far more than "details" to be "fill[ed] up."  Divesting this extraordinary degree of law-making to an unaccountable agency "dash[es]" the entire scheme of "vesting the lawmaking power in the people's elected representatives . . ."  *Id.* at 2617-618 (Gorsuch, J., concurring).

26

*W. Va.* v. *E.P.A.* points to at least two types of cases triggering the major questions doctrine which apply here. First, "the doctrine applies when an agency claims the power to resolve a matter of great 'political significance' or end an 'earnest and profound debate across the country.'" *Id.* at 2620 (Gorsuch, J., concurring) (citations omitted). Occupational safety has been a hotly debated political topic since the late 1800's. Asher, *supra,* at 280. Prior to the OSH Act, Congress generally responded to occupational safety issues only when there was a major disaster that made the regulations politically advantageous. *See* MacLaury, *supra*. When Congress passed these early occupational safety laws to address the causes of the disasters, it restrained itself from granting broad enforcement authority to the federal agencies. *See id*. Congress cannot just say: "safety is important, and the agency needs to fix the problem." But that is effectively what the OSH Act does. What constitutes a safe practice or a safe environment is vague enough that it requires more congressional guidance than a directive to pass regulations that are "reasonably necessary or appropriate." There is no comfort in the idea that OSHA will restrain itself appropriately, as was illustrated in *NFIB* wherein OSHA jumped the rail in a very obvious fashion and the Court struck down OSHA's worker COVID vaccine mandate. *NFIB*, 142 S. Ct. at 662-664.

"*Second*, the Supreme Court has said that "We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and

political significance." *Id.* at 665 (quoting *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 141 S. Ct. 2485, 2489 (2021)) (internal quotation marks omitted)). As established, *supra*, the OSH Act directive to promulgate "reasonably necessary or appropriate" regulations is anything but clear.   And the powers executed by OSHA pursuant to the OSH Act are indisputably of vast economic and political significance.  "Federal OSHA and the state OSHA plans are responsible for overseeing the safety and health of 160 million workers at more than 8 million workplaces, twice as many as when the OSH Act was passed in 1970."  Seminario, *supra*, at 642. This costs the American economy billions.  The challenged portion of the OSH Act violates both of the foregoing tests.

# CONCLUSION

For the foregoing reasons, and the reasons stated in the Appellant's brief, the decision of the district court should be reversed.

Respectfully submitted,

David C. Tryon
  *Counsel of Record*
Jay R. Carson
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
d.tryon@buckeyeinstitute.org
j.carson@buckeyeinstitute.org

November 15, 2022

**CERTIFICATE OF COMPLIANCE**
Federal Rules of Appellate Procedure
Appendix 6

1. This document complies with the word limit of Fed. R. App. Rule 29(a)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   X     this document contains 6,233 words, or

   ☐     this brief uses a monospaced typeface and contains [state the number of] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type-style requirements of Fed. R. App. R. 32(a)(6) because:

   X     this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14-point type, Times New Roman, or

   ☐     this document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type style].

David C. Tryon       
*Counsel of Record*
Jay R. Carson
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
d.tryon@buckeyeinstitute.org
j.carson@buckeyeinstitute.org

November 15, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2022, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Sixth Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

*/s/ David C. Tryon*