————————————————

No. 22-3772

————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

————————————————

ALLSTATES REFRACTORY CONTRACTORS, LLC,

Plaintiff–Appellant,

v.

MARTIN J. WALSH, et al.,

Defendants–Appellees,

————————————————

On Appeal from the United States District Court
for the Northern District of Ohio at Toledo
Honorable Jack Zouhary, District Judge

————————————————

**BRIEF AMICUS CURIAE OF
PACIFIC LEGAL FOUNDATION IN SUPPORT OF
PLAINTIFF–APPELLANT**

————————————————

OLIVER J. DUNFORD
　Pacific Legal Foundation
　4440 PGA Blvd., Suite 307
　Palm Beach Gardens, FL 33410
　Telephone: (916) 503-9060
　Facsimile: (916) 419-7747

LUKE A. WAKE
　Pacific Legal Foundation
　555 Capitol Mall, Suite 1290
　Sacramento, California 95814
　Telephone: (916) 419-7111
　Facsimile: (916) 419-7747

*Counsel for Amicus Curiae Pacific Legal Foundation*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 22-3772　　　　　　Case Name: Allstates Refractory Contractors v. Walsh

Name of counsel:  Oliver J. Dunford

Pursuant to 6th Cir. R. 26.1, Amicus, Pacific Legal Foundation
*Name of Party*

makes the following disclosure:

1.　　Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.　　Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on _____ November 15, 2022 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Oliver J. Dunford

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page(s)**

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST .........i

TABLE OF CONTENTS ...................................................................ii

TABLE OF AUTHORITIES............................................................. iii

STATEMENT OF INTEREST OF AMICUS CURIAE ............................................1

SUMMARY OF ARGUMENT ...........................................................3

    I.    Congress Must Resolve Fundamental Policy Issues..............5

        A.    The Danger in Allowing Unelected Ministers to Make Law ...................................................................5

        B.    Congress Must Provide a Governing Standard..........10

    II.    Congress Failed to Establish Fundamental Policy .............12

        A.    The OSH Act Provides No Governing Standard ........12

        B.    The General Goal of Protecting Public Safety Tells Us Nothing .......................................................15

CONCLUSION .......................................................................19

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT........................21

CERTIFICATE OF SERVICE ......................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935)................................................................3–4, 16

*Caha v. United States*, 152 U.S. 210 (1894)............................................11

*Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793)................................5–6

*Clean Air Constituency v. Cal. State Air Res. Bd.*,
  11 Cal. 3d 801 (1974) ...........................................................................11

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ..................................................2

*Encino Motor Cars v. Navarro*, 138 S. Ct. 1134 (2018) .........................16

*Fama Constr., LLC v. U.S. Dep't of Labor*,
  No. 19-13277, 2022 WL 2375708 (11th Cir. June 30, 2022) ..............10

*Ghost Golf, Inc. v. Newsom*,
  No. F082357, 2021 WL 3483271 (Cal. Ct. App. Aug. 9, 2021).........2–3

*Henson v. Santander Consumer USA Inc.*,
  137 S. Ct. 1718 (2017)........................................................................16

*I.N.S. v. Chadha*, 462 U.S. 919 (1983) .......................................................6

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
  448 U.S. 607 (1980)...............................................................15–16, 18

*Int'l Union v. OSHA*, 938 F.2d 1310 (D.C. Cir. 1991) ............................10

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928)..............................................................................11

*Mayfield v. Walsh*, 1:22-cv-00792 (W.D. Tex. filed Aug. 9, 2022) ...........2

*Michigan v. EPA*, 576 U.S. 743 (2015).....................................................13

*Mistretta v. United States*, 488 U.S. 361 (1989) ..................................... 15

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ...................... *passim*

*Rapanos v. United States*, 547 U.S. 715 (2006) ....................................... 1

*Rodriguez v. United States*, 480 U.S. 522 (1987) ........................ 12, 16, 18

*Sackett v. EPA*, 566 U.S. 120 (2012) ........................................................ 1

*Securities and Exchange Comm'n v. Cochran*,
  U.S. No. 21-1239 (2022) .......................................................... 2

