No. 22-3772

## IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

ALLSTATES REFRACTORY CONTRACTORS, LLC,
*Plaintiff-Appellant,*

v.

MARTIN WALSH, *et al.,*
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Ohio, No. 3:21-cv-1864
Hon. Jack Zouhary, United States District Judge

## BRIEF OF AMICUS CURIAE PUBLIC CITIZEN IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Nicolas A. Sansone
Allison M. Zieve
Scott L. Nelson
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Amicus Curiae*

January 30, 2023

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 22-3772                    Case Name: Allstates Refractory Contrs. v. Walsh

Name of counsel: Nicolas Sansone

Pursuant to 6th Cir. R. 26.1, Public Citizen
                              *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

CERTIFICATE OF SERVICE

I certify that on _____ January 30, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Nicolas Sansone

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS ................................. i

TABLE OF AUTHORITIES.................................................................... iii

INTEREST OF AMICUS CURIAE......................................................... 1

SUMMARY OF ARGUMENT ................................................................ 2

ARGUMENT ........................................................................................... 4

I.    A statute that provides an intelligible principle to guide the executive in implementing congressional policy does not delegate legislative power................................................................................ 4

II.   The OSH Act supplies intelligible principles that sufficiently guide the executive in promulgating permanent safety regulations................................................................................... 16

III.  Accepting Allstates' argument would contravene an entire body of settled law. ................................................................................ 29

CONCLUSION ..................................................................................... 32

CERTIFICATE OF COMPLIANCE...................................................... 33

CERTIFICATE OF SERVICE.............................................................. 34

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935)................................................................24

*Alabama Power Co. v. OSHA*,
    89 F.3d 740 (11th Cir. 1996)..............................................20

*American Federation of Labor & Congress of Industrial*
    *Organizations v. Brennan*,
    530 F.2d 109 (3d Cir. 1975) ..............................................22

*American Power & Light Co. v. SEC*,
    329 U.S. 90 (1946)....................................................... passim

*American Textile Manufacturers Institute, Inc. v. Donovan*,
    452 U.S. 490 (1981)....................................................21, 27

*Blocksom & Co. v. Marshall*,
    582 F.2d 1122 (7th Cir. 1978)............................................19

*Donovan v. Castle & Cooke Foods*,
    692 F.2d 641 (9th Cir. 1982)..............................................21

*Federal Power Comm'n v. Hope Natural Gas Co.*,
    320 U.S. 591 (1944)............................................................31

*Forging Industry Ass'n v. Secretary of Labor*,
    748 F.2d 210 (4th Cir. 1984)..............................................23

*Gundy v. United States*,
    139 S. Ct. 2116 (2019)................................................. passim

*In re MCP No. 165*,
    21 F.4th 357 (6th Cir. 2021) ..........................................9, 22

*Industrial Union Department, AFL-CIO v. American*
    *Petroleum Institute,*
    448 U.S. 607 (1980) ..................................................................... passim

*International Union, United Automobile, Aerospace, & Agricultural*
    *Implement Workers of America, UAW v. OSHA,*
    938 F.2d 1310 (D.C. Cir. 1991) ................................................... 21, 24

*J.W. Hampton, Jr., & Co. v. United States,*
    276 U.S. 394 (1928) ..................................................................... 5, 6, 32

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018) ............................................................................ 28

*Martin v. Occupational Safety & Health Review Comm'n,*
    499 U.S. 144 (1991) .............................................................................. 16

*Mistretta v. United States,*
    488 U.S. 361 (1989) ..................................................................... passim

*National Broadcasting Co. v. United States,*
    319 U.S. 190 (1943) ....................................................................... 17, 30

*National Cable Television Ass'n v. United States,*
    415 U.S. 336 (1974) .............................................................................. 28

*National Federation of Independent Business v. OSHA,*
    142 S. Ct. 661 (2022) ................................................................. 9, 12, 23

*National Grain & Feed Ass'n v. OSHA,*
    903 F.2d 308 (5th Cir. 1990) ............................................................... 21

*National Maritime Safety Ass'n v. OSHA,*
    649 F.3d 743 (D.C. Cir. 2011) ............................................................ 22

*New York Central Securities Corp. v. United States,*
    287 U.S. 12 (1932) ............................................................................... 30

*Panama Refining Co. v. Ryan*,
   293 U.S. 388 (1935)..................................................................9, 24

*Sveen v. Melin*,
   138 S. Ct. 1815 (2018)...................................................................20

*Tagg Bros. & Moorhead v. United States*,
   280 U.S. 420 (1930)........................................................................32

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016)........................................................29

*Thompson v. Marietta Education Ass'n*,
   972 F.3d 809 (6th Cir. 2020).........................................................8

*Trinity Marine Nashville, Inc. v. Occupational Safety & Health Review Comm'n*,
   275 F.3d 423 (5th Cir. 2001)........................................................23

*United Parcel Service of Ohio, Inc. v. Occupational Safety & Health Review Comm'n*,
   570 F.2d 806 (8th Cir. 1978).........................................................21

*United States v. Edge Broadcasting Co.*,
   509 U.S. 418 (1993)........................................................................20

*United States v. Johnson*,
   921 F.3d 991 (11th Cir. 2019)........................................................8

*United States v. Rock Royal Co-operative*,
   307 U.S. 533 (1939)........................................................................14

