# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

————————————

ALLSTATES REFRACTORY CONTRACTORS, LLC,

Plaintiff-Appellant,

v.

MARTIN J. WALSH, in his official capacity as Secretary of Labor, et al.,

Defendants-Appellees.

————————————

On Appeal from the United States District Court
for the Northern District of Ohio

————————————

**BRIEF OF INTERNATIONAL SAFETY EQUIPMENT ASSOCIATION,
NATIONAL SAFETY COUNCIL, AMERICAN INDUSTRIAL HYGIENE ASSOCIATION,
AMERICAN SOCIETY OF SAFETY PROFESSIONALS, BOARD OF CERTIFIED
SAFETY PROFESSIONALS, AMERICAN COLLEGE OF OCCUPATIONAL AND
ENVIRONMENTAL MEDICINE, NATIONAL ENVIRONMENTAL HEALTH
ASSOCIATION, AMERICAN ASSOCIATION OF OCCUPATIONAL HEALTH NURSES,
HUMAN FACTORS AND ERGONOMICS SOCIETY, NATIONAL COMMITTEE ON
OCCUPATIONAL SAFETY & HEALTH, WORKER INJURY LAW & ADVOCACY
GROUP, AND THE NATIONAL EMPLOYMENT LAW PROJECT
AS AMICI CURIAE IN SUPPORT OF DEFENDANT APPELLEES**

————————————

Pamela M. Newport
**BRANSTETTER, STRANCH & JENNINGS, PLLC**
425 Walnut Street, Suite 2315
Cincinnati, OH 45202
Phone:  513.381.2224
Fax:  513.381.2225
Email:  pamelan@bsjfirm.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT (FRAP 29(a)(4)(A))

Pursuant to Federal Rules of Appellate Procedure 29(a)(4)(A), undersigned counsel states that amici curiae International Safety Equipment Association, National Safety Council, American Industrial Hygiene Association, American Society of Safety Professionals, Board of Certified Safety Professionals, American College of Occupational and Environmental Medicine, National Environmental Health Association, American Association of Occupational Health Nurses, Human Factors and Ergonomics Society, National Committee of Occupational Safety and Health, Worker Injury Law and Advocacy Group, and National Employment Law Project state that they are all non-profit entities and have no parent corporations. No publicly owned or traded corporation owns, in whole or in part, any of the amici.

*/s/ Pamela M. Newport*
Pamela M. Newport

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 22-3772         Case Name: Allstates Refractory Contractors, LLC v. Walsh, et al.

Name of counsel: Pamela M. Newport

Pursuant to 6th Cir. R. 26.1, International Safety Equipment Association, National Safety Council, American Industrial Hygiene Association, American Society of Safety Professionals, Board of Certified Safety Professionals, American College of Occupational and Environmental Medicine, National Environmental Health Association,

*Name of Party*

makes the following disclosure: American Association of Occupational Health Nurses, Human Factors and Ergonomics Society, National Committee of Occupational Safety and Health, Worker Injury Law and Advocacy Group, and National Employment Law Project

1. Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on January 30, 2023 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Pamela M. Newport

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT (FRAP 29(A)(4)(A)).................... ii

TABLE OF CONTENTS...................................................................... iii

TABLE OF AUTHORITIES .............................................................v

AMICI CURIAE STATEMENTS OF INTEREST & CONSENT TO FILE ..........1

NON-AFFILIATION WITH PARTIES ...................................6

INTRODUCTION AND SUMMARY OF ARGUMENT .......................7

ARGUMENT ........................................................................8

   I.  OSHA Health and Safety Standards are the Keystone of the National Regulatory Scheme Protecting American Workers from Workplace Injuries. ..................................................................8

     A.   OSHA Has Played a Critical Role in Reducing Workplace Injuries and Deaths. ...................................................8

     B.  The OSH Act's Broad Delegation of Standard-Setting Authority is Necessary to Achieve the Statute's Purpose. .................................10

   II.  Workers' Compensation Systems Are Not a Substitute for OSHA Safety Standards. ...................................................12

     A.   OSHA Safety Standards Prevent Workplace Injuries; Workers' Compensation is Intended Only to Compensate Workers Post-Hoc............13

     B.  Workers' Compensation Shifts Costs to Workers and Fails to Adequately Incentivize Employers to Make Workplaces Safer....................14

   III.  Outside of the Federally-Approved State OSHA Plans, States Alone Cannot Create Safe and Healthy Jobs. .........................................17

A.    States Like Ohio Without Approved State Plans Have Little Meaningful Occupational Safety Regulation. ...............................................17

B.  OSHA Safety Standards Set a Minimum National Floor. ......................19

IV. Voluntary Employer Associations Are Not an Adequate Substitute for Government Regulation. ................................................................................20

A.    Employer Associations Function Best Building on a Federal Regulatory Floor. ........................................................................................20

B.  A Key Function of Employer, Labor, Trade, and Professional Associations is to Help OSHA Set Industry Safety and Health Standards by Providing Comments, Recommendations, Guidance, and Support. .............................................................................................................22

V.  Only An Extremely Narrow Set of Intentional Workplace Tort Claims are Available to Workers, Making Tort Law a Wholly Inadequate Substitute for OSHA Standards. .......................................................................................23

CONCLUSION .....................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992). ...........................7, 17

