No. 22-3772

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

ALLSTATES REFRACTORY CONTRACTORS, LLC,

*Plaintiff – Appellant*,

v.

MARTIN J. WALSH, in his official capacity as Secretary of Labor, et al.,

*Defendants – Appellees*.

*On Appeal from the United States District Court
for the Northern District of Ohio*

## BRIEF OF PROFESSORS JULIAN DAVIS MORTENSON AND
## NICHOLAS BAGLEY AS *AMICI CURIAE* IN SUPPORT OF APPELLEES

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
J. Alexander Rowell
CONSTITUTIONAL
    ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 22-3772 _____          Case Name: Allstates Refractory Cont., LLC v. Walsh

Name of counsel: Brianne J. Gorod _____

Pursuant to 6th Cir. R. 26.1, Professors Julian Davis Mortenson and Nicholas Bagley _____
*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

   No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

   No.

---

CERTIFICATE OF SERVICE

I certify that on _____ 01/30/2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Brianne J. Gorod _____

_____

_____

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

INTEREST OF *AMICI CURIAE* ...................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 1

ARGUMENT.................................................................................. 4

   I.   As Originally Understood, the Constitution Did Not Limit
       Legislative Delegations........................................................... 4

   II.  The First Congresses Routinely Delegated Major Policy Questions
       to the Executive Branch.......................................................... 11

   III. Modern Proposals for Strict Delegation Limits Hinge on Distinctions
       with No Historical Grounding ................................................. 23

CONCLUSION............................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Dep't of Transp. v. Ass'n of Am. Railroads*,
  575 U.S. 43 (2015)..................................................................... 16, 19

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*,
  140 S. Ct. 1649 (2020)................................................................. 11

*Gundy v. United States*,
  139 S. Ct. 2116 (2019)......................................................... 10, 24, 25

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
  448 U.S. 607 (1980).................................................................... 1

*INS v. Chadha*,
  462 U.S. 919 (1983).................................................................... 11

*The Margaretta*,
  16 F. Cas. 719 (C.C.D. Mass. 1815)...................................... 16

*Martin v. Mott*,
  25 U.S. 19 (1827)....................................................................... 28

*Mistretta v. United States*,
  488 U.S. 361 (1989)................................................................... 28

*Printz v. United States*,
  521 U.S. 898 (1997).................................................................... 3

*United States v. Grimaud*,
  220 U.S. 506 (1911)................................................................... 11

*Wayman v. Southard*,
  23 U.S. 1 (1825)............................................................... 26, 27, 28

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)................................................................... 28

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

CONSTITUTIONAL PROVISIONS

Art. of Confederation of 1781, art. II.............................................................. 7

U.S. Const. art. I, § 1 .............................................................................. 7, 10

U.S. Const. art. I, § 8 ............................................................................. *passim*

U.S. Const. art. I, § 9 .................................................................................. 8

U.S. Const. art. IV, § 3 .............................................................................. 18

Va. Const. of 1776 .................................................................................... 6

STATUTES

Act of Aug. 7, 1789, ch. 8, 1 Stat. 50 .......................................................... 17

Act of Sept. 29, 1789, ch. 24, 1 Stat. 95 ....................................................... 20

Act of Mar. 26, 1790, ch. 3, 1 Stat. 103 ........................................................ 21

Act of Apr. 10, 1790, ch. 7, 1 Stat. 109 ........................................................ 15

Act of Apr. 30, 1790, ch. 10, 1 Stat. 119 ....................................................... 20

Act of May 26, 1790, ch. 12, 1 Stat. 122 ....................................................... 16

Act of July 16, 1790, ch. 8, 1 Stat. 130 ......................................................... 21

Act of July 22, 1790, ch. 33, 1 Stat. 137 ................................................... 12, 13

Act of Aug. 4, 1790, ch. 34, 1 Stat. 138 ........................................................ 13

Act of Aug. 4, 1790, ch. 35, 1 Stat. 145 ........................................................ 20

Act of Aug. 12, 1790, ch. 47, 1 Stat. 186 ....................................................... 14

Act of Mar. 3, 1791, ch. 15, 1 Stat. 199 ........................................................ 20

Act of Feb. 20, 1792, ch. 7, 1 Stat. 232 ........................................................ 22

Act of June 4, 1794, ch. 41, 1 Stat. 372 ........................................................ 18

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Act of May 27, 1796, ch. 31, 1 Stat. 474 ..................................... 19

Act of July 9, 1798, ch. 70, 1 Stat. 580 ...................................... 19

29 U.S.C. § 652(8) ................................................................ 1

29 U.S.C. § 655(b) ............................................................... 1

BOOKS, ARTICLES, AND OTHER AUTHORITIES

1 Annals of Cong. (1789) ........................................................ 21

3 Annals of Cong. (1791) ..................................................... 22, 26

Kevin Arlyck, *Delegation, Administration, and Improvisation*,
97 Notre Dame L. Rev. 24 3 (2021) ......................... 16, 17, 22, 24, 25

Francis Bacon, *The Elements of the Common Laws of England* (1636) .... 6

William Blackstone, *Commentaries on the Laws of England* (1791) ........ 5

Edmund Burke, *Reflections on the Revolution in France* (1790) .............. 6

Cecil T. Carr, *Delegated Legislation: Three Lectures* (1921) .................... 5

Ronald A. Cass, *Delegation Reconsidered: A Delegation Doctrine for
the Modern Administrative State*, 40 Harv. J.L. & Pub. Pol'y 147
(2017) ................................................................................ 2