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ................................. 2, 6

*Skyworks v. Centers for Disease Control and Prevention*,
  524 F. Supp. 3d 745 (N.D. Ohio 2021) .................................... 2, 16–17

*Synar v. United States*, 626 F. Supp. 1374 (D.D.C. 1986) ..................... 15

*Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*,
  5 F.4th 666 (6th Cir. 2021) ................................................... 8

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
  578 U.S. 590 (2016) ............................................................... 1

*Wayman v. Southard*, 23 U.S. (10 Wheat) 1 (1825) ............................... 10

*West Virginia v. Environmental Protection Agency*,
  142 S. Ct. 2587 (2022) ......................................................... 7–8

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) ................... 4

## **Statutes**

29 U.S.C. § 651(b)(3) ............................................................... 15

29 U.S.C. § 652(8) ............................................................... 3, 13

## **Court Rule**

Federal Rule of Appellate Procedure 29(a) ............................................. 1

## **Miscellaneous**

V *Elliot's Debates* 500 (1787)...................................................................5–6

Alexander Hamilton, *The Federalist No. 11* ..........................................7

James Madison, *The Federalist No. 10* ..................................................7

James Madison, *The Federalist No. 47* .............................................6, 10

James Madison, *The Federalist No. 41* ...............................................6–7

James Madison, *The Federalist No. 45* ..................................................19

James Madison, *The Federalist No. 51* ...............................................7–8

Paretti, Jim, Lotito, Michael, and Baskin, Maury, *NLRB Proposes New Joint-Employer Standard That Would Dramatically Expand Scope of "Joint Employment" Under the National Labor Relations Act*, Littler (Sept. 6, 2022) ................................................................................9

Schiff, Damien, *Is OSHA Unconstitutional?,* PLF Blog (Jan. 6, 2016), *available* at https://pacificlegal.org/is-osha-unconstitutional/ ....................3, 13–14

Wake, Luke A., *Taking Non-Delegation Doctrine Seriously*, 15 NYU J.L. & Liberty 751 (2022) ..................................................3, 9

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

Founded in 1973, Pacific Legal Foundation is a nonprofit, tax-exempt, California corporation established for the purpose of litigating matters affecting the public interest. PLF provides a voice in the courts for Americans who believe in limited constitutional government, private property rights, and individual freedom. PLF is the most experienced public-interest legal organization defending the constitutional principle of separation of powers. PLF attorneys have participated as lead counsel in several cases involving the role of the Judicial Branch as an independent check on the Executive and Legislative branches under the Constitution's Separation of Powers. *See, e.g.*, *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590 (2016) (judicial review of agency interpretation of Clean Water Act); *Sackett v. EPA*, 566 U.S. 120 (2012) (same); *Rapanos v. United States*, 547 U.S. 715 (2006) (same). PLF regularly participates in separation of powers cases as amicus curiae.

---

[1] This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the consent of all parties. Undersigned counsel for amicus curiae certifies that this brief was not authored in whole or in part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than amicus and its counsel has contributed money for this brief.

*See, e.g.*, *Collins v. Yellen*, 141 S. Ct. 1761 (2021) (concerning constitutionality of removal restrictions); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) (same); *Securities and Exchange Comm'n v. Cochran*, U.S. No. 21-1239 (2022) (concerning whether district courts have jurisdiction to consider a suit challenging an independent agency's enforcement proceedings).

This case addresses whether the Occupational Safety and Health Act violates the non-delegation doctrine. PLF seeks to participate as amicus curiae because PLF is committed to reinvigorating the non-delegation doctrine by prompting courts to affirm that the intelligible principle test has bite, or by urging the U.S. Supreme Court to revisit its non-delegation precedent. PLF attorneys have litigated non-delegation cases in the past and have written extensively on the non-delegation doctrine. *E.g.*, *Skyworks v. Centers for Disease Control and Prevention*, 524 F. Supp. 3d 745 (N.D. Ohio 2021) (invoking the non-delegation doctrine and the avoidance canon); *Mayfield v. Walsh*, 1:22-cv-00792 (W.D. Tex. filed Aug. 9, 2022) (challenging a delegation of authority for the Secretary of Labor to dictate salary level requirements without direction); *Ghost Golf, Inc. v. Newsom*, No. F082357, 2021 WL 3483271,