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022)...................................................................12

*Whitman v. American Trucking Ass'ns*,
   531 U.S. 457 (2001)................................................................. passim

*Wilkerson v. Rahrer*,
 140 U.S. 545 (1891) .................................................................5

*Yakus v. United States*,
 321 U.S. 414 (1944) ........................................................ passim

## Statutes

29 U.S.C. § 651 ......................................................................18

29 U.S.C. § 652 ............................................................... passim

29 U.S.C. § 654 ......................................................................16

29 U.S.C. § 655 ............................................................... passim

42 U.S.C. § 7409 ...................................................................30

## Regulations

29 C.F.R. § 1910.140 ............................................................13

29 C.F.R. § 1910.147 ............................................................13

29 C.F.R. § 1910.23 ..............................................................13

## Constitutional Provisions

U.S. Const. art. I, § 1 .............................................................4

U.S. Const. art. II, § 3 .........................................................4, 6

## Other Authorities

Cass R. Sunstein, *Is OSHA Unconstitutional?*,
 94 Va. L. Rev. 1407 (2008) ...............................................27

## INTEREST OF AMICUS CURIAE[1]

Public Citizen, a nonprofit consumer advocacy organization with members in all fifty states, appears before Congress, administrative agencies, and courts to advocate for the enactment and enforcement of laws protecting consumers, workers, and the public. To advance its interest in promoting workplace safety, Public Citizen has frequently petitioned the Occupational Safety and Health Administration (OSHA) to adopt or strengthen safety and health regulations under the Occupational Safety and Health Act of 1970 (OSH Act). *See*, *e.g.*, Petition to OSHA for a Heat Standard (July 17, 2018), https://tinyurl.com/2zttmuxz; Petition to Reduce Medical Resident Work Hours (Sept. 2, 2010), https://www.citizen.org/wp-content/uploads/migration/1917.pdf. On a number of occasions, Public Citizen has also successfully sued OSHA to compel it to carry out its statutory duty to issue standards when it finds that workplace conditions pose a significant risk to worker health or safety. *See*, *e.g.*, *Public Citizen Health Research Grp. v. Chao*, 314 F.3d

---

[1] This brief was not authored in whole or part by counsel for a party, and no one other than amicus curiae or its counsel made a monetary contribution to the preparation or submission of the brief. Counsel for all parties have consented to its filing.

143 (3d Cir. 2002). Public Citizen submits this brief because appellant's position, if accepted by the Court, would threaten worker safety and frustrate Public Citizen's interest in advocating for OSHA's exercise of its statutory responsibilities.

## SUMMARY OF ARGUMENT

**I.** For nearly a century, the Supreme Court has consistently held that Congress may confer discretion on executive-branch agencies to implement broadly drawn legislative policies, provided that Congress supplies an intelligible principle to guide executive action. The intelligible principle test evinces respect for Congress's judgment about how best to pursue its statutory aims, while enabling the judiciary to ensure that executive action stays within its proper realm.

Plaintiff-Appellant Allstates Refractory Contractors, LLC (Allstates) nominally accepts that this precedent binds this Court in evaluating Allstates' nondelegation challenge to OSHA's authority to promulgate safety standards under 29 U.S.C. § 655(b). Nonetheless, Allstates asks this Court to limit prior nondelegation opinions to their facts, rather than faithfully applying their holdings. That is not how precedent works. Moreover, even if this Court could abandon the

intelligible principle test, Allstates offers no good reason why it should do so. Each of Allstates' proposed alternative tests contravenes precedent, is unworkable, or is inapposite here.

**II.** Section 655(b) supplies intelligible principles that guide executive action. The provision directs OSHA to promulgate regulations that further workplace safety, with certain existing industry standards serving as a regulatory baseline. It requires that those regulations be feasible and reasonable, with costs roughly proportionate to their benefits, and it permits OSHA to issue new safety standards only upon finding a significant workplace-safety risk. These limitations adequately constrain executive discretion, and courts have routinely enforced them.

Allstates' contention that Congress must specify an exact regulatory cost-benefit calculus lacks precedential support and demands an impossible degree of statutory precision. Further, constitutional avoidance requires this Court to reject Allstates' facial challenge unless *no* permissible reading of the statute offers sufficient legislative guidance. A permissible reading that does so is easily available, as evidenced by the statutory limits courts have readily discerned.

**III.** Allstates' position is contrary to numerous Supreme Court decisions approving comparably broad statutory mandates, including mandates that direct the executive to set air-quality standards that will "protect the public health," to regulate certain commercial activities in the "public interest," and to set "fair and equitable" price caps. Allstates draws laborious distinctions between those cases and this one, but it cannot obscure that an entire body of binding precedents confirms the OSH Act's constitutionality.

## ARGUMENT

### I. A statute that provides an intelligible principle to guide the executive in implementing congressional policy does not delegate legislative power.

Article I of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in … Congress." U.S. Const. art. I, § 1. Article II then confers authority on the executive to "take Care that [Congress's] Laws be faithfully executed." U.S. Const. art. II, § 3. The Supreme Court has long and consistently recognized that these complementary provisions allow Congress to "use officers of the executive branch within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public

regulations interpreting a statute and directing the details of its execution." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928). Indeed, the Court has repeatedly observed that such arrangements are not only permissible but essential. *See*, *e.g.*, *Mistretta v. United States*, 488 U.S. 361, 372 (1989) ("[I]n our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives."); *J.W. Hampton*, 276 U.S. at 407–08 (explaining that Congress may direct the executive to set "just and reasonable" interstate-carrier rates because "[t]he rates to be fixed are myriad" and "[i]f Congress were to be required to fix every rate, it would be impossible to exercise the power at all").