*Houdek v. ThyssenKrupp Materials N.A., Inc.*, 983 N.E.2d 1253 (Ohio Sup. Ct. 2012) ...................................................................................................25

*Howard-Johnson v. V & S Detroit Galvanizing, LLC*, 895 F. Supp. 2d 854 (E.D. Mich. 2012)...........................................................................................26

*Rudisill v. Ford Motor Co.*, 709 F.3d 595 (6th Cir. 2013) ......................................25

## Statutes

29 U.S.C. § 654(a)(1)...........................................................................................21

29 § U.S.C. 676.....................................................................................................14

29 U.S.C. § 651(b) ....................................................................................... 7, 8, 20

29 U.S.C. § 653(b)(4)............................................................................................13

29 U.S.C. § 655(a) ................................................................................................21

29 U.S.C. § 655(b) ....................................................................................... 11, 21

29 U.S.C. § 667(b). ...............................................................................................18

29 U.S.C. § 667(c)(2)............................................................................................19

29 U.S.C. 651(a) ...................................................................................................19

42 U.S.C. § 423.....................................................................................................15

M.C.L.A. § 418.131(1) .........................................................................................26

v

Ohio Rev. Code Ann. § 2745.01................................................................25

**Regulations**

29 CFR 1926.453 ...................................................................................22

*EM 385-1-1: Safety and Health Requirements*, Dept. of the Army (Nov. 30, 2014) ...............................................................................................................21

OSHA Standards, 1953.5 Subpart A. ....................................................18

**Treatises**

101 C.J.S. Workers' Compensation § 1748 Corpus Juris Secundum, at fn. 17 et seq. (Dec. 2022 Update)................................................................24

American Law Reports; 101 C.J.S. Workers' Compensation § 1748 Corpus Juris Secundum (Dec. 2022 Update)...............................................................24

David B. Harrison, *What Conduct Is Willful, Intentional, or Deliberate Within Workmen's Compensation Act Provision Authorizing Tort Action for Such Conduc*t, 96 A.L.R.3d 1064 (Originally published in 1979)...............................24

**Legislative Materials**

S. Rep. No. 91-1282 (1970) .................................................... 12, 14, 19, 21

**Other Authorities**

*Adding Inequality to Injury: The Costs of Failing to Protect Workers on the Job*, OSHA (Jun. 2015). ...............................................................................15

Brice Smallwood, *R.I.P. Employer Intentional Torts: The Debilitating Application of Ohio Revised Code Section 2745.01*, 85 U. Cincinnati L. Rev. 251 (Mar. 2017) ...............................................................................................................26

Deborah Berkowitz, *Workers' Rights: Comp System Fails to Offer Adequate Benefits*, WC Magazine (Jun. 1, 2018) ................................................................16

Emily Spieler, *(Re)Assessing the Grand Bargain: Compensation for Work Injuries in the United States, 1900-2017*, 69 Rutgers Univ. L. Rev. 891 (2017).  13, 16, 24

General Accountability Office, *Contingent Workforce*, GAO-15-168R (2015) .....16

Luis Feliz Leon, *Life and Death in the Poultry Capital of the World*, The Nation (Feb. 2011) ...........................................................................................................16

Michael Grabell, *The Expendables: How the Temps Who Power Corporate Giants Are Getting Crushed*, ProPublica (Jun. 27, 2013) ................................................15

*National Census of Fatal Occupational Injuries in 2021*, U.S. Bureau of Lab. Statistics (2021). .......................................................................................................9

OSHA Standards Development, OSHA. ..................................................................23

OSHA, *Communication Towers* ..............................................................................11

OSHA, *Heat Stress Guide* .......................................................................................11

*Position Statement on the Role of Consensus Standards and Governmental Regulations in Occupational Safety and Health*, Am. Soc. of Safety Professionals (Aug. 1995, reaff'd Jun. 2018). ..........................................................................22

*Preventing Needlestick Injuries in Healthcare Settings*, DHHS (NIOSH) Publication No. 2000-108 (Nov. 1999). ...............................................................9

*Regulatory Review of 29 CFR 1926, Subpart P: Excavations*, OSHA (Mar. 2007) .8

*State Plans*, OSHA Website. ...................................................................................18

*The Report of the National Commission on State Workmen's Compensation Laws*
    *at \*3 (Jul. 1972).* ...................................................................................................14

*Who's the Boss: Restoring Accountability for Labor Standards in Outsourced*
    *Work*, Nat'l Emp. L. Project (May 2014) ...........................................................16

*Worker Safety & Health in the Obama Years*, Nat'l Emp. L. Project (Jan. 2017)....9

**AMICI CURIAE STATEMENTS OF INTEREST & CONSENT TO FILE**

Amici are safety professionals and public health and healthcare organizations working with companies, employees, and organized labor to ensure safe and healthy workplaces, and are joined by workers compensation experts. Amici present a clear safety and health professional consensus that the Occupational Safety & Health Administration ("OSHA") is critical to preventing job injuries and to ensure safe and healthy worksites. Its longstanding Congressional mandate to enact and enforce safety standards across workplaces creates an important minimum floor that, in conjunction with trainings, state efforts, and voluntary employer safety compliance programs, creates a culture of workplace safety and health. Amici write not to repeat arguments made by the parties, but to share their deep expertise in occupational safety and health, and their commitment to supporting a robust federal OSHA to ensure safety and health for workers and their communities.