Christine Kexel Chabot, *The Lost History of Delegation at the
Founding*, 56 Ga. L. Rev. 81 (2021) ............................... 13, 14, 15, 22

Paul Craig, *The Legitimacy of US Administrative Law and the
Foundations of English Administrative Law: Setting the Historical
Record Straight* (2016) .......................................................... 5

*Documentary History of the First Federal Congress of the United States
of America* (Linda Grant DePauw et al. eds., 1972) ............................ 14

*The Federalist No. 47* (Clinton Rossiter ed., 1961) .................................. 9, 10

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Philip Hamburger, *Nondelegation Blues*, 91 Geo. Wash. L. Rev. (forthcoming 2023) .................................................................... 27

Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785).... 10

Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327 (2002).................................................................................. 7

John Locke, *Two Treatises of Government* (1690)..................................... 6

Thomas W. Merrill, *Rethinking Article I, Section 1: From Nondelegation to Exclusive Delegation*, 104 Colum. L. Rev. 2097 (2004)................................................................................. 7, 10

Julian Davis Mortenson, *Article II Vests the Executive Power, Not the Royal Prerogative*, 119 Colum. L. Rev. 1169 (2019)............................ 11

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277 (2021)............................................. *passim*

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding: A Response to the Critics*, 122 Colum. L. Rev. 2323 (2022)................................................................................. 28

Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288 (2021)................................................................................. 19, 20

Nicholas R. Parrillo, *Supplemental Paper to "A Critical Assessment of the Originalist Case Against Administrative Regulatory Power"* (2021)................................................................................. 7, 9, 10, 23

Eric A. Posner & Adrian Vermeule, *Interring the Nondelegation Doctrine*, 69 U. Chi. L. Rev. 1721 (2002) ............................................. 8, 9

Gautham Rao, *National Duties: Custom Houses and the Making of the American State* (2016) ............................................................ 18

Session of Virginia Council of State (Jan. 14, 1778) ................................. 6

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Algernon Sidney, *Discourses Concerning Government* (1698) ................. 5

Henry St. John, Viscount Bolingbroke, *A Dissertation upon Parties* (1735) ................................................................................................... 5

Edward C. Walterscheid, *Patents and the Jeffersonian Mythology*, 29 J. Marshall L. Rev. 269 (1995) ............................................................. 15

Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490 (2021) ................................................................................................ 12, 15, 26

## INTEREST OF *AMICI CURIAE*[1]

Julian Davis Mortenson and Nicholas Bagley are professors at the University of Michigan Law School.  Mortenson is a specialist in constitutional history and has written extensively on executive authority and the separation of powers.  Bagley is a leading scholar in administrative law.  They are the co-authors of *Delegation at the Founding*, 121 Colum. L. Rev. 277 (2021), which examines constitutional principles in the Founding era regarding legislative delegations of authority.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Exercising its legislative powers, Congress directed the Secretary of Labor to set workplace safety standards upon a threshold finding "that significant risks are present and can be eliminated or lessened by a change in practices."  *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 642 (1980) (plurality opinion); *see* 29 U.S.C. §§ 652(8), 655(b).  Those standards must be "reasonably necessary or appropriate to provide safe . . . places of employment."  *Id.* § 652(8).

Seeking to invalidate Congress's choice, Allstates Refractory claims that this statute "flunks the intelligible principle test set forth in modern Supreme Court precedent."  Appellant Br. 15.  Perhaps recognizing the implausibility of this claim,

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel made a monetary contribution to the brief's preparation or submission.  All parties have consented to the filing of this brief.

Allstates urges this Court to make that test more stringent, purportedly based on "the original meaning of Article I."  *Id.* at 14.

Article I's original meaning, however, provides no basis for *any* limit on legislative delegations of rulemaking authority, much less the strict new limits Allstates proposes.  The nondelegation doctrine was not "first clearly articulated" until the 1890s, Ronald A. Cass, *Delegation Reconsidered: A Delegation Doctrine for the Modern Administrative State*, 40 Harv. J.L. & Pub. Pol'y 147, 149 (2017), and delegations going back to the First Congress were at least as broad as the "reasonably necessary or appropriate" standard challenged here.  Tellingly, Allstates cites only two sources from before 1897 in its account of original meaning— a passing quote from *The Federalist* and another from a decision written three decades after the Constitution's ratification.  This Court should reject Allstates's hollow assertions about the original understanding of Article I.

At the Founding, legislative delegations were familiar and uncontroversial in Anglo-American law.  Parliament had a long tradition of delegating rulemaking power to the executive and other agents.  These delegates were not regarded as impermissibly legislating when they exercised such power.  Continuing that tradition, delegations were also a pervasive feature of state governance in America after independence.

The Constitution's separation of powers and vesting of legislative authority in Congress was not meant to prevent Congress from delegating.  Nothing in the constitutional text or structure requires such a limit, so long as Congress retains ultimate control over the delegation.  And the debates surrounding the Constitution's drafting and ratification betray no concern about legislative delegations or any notion that the Constitution would restrict them.

Congressional practice in the early Republic confirms this conclusion, decisively refuting any implied prohibition on delegation.  In statute after statute, the early Congress made sweeping delegations of policymaking authority over matters of the highest economic and political significance—including trade restrictions, patent rights, property taxation, refinancing the national debt, regulating the federal territories, embargoes, quarantines, and search-and-seizure authority.   These delegations routinely granted vast discretion to resolve major policy questions with little or no guidance.  And they repeatedly permitted the executive branch to devise rules that intruded on private rights and conduct.  Simply put, broad delegations of authority were ubiquitous in the early Republic.