at \*1 (Cal. Ct. App. Aug. 9, 2021) (non-delegation challenge to statutes conferring open-ended power to issue public health orders as deemed necessary). *See also* Luke A. Wake, *Taking Non-Delegation Doctrine Seriously*, 15 NYU J.L. & Liberty 751 (2022); Damien Schiff, *Is OSHA Unconstitutional?*, PLF Blog (Jan. 6, 2016), *available* at https://pacificlegal.org/is-osha-unconstitutional/.

## SUMMARY OF ARGUMENT

The Occupational Safety and Health Act delegates expansive authority to the Executive Branch to create rules governing all aspects of industrial activity, with a roving charge for the Secretary of Labor to establish, modify, or withdrawal any safety standard as he deems either **"reasonably necessary *or* appropriate."** 29 U.S.C. § 652(8) (emphasis added). Supreme Court precedent requires invalidating this open-ended delegation. First, in *Panama Refining Co. v. Ryan*, the Supreme Court ruled that the National Recovery Act violated the non-delegation doctrine by authorizing the President to prohibit interstate transport of hot oil as he "may see fit" or "think desirable." 293 U.S. 388, 415, 420–21 (1935). Second, in *A.L.A. Schechter Poultry Corp. v. United States*, the Court held that the NRA violated the non-delegation doctrine by giving the

President the sweeping power to impose "codes of fair competition," as "the President in his discretion deem[ed] necessary to effectuate" the goals of the Act. 295 U.S. 495, 497 (1935). The OSH Act's delegation to the Secretary of Labor is every bit as capacious as the NRA's delegations to the President.

Like the NRA, the OSH Act lacks an intelligible principle to guide the Secretary's delegated authority. OSHA attempts to infer an intelligible principle from the Act's shadowy penumbras. But the agency ultimately falls back on a troubling assertion that the delegation should be upheld simply by reference to Congress's policy declaration. That anemic approach conflicts with the Supreme Court's repeated admonition that Congress must provide an intelligible governing principle in the operative statutory text. *See Panama Refining*, 293 U.S. 388 at 418 (dismissing the NRA's "declaration of policy" as merely "an introduction of the act" that left "legislative policy as to particular subjects to be declared and defined, if at all, by the subsequent sections"); *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472–73 (2001) (looking only to the operative text). In this case the OSH Act violates the non-delegation doctrine, notwithstanding its general aspirational goal of improving

workplace safety, because it gives the Secretary no guidance whatsoever—much less an intelligible principle—to weigh competing public concerns in deciding what shall constitute an intolerable safety risk.

As *Schechter* and *Panama Refining* make clear, Congress must establish the fundamental policy governing the exercise of discretion. Otherwise, the Executive is left free to make legislative judgments that our constitutional system reserves to Congress alone. For this reason, the non-delegation doctrine is vital to our republican form of government. If we take seriously the idea that we are a free people, then the judiciary must vigorously enforce this doctrine. Conversely, if we apply OSHA's toothless version of the intelligible principle test, we upset the social contract on which our republic stands.

## I.    Congress Must Resolve Fundamental Policy Issues

### A.    The Danger in Allowing Unelected Ministers to Make Law

Our republican government is based on the simple premise that the American people are free and sovereign. *See* V *Elliot's Debates* 500 (1787) (James Madison) ("The people, were, in fact, the fountain of all power."); *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 471–72 (1793) ("[T]he

sovereignty of the nation is in the people of the nation…."). With this precept in mind, the Framers sought to safeguard individual liberty in two ways. *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2202 (2020). First, federalism limits the powers bestowed to the federal government. *Id*. Second, the separation of powers guards against despotism by dividing the "powers of the new Federal Government into three defined categories, Legislative, Executive and Judicial." *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983). Thus, the judiciary is charged only with resolving cases and controversies; the Executive has authority only to execute the law; and Congress alone *makes law*. *See* James Madison, *The Federalist No. 47* (explaining the Constitution's structural protections).