Congress cannot, of course, "give[] up its legislative power and transfer[] it to the President" under the guise of a grant of discretion. *J.W. Hampton*, 276 U.S. at 406. Congress cannot delegate its Article I authority "to make a law" at all. *Wilkerson v. Rahrer*, 140 U.S. 545, 562 (1891). But Congress does not abdicate its legislative role by writing "broad general directives," *Mistretta*, 488 U.S. at 372, that allow substantial leeway for the executive to "exercise judgment on matters of

5

policy" when it comes to implementation, *id.* at 378. As the Supreme Court has held, Congress fulfills its legislative function if it "clearly delineates the general policy, the public agency which is to apply it, and the boundaries" of the agency's "authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). The touchstone inquiry that has governed nondelegation challenges for nearly a century, then, is whether Congress has "la[id] down by legislative act an intelligible principle to which the person or body authorized" to execute the legislation "is directed to conform." *J.W. Hampton*, 276 U.S. at 409. "So long as Congress" has done so, it has not delegated legislative power, *Mistretta*, 488 U.S. at 372, and an executive-branch agency that issues regulations or orders carrying out Congress's statute exercises proper Article II *executive* power by "tak[ing] Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

The intelligible principle test evinces respect for the legislative, executive, and judicial branches' respective roles. By allowing Congress wide latitude to repose authority in executive bodies capable of responding flexibly to novel or unforeseen situations, the test guards against undue judicial interference with Congress's choice of how best to accomplish its legislative aims. *See Whitman v. Am. Trucking Ass'ns*, 531

U.S. 457, 474–75 (2001) ("[W]e have 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting))). Meanwhile, the requirement that Congress must supply an intelligible principle to guide executive discretion enables judicial assessment of the executive's "application of [Congress's] policy in the light of [Congress's] legislative declarations" and ensures that courts can protect regulated parties by "safeguard[ing] against statutory or constitutional excesses." *Am. Power & Light*, 329 U.S. at 105–06; *see Yakus v. United States*, 321 U.S. 414, 426 (1944) (explaining that a statute creates a nondelegation problem only if "there is an absence of standards … so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed").

Allstates acknowledges that "this Court cannot revisit the validity of the intelligible principle test." Allstates Br. 28. It nonetheless urges this Court to abandon the test by refusing to apply it to uphold any substantial delegation that the Supreme Court has not already specifically approved. *See id.* at 23–31. But while Allstates cites nonprecedential writings questioning the Supreme Court's century-

strong body of binding nondelegation decisions, *see id.* at 27–28, this Court's analysis must be "controlled by a fair reading" of those decisions, not a "cramped reading" that "would functionally overrule the[m]," *Thompson v. Marietta Educ. Ass'n*, 972 F.3d 809, 814–15 (6th Cir. 2020).

Allstates offers no persuasive reason why this Court should eschew application of the intelligible principle test—even if the Court could refuse to follow Supreme Court precedent. Citing virtually no Founding-era evidence, Allstates chiefly contends that the test somehow departs from "the original understanding of Article I." Allstates Br. 31. *But see United States v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019) (en banc) (rejecting an invitation to narrowly apply Supreme Court precedent that was supposedly "inconsistent with the [Constitution's] original meaning" and recognizing a judicial duty to "apply [that] precedent neither narrowly nor liberally—only faithfully"). None of the various nondelegation theories that Allstates proposes as more faithful to its view of original constitutional meaning, though, offers this Court a viable alternative to the traditional intelligible principle test.

First, Allstates briefly claims that an unconstitutional delegation occurs whenever implementation of a legislative scheme requires the

executive to create rules governing private parties' conduct. *See* Allstates Br. 18–19. Precedent forecloses this theory. The Supreme Court has "over and over" upheld federal statutes that direct executive bodies to regulate private conduct in pursuit of "even very broad" congressional aims. *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality opinion); *see*, *e.g.*, *Am. Power & Light*, 329 U.S. at 104–06 (upholding statute enabling the executive to order dissolution of "unduly or unnecessarily complicate[d]" corporate structures); *Yakus*, 321 U.S. at 426–27 (upholding statute directing the executive to set "fair and equitable" commodity-price caps enforceable by criminal sanction); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 428–29 (1935) (observing that the executive may promulgate "binding rules of conduct" if they fall "within the framework of the policy which the Legislature has sufficiently defined"). This Court, too, has acknowledged as much. *See In re MCP No. 165*, 21 F.4th 357, 386–87 (6th Cir. 2021) (holding that a nondelegation challenge to an OSHA standard that required employers to adopt certain COVID-19 mitigation measures had "little possibility of success" under Supreme Court precedent), *rev'd on other grounds sub nom. NFIB v. OSHA*, 142 S. Ct. 661 (2022) (per curiam).