Amici believe that industry and employer associations are an indispensable part of the regulatory infrastructure ensuring safety and health in American workplaces, and most signatories to this brief are a part of that infrastructure, but they never have been, and are not intended to be, a substitute for government regulation or enforcement of workplace rules.

Amici have received consent from both parties for leave to file this brief.

1

The **International Safety Equipment Association** (ISEA) is the association of manufacturers, distributors, testers and safety professionals that works closely with government agencies on standards for design, use and approval of safety equipment and technologies that protect people who work in hazardous environments. For more than 85 years, ISEA has set the standard for personal protective technologies, supporting the interests of its member companies who are united in the goal of protecting the health and safety of people worldwide. ISEA is a recognized leader in the development of ANSI-accredited safety equipment standards, in the U.S. and around the world.  It works with Congress and government agencies to consult with policymakers whose decisions affect the industry.

The **National Safety Council (NSC)**, founded in 1913, is one of the nation's leading non-profit advocates for workplace safety and health. NSC helps employers and employees create a culture of safety and health that will make people safer at work. NSC uses research, data, and training to drive better, smarter, more personal safety and health programs. NSC engages government nationally and locally to drive polices that create a culture of safety and health.

The **American Industrial Hygiene Association** (AIHA) is the association for scientists and professionals committed to ensuring occupational and environmental health and safety in the workplace and community. Founded in

1930, more than half of AIHA's 8,500 members are Certified Industrial Hygienists, and many hold other professional designations.

The **American Society of Safety Professionals** (ASSP) is the world's oldest safety society. Its 36,000 members serve on federal committees, support key safety, health and environmental legislation, participate in international safety and health efforts, and raise awareness of OSH with the public. ASSP is the secretariat for eleven American National Standards Institute (ANSI) committees responsible for more than 100 safety standards. ASSP members to work with businesses, employers, employees, regulators and legislators on all levels to increase workplace safety for all.

The **Board of Certified Safety Professionals** (BCSP) a not-for-profit corporation, has been setting and certifying the technical competency criteria for safety, health, and environmental (SH&E) practitioners since 1969. In that time, over 100,000 BCSP credentials have been achieved by our safety practitioner pioneers, improving safety practice by meeting the challenge of achieving and maintaining quality, accredited safety certifications.

The **American College of Occupational and Environmental Medicine** (ACOEM) is the pre-eminent physician-led organization that champions the health of workers, safety of workplaces, and quality of environments.

The **National Environmental Health Association** (NEHA) is a 6,000-member professional association that's mission is "To build, sustain, and empower an effective environmental health workforce". NEHA provides education and training and credentialing to support the advancement of environmental health professionals.

**American Association of Occupational Health Nurses** (AAOHN) is the professional association of licensed nurses engaged in the practice of occupational and environmental health nursing.

The **Human Factors and Ergonomics Society** (HFES), founded in 1957, is the world's largest scientific association for human factors/ergonomics professionals.  HFES provides education, builds connections, and advocates on behalf of human factors/ergonomics field and fosters collaboration across the spectrum of professionals to drive forward advances in human factors and ergonomics. HFES believes that the seamless connection between humans and systems, and the connection between research and application, is vital to keeping all human beings safe.

The **National Committee on Occupational Safety & Health** (NCOSH) builds the power of workers and their organizations to demand jobs that are safe, healthy and free from exploitation and abuse. NCOSH is a federation of 26 grassroots worker groups and the home of the workers' health and safety

movement in the U.S. Its members include unions and workers' centers, health and safety professionals, academic specialists, and nonprofit advocates. NCOSH specializes in peer learning, training, and advocacy campaigns.

**Worker Injury Law & Advocacy Group** (WILG) is the national non-profit membership organization dedicated to representing the interests of millions of workers and their families who, each year, suffer the consequences of workplace injuries and illnesses. The group acts principally to assist workers compensation attorneys and non-profit groups in advocating the rights of injured workers through education, communication, research, and information gathering.

**The National Employment Law Project** (NELP) is a non-profit legal organization with over 50 years of experience advocating for the employment and labor rights of low-wage and unemployed workers. NELP seeks to ensure that all employees, and especially the most vulnerable ones, receive the full protection of employment laws, including health and safety protections. NELP has testified in Congress and before state and city legislators, and participated in litigation to promote the enforcement of health and safety and other labor protections for all workers.

## NON-AFFILIATION WITH PARTIES

Pursuant to Rule 29 of the Federal Rules of Appellate Procedures, the amici curiae herein represent that no party's counsel authored the brief in whole or in part or contributed money intended to fund preparing or submitting the brief. No person, other than amici, its members, or its counsel, contributed money intended to fund preparing or submitting the brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

When Congress passed the Occupational Safety & Health Act of 1970, 29 U.S.C. §§ 651-78 (2000), ("OSH Act" or "the Act") it recognized that existing efforts, including varied state laws, workers compensation programs, and voluntary employer plans to ensure healthy and safe workplaces were inconsistent and inadequate by themselves. Congress determined that a federal law, covering most workplaces, was necessary to create a uniform and minimum floor with which employers must comply. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992). The OSH Act aims "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b).

Appellant Allstates Refractory Contractors, LLC ("Allstates") brings this novel broad-scoped challenge to the Occupational Safety & Health Administration's ("OSHA") ability to issue and enforce a broad range of longstanding safety standards, claiming that Congress acted inappropriately in enacting certain OSH Act provisions in the 1970's, in violation of the Constitution's non-delegation doctrine.