Allstates does not acknowledge—much less grapple with—these early statutes, which offer "contemporaneous and weighty evidence of the Constitution's meaning."  *Printz v. United States*, 521 U.S. 898, 905 (1997) (quotation marks omitted).  That is unsurprising, because modern critics of delegation have been

unable to account for this evidence.  Their efforts to explain away the historical record hinge on convenient but anachronistic distinctions—such as the notion that Congress may delegate authority over public institutions but not "private conduct," or authority to resolve minor details but not "major policy questions."  Appellant Br. 14.  No one articulated such distinctions in the Founding era, however, much less invoked them to justify early congressional delegations.  And contrary to these claims, the early Congress *did* delegate the authority to resolve major policy questions concerning private conduct, as shown below.

Given the massive historical record from the Founding era, it should be easy to identify concrete, consistent evidence of widely understood limits on legislative delegations—if they existed.  But proponents of a newly invigorated nondelegation doctrine have failed to make that showing.  Original meaning simply does not support the strict delegation limits that Allstates takes as a given.

## ARGUMENT

## I.    As Originally Understood, the Constitution Did Not Limit Legislative Delegations.

At the Founding, legislative delegations of policymaking authority to the executive were both familiar and uncontroversial.  Nothing in the Constitution's text or structure was meant to limit them.

**A.**  In the eighteenth century, British legal and political doctrine permitted statutory delegations of rulemaking authority to actors outside the legislature.  *See*

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277, 296-99 (2021). Indeed, Parliament had a long tradition of making such delegations, *see* Cecil T. Carr, *Delegated Legislation: Three Lectures* 48-56 (1921), and it assigned broad rulemaking authority to the king and others over commerce, environmental management, welfare and vagrancy policy, and other matters, *see* Paul Craig, *The Legitimacy of US Administrative Law and the Foundations of English Administrative Law: Setting the Historical Record Straight* 19-27 (2016), https://ssrn.com/abstract=2802784.

As commentators explained, the king alone could not "have the Legislative power in himself," but Parliament could give him the "part in it" that was "necessarily to be performed by him, as the Law prescribes." Algernon Sidney, *Discourses Concerning Government* 459 (1698); *see* 1 William Blackstone, *Commentaries on the Laws of England* 270-71 (1791) (royal proclamations "founded upon a prior law" and enforcing that law "in such manner as the king shall judge necessary" are "binding upon the subject," whereas a royal proclamation unauthorized by statute "would be to assume . . . a legislative" power).

The only theoretical limit voiced by (some) British writers was that Parliament had to retain ultimate control over the power it delegated—just as the people retained control over the legislators to whom they delegated that power. *See* Henry St. John, Viscount Bolingbroke, *A Dissertation upon Parties* 209 (1735) ("the People of Great

Britain delegate, *but do not give up*, trust, *but do not alienate* their Right and their Power" (emphasis added)); Edmund Burke, *Reflections on the Revolution in France* 294 (1790) ("the House of Commons cannot *renounce* its share of authority," because "the constitution[] forbids . . . such *surrender*" (emphasis added)).  What was prohibited, in other words, was the irrevocable *alienation* of legislative power. *See* John Locke, *Two Treatises of Government*, bk. II, ch. XI, § 141 (1690) ("the legislative [body] cannot *transfer* the power of making laws to any other hands" (emphasis added)); *see also* Mortenson & Bagley, *supra*, at 307-09 (describing seventeenth-century debate about whether Parliament could, as some monarchists argued, "extinguish" its own authority (quoting Francis Bacon, *The Elements of the Common Laws of England* 69 (1636))).

**B.**    After Independence, American state legislatures similarly delegated policymaking authority to executive officials, including in states that adopted a formal separation of powers.  Virginia's constitution, for instance, required the "legislative, executive, and judiciary" departments to be "separate and distinct, so that neither exercise the powers properly belonging to the other."  Va. Const. of 1776, ¶ 4.  Yet its legislature "delegated many special powers" to the governor and Council of State, including the power, for example, to "maintain fair prices."  Session of Virginia Council of State (Jan. 14, 1778) (editorial note), https://founders.archives.gov/documents/Madison/01-01-02-0065.

Collectively, the states "expressly delegated" many of their legislative powers to the Continental Congress.  Art. of Confederation of 1781, art. II.  That Congress, in turn, further delegated its authority on a plethora of important subjects to committees, boards, and officers.  *See* Mortenson & Bagley, *supra*, at 303-04.

**C.**  Legislative delegations were thus an uncontroversial phenomenon in the Founding era.  The Constitution was not meant to alter that.

The text of the Constitution is "silent" on delegation.  Thomas W. Merrill, *Rethinking Article I, Section 1: From Nondelegation to Exclusive Delegation*, 104 Colum. L. Rev. 2097, 2127 (2004).  While Article I vests Congress with "[a]ll legislative Powers herein granted," U.S. Const. art. I, § 1, "nothing in the Constitution . . . specifically states . . . that Congress may not authorize other actors to exercise legislative power," Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 335 (2002).  Even if it did, the text does not "tell us how to discern when that has happened."  Nicholas R. Parrillo, *Supplemental Paper to "A Critical Assessment of the Originalist Case Against Administrative Regulatory Power,"* at 3 (May 14, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3696902.  That is, Article I does not clarify whether an agency is exercising "legislative" power when Congress itself enacted legislation directing the agency to establish rules on a particular subject.