As between these three powers, the Framers were most concerned about the power to make law because of its dangerous propensity to abrogate individual liberty.[2] *See* James Madison, *The Federalist No. 41*

---

[2] "[I]t would not only be useless, but dangerous, to enumerate a number of [individual] rights which are not intended to be given up…. Let anyone make what collection or enumeration of rights he pleases, I will immediately mention twenty or thirty more rights not contained in it." Elliot, *Debates*, 167 (James Iredell, North Carolina ratifying convention, Tuesday, July 19, 1788).

("The legislative department is everywhere extending the sphere of its activity, and drawing all power into its impetuous vortex."). Drawing from the lessons of history, they understood that the best way to safeguard liberty was to assign the lawmaking power to a legislative body that would be directly accountable to the People. Thus, "by vesting the lawmaking power in the people's elected representatives, the Constitution sought to ensure 'not only that all power [w]ould be derived from the people, but also 'that those [e]ntrusted with it should be kept in dependence on the people.'" *West Virginia v. Environmental Protection Agency*, 142 S. Ct. 2587, 2617 (2022) (Gorsuch, J., concurring) (quoting Alexander Hamilton, *The Federalist No. 11*).

This system gave the Framers comfort because they knew it would be relatively difficult for any faction to force its will upon the Nation. As Madison explained, it is "less probable" that a majority will act "to invade the rights of other citizens" in a republican government representing diverse and geographically dispersed interests. *The Federalist No. 10*. Indeed, the genius of our Constitution is that it pits faction against faction. *Id*. That is true even within the institution of Congress. *See* Madison, *The Federalist No. 51* (arguing that the risks presented in

7

vesting lawmaking power in Congress are mitigated by the fact that the Constitution "divide[s] the legislature into different branches [*i.e.*, the Senate and the House]… [subject to] different modes of election…"). As such, our constitutional system ensures that enacted law reflects a broad social consensus from across the entire political community. And for this reason, it remains true that Congress is "more likely to enact just laws than a regime administered by a ruling class of largely unaccountable 'ministers.'" *West Virginia*, 142 S. Ct. at 2617 (Gorsuch, J., concurring).

But when the Executive Branch usurps the lawmaking power, it upends our social contract.[3] If agencies can bypass Congress to impose laws affecting our lives, then we are no longer a free people. At that point "law" loses its moral force; it becomes "nothing more than" a crude exercise of raw political power. *West Virginia*, 142 S. Ct. at 2618 (Gorsuch, J., concurring). And unrestrained by the need to seek broad consensus in a representative assembly, the Executive can all too easily

---

[3] *See Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring) ("The constitutional design is frustrated if 'Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals.'") (quoting *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting)).

force its will upon the American people based on nothing more than the shifting political priorities of different administrations.[4] *See* Wake, *supra*, at 767 (observing that "even the most beneficent individual will act with an ever-changing and arbitrary hand when unconstrained by the deliberative process of brokering consensus within the legislative assemblage").

Still worse, agencies like the Department of Labor and the Occupational Safety and Health Commission can abrogate our liberties through rulemaking while *also* wielding formidable powers to execute law and to adjudicate cases. Indeed, OSHA wields breathtaking power not only to issue rules that may bring entire industries to the "verge of economic ruin," *Int'l Union v. OSHA*, 938 F.2d 1310, 1317 (D.C. Cir. 1991), but also, the coercive threat of enforcement actions that are

---

[4] In 21st Century America, federal agencies often exercise their powers with oscillating legal prescriptions from one administration to the next. For just one example, the National Labor Relations Board (an unaccountable independent agency) "has gone back and forth dramatically [on issues of great significance] as the composition and political control of the Board has shifted from Democratic to Republican and now once more Democratic." Jim Paretti, Michael Lotito, and Maury Baskin, *NLRB Proposes New Joint-Employer Standard That Would Dramatically Expand Scope of "Joint Employment" Under the National Labor Relations Act*, Littler (Sept. 6, 2022).

adjudicated in an agency-run "court."[5] This consolidation of powers is "the very definition of tyranny." *The Federalist No. 47* (arguing that individuals are subject to "arbitrary" and "oppressive" control whenever legislative, executive, and judicial powers are consolidated).