9

Even if precedent allowed, to define every standard that governs private conduct as a manifestation of nondelegable legislative power would be unworkable. As Justice Scalia recognized, "a certain degree of discretion, and thus of lawmaking, *inheres* in most executive or judicial action, and it is up to Congress, by the relative specificity or generality of its statutory commands, to determine—up to a point—how small or how large that degree shall be." *Mistretta*, 488 U.S. at 417 (Scalia, J., dissenting). Given that virtually any executive rule directs regulated parties' conduct to some extent, holding all such rules unconstitutional would eliminate executive discretion in implementing congressional policy. But the Supreme Court has described such discretion as essential for Congress to "do its job," *id.* at 372 (majority opinion), and it is squarely within the executive branch's Article II powers. *See supra* at 4–6.

Second, retreating from the claim that executive regulation of private conduct is always legislative, Allstates proposes a distinction between regulations that "fill in the *details*" of a narrow statutory scheme and ones that arise under a broader statutory grant of discretion. Allstates Br. 19. This theory, no less than Allstates' first, contravenes Supreme Court precedent. *See, e.g., Mistretta*, 488 U.S. at 372 (approving

10

Congress's use of "broad general directives"); *Yakus*, 321 U.S. at 425 (explaining that Congress may allow executive officers "ample latitude" in "ascertain[ing] the conditions" that support regulatory action). Allstates, moreover, suggests no principled way to decide how broad is too broad, and it offers no textual or historical basis for the amorphous distinction it tries to draw. Allstates also fails to explain why Congress may permissibly entrust the executive with discretion to make a given set of policy decisions pursuant to multiple narrow directives but may not entrust the executive to make the same set of decisions under a single broader, intelligible directive. The intelligible principle test, in contrast, has none of these conceptual infirmities.

Finally, citing the Supreme Court's recent elaboration of the "major questions doctrine," Allstates urges this Court to adopt a novel nondelegation theory that would forbid Congress from entrusting an executive agency with resolution of sufficiently "important" policy questions. Allstates Br. 20–22. Although one of its amici suggests otherwise, *see* Buckeye Br. 26–28, Allstates correctly recognizes that the "major questions doctrine" itself is a "statutory-construction rule" that does not control the constitutional challenge presented here, Allstates Br.

20. The major questions doctrine directs courts not to construe a statute to grant an executive agency novel, "transformative" powers absent "clear congressional authorization." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609–10 (2022) (quoting *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). The OSH Act, though, unambiguously "empowers the Secretary [of Labor] to set workplace safety standards," and specific, "targeted regulations" to that effect "are plainly permissible" under the statute. *NFIB*, 142 S. Ct. at 665–66 (emphasis omitted). OSHA's exercise of its express statutory authority to issue "occupational safety … standard[s]," 29 U.S.C. § 655(b), that are "reasonably necessary or appropriate to provide safe or healthful employment and places of employment," *id.* § 652(8), cannot plausibly be deemed an exercise of "highly consequential power beyond what Congress could reasonably be understood to have granted," *West Va.*, 142 S. Ct. at 2609. The existing major questions doctrine as set out by the Supreme Court thus has no role to play here.

Nonetheless, Allstates invokes the doctrine as a jumping-off point for a proposed "nondelegation principle for major questions." Allstates Br. 21. Although Congress may delegate broad discretion to implement legislative policy, Allstates maintains that Congress may not delegate

"important" decisions. *Id.* at 20. And Allstates further contends in conclusory fashion that "[t]he power to write 'appropriate' workplace-safety rules governing virtually every business in America easily qualifies as a delegation of 'authority to decide major policy questions.'" *Id.* at 21 (quoting *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (statement of Kavanaugh, J., respecting the denial of certiorari)). The only "major policy question" embodied in section 655(b), however, is whether workers should be protected by occupational safety standards. In enacting the OSH Act, Congress plainly answered yes to that important question. OSHA, in turn, is charged with implementing Congress's important decision through promulgation of individual standards, all of which are important to workplace safety but none of which alone could reasonably be characterized as representing an "exercise [of] regulatory authority over a major policy question of great economic and political importance." *Id.* (quoting *Paul*, 140 S. Ct. at 342 (statement of Kavanaugh, J., respecting the denial of certiorari)); *see*, *e.g.*, 29 C.F.R. § 1910.23 (setting ladder-safety standards); *id.* § 1910.140 (requiring certain fall-protection measures); *id.* § 1910.147 (setting standards for working with machines that could cause injury by starting

unexpectedly). And "[i]t is well settled … that it is no argument against the constitutionality of an act to say that it delegates broad powers to executives to determine the details of any legislative scheme." *United States v. Rock Royal Co-op.*, 307 U.S. 533, 574 (1939). Contrary to Allstates' suggestion, Allstates Br. 21–22, then, it is immaterial that OSHA's targeted, hazard-specific regulations apply to a wide range of employers and that the aggregate body of regulations applies to a wide range of workplace hazards. *See Mistretta*, 488 U.S. at 379 (upholding as "especially appropriate" Congress's delegation of authority to an expert body to "[d]evelop[] proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders").