Amici write to describe the importance of a federal OSHA minimum standards floor, and to bring their experience and expertise to bear in explaining how occupational health and safety components like workers' compensation and

employer voluntary efforts cannot achieve healthy and safe workplaces without federal OSHA standards directly challenged by this lawsuit.

## ARGUMENT

I. **OSHA Health and Safety Standards are the Keystone of the National Regulatory Scheme Protecting American Workers from Workplace Injuries.**

    A. OSHA Has Played a Critical Role in Reducing Workplace Injuries and Deaths.

In the findings and purpose clause of the OSH Act, as signed into law by President Nixon in 1970, the declared Congressional purpose is to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. 651(b). To a degree unusual for a statute whose constitutionality is being drawn into question fifty-three years later, the Act is decisively serving its declared purpose. While much remains to be done, working people across the country enjoy much safer and healthier working conditions than they did in the decades before the Act's inception.

Evaluation of a few individual OSHA standards bears this out. OSHA's rule to prevent workers getting killed in construction trenching and excavation work has reduced workplace deaths by more than 40 percent.[1] The OSHA standard for

---

[1] *Regulatory Review of 29 CFR 1926, Subpart P: Excavations*, OSHA (Mar. 2007), https://www.osha.gov/sites/default/files/excavation_lookback.pdf.

handling bloodborne pathogens has virtually eliminated occupationally-acquired hepatitis B fatalities that killed 120 workers every year.[2] And its grain-handling standard led to a 70 per cent decrease in fatalities.[3] Overall, incidents of workers killed or injured on the job have fallen precipitously since the 1970s. Since the passage of the OSH Act, the rate of workers being killed on the job has declined by more than 67 per cent, and the number of fatalities has declined from about 14,000 a year in 1970 to 5,190 in 2021, with a workforce more than twice as large.[4] Over five thousand reported worker deaths in 2021 is still too many, but represents a huge improvement and vindication of OSHA.

In addition, a substantial body of empirical evidence, including recent studies conducted by the Rand Corporation and by Harvard University and the University of California at Berkeley's business schools confirm that OSHA inspections result in substantially and persistently reduced rates of injuries, illnesses, and insurance costs, to the tune of billions of dollars annually for employers, both large and small.[5] The OSH Act has—in short—done a remarkably

---

[2] *Preventing Needlestick Injuries in Healthcare Settings*, DHHS (NIOSH) Publication No. 2000-108 (Nov. 1999), https://www.cdc.gov/niosh/docs/2000-108/pdfs/2000-108.pdf.
[3] *Worker Safety & Health in the Obama Years*, Nat'l Emp. L. Project (Jan. 2017), http://s27147.pcdn.co/wp-content/uploads/NELP-Worker-Safey-Health-in-Obama-Years.pdf.
[4] *National Census of Fatal Occupational Injuries in 2021*, U.S. Bureau of Lab. Statistics (2021), https://www.bls.gov/news.release/pdf/cfoi.pdf.
[5] *Worker Safety & Health in the Obama Years*, *supra* note 3.

good job of achieving the goals that it was enacted to achieve, despite limited enforcement resources. Workers are safer and healthier at work now than they ever have been.

One key reason OSHA safety and health standards have been so effective is that they serve a unique function within the overall system of federal and state rules and efforts governing workplace safety and health. Unlike both the workers compensation system and state tort law, OSHA standards play a preventative role, not a compensatory one. The function of OSHA's safety and health standards, including the ones directly challenged by Allstates here, is to keep workers safe by identifying workplace conditions likely to cause death, illness, or injury *ex ante*, rather than offering injured workers compensation for the harm they suffered *ex post*. Stripping away OSHA's power to issue the safety standards challenged here would hobble the agency's power to prevent workplace injuries before they happen, leaving in its place a patchwork of state-level regulatory authorities, often flawed state worker's compensation systems, and voluntary employer efforts—a regime whose flaws the OSH act was designed to remedy.

B. The OSH Act's Broad Delegation of Standard-Setting Authority is Necessary to Achieve the Statute's Purpose.

Allstates' challenge cuts to the heart of this successful regulatory regime, alleging that OSHA's power to issue safety standards under Section 6(b) of the

OSH Act, 29 U.S.C. § 655(b), is unconstitutional as an overbroad delegation of legislative power to an executive agency. But OSHA's power to set safety standards is not, as appellants suggest, a "sweeping" and "standardless" delegation of power. Appellant's Brief, R. 34, Page ID #34. It is appropriately tailored to the relatively narrow and highly technical statutory objective of ensuring safe and healthy workplaces.

Health and safety regulation is necessarily complex and highly fact-dependent, and must be based on expertise and constant monitoring and learning. Workplaces change every year as new industries emerge, as new employers enter existing industries and adopt new practices, and as incumbent employers purchase new machinery and employ new materials.[6] This is something the enacting Congress recognized, with the Senate Report highlighting the "unprecedented complexity" of occupational health & safety as new materials and processes are

---

[6] Two examples are: the telecommunications industry's move to cell phones brought an increase in workers needing to climb cell towers to maintain and repair communications. Amicus ISEA and OSHA experts created and approved a tower climbing system that allows a worker to ascend a tower, with locks to prevent a fall. OSHA, *Communication Towers,* https://www.osha.gov/communication-towers, accessed January 26, 2023. In addition, the developing OSHA heat stress standard will likely recognize fabric technologies found in cooling towels, phase-change cooling vests and moisture wicking fabrics. OSHA, *Heat Stress Guide*, https://www.osha.gov/emergency-preparedness/guides/heat-stress, accessed January 26, 2023.