The text alone thus does not resolve "whether a statutory grant of authority can ever violate the constitutional allocation."  Eric A. Posner & Adrian Vermeule, *Interring the Nondelegation Doctrine*, 69 U. Chi. L. Rev. 1721, 1729 (2002). Nothing about vesting the legislative power in Congress implies a limit on Congress's authority to delegate to others.

Indeed, to the extent the text implies anything about delegation, it points *against* such limits.  The Constitution expressly restricts Congress's legislative authorities in several respects, *see* U.S. Const. art. I, § 9, which weighs against inferring additional unwritten restrictions.  The Constitution also empowers Congress to make "all Laws" that are "necessary and proper for carrying into Execution" its legislative powers.  *Id.* art. I, § 8, cl. 18.

In the end, all that can safely be inferred from text and structure is that Congress may not *alienate* its legislative power—the only outcome inconsistent with the vesting clauses.

**D.**  The Constitution's drafting and ratification history offers no reason to infer limits on delegation.  Among the vast records of the Constitutional Convention, the state ratification conventions, *The Federalist*, and other public and private discourse, there is "remarkably little evidence" of any concern with legislative delegations. Posner & Vermeule, *supra*, at 1733.  After all, "the Framers' principal concern was with legislative aggrandizement," not "grants of statutory authority to executive

agents." *Id.* at 1733-34. The few "scattered" references to delegation limits in Founding-era discussions were "rejected by majorities of their audiences, or involved types of delegations categorically different from those that Congress makes to an agency." Parrillo, *supra*, at 8, 43.

Allstates cites precisely one eighteenth-century document in discussing the Constitution's original meaning. Specifically, it notes Madison's recitation in *The Federalist* of Montesquieu's statement that "there can be no liberty where the legislative and executive powers are united in the same person." Appellant Br. 17. Allstates should have read the whole essay—or at least the rest of the paragraph. Madison goes on to discuss "the impossibility and inexpediency of avoiding any mixture whatever of these departments," explaining that Montesquieu warned only about a situation in which "the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department." *The Federalist No. 47*, at 304, 302 (Clinton Rossiter ed., 1961) (emphasis in original). That danger would arise if the executive possessed "*the complete* legislative power," but there is no such threat when the executive "cannot of himself make a law." *Id.*

When Congress passes a law allowing the executive to establish rules on particular subjects, and the executive's delegated authority depends entirely on that legislation, Congress can always modify or end the delegation, over a veto if necessary. Accordingly, Congress's vested powers remain fully intact, and this

arrangement does not constitute "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands." *Id.* at 301.

Allstates's effort to fix the meaning of "legislative" power—and to infer delegation limits from that definition—fares no better. According to Allstates, "[t]he framers understood the term 'legislative power' in Article I 'to mean the power to adopt generally applicable rules of conduct governing future actions by private persons.'" Appellant Br. 18 (quoting *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting)). The text of the Constitution says otherwise. Article I enumerates the "legislative Powers" granted to Congress, *see* U.S. Const. art. I, § 1, and they are not confined to measures that regulate future private conduct, *see id.* art. I, § 8, cl. 1, cl. 5, cl. 7, cl. 9, cl. 14, cl. 17, nor do they single out such measures in any way. The Framers showed us what they meant by "legislative power," and it does not match Allstates's convoluted definition. *Cf.* Parrillo, *supra*, at 4-5 n.7 (demonstrating that the four sources cited for this definition in the *Gundy* dissent do not support it).

Instead, most Founding-era references to "legislative power" merely describe it as "the power to make laws, or something to that effect," Merrill, *supra*, at 2124, consistent with the usage in Article I. *See* Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) (defining "Legislative" only as "Giving laws; lawgiving").

Importantly, too, the Founders did not distinguish between legislative and executive powers in the categorical manner of Allstates's proposed definition. Instead, the same type of government action could be described as either "legislative" or "executive" depending on the actor.  *See* Mortenson & Bagley, *supra*, at 313-32.  Executive power simply meant the authority to carry out projects defined by a prior exercise of legislative power.  *See* Julian Davis Mortenson, *Article II Vests the Executive Power, Not the Royal Prerogative*, 119 Colum. L. Rev. 1169, 1221-38 (2019).  Rulemaking under statutory authorization was therefore regarded as an exercise of "executive" power, *see* Mortenson & Bagley, *supra*, at 313-23, as it has ever since, *see United States v. Grimaud*, 220 U.S. 506, 521 (1911) ("[T]he authority to make administrative rules is not a delegation of legislative power."); *INS v. Chadha*, 462 U.S. 919, 953 n.16 (1983) (explaining why).

In sum, the limits on delegation urged by Allstates have no basis in the Constitution's original public meaning.  Any possible doubt about that is dispelled by the early Congress's use of its legislative power, as discussed next.

## II.    The First Congresses Routinely Delegated Major Policy Questions to the Executive Branch.

Early legislation is "strong evidence of the original meaning of the Constitution."  *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1659 (2020).  And in the Republic's first decade, Congress regularly delegated policymaking authority to the executive branch on the most pressing

issues facing the nation. These statutes conveyed immense, often unguided discretion going far beyond filling in details, finding facts, or organizing public institutions. They confirm that the Constitution, as originally understood, permits broad legislative delegations.