## B.   Congress Must Provide a Governing Standard

Mindful of first principles, the Supreme Court has repeatedly affirmed that Congress may not give away its lawmaking powers to the Executive Branch. As Chief Justice Marshall put it, Congress must decide the "important subjects." *See Wayman v. Southard*, 23 U.S. (10 Wheat) 1, 43 (1825). Accordingly, the non-delegation doctrine requires that Congress must resolve fundamental policy issues by providing a governing standard that will enable courts to judge whether the

---

[5] As Appellants note, OSHA may fine employers nearly $15,000 even for good faith mistakes, and nearly $150,000 for repeated offenses. *See* Appellant's Opening Br. at 10. But employers who contest a citation must run the administrative gauntlet. They face immense pressure to pay and move on because otherwise they must expend tremendous resources, time, and energy fighting to get the agency to reverse its decision, appealing to the agency itself, and then finally, after an adverse decision from an Administrative Law Judge, going to a federal court that will defer to the ALJ's findings. *E.g.*, *Fama Constr., LLC v. U.S. Dep't of Labor*, No. 19-13277, 2022 WL 2375708, at *1 (11th Cir. June 30, 2022) (affirming that the substantial evidence standard applies in review of OSHA ALJ proceedings).

Executive has faithfully executed the law. *E.g.*, *Caha v. United States*, 152 U.S. 210 (1894) (stressing that Congress had decided the important matter).[6] The Supreme Court has distilled this precept by requiring that the statutory text provide a governing "intelligible principle" to properly direct the Executive Branch. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

The Court's opinion in *Panama Refining* is especially instructive. That case demonstrates that the intelligible principle test has teeth, even where Congress has delegated rulemaking authority on more narrow regulatory subjects. Specifically, the Court found a provision of the National Recovery Act unconstitutional because it conferred unfettered discretion for the President to decide whether and under what conditions the transport of hot oil should be prohibited. 293 U.S. at 430. Notwithstanding the general goal of improving American economic conditions, the NRA had a non-delegation problem because Congress

---

[6] As Chief Justice Hughes put it, regulations "are valid only as subordinate rules … within [a] framework of the policy which the Legislature has sufficiently defined." *Panama Refining*, 293 U.S. at 429. Put differently, Congress must provide "an adequate yardstick for the guidance of the administrative body empowered to execute the law[.]" *Clean Air Constituency v. Cal. State Air Res. Bd.*, 11 Cal. 3d 801, 817 (1974).

failed to make any policy decision governing this specific issue. *Id.* at 416–18. The President was simply free to weigh competing policy considerations as he deemed "fit." *Id.* at 415. *See Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (observing that weighing "competing values" is a legislative function).

## II. Congress Failed to Establish Fundamental Policy

### A. The OSH Act Provides No Governing Standard

Whether or to what extent American industry should be subject to federal safety standards is "obviously [a question] of legislative policy" that Congress alone can decide. *Panama Refining*, 293 U.S. at 414. As such, if the OSH Act is to survive a non-delegation challenge, the statute itself must demonstrate that "Congress has declared a policy with respect to that subject…." *Id.* at 415. Yet there is nothing.

Just as in *Panama Refining*, we must look first to the specific provision delegating the power in question. In that case Section 9(c) of the NRA said merely that "[t]he President [wa]s authorized to prohibit the transportation" of hot oil. Nothing spoke to "whether or in what circumstances or under what conditions the President [was] to prohibit the transportation of [excess oil]…." *Id.* at 415. There was "no criterion to

govern the President's course[,]" not even a requirement that the President make "any findings … as a condition of his action." *Id*. Thus, the President maintained total discretion to prohibit transportation of hot oil if he deemed such a prohibition "desirable." *Id*. at 420–21.