The only judicial authority that Allstates cites to support its claim that OSHA safety standards reflect inherently nondelegable policy decisions is a concurring opinion by Justice Rehnquist chiefly addressing an OSH Act provision not at issue here: section 655(b)(5), which sets out distinct criteria for standards addressing toxic substances. *See* Allstates Br. 22 (citing *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.* ("*Benzene*"), 448 U.S. 607, 685–86 (1980) (Rehnquist, J., concurring in the judgment)). Justice Rehnquist did not suggest that workplace-safety

decisions are so important that Congress may not entrust them to the executive. Rather, he opined that section 655(b)(5)—a provision that Allstates appears to concede is constitutional, *see id.* at 7—failed to supply an intelligible principle to guide implementation and, in doing so, left OSHA to resolve the important issue of *what principle to apply*. *See Benzene*, 448 U.S. at 685–86 (Rehnquist, J., concurring in the judgment). No other Justice joined that opinion and in any event, as explained *infra* at 26–27, its reasoning was specific to statutory language at issue there.

In sum, as the Supreme Court has stated time and again, "a delegation is constitutional so long as Congress has set out an 'intelligible principle' to guide the delegee's exercise of authority." *Gundy*, 139 S. Ct. at 2129 (plurality opinion) (quoting *J.W. Hampton*, 276 U.S. at 409); *see id.* at 2130–31 (Alito, J., concurring in the judgment) (acknowledging that binding precedent has long "upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards"). As discussed below, section 655(b) cannot reasonably be said to present one of those "rare[]" cases, *Mistretta*, 488 U.S. at 419 (Scalia, J., dissenting), that is characterized by a total "absence of standards for the guidance of the [executive's] action," *Yakus*, 321 U.S. at 426.

## II.    The OSH Act supplies intelligible principles that sufficiently guide the executive in promulgating permanent safety regulations.

The OSH Act creates "a comprehensive regulatory scheme designed 'to assure so far as possible … safe and healthful working conditions' for 'every working man and woman in the Nation.'" *Martin v. OSHRC*, 499 U.S. 144, 147 (1991) (omission in original; quoting 29 U.S.C. § 651(b)). In furtherance of this goal, the OSH Act requires an employer to provide "employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1). It also empowers the Secretary of Labor to promulgate binding "occupational safety or health standard[s]" that are "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." *Id.* §§ 652(8), 655(b); *see id.* §§ 654(a)(2), (b).

These provisions set out Congress's "general policy" of ensuring safe and healthy working conditions. *Am. Power & Light Co.*, 329 U.S. at 105. They establish that the Department of Labor is "the public agency which is to apply" that policy. *Id.* And they empower the agency to promulgate standards that reasonably advance the OSH Act's legislative aims. The

statute thus precisely satisfies the intelligible principle test's demands. *See id.*

Allstates' claim that the OSH Act lacks an intelligible principle for promulgating safety standards rests on a distorted reading of the statute. Focusing narrowly on the words "reasonably necessary or appropriate," Allstates reads the Act to "allow[] [OSHA] to make any workplace-safety standard that it deems 'appropriate,' with no intelligible guidance or limitation." Allstates Br. 32. A fair reading of the statute as a whole, however, reveals—as courts have held for half a century—that it does not create an unbounded grant of executive authority.

"[A] nondelegation inquiry always begins (and often almost ends) with statutory interpretation" of the relevant text "alongside its context, purpose, and history." *Gundy*, 139 S. Ct. at 2123 (plurality opinion). Read in context, Congress's directive that OSHA promulgate workplace-safety rules is not an invitation for the agency to do anything it likes to "govern 'the entire national economy.'" Allstates Br. 33 (quoting *Whitman*, 531 U.S. at 475); *see NBC v. United States*, 319 U.S. 190, 216 (1943) (warning that a broad statutory grant of executive authority "is not to be interpreted as setting up a standard so indefinite as to confer an

unlimited power" but must be "interpreted by its context" (quoting *Fed. Radio Comm'n v. Nelson Bros. Bond & Mortg. Co.*, 289 U.S. 266, 285 (1933))). Instead, the OSH Act tasks the agency with a specific goal— ensuring "safe or healthful employment and places of employment"—and requires the promulgation of standards "reasonably" calculated to further that goal.[2] 29 U.S.C. § 652(8); *see id.* § 651(b) (announcing statutory purpose of ensuring "safe and healthful working conditions" for all American workers "so far as possible").

Additional statutory provisions also cabin OSHA's authority. Congress provided that the regulatory starting point under the OSH Act should be "national consensus" standards that had been "adopted and promulgated by a nationally recognized standards-producing organization" and certain "established Federal" standards already in effect. *Id.* §§ 652(9)–(10); *see id.* § 655(a). Congress required OSHA to promulgate these standards (or, in case of a conflict, whichever standard "assure[d] the greatest protection of … safety or health") "by rule" soon

---

[2] Allstates suggests that the OSH Act uses "reasonably" to modify only "necessary," not "appropriate." Allstates Br. 35. This Court should dismiss Allstates' suggestion that a standard could be at once appropriate and unreasonable.

after the Act's passage, unless it "determine[d] that the promulgation of such a standard would not result in improved safety or health." *Id.* § 655(a). If OSHA promulgates a standard that "differs substantially from an existing national consensus standard," it must explain "why the rule as adopted will better effectuate the [OSH Act's] purposes … than the national consensus standard." *Id.* § 655(b)(8). As the Seventh Circuit has stated, it is "perfectly clear" from the OSH Act's text that "Congress has chosen a policy and announced general standards which guide the Secretary in establishing specific standards to assure the safest and healthiest possible working environments." *Blocksom & Co. v. Marshall*, 582 F.2d 1122, 1126 (7th Cir. 1978).