"introduced into industry at a much faster rate than the present meager resources...can keep up with." S. Rep. No. 91-1282, at 5178 (1970).

The structure of the OSH Act reflects a clear congressional choice to embrace the sector-specific understanding and technical expertise that a dedicated federal agency provides, rather than attempting to impose a one-size-fits-all regime of safety regulation on all employers. Congress understood that the dynamism of American industry required a flexible and responsive regulatory regime, not one prescribed exactly in statute.

## II.  Workers' Compensation Systems Are Not a Substitute for OSHA Safety Standards.

Worker's compensation cannot substitute for OSHA's power to issue safety regulations, as the state-level programs were enacted to compensate injured workers after the fact, and to protect employers from individual tort actions based on employer workplace negligence, not to prevent workplace injuries and fatalities. OSHA safety standards, on the other hand, encourage preventive measures, and require better employer practices aimed at complying with safety standards.

A. <u>OSHA Safety Standards Prevent Workplace Injuries; Workers'
Compensation is Intended Only to Compensate Workers Post-Hoc.</u>

When the OSH Act was signed into law by President Nixon in 1970, state
workers' compensation laws had been in place for over half a century.[7] Neither
Congress nor the President believed those systems to be a substitute for OSHA's
standard-setting. The savings clause of Section 4(b)(4) of the Act makes plain that
the new federal regulatory scheme was designed to function separately from the
existing state-level workers' compensation systems. "Nothing in this Act shall be
construed to supersede or in any manner affect any workmen's compensation law
or to enlarge or diminish… common law or statutory rights…of employees arising
out of, or in the course of, employment." 29 U.S.C. § 653(b)(4).

In fact, part of the impetus for Congress to set up a new federal agency with
rulemaking and enforcement authority was the structural weakness of the workers'
compensation systems, and their failure to prevent workplace death and injuries. In
the Senate Report accompanying the OSH Act, the Senate lamented the enormous
economic drain of having a compensatory worker's compensation system without
a corresponding preventative scheme. As then Secretary of Labor George P.
Schultz noted during Senate hearings on the OSH Act, at least "2.2 million persons

---

[7] Emily Spieler, *(Re)Assessing the Grand Bargain: Compensation for Work
Injuries in the United States, 1900-2017*, 69 Rutgers Univ. L. Rev. 891, 908-912
(2017) (discussing the history of worker's compensation in the early decades of the
Twentieth Century).

are disabled on the job each year…over $1.5 billion is wasted in lost wages, and the annual loss to the gross national product is $8 billion. Vast resources that could be available for productive use are siphoned off to pay workmen's compensation benefits and medical scheme." S. Rep. No. 91-1282, at 5179 (1970).

Such was the consternation among members of Congress over the failure of workers' compensation programs to protect workers that they inserted into the OSH Act a section providing for a "national commission" on workers' compensation, to address the "serious questions" that had been raised "concerning the adequacy of existing state workmen's compensation programs." S. Rep. No. 91-1282, at 5222 (1970) (Javits Amendments); Sec. 27 of the OSH Act (codified at 29 § U.S.C. 676). When the commission produced its report in 1972, the verdict was unsparing: "[t]he protection furthered by workmen's compensation to American workers present is, in general, inadequate and inequitable."[8]

B.  Workers' Compensation Shifts Costs to Workers and Fails to Adequately Incentivize Employers to Make Workplaces Safer.

Workers' compensation continues to provide inadequate protection for workers. The costs of workplace injuries continue to be subsidized by injured workers, their families, and by the taxpayer-funded components of the social safety

---

[8] *The Report of the National Commission on State Workmen's Compensation Laws* at *3 (Jul. 1972), *available at* https://workerscompresources.com/wp-content/uploads/2012/11/Introduction-Summary.pdf.

net. Workers' compensation payments cover only about one fifth of the total lost wages and medical costs of work injuries and illnesses.[9] Much of the rest is paid out of pocket by the workers themselves, and of the remainder, federal and state programs pick up a further 16 percent of the overall cost.[10] Other social insurance programs, like the Social Security Act's Disability Insurance,[11] end up subsidizing employers with inadequate safety programs, with seven percent of the roughly one million people who became new SSDI beneficiaries in 2010 becoming disabled a result of a work injury.[12]

Moreover, many work-related injuries and diseases are never addressed at all within the workers' compensation system. Many low-wage workers, including Black and immigrant workers in high-hazard jobs, are functionally excluded from workers' compensation when their employers insert labor subcontractors between them and the jobs, as they disclaim any responsibility for workers' compensation benefits and coverage, leaving the workers on their own to recover from undercapitalized and uninsured labor brokers or temp agencies.[13] Domestic and