## A. Regulating Commerce with Native American Tribes

Congress has the legislative power to "regulate Commerce . . . with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3, and the First Congress gave the president capacious authority to establish binding rules for this politically significant trade.

In 1790, Congress prohibited anyone from conducting "any trade or intercourse with the Indian tribes" without a license from the executive branch. Act of July 22, 1790, ch. 33, § 1, 1 Stat. 137, 137. And Congress gave the president complete discretion over the licensing scheme, authorizing "such rules, regulations and restrictions, as . . . shall be made for the government of trade and intercourse with the Indian tribes." *Id.* Although the president's rules would "govern[]" the conduct of any licensee "in all things touching the said trade," *id.*, the statute offered nothing—not even an "intelligible principle"—to guide the content of those rules.

 "This was indeed a broad statute that delegated authority to regulate private conduct," "giving the Executive complete discretion to decide whether, to whom, and why to grant such licenses." Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490, 1543 (2021). The president's authority encompassed both cross-

border exchanges and trading that occurred entirely within a state's territory. *See* Act of July 22, § 1, 1 Stat. at 137. Taking full advantage of this discretion, President Washington established a host of rules that specified *who* could trade, *what* items could be traded, and *where*. *See* Mortenson & Bagley, *supra*, at 341.

In short, this law did not merely delegate "the power to fill in the *details* of the rules set by Congress" but instead allowed the president "to decide what *rules* are 'appropriate' in the first place." Appellant Br. 19. It empowered the president to fashion "generally applicable rules governing future private conduct." *Id.* at 14.

### B. Refinancing the National Debt

"Delegation was the First Congress's solution to what was arguably *the* greatest problem facing our fledgling Republic: a potentially insurmountable national debt." Christine Kexel Chabot, *The Lost History of Delegation at the Founding*, 56 Ga. L. Rev. 81, 81 (2021).

To help solve this problem, Congress authorized the president to restructure the nation's foreign debt on essentially whatever terms he judged best. The president could borrow up to about $1.3 trillion (in today's dollars) in new loans, and could make other contracts regarding the debt "as shall be found for the interest of the [United] States." Act of Aug. 4, 1790, ch. 34, § 2, 1 Stat. 138, 138. Aside from a time limit on the duration of new loans, *id.* § 2, 1 Stat. at 139, the statute left key decisions concerning terms, parties, and conditions entirely to the president's

discretion.  *See* Chabot, *supra*, at 124; Mortenson & Bagley, *supra*, at 344-45. Congress effectively told the president: "Do what you think best."  Appellant Br. 36 (quotation marks omitted).

Congress delegated similarly broad authority to refinance the *domestic* debt to a commission of high-level officials, empowering this new body to purchase debt "in such manner, and under such regulations as shall appear to them best calculated to fulfill the intent of this act."  Act of Aug. 12, 1790, ch. 47, § 2, 1 Stat. 186, 186. The entire responsibility for Congress's plan to reduce the domestic debt was therefore vested in a commission given little guidance.  *See id.* §§ 1, 2, 1 Stat. at 186 (specifying minimal requirements, *e.g.*, that purchases be made openly).  Congress also authorized the president to borrow huge amounts of additional money for this purpose.  *Id.* § 4, 1 Stat. at 187.

Through these measures, Congress delegated "decisions regarding borrowing and payment policies of the utmost importance to the national economy."  Chabot, *supra*, at 81.  James Madison described the borrowing power alone as "one of the most important laws."  12 *Documentary History of the First Federal Congress of the United States of America* 1354 (Linda Grant DePauw et al. eds., 1972).

## C.  Granting Patent Rights

To foster commercial innovation and cultivate the economy, the Constitution empowers Congress to grant authors and inventors "the exclusive Right to their

respective Writings and Discoveries."  U.S. Const. art. I, § 8, cl. 8.  The First

Congress promptly delegated this power to a board of executive officials, allowing

them to grant patents when they deemed the invention or discovery "sufficiently

useful and important."  Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109, 110.  Congress

supplied no further guidance, and once a patent was granted, all other Americans

were deprived of the "right and liberty of making, constructing, using and vending"

the invention or discovery.  *Id.*

In other words, Congress delegated its authority to decide what counted as

"sufficiently useful and important" to warrant a legally enforceable monopoly—a

mandate that "certainly leaves a lot of discretion" to "alter the rights of private

persons."  Wurman, *supra*, at 1548; *see* Edward C. Walterscheid, *Patents and the

Jeffersonian Mythology*, 29 J. Marshall L. Rev. 269, 280 (1995) (the patent board

was "left almost entirely to its own devices").  *But see* Appellant Br. 1 (objecting

that "Congress offered no guidance on what makes a rule 'reasonably necessary or

appropriate'").

Exercising this delegated power, the executive branch crafted substantive and

procedural standards that were nowhere to be found in the statute.  *See* Mortenson

& Bagley, *supra*, at 339; Chabot, *supra*, at 142-46 (describing the board's resolution

of steamboat technology questions that "rendered . . . inventors' interests in existing

state patents worthless").

### D.  Remitting Penalties for Customs Violations

The bulk of the early federal government's income came from customs duties, and Congress established a detailed system of customs enforcement.  Having done so, however, Congress gave the executive branch the "authority to effectively rewrite the statutory penalties for customs violations," delegating "Congress's own authority to determine what financial punishments the government would impose on private individuals for violations of the law."  Kevin Arlyck, *Delegation, Administration, and Improvisation*, 97 Notre Dame L. Rev. 243, 306, 249 (2021).