The same is true here. Nothing within the OSH Act's operative text speaks to whether or under what conditions the Secretary of Labor should impose, modify, or withdraw safety standards. There is no requirement that the Secretary make any specific findings to justify new or modified safety standards. The text provides only that the Secretary may issue safety standards as he deems "reasonably necessary *or appropriate*…." 29 U.S.C. § 652(8) (emphasis added). And because the text is phrased in the disjunctive, the Secretary remains free to ignore any consideration of the economic impacts when imposing safety standards. *Cf. Michigan v. EPA*, 576 U.S. 743, 752 (2015) (concluding that a directive to make "appropriate" regulatory changes entails a requirement to consider the likely economic impact).

Section 652(8) thus allows the Secretary to decide what standards should govern industries based on nothing more than his personal sense of propriety. *See* Schiff, *supra* (arguing that the OSH Act cannot survive

constitutionally scrutiny because the Secretary is free to decide for himself whether to consider economic impacts).[7] Secretary Walsh has every bit as much leeway to weigh competing policy considerations in deciding whether to impose or modify safety standards as did President Roosevelt when deciding whether, or under what conditions, to prohibit the transport of hot oil. *See Panama Refining*, 293 U.S. 388 at 415 (observing that the operative text conferred "unlimited authority to determine the policy"); *id.* at 437 (Cardoza, J., dissenting) (acknowledging that the text of the NRA appeared to confer a "privilege of choice between one standard and another … according to an estimate of values that is individual and personal").

*Panama Refining* signals that a reviewing court must next search for contextual clues in the structure and text of the rest of the statute that may speak to a fundamental policy and a governing standard to control the exercise of discretion. *Id.* at 416 (searching in vain for some constraint to limit the President's discretion). But nothing in the text or structure of the OSH Act "impl[ies] a limitation of the broad grant of authority" delegated to the Secretary to establish safety standards. *Id.*

---

[7] https://pacificlegal.org/is-osha-unconstitutional/.

Congress failed to establish fundamental policy because it neglected to provide any direction as to what should be deemed an intolerable safety threat. The statute does not even suggest factors that might play into the Secretary's judgment. *Cf. Mistretta v. United States*, 488 U.S. 361 (1989) (suggesting a list of relevant factors that may guide the exercise of discretion). And what is more, since every activity presents some degree of risk, OSHA's delegation of authority to decide what shall be deemed tolerable or intolerable represents an especially sweeping delegation that requires a *clear* governing standard. *See Synar v. United States*, 626 F. Supp. 1374, 1386 (D.D.C. 1986) ("When the scope [of delegated power] increases to immense proportions … the standards must be correspondingly more precise.").

### B.   The General Goal of Protecting Public Safety Tells Us Nothing

The Government argues that we may infer an intelligible principle from the statute's aspirational goal of making the American workplace safer. *See* 29 U.S.C. § 651(b)(3) (stating that the purpose of the Act is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions"). But Congress's putative goal cannot save the OSH Act. *See Indus. Union Dep't, AFL-CIO v. Am.*

*Petroleum Inst.*, 448 U.S. 607, 682–84 (1980) (Rehnquist, J., concurring) (observing that the Supreme Court has never relied on a general purpose alone in upholding statutory delegations). *E.g.*, *Schechter*, 295 U.S. at 538–39 (finding no intelligible principle in the directive to adopt codes of fair competition that "will tend to effectuate the policy" of the National Recovery Act). As *Panama Refining* demonstrates, it is improper to assume an intelligible governing principle from the supposed remedial goals of a statute without a firm textual grounding.[8] *Id.*, 293 U.S. 388 at 417–18 (looking to the broad goals of the NRA and finding that there was no "policy" speaking to "the circumstances or conditions in which the transportation of [excess oil]… should be prohibited.…"); *id.* at 418 (affirming that it is "no answer to insist" that an open-ended delegation is necessary to avoid "deleterious consequences").

In any event, an open charge to protect public health and safety amounts to a delegation of a roving "police power." *Cf. Skyworks, Ltd.*,

---

[8] Such an assumption is also unwarranted because statutes represent legislative compromises. "[N]o legislation pursues its purposes at all costs." *Rodriguez*, 480 U.S. at 525–26. *See also Encino Motor Cars v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (repudiating the remedial canon of construction); *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) ("It is quite mistaken to assume that whatever might appear to further the statute's primary objective must be the law.") (cleaned up).