Allstates is incorrect that national consensus standards fail to create a meaningful baseline for agency action. *See* Allstates Br. 51–52. Although Allstates rightly notes that OSHA may "differ substantially" from these standards "so long as it explains why it is doing so," *id.* at 52, it overlooks that OSHA must demonstrate why any departure will "better effectuate" the OSH Act's worker-protective "purposes," 29 U.S.C. § 655(b)(8). While the requirement that OSHA explain its standards is, as Allstates emphasizes, "*procedural*," Allstates Br. 52, the expectation

19

that those standards be at least as protective as the national consensus standards reflects Congress's *substantive* aims.

Further constraining the agency, the statute provides that safety standards must be "reasonably necessary or appropriate" to further these aims. 29 U.S.C. § 652(8). Allstates claims that "it is unclear how any judge could begin to assess" whether a standard meets this requirement, Allstates Br. 38, but courts often assess the reasonableness of governmental action in relation to specific policy aims. *See*, *e.g.*, *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018) (considering whether a state law has been "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose'" (quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983))); *United States v. Edge Broad. Co.*, 509 U.S. 418, 429 (1993) (describing cases that "require a fit … that is not necessarily perfect, but reasonable" between the government's actions and goals). Indeed, courts have regularly interpreted the OSH Act's reasonableness language to incorporate a substantive requirement that a safety standard's costs be reasonably proportionate to its benefits. *See*, *e.g.*, *Ala. Power Co. v. OSHA*, 89 F.3d 740, 746 (11th Cir. 1996); *Nat'l Grain & Feed Ass'n v.*

*OSHA*, 903 F.2d 308, 311 (5th Cir. 1990) (per curiam); *UPS of Ohio, Inc. v. OSHRC*, 570 F.2d 806, 811–12 (8th Cir. 1978); *cf. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am., UAW v. OSHA*, 938 F.2d 1310, 1319 (D.C. Cir. 1991) (holding that "[c]ost-benefit analysis is certainly consistent" with the language at issue); *Donovan v. Castle & Cooke Foods*, 692 F.2d 641, 649 (9th Cir. 1982) (same). Moreover, the Supreme Court has read the language to require that all OSHA standards be both technologically and economically feasible. *Am. Textile Mfrs. Inst., Inc. v. Donovan* ("*Cotton Dust*"), 452 U.S. 490, 513 n.31 (1981).

Meanwhile, just as the OSH Act creates substantive standards to guide OSHA rulemaking under section 655(b), it also limits when OSHA can regulate at all. "[B]efore he can promulgate *any* permanent health or safety standard, the Secretary is required to make a threshold finding that a place of employment is unsafe—in the sense that significant risks are present and can be eliminated or lessened by a change in practices." *Benzene*, 448 U.S. at 642 (plurality opinion). A majority of the Supreme Court has embraced this significant-risk requirement. *See Cotton Dust*, 452 U.S. at 513 n.32; *Nat'l Maritime Safety Ass'n v. OSHA*, 649 F.3d 743,

750 & n.8 (D.C. Cir. 2011) (acknowledging the requirement's majority support). This Court has, too. *See In re MCP No. 165*, 21 F.4th at 391.

The significant-risk requirement flows directly from the OSH Act's text. As shown in *Benzene*'s careful examination of that text and of the Act's structure, purpose, and history, the statute cannot be read to direct OSHA to create regulations aimed at "guarantee[ing] workplaces that are free from any risk of material health impairment, however small." 448 U.S. at 641; *see id.* at 642–52. Allstates quarrels over whether *Benzene*'s holding is precedential, Allstates Br. 40–41, but it does not attempt to refute the persuasiveness of the opinion's analysis.

A wealth of judicial authority enforcing the statute's limits further confirms that the OSH Act sufficiently defines the executive's regulatory role. Courts have invalidated safety standards where OSHA failed to show that they advanced workplace safety beyond existing national consensus standards, *Am. Fed. of Labor & Congress of Indus. Orgs. v. Brennan*, 530 F.2d 109, 124 (3d Cir. 1975), or that they were technologically feasible, *Nat'l Maritime Safety Ass'n*, 649 F.3d at 752–54. Courts have invalidated safety standards that bore an insufficient nexus to the sort of workplace "problem[s] that Congress delegated to OSHA to

remedy." *Forging Indus. Ass'n v. Sec'y of Labor*, 748 F.2d 210, 215 (4th Cir. 1984).[3] And courts have vacated regulatory citations where OSHA's application of its safety standards rested on an unreasonable "cost-risk analysis." *Trinity Marine Nashville, Inc. v. OSHRC*, 275 F.3d 423, 429 (5th Cir. 2001). These examples underscore the critical point: Courts' routine enforcement of the limits Congress built into the OSH Act belies Allstates' claim that the statute confers illimitable executive discretion.