---

[9] *Adding Inequality to Injury: The Costs of Failing to Protect Workers on the Job*, OSHA (Jun. 2015).
https://www.osha.gov/sites/default/files/inequality_michaels_june2015.pdf.
[10] Id.
[11] 42 U.S.C. § 423.
[12] *Adding Inequality to Injury*, *supra* note 9.
[13] *See*, *e.g.*, Michael Grabell, *The Expendables: How the Temps Who Power Corporate Giants Are Getting Crushed*, ProPublica (Jun. 27, 2013) (describing the appalling safety record for temp workers in warehousing); Luis Feliz Leon, *Life*

care workers, subject to hazards on the job, are almost universally excluded from

workers' compensation by statute, and coverage for farmworkers remains

extremely limited.[14] Workers whose employers call them independent contractors

and casual workers who labor in construction, delivery, transportation, and other

high-hazard jobs are outside the scope of social insurance programs entirely.[15] And

those that are covered often do not file claims, because they do not believe they are

eligible to seek worker's compensation, they fear retaliation, or because the

administrative and procedural hurdles they have to overcome can be byzantine and

confusing.[16]

---

[14] Emily Spieler, *(Re)Assessing the Grand Bargain: Compensation for Work Injuries in the United States, 1900-2017*, 69 Rutgers Univ. L. Rev. 891, 991 (2017).

[15] General Accountability Office, *Contingent Workforce,* GAO-15-168R, https://www.gao.gov/assets/gao-15-168r.pdf (report cites that these workers could make upwards of 33% of the workforce in certain sectors); *see also Who's the Boss: Restoring Accountability for Labor Standards in Outsourced Work*, Nat'l Emp. L. Project (May 2014), https://www.nelp.org/wp-content/uploads/2015/02/Whos-the-Boss-Restoring-Accountability-Labor-Standards-Outsourced-Work-Report.pdf (noting high incidence of health and safety violations in subcontracted jobs).

[16] Spieler, *supra* note 14, at 994. A landmark study of more than 4,000 low-wage workers in Chicago, Los Angeles and New York published nine years ago found that among those workers experiencing a serious injury on the job, fewer than 1 in 10 (8%) filed for workers compensation benefits. *See* Deborah Berkowitz, *Workers' Rights: Comp System Fails to Offer Adequate Benefits*, WC Magazine (Jun. 1, 2018), https://www.nelp.org/press-clips/workers-rights-comp-system-fails-offer-adequate-benefits/.

*and Death in the Poultry Capital of the World*, The Nation (Feb. 2011) (detailing deaths of multiple temp poultry workers, hired by staffing agencies, due to unsafe conditions at major poultry plants).

In sum, workers' compensation is not a prevention scheme; it is a compensation scheme. Its persistent failure to prevent workplace injuries and fatalities is one key reason that Congress enacted the OSH Act, a regulatory regime they thought would do a better job of incentivizing employers to maintain safer workplaces. This Court should not second-guess that judgment.

## III.    Outside of the Federally-Approved State OSHA Plans, States Alone Cannot Create Safe and Healthy Jobs.

State OSHA plans are a key part of the national regulatory framework keeping workers safe. But beyond federally-approved state OSHA plans that require a comprehensive state program, state-level regulation governing occupational health and safety is largely non-existent. See *Gade*, 505 U.S at 102 (a "State may develop an occupational safety and health program tailored to its own needs, but only…" by creating a comprehensive State OSHA plan). As a result, state regulators in non-state plan states like Ohio lack the staffing, capacity, and expertise to ensure safe workplaces. Contrary to arguments made by Appellant's amici, state regulation is no substitute for federal OSHA safety standards.

### A.    States Like Ohio Without Approved State Plans Have Little Meaningful Occupational Safety Regulation.

The OSH Act permits states to create their own comprehensive regulatory scheme, subject to approval by the Secretary of the Department of Labor, as authorized State OSHA plans:

Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated [by the Secretary under the OSH Act] shall submit a State plan for the development of such standards and their enforcement. 29 U.S.C. § 667(b).

Twenty-nine states have received approval for their own state plans under this provision, with only twenty-two of those covering both public and private sector workers (the other seven cover only public sector workers).[17] The overwhelming majority of the plans look to federal expertise and adopt in large part federal OSHA standards as a baseline starting point.[18]

Ohio, where this Allstates challenge originates, is not a state-plan state, meaning that it completely relies on federal OSHA's minimum health and safety floor. While all states have access to OSHA's nearly-free consultation program for safety and health, states that have not sought an approved state plan simply lack the capacity or staffing to issue safety regulations that will adequately protect workers in dangerous occupations, and are no substitute for federal OSHA's expertise and experience.

---

[17] *State Plans*, OSHA Website (accessed Jan. 17, 2023), https://www.osha.gov/stateplans.
[18] OSHA Standards, 1953.5 Subpart A (accessed Jan. 25, 2023) *available at* https://www.osha.gov/laws-regs/regulations/standardnumber/1953/1953.5.

B. OSHA Safety Standards Set a Minimum National Floor.

The point of the OSH Act was, in substantial part, to set a federal floor that would apply uniformly to all employers across the country. "The chemical and physical hazards which characterize modern industry," the OSH Act Senate Report explained, "are not the problem of a single employer, a single industry, nor a single state jurisdiction. The spread of industry and the mobility of the workforce combine to make the health and safety of the worker truly a national concern." S. Rep. No. 91-1282, at 5180 (1970). Because employer practices that pose safety risks to workers appear across the country without regard to state lines, so should the system of workplace safety and health protections.