Under the Remission Act of 1790, if the Treasury Secretary concluded that, "in his opinion," a violator acted without "wilful negligence or any intention of fraud," the Secretary had complete discretion to impose as much or as little of the statutory penalty as he "deem[ed] reasonable and just."  Act of May 26, 1790, ch. 12, § 1, 1 Stat. 122, 122-23.  No further standards were prescribed.

Remittance authority was "one of the most important and extensive powers" of the government.  *The Margaretta*, 16 F. Cas. 719, 721 (C.C.D. Mass. 1815) (Story, C.J.).  And the discretion the Act conferred went beyond mere fact finding.  *See id.* (contrasting the Remittance Act with another statute making relief "mandatory" under certain facts, allowing "no further discretion").  The Act effectively "allowed the Executive . . . to make political judgments about what is 'unfair' or 'unnecessary.'"  *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43,

85 (2015) (Thomas, J., concurring in the judgment).  Even so, Congress "repeatedly reauthorized the Act" and ultimately made it permanent.  Arlyck, *supra*, at 7.

### E.  Writing Laws for the Federal Territories

One of Congress's first acts was to "continue" the Northwest Ordinance, which authorized territorial officials to adopt "such laws of the original States, criminal and civil, as may be necessary, and best suited to the circumstances of the[ir] district."  Act of Aug. 7, 1789, ch. 8, 1 Stat. 50, 51.  This statute delegated standardless discretion to craft a territory's entire body of laws.  Notably, while Congress made several changes to the Northwest Ordinance "to adapt [it] to the present Constitution," *id.*, it left in place the Ordinance's "sweeping transfer of lawmaking authority," Appellant Br. 3, from Congress to territorial officials.

Exercising this delegated power, territorial officials adopted measures ranging from the regulation of taverns to the probate of wills, from liability for animal trespassing to the suppression of gambling.  *See* Mortenson & Bagley, *supra*, at 335. If the Founders allowed a person to be publicly whipped for violating rules that Congress never enacted—as they did here, for instance, for petty larceny, *see id.*— it is difficult to claim they would have looked askance at delegations of authority to regulate "private conduct," Appellant Br. 14.  And indeed, no one protested that non-legislative actors were unconstitutionally making laws, even though Congress alone

is empowered to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," U.S. Const. art. IV, § 3, cl. 2.

### F.  Imposing Embargoes

Broad delegations of authority continued beyond the First Congress and throughout the 1790s.  For example, in 1794, Congress gave the president unilateral and largely unfettered authority to lay an embargo "on all ships and vessels in the ports of the United States" whenever, "in his opinion, the public safety shall so require" and Congress was out of session.  Act of June 4, 1794, ch. 41, § 1, 1 Stat. 372, 372.  The president could impose such an embargo "under such regulations as the circumstances of the case may require."  *Id.*

This statute allowed the president to make binding rules for private persons "based on nothing more than [his] own subjective judgment" about "the adequate level of public safety."  Appellant Br. 2, 14.  Given the vital importance in this era of foreign trade and customs revenue, which "almost singlehandedly funded the federal government," Gautham Rao, *National Duties: Custom Houses and the Making of the American State* 6 (2016), such discretion certainly gave the president "regulatory authority over a major policy question of great economic and political importance," Appellant Br. 21.

### G.  Implementing Quarantines

Similarly, the nation's first quarantine law empowered the president "to aid in the execution of quarantine, and also in the execution of the health laws of the states . . . *in such manner as may to him appear necessary*."  Act of May 27, 1796, ch. 31, 1 Stat. 474, 474 (emphasis added).  That mandate "permitted the Executive to make trade-offs between competing policy goals," *Am. Railroads*, 575 U.S. at 85 (Thomas, J., concurring in the judgment), about which "Congress offered no guidance," Appellant Br. 1.

### H.  Establishing Tax Policies

In 1798, Congress delegated broad and coercive rulemaking authority when exercising its power to levy a "direct tax."  Act of July 9, 1798, ch. 70, § 8, 1 Stat. 580, 585.  Having established an "administrative army" to estimate private real estate values across the nation, Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288, 1332-33 (2021); *see* Act of July 9, § 8, 1 Stat. at 585, Congress empowered federal commissioners "to revise, adjust and vary" these valuations "as shall appear to be just and equitable," *id*. § 22, 1 Stat. at 589.

The statute did not define "just and equitable," and the subjective nature of property valuation meant that nearly any approach could merit that label.  Parrillo,

*Critical Assessment*, *supra*, at 1304, 1314 n.102. Moreover, the question of how to appraise property values was politically fraught, typically pitting regional interests against one another—richer coastal areas versus poorer frontier lands, for instance. *See id.* at 1391-1401. But Congress left this "weighty policy question," Appellant Br. 1, almost entirely to rulemakings by the valuation boards, which used their authority in a "dramatic and sweeping" fashion to determine the tax liabilities of "literally every farmer, homeowner, and slaveholder" in the nation, Parrillo, *Critical Assessment*, *supra*, at 1306, 1302.