524 F. Supp. 3d at 758 (raising concern over an agency's excessively broad interpretation of its statutory authority). Just as a state legislature may enact legislation to protect public health and safety in innumerable ways, the Secretary has been vested with a free-wielding power to decide for himself what rules should govern the American workplace. Indeed, a roving power to protect workers is not a limitation on the Secretary's discretion at all. And the remedial goal of the OSH Act tells us nothing as to what practices or physical conditions should be regarded as presenting intolerable workplace safety risks.

There is a degree of risk in every workplace activity. A barista might sprain an ankle walking into work. A librarian might hurt his foot dropping a book. An accountant might throw out her back carrying a box of files. A bank teller might exacerbate a knee injury by standing too long. But does any of this justify rules prohibiting workers from carrying out tasks that may be vital across industry lines, or that would require cumbersome safety precautions? And how does the Secretary decide what risks are tolerable or intolerable?

The answer is that the Secretary must exercise *legislative judgment* in deciding whether any contemplated protective measure is warranted.

*See Indus. Union*, 448 U.S. at 655 n.62 (agreeing that "the determination of the acceptable level of risk … must necessarily be based on considerations of policy"). That is so because he must inevitably weigh competing policy concerns. *See Rodriguez*, 480 U.S. at 525–26 (explaining that the *very essence of legislative choice*" is in "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective...") (emphasis added). Indeed, without further direction from Congress, the Secretary must decide for himself whether additional safety measures are worth the anticipated social or economic costs to business and the American way of life. *Indus. Union*, 448 U.S. at 687 (Rehnquist, J., concurring) (observing that, faced with a "difficult[] choice between balancing statistical lives and industrial resources[,]" Congress opted to punt to the Executive Branch). For example, the Secretary might (or might not) impose such severe restrictions as to destroy the window-cleaning or chimney-sweeping industries if he should decide that the risks inherent in scaling roofs or buildings are intolerable under OSHA's existing regulations.

We are left only with the open-ended charge for the Secretary to make a "reasonable[]" judgment as to what he may think either

"necessary" *or* "appropriate." But that is not an intelligible principle. If it were, the Supreme Court would have upheld the delegation of authority for President Roosevelt to decide whether to prohibit transport of hot oil on the assumption that the President could be expected to act reasonably. But the Supreme Court rebuffed that argument. *Panama Refining*, 293 U.S. at 420 (rejecting the argument that a delegation may be upheld on the assumption that a federal officer will act in furtherance of the "public good"). Likewise, an unfettered delegation of rulemaking authority cannot be saved on the mere assumption that the Secretary of Labor will act prudently. *See* Madison, *The Federalist No. 45* (stressing that separation of powers is essential to guard against the risk of arbitrary or oppressive rule).

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment below.

DATED:  November 15, 2022.

Respectfully submitted,

OLIVER J. DUNFORD
LUKE A. WAKE

By _____/s/ Oliver J. Dunford_____
　　　　　　OLIVER J. DUNFORD
*Counsel for Amicus Curiae Pacific Legal Foundation*

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1.    This document complies with [the word limit of Fed. R. App. P. 29(a)(5)because, excluding the  parts of the document exempted by Fed. R. App. P. 32(f):

    ✓    this document contains 3,909 words, or

    ___    this brief uses a monospaced typeface and contains _____ lines of text.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    ✓    this document has been prepared in a proportionally spaced typeface using MicrosoftWord 2013 in 14-point Century Schoolbook, or

    ___    this document has been prepared in a monospaced typeface using _____ with _____

DATED:  November 15, 2022.


        _____ /s/ Oliver J. Dunford _____
            OLIVER J. DUNFORD
            *Counsel for Amicus Curiae*
            *Pacific Legal Foundation*

20

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Oliver J. Dunford
OLIVER J. DUNFORD

*Counsel for Amicus Curiae*
*Pacific Legal Foundation*