The intelligible principles that the OSH Act supplies to guide and limit executive action readily distinguish the Act from the "only two statutes" that the Supreme Court has ever held to impermissibly delegate legislative power. *Whitman*, 531 U.S. at 474. In *Panama Refining*, the Court discerned a nondelegation problem where a statute identified the policy question of whether to prohibit interstate transportation of "hot oil," but then granted the President "unlimited authority to determine the policy and to lay down the prohibition, or not

---

[3] Although *Forging Industry Ass'n* addressed OSHA's update to an established Federal standard and not a regulation promulgated under section 655(b), the workplace-nexus requirement derives from section 655(b)'s requirement that all OSHA regulations address "*occupational* safety or health." *NFIB*, 142 S. Ct. at 666 (emphasis in original; quoting 29 U.S.C. § 655(b)).

to lay it down, as he may see fit," without stating "whether or in what circumstances or under what conditions the President" was to enact the prohibition. 293 U.S. at 415. In *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), meanwhile, the Court held that Congress had impermissibly delegated when it authorized the executive to pass "whatever" industrial codes might "tend to effectuate" any one of a "broad range of objectives," such as ensuring a free flow of commerce, promoting industrial capacity, fostering labor-management harmony, eliminating unfair commercial practices, reducing unemployment, conserving natural resources, and increasing domestic consumption and purchasing power. *Id.* at 534–35; *see id.* at 551. Unlike the statute in *Panama Refining*, the OSH Act does not leave the executive branch free to act or not act as it wishes. *See supra* at 16–20; *see also Int'l Union*, 938 F.2d at 1317–18 (recognizing that the OSH Act would create a nondelegation problem if it permitted OSHA to decide whether to respond to a recognized safety hazard by regulating or by "do[ing] nothing at all," but holding that the statute should not be construed that way). Unlike the statute in *A.L.A. Schechter*, the OSH Act requires executive action to reasonably further a discrete, clearly defined objective.

Unable to persuasively construe the OSH Act to confer the sort of unbounded executive discretion that created nondelegation problems in prior cases, Allstates falls back on the claim that the Act impermissibly delegates legislative power because it fails to indicate precisely where OSHA must strike the balance between workplace safety and economic impact. *See* Allstates Br. 36–38. The Supreme Court, though, has been clear that Congress need not constrain executive discretion so minutely. *See Gundy*, 139 S. Ct. at 2130 (plurality opinion) (observing that statutes entrusting the executive with feasibility judgments "are ubiquitous in the U.S. Code"); *Whitman*, 531 U.S. at 475 (noting that "even in sweeping regulatory schemes" the Supreme Court has "never demanded" that Congress "provide a 'determinate criterion' for saying 'how much [of the regulated harm] is too much'" (alteration in original; quoting *Am. Trucking Ass'ns, Inc. v. EPA*, 175 F.3d 1027, 1034 (D.C. Cir. 1999) (per curiam))). And it is hard to imagine a statute that does. Deciding whether a "safety rule [that] will save a hundred lives but cost ten thousand jobs[] should … be enacted," Allstates Br. 37, is just the sort of detail-dependent, case-specific judgment call that Congress cannot anticipate and answer in the abstract. It is thus sensible—if not inevitable—that

Congress entrusted such interstitial decision-making to an expert body tasked with applying broad policy directives to concrete scenarios.

The principal authority that Allstates cites for its claim that Congress must be more specific about precisely how to "balanc[e] the lives of workers against economic harms," *id.*—Justice Rehnquist's *Benzene* concurrence—offers little support for that claim. The concurrence does not suggest that Congress impermissibly delegates legislative power whenever it lets the executive determine what economic tradeoffs are justifiable in pursuing legislative aims. Rather, Justice Rehnquist's opinion principally addresses a statutory provision regarding standards applicable to workplace exposures to toxic substances, not at issue here, that he thought "admonish[ed] the Secretary to adopt the most protective standard if he [could]" but at the same time "excus[ed] him from that duty" altogether if he could not. *Benzene*, 448 U.S. at 675 (Rehnquist, J., concurring in the judgment). Faced with a statutory provision that supposedly sent the executive conflicting messages by first setting out a policy of maximum workplace protections and then immediately undercutting that policy by seeming to let the executive "reject a more protective standard … for any reason whatsoever," *id.* at 682, Justice

Rehnquist would have held the provision insufficiently intelligible to guide executive action, *id.* at 685–86. As he later elaborated, though, his difficulty was not that the provision contained an excessively "general standard" but that its supposed internal incoherence appeared to reflect deliberate congressional opacity on "whether the Secretary should be either mandated, permitted, or prohibited from undertaking a cost-benefit analysis." *Cotton Dust*, 452 U.S. at 547–48 (Rehnquist, J., dissenting). Nothing in Justice Rehnquist's *Benzene* concurrence suggests that where, as here, Congress has permitted the agency to consider both costs and benefits, Congress must take the further step of devising a mathematically precise formula for the agency's calculations.

Finally, as Allstates' own source acknowledges, the "best response" to a perceived nondelegation issue with section 655(b) would be to assign the provision an available limiting construction rather than taking the "aggressive" step of invalidating it. Cass R. Sunstein, *Is OSHA Unconstitutional?*, 94 VA. L. REV. 1407, 1410–12 (2008). Accordingly, even if Allstates had offered a plausible reading that suggested an unconstitutional delegation, its challenge would nonetheless fail because the statute *can* plausibly be read to confer a sufficiently narrow grant of

discretion. After all, "[w]hen 'a serious doubt' is raised about the constitutionality of an act of Congress, 'it is a cardinal principle that [the Supreme] Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). This principle applies as much to nondelegation concerns as to any other form of constitutional doubt. *See Benzene*, 448 U.S. at 646 (plurality opinion) (explaining that "[a] construction of the [OSH Act] that avoids th[e] kind of open-ended grant" that raises nondelegation issues "should certainly be favored"); *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 342 (1974) (reading a statute "narrowly to avoid [nondelegation] problems").