A uniform health and safety system with a floor beneath which workplace practices cannot drop is important to prevent the unfair competition that accompanies low-road practices. The Act states in relevant part: "The Congress finds that personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments." 29 U.S.C. 651(a); *see also* 29 U.S.C. § 667(c)(2) (requiring that state safety and health standards be "at least as effective" as the federal standards).

## IV.    Voluntary Employer Associations Are Not an Adequate Substitute for Government Regulation.

The Buckeye Institute, in its brief in support of Allstates, argues that "industry organizations are likely more effective in addressing worker safety than any government agency." Amicus Brief, R. 30, Page ID #18. As representatives of numerous industry associations, including some of those referenced by name by Buckeye, amici write to disagree. Amici are a part of the professional occupational safety and health infrastructure, and certainly believe that industry and employer associations are an important part of the multi-pronged programs and regulations ensuring safety and health in American workplaces, but they never have been, and are not intended to be, a substitute for government regulation or enforcement of workplace rules.

### A.    Employer Associations Function Best Building on a Federal Regulatory Floor.

The statutory text of the OSH Act makes clear that the enacting Congress shared this view: it recognized the value of employer associations yet understood the critical importance of establishing a federal regulatory framework to underly them. The success of OSHA would come through "building upon advances already made through employer and employee initiative for providing safe and healthful working conditions." 29 U.S.C. § 651(b)(4).

Voluntary employer associations lack the power to bind all employers to a set of minimum standards. The enacting Congress recognized the commitment of "many employers in all industries," who had "demonstrated an exemplary degree of concern for health and safety in the workplace." S. Rep. No. 91-1282, at 5180 (1970). But "their efforts are too often undercut by those [employers] who are not so concerned...Many employers—particularly smaller ones—simply cannot make the necessary investment in health and safety, and survive competitively, unless all are compelled to do so." Id.

For example, as the Buckeye Institute points out, the American National Standards Institute (ANSI) plays a critical role in benchmarking employer practices through its regular issuance of consensus standards. Amicus Brief, R. 30, Page ID #19. But what Buckeye misses is that a key source of value of these consensus standards is in OSHA's use of them. Many were adopted by OSHA in its early years through 6(a) rulemaking, 29 U.S.C. § 655(a), and they continue to be used as national safety standards through 6(b) rulemaking, 29 U.S.C. § 655(b), and used in Section 5(a)(1) General Duty Clause enforcement actions, 29 U.S.C. § 654(a)(1). Other federal agencies like the Army Corps of Engineers also use ANSI standards to ensure safe practices.[19] Without the federal agency imprimatur, ANSI

---

[19] *See, e.g.*, *EM 385-1-1: Safety and Health Requirements*, Dept. of the Army (Nov. 30, 2014),

standards are recommendations that employers can and often do choose to ignore. But when adopted formally by OSHA, pursuant to its standard-setting power, they can bind all employers—setting a floor below which no employer can fall.[20]

Consensus standards on their own are also a limited tool, if not recognized and deployed by employers in the workplace. And as amicus the American Society of Safety Professionals has laid out, "government regulation is probably necessary when consensus cannot be achieved in the voluntary standards process." *See Position Statement on the Role of Consensus Standards and Governmental Regulations in Occupational Safety and Health*, Am. Soc. of Safety Professionals (Aug. 1995, reaff'd Jun. 2018).

    B.  <u>A Key Function of Employer, Labor, Trade, and Professional Associations is to Help OSHA Set Industry Safety and Health Standards by Providing Comments, Recommendations, Guidance, and Support.</u>

More generally, a critical function of civil society institutions like employer associations and industry groups, as well as labor organizations, in any regulatory regime is as experts whose input is sought by agency officials. They are key

_____

https://www.publications.usace.army.mil/Portals/76/Publications/EngineerManuals/EM_385-1-1.pdf.
[20] *See, e.g.*, 29 CFR 1926.453 *Aerial Lifts*, https://www.osha.gov/laws-regs/standardinterpretations/2001-02-28-0 (part of OSHA's construction scaffolding standard that requires that aerial lifts be designed and constructed in accordance with certain standards to protect construction workers),.

participants in rulemaking—both by responding to OSHA requests for information and giving formal and informal input, as well as by filing public comments.[21] They are key partners with OSHA in educating employers and employees on worker safety and health protections, and in enforcement, and the agency works with them very closely in carrying out its mission. Soliciting input from, and consulting with, these groups is a foundational part of how OSHA sets its health and safety standards.[22] But consultation with industry groups *without regulation*, the paradigm Buckeye celebrates in its brief, would leave occupational safety and health regulation utterly toothless and subject to idiosyncratic and non-transparent interpretations. Amicus Brief, R. 30, Page ID #18-20.

## V.  Only An Extremely Narrow Set of Intentional Workplace Tort Claims are Available to Workers, Making Tort Law a Wholly Inadequate Substitute for OSHA Standards.

Tort law offers almost nothing in terms of additional protections to workers in unsafe workplaces, and cannot be considered a substitute for federal OSHA standards. Tort claims by workers are preempted almost entirely by the exclusive remedy provisions in state worker's compensation statutes. The "grand bargain" at

---

[21] OSHA rulemaking also relies on the advisory committee process, as codified in the Federal Advisory Committee Act of 1972 (FACA) (Public Law 92-463; 5 U.S.C. App. 2). Advisory Committee members are from diverse groups from the public, labor, and industry.