## I. Other Delegated Authorities

Congress delegated broad policymaking authority in many other areas, with little or no specific guidance. In the First Congress alone, it authorized tax inspectors and customs officials to search private property without a warrant and with little direction—effectively permitting the executive branch to craft policy on when such searches were appropriate. *See* Act of Aug. 4, 1790, ch. 35, §§ 30, 64, 1 Stat. 145, 164, 175; Act of Mar. 3, 1791, ch. 15, § 29, 1 Stat. 199, 206. Other statutes provided that pension policy for servicemembers would be governed by "such regulations as shall be directed by the President." Act of Apr. 30, 1790, ch. 10, § 11, 1 Stat. 119, 121; *see also* Act of Sept. 29, 1789, ch. 24, § 1, 1 Stat. 95, 95. Legislation similarly delegated to the president the power to activate whatever portions of the state militias "he may judge necessary" to protect the frontiers. Act of Apr. 30, 1790, ch. 10, § 16,

1 Stat. 119, 121.  And Congress also delegated its power to "exercise exclusive Legislation" in the capital district.  U.S. Const. art. I, § 8, cl. 17; *see* Act of July 16, 1790, ch. 8, §§ 1-2, 1 Stat. 130, 130.  So too its power to "establish an uniform rule of naturalization."  U.S. Const. art. I, § 8, cl. 4; *see* Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103, 103-04.  In short, sweeping delegations were anything but rare—they were routine.

And notably, the House of Representatives voted for these delegations even as it approved a constitutional amendment stating in part that the executive branch "shall not exercise . . . the power vested in the Legislative" branch.  1 Annals of Cong. 789 (1789).  The House did not seem to think it was an impermissible "exercise" of Congress's "Legislative" powers, *id.*, when the executive branch wielded statutory authority to establish policies and impose binding rules on designated subjects.

*    *    *

Almost as telling as the enactment of these delegations is the dearth of constitutional objections to them.  The vast majority of the bills discussed above prompted no delegation-related concerns, even as they granted rulemaking authority over some of the most important matters in the new Republic.  A small number of congressmen did object to particular delegations in the 1790s, but such objections were only sporadically raised, were almost always peripheral to the debates in

question, and articulated no consistent theory of delegation that might indicate a shared belief in implicit constitutional restrictions.   Most importantly, these objections repeatedly failed.  *See* Mortenson & Bagley, *supra*, at 360-66; Arlyck, *supra*, at 27; Chabot, *supra*, at 116-17.  Rather than revealing a broad preexisting consensus about delegation limits, the very novelty (and failure) of these arguments shows the opposite.

To be sure, Congress did reject one proposed delegation after constitutional concerns were raised.  During the Second Congress, legislators decided to specify the routes for the nation's post roads themselves, instead of leaving this matter to the president as one congressman proposed.  *See* 3 Annals of Cong. 229, 238-41 (1791).  But no more than a handful of representatives invoked constitutional concerns about the delegation.  And those comments were hotly contested, with detractors pointing out their inconsistency with constitutional text, *e.g.*, *id.* at 236 (Rep. Benson), and congressional precedent, *e.g.*, *id.* at 232 (Rep. Bourne); *see* Mortenson & Bagley, *supra*, at 350-55.  While Congress decided to designate the initial post roads itself, it gave the executive branch unfettered discretion to designate additional post roads and the locations of all post offices.  *See* Act of Feb. 20, 1792, ch. 7, §§ 2-3, 1 Stat. 232, 233-34.  Hardly an impressive showing for the most frequently cited evidence of nondelegation sentiment in the Founding era.

### III.    Modern Proposals for Strict Delegation Limits Hinge on Distinctions with No Historical Grounding.

As shown above, broad delegations of rulemaking authority over crucial national issues were ubiquitous in the nation's first decade. Critics of delegation often concede that these statutes conferred expansive policymaking discretion. But to explain this evidence away, they claim that delegation limits are applicable only in certain contexts, and that all these early statutes arose outside of those contexts. Allstates, for example, suggests that delegation is problematic only if it involves "private conduct" or "major policy questions." Appellant Br. 19-20.

This idea, however, is a modern invention. In the Founding era, no one drew the distinctions that delegation's critics now make, much less invoked them to justify early delegations. Just as telling, the few legislators who raised delegation concerns in early congressional debates did so about bills addressing "foreign, military, or non-coercive" government activities—precisely the topics that today's commentators try to exclude from the nondelegation doctrine. Parrillo, *Supplement*, *supra*, at 13. These distinctions are merely *post hoc* rationalizations, unmoored from history. And without those untenable carveouts, it is impossible to reconcile Congress's early practice with a robust nondelegation doctrine.

### A.  Private Conduct

Text and history foreclose Allstates's claim that broad delegations become unconstitutional if they confer power over private conduct.

23

To begin, this position cannot be reconciled with the text of Article I, which makes no distinction between public and private rights when enumerating Congress's "legislative Powers." *See supra* at 10.

Moreover, no one has identified a *single* Founding-era statement suggesting that delegation limits turned on this distinction. Indeed, the historical record refutes that idea. The most substantial early discussion of delegation occurred during the post-roads debate discussed above. And that proposed delegation involved government operations—not "rules of conduct governing future actions by private persons." Appellant Br. 18 (quoting *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting)). "If there had been a consensus view that Congress could broadly delegate legislative authority to the executive when 'privileges' were at issue," the objections to the delegation "would have been pointless," and its supporters "would likely have invoked the exception, instead of defending the proposal on the ground they actually did." Arlyck, *supra*, at 294.

Finally, Congress repeatedly delegated broad authority to fashion rules governing private conduct in the nation's first decade. Yet these laws never provoked any comment that power over "private conduct" could not be delegated.