Allstates does not challenge any specific OSHA regulation as exceeding the agency's statutory authority, so this Court need not adopt any definitive interpretation delimiting the precise contours of that authority. Rather, this Court can reject Allstates' facial constitutional challenge simply by recognizing that the OSH Act is best read, and can easily be construed, to place constitutionally sufficient limits on the executive's discretion in promulgating permanent safety regulations.

### III. Accepting Allstates' argument would contravene an entire body of settled law.

Despite Allstates' efforts to cast section 655(b) as uniquely unbounded, it fits squarely within the body of "broad general directives" the Supreme Court has routinely upheld. *Mistretta*, 488 U.S. at 372. Invalidating that provision would contravene several binding precedents.

*Whitman*, for example, upheld the Clean Air Act's direction that the Environmental Protection Agency (EPA) set air-quality standards "'requisite to protect the public health' with 'an adequate margin of safety.'" 531 U.S. at 465 (quoting 42 U.S.C. § 7409(b)(1)). Allstates claims that EPA standards bind states rather than private parties, Allstates Br. 52–53, but the target of the regulation is irrelevant to whether Congress has provided a sufficiently intelligible substantive standard to guide that regulation. In any event, Allstates' claim is incorrect. *See*, *e.g.*, *Texas v. EPA*, 829 F.3d 405, 416 (5th Cir. 2016) (describing an EPA-promulgated "federal implementation plan" requiring "specific emission controls" at designated facilities). And while Allstates attempts to paint the Clean Air Act's "requisite" standard as more precise than the OSH Act's "reasonably necessary or appropriate" standard, Allstates Br. 54–55, the legislative *aim* of OSH Act regulations—"safe or healthful employment

and places of employment," 29 U.S.C. § 652(8)—is easily as precise as the aim of air-quality regulations under the Clean Air Act, *i.e.*, an "adequate" level of safety, 42 U.S.C. § 7409(b)(1).

*National Broadcasting Co.* and *New York Central Securities Corp. v. United States*, 287 U.S. 12 (1932), meanwhile, approved executive authority to, respectively, regulate national radio services and approve railroad acquisitions in the "public interest." *See* 319 U.S. at 215–17; 287 U.S. at 24–25. Here, too, the criteria guiding executive action are no more precise than those in the OSH Act. Allstates does not contend otherwise, but instead it argues that executive action under the statutes at issue in those cases did not involve "rules of conduct governing future actions by private persons." Allstates Br. 57 (quoting *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting)). Again, Allstates' distinction is both immaterial and factually wrong. *See NBC*, 319 U.S. at 198–209 (describing regulations under the challenged statute that prohibited certain business practices of radio stations). And while Allstates emphasizes that "statutory context … limit[ed] the meaning of 'public interest'" in these cases, Allstates Br. 57, context likewise meaningfully informs interpretation of the OSH Act. *See supra* at 16–23.

Similarly, *Yakus* approved a congressional delegation to the executive to set "fair and equitable" commodity prices during wartime. 321 U.S. at 423. Allstates claims the President's inherent Article II war powers "at least arguably" justified the delegation, Allstates Br. 58 (quoting *Gundy*, 139 S. Ct. at 2140 (Gorsuch, J., dissenting)), but this reasoning was not the Court's. Rather, the Court upheld the statutory delegation as a valid "exercise by Congress of its legislative power" because Congress had "stated the legislative objective, … prescribed the method of achieving that objective," and "laid down standards" to guide executive implementation. *Yakus*, 321 U.S. at 423. And although Allstates emphasizes that the statute at issue in *Yakus* indicated that the executive's action should be informed by the prices that prevailed during a specified base period, Allstates Br. 58, so too did Congress peg executive action under the OSH Act to preexisting national consensus standards. Moreover, Allstates simply ignores that the Supreme Court has unflinchingly accepted the executive's authority to set "just and reasonable" rates in other contexts. *See, e.g.*, *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 600–02 (1944) (wholesale natural gas prices); *Tagg Bros. & Moorhead v. United States*, 280 U.S. 420, 439–40

31

(1930) (certain stockyard services); *J.W. Hampton*, 276 U.S. at 407–08 (interstate carriage).

These examples represent just the handful of nondelegation precedents that Allstates even tries to distinguish. But the list of broad statutory standards that have survived nondelegation challenges could go on and on. *See*, *e.g.*, *Whitman*, 531 U.S. at 474–76 (citing several more); *Yakus*, 321 U.S. at 426–27 (citing still more). In light of the approach that the Supreme Court has taken consistently for nearly a century, "it would be freakish to single out the provision at issue here for special treatment." *Gundy*, 139 S. Ct. at 2131 (Alito, J., concurring in the judgment).

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

/s/ Nicolas A. Sansone
Nicolas A. Sansone
Allison M. Zieve
Scott L. Nelson
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Amicus Curiae*

January 30, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, it contains 6,323 words.

This brief also complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 29(a)(4), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

<u>/s/ Nicolas A. Sansone</u>
Nicolas A. Sansone
*Attorney for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of Amicus Curiae with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit on January 30, 2023, using the Appellate Electronic Filing system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Nicolas A. Sansone
Nicolas A. Sansone
*Attorney for Amicus Curiae*