[22] OSHA Standards Development, OSHA (accessed Jan. 25, 2023), https://www.osha.gov/laws-regs/standards-development.

the heart of worker's comp precludes almost all applicable tort claims that workers could otherwise bring against negligent employers. Emily Spieler, *(Re)Assessing the Grand Bargain: Compensation for Work Injuries in the United States, 1900-2017*, 69 Rutgers Univ. L. Rev. 891, 999-1000 (2017).

A slim exception to the exclusivity of workers compensation laws existing in most states lies in intentional torts by employers that result in intended harm or death to workers. *See, e.g*., David B. Harrison, *What Conduct Is Willful, Intentional, or Deliberate Within Workmen's Compensation Act Provision Authorizing Tort Action for Such Conduc*t, 96 A.L.R.3d 1064 (Originally published in 1979); American Law Reports; 101 C.J.S. Workers' Compensation § 1748 Corpus Juris Secundum (Dec. 2022 Update) (intentional tort claims are narrowly construed).

These torts can only be successful in most cases where the employee shows that the employer had a deliberate and willful intention to cause the harm. *Id*. at fn 17. It is not enough to show that the employer "exhibited a lackadaisical or even cavalier attitude toward worker safety…acts or omissions of gross negligence, carelessness, recklessness, or conscious indifference to injury *do not meet* the requisites of deliberate intention on the part of the employer to injure an employee so as to deprive the employer of the protection of the exclusive remedy provision

of the workers' compensation act." 101 C.J.S. Workers' Compensation § 1748 Corpus Juris Secundum, at fn. 17 et seq. (Dec. 2022 Update) (emphasis added).

Two states in the Sixth Circuit illustrate the near-impossibility of succeeding in an intentional tort claim against one's employer in the workplace safety context. The first is Ohio. Ohio's worker's compensation act provides that employers are not liable in tort "unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur." Ohio Rev. Code Ann. § 2745.01. As understood by the Supreme Court of Ohio, this statutory provision allows workers to bring tort claims against their employers only where the "employer acts with specific intent to cause an injury." *Houdek v. ThyssenKrupp Materials N.A., Inc.*, 983 N.E.2d 1253, 1258 (Ohio Sup. Ct. 2012); *see also Rudisill v. Ford Motor Co.*, 709 F.3d 595 (6th Cir. 2013) (the only way an employee can recover under an intentional claim in Ohio is if the employer acted with *specific intent* to cause injury).

The sole dissenter in *Houdek* states in part,

The court below … wrote what the consequences would be if my dire evaluation of the law was indeed correct: "As a cautionary note, if Justice Pfeifer is correct, Ohio employees who are sent in harm's way and conduct themselves in accordance with the specific directives of their employers, if injured, may be discarded as if they were broken machinery to then become wards of the Workers' Compensation Fund. Such a policy would spread the risk of such employer conduct to all of Ohio's employers, those for whom worker safety is a paramount concern and those for whom it is not. So much for "personal responsibility" in the brave, new world of corporations are real persons." More's the pity.

25

*Houdek*, 983 N.E.2d at 1261 (Pfeifer, J., dissenting).

Not surprisingly, commentators have described a near null-set of instances where an injured employee can recover against an employer under Ohio's strictly-cabined exemption. Brice Smallwood, *R.I.P. Employer Intentional Torts: The Debilitating Application of Ohio Revised Code Section 2745.01*, 85 U. Cincinnati L. Rev. 251 (Mar. 2017)

The second example is Michigan, where intentional tort claims are equally difficult, if not impossible, to prove. An injured employee must prove that the employer *actually knew* of the *certainty* of injury. An employer's constructive, implied, or imputed knowledge is not sufficient. M.C.L.A. § 418.131(1); *Howard-Johnson v. V & S Detroit Galvanizing, LLC*, 895 F. Supp. 2d 854 (E.D. Mich. 2012). Most states allow workplace tort claims only for the most egregious employer behavior. American workplaces cannot be kept safe by tort law alone.

## CONCLUSION

OSHA health and safety standards are the centerpiece of the regulatory regime protecting workers in Ohio and across the country. Misapplying the non-delegation doctrine to strip away OSHA's power to issue safety standards would undermine decades of efforts to protect workers on the job, and undercut the goals and expertise of occupational safety and health employer and public interest

associations like amici. For the foregoing reasons, and the reasons stated in

Appellees' brief, the decision of the district court should be affirmed.


Dated January 30, 2023                    Respectfully submitted,

                                          */s/ Pamela M. Newport*
                                          Pamela M. Newport
                                          **BRANSTETTER, STRANCH & JENNINGS, PLLC**
                                          425 Walnut Street, Suite 2315
                                          Cincinnati, OH 45202
                                          Phone:  513.381.2224
                                          Fax:  513.381.2225
                                          Email:  pamelan@bsjfirm.com

                                          *Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS AND TYPE-STYLE REQUIREMENTS**

This document complies with Circuit Rule 29-2 because, excluding parts of the document exempted by Fed. R. App. P. 32(f) this brief contains 5,552 words.

This document complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this documents has been prepared in a 14-point proportionally spaced typeface, Times New Roman, using Microsoft Word 2016.

January 30, 2023                    */s/ Pamela M. Newport*
                                   Pamela M. Newport

                                   *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on January 30, 2023. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Pamela M. Newport*
Pamela M. Newport