### B. Military and Foreign Affairs

Allstates briefly nods at the idea that delegations implicating the president's "inherent Article II authority" are exempt from an otherwise strict nondelegation

doctrine.  Appellant Br. 26 (quoting *Gundy*, 139 S. Ct. at 2140 (Gorsuch, J., dissenting)).  Again, however, no one articulated that distinction in the Founding era.  *See* Arlyck, *supra*, at 289-90.

Indeed, the historical evidence is plainly to the contrary.  Most of the early objections to presidential delegations were made *precisely* in the context of bills implicating the military or foreign relations.  *See* Mortenson & Bagley, *supra*, at 360-66 & n.471.  Yet "in no case did proponents of the proposed legislation defend it on grounds of a delegation exception for military and foreign affairs."  Arlyck, *supra*, at 291.

### C. Major Policy Questions

Finally, Allstates echoes a claim that the Constitution distinguishes between "important policy decisions," which Congress must resolve itself, and "filling up details and finding facts," which Congress may delegate.  *Gundy*, 139 S. Ct. at 2145, 2148 (Gorsuch, J., dissenting).  This too lacks any basis in original meaning.

No evidence from the Founding era has ever been unearthed to support a "major questions" theory of delegation.  Early Congresses enacted statute after statute granting immense discretion on crucial policy issues, and there is no record of anyone proposing delegation limits based on an issue's subjective importance.

Indeed, efforts to turn up such evidence only backfire.  One scholar, for example, points to a single remark during the post-roads debate, which seemed to

suggest that the routes of the roads were more "important" than where post offices were placed along those roads.  Wurman, *supra*, at 1511 (quoting 3 Annals of Cong. 230 (1791) (Rep. Livermore)).  But this very speaker *foreclosed* any constitutional distinction based on importance: "the Legislative body being empowered by the Constitution 'to establish post offices and post roads,' *it is as clearly their duty to designate the roads as to establish the offices*."  *Id.* at 229 (emphasis added).

Lacking any Founding-era evidence, proponents of a "major questions" limit have instead seized on a passage from *Wayman v. Southard*, 23 U.S. 1 (1825).  But this ambiguous *dicta*, written three decades after ratification, will not suffice.

*Wayman* was not a delegation case; it was a federalism case, involving a statute that required federal courts to follow preexisting state court procedures, subject to their own alterations.  The plaintiffs insisted that federal courts also had to obey *newly adopted* state procedures, and that allowing the courts to alter those procedures impermissibly gave them legislative authority.  *Id.* at 13-16.

*Wayman* did not decide whether Congress could delegate such power.  As it explained, that issue "does not arise in this case," because "[t]he question really adjourned" was whether newly enacted state laws could indirectly dictate federal procedures.  *Id.* at 48.  The plaintiffs' nondelegation argument was rejected out of hand because it proved too much.  *Id.* at 47-48 ("If Congress cannot invest the Courts

with the power of altering the modes of proceeding of their own officers, . . . how will gentlemen defend a delegation of the same power to the State legislatures?").

Allstates claims that *Wayman* "drew a line between 'those important subjects, which must be entirely regulated by the legislature itself'" and "'those of less interest, in which a general provision may be made.'"  Appellant Br. 20 (quoting *Wayman*, 23 U.S. at 43).  But drawing such a line is exactly what *Wayman* admitted it could *not* do.  "The line has not been exactly drawn," it explained, and "the law may commit something to the discretion of the other departments," but "the precise boundary of this power is a subject of delicate and difficult inquiry, into which a Court will not enter unnecessarily."  23 U.S. at 43, 46; *see* Philip Hamburger, *Nondelegation Blues*, 91 Geo. Wash. L. Rev. at 6, 15 (forthcoming 2023) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3990247 (*Wayman* "did not propose importance as a measure of what can and cannot be delegated" and "made abundantly clear that [it] was not stating a legal standard").

As for the underlying premise of *Wayman*'s *dicta*—a constitutional limit of some kind on delegation—the opinion offered no citation, no examples, and no indication of the possible contours of such a limit.  These tentative musings betray the *absence* of any widely shared principles limiting delegation.

Indeed, two years later, the Court unanimously upheld a statutory delegation containing some of the only language that prompted nondelegation objections in the

1790s.  *See* Mortenson & Bagley, *supra*, at 360-62.  Finding "no ground for a doubt," this ruling confirmed that Congress may delegate powers "of a very high and delicate nature" to the president.  *Martin v. Mott*, 25 U.S. 19, 29 (1827).  It did so without citing *Wayman* or employing an "important subjects" framework.  *See* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding: A Response to the Critics*, 122 Colum. L. Rev. 2323, 2362-64 (2022).

*Wayman*'s quickly forgotten *dicta*, whatever it means, cannot overcome the routine delegation of major policy decisions to the executive branch in the early Congress.  Nor can it stand in for the missing evidence of any concern about delegations at the Founding.  If anything, *Wayman*'s caution against delving into the "delicate and difficult inquiry" of what limits the Constitution might impose on delegation, 23 U.S. at 46, counsels in favor of the judicial restraint—and respect for the elected branches—embodied in the "intelligible principle" test.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474-75 (2001) ("we have 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law'" (quoting *Mistretta v. United States*, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting))).  This Court should not distort that test based on spurious myths about original meaning.

## CONCLUSION

For the foregoing reasons, the decision below should be affirmed.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Brian Frazelle
J. Alexander Rowell
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

Dated: January 30, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,414 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 30th day of January, 2023.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2023, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Executed this 30th day of January, 2023.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amici Curiae*

31