No. 22-3772

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

---

ALLSTATES REFRACTORY CONTRACTORS, LLC,
*Plaintiff-Appellant*,

v.

MARTIN J. WALSH, *et al.*,
*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Northern District of Ohio
(3:21-cv-1864)

---

# BRIEF OF MAIN STREET ALLIANCE AND AMERICAN SUSTAINABLE BUSINESS NETWORK AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES

---

Ben Seel
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Main Street Alliance is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of Main Street Alliance.

American Sustainable Business Network is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of American Sustainable Business Network.

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ............................................................... 1

INTRODUCTION ..................................................................................... 2

ARGUMENT ............................................................................................. 5

  I.  OSHA's Permanent Safety Standards Provide Financial Benefits to Small Businesses. .................................................................................. 6

  II.   The Benefits of OSHA's Ability to Make and Enforce Permanent Safety Standards Cannot be Replaced by Private Employers. ............. 14

CONCLUSION ........................................................................................ 20

CERTIFICATE OF COMPLIANCE ....................................................... 22

CERTIFICATE OF SERVICE ................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstates Refractory Contractors, LLC v. Walsh*,
   No. 3:21-cv-1864, 2022 WL 4017451 (N.D. Ohio Sept. 2,
   2022) ....................................................................................... 2

*Kiewit Power Constructors Co. v. Sec'y of Lab.*,
   959 F.3d 381 (D.C. Cir. 2020) .................................................. 5, 6, 14

**Statutes**

Occupational Safety and Health Act of 1970, 29 U.S.C.
   §§ 651-678 .............................................................................. 3

29 U.S.C. § 651 ........................................................................... 4

29 U.S.C. § 655 ........................................................................... 10

29 U.S.C. § 667 ........................................................................... 10

**Other Authorities**

29 C.F.R. § 1952.4 ...................................................................... 11

29 C.F.R. § 1952.7 ...................................................................... 10

Am. Soc. Safety Professionals, *Why Safety Is Good Business*,
   https://www.assp.org/advocacy/roi-of-safety (last visited
   Jan. 26, 2023) ......................................................................... 12, 13

Bureau of Lab. Stat., *Census of Fatal Occupational Injuries
   Summary, 2021* (Dec. 16, 2022),
   https://www.bls.gov/news.release/cfoi.nr0.htm .................................... 7

Bureau of Lab. Stat., *Employer-Reported Workplace Injuries
   and Illnesses, 2021* (Nov. 9, 2022),
   https://www.bls.gov/news.release/osh.nr0.htm ..................................... 7

Employers, *Workplace Safety Can Give Small Business Owners A Recruiting Edge, Employers Survey Finds* (Sept. 6, 2017), https://www.employers.com/news/2017/workplace-safety-can-give-small-business-owners-a-recruiting-edge/ .................... 13

Fabius, Raymond, et al., *The Link Between Workforce Health and Safety and the Health of the Bottom Line*, 55 J. of Occupational & Env't Econ. Med. 993 (2013) ...................................... 6

Foley, Michael, *DOSH Compliance Effectiveness in Washington State, 2019-2020* Wash. State Dep't of Lab. & Indus. (Dec. 2022), https://www.lni.wa.gov/safety-health/safety-research/files/2022/70_12_2022_CNE_ TechReport_2021_Final.pdf ................................................ 11

Foley, Michael, et al., *The Impact of Regulatory Enforcement and Consultation Visits on Workers' Compensation Claims Incidence Rates and Costs, 1999-2008*, 55 Am. J. Ind. Med. 976 (2012) .................................................................... 11

Haviland, Amelia M., et al., *A New Estimate of the Impact of OSHA Inspections on Manufacturing Injury Rates, 1998-2005*, 55 Am. J. of Indus. Med. 964 (2012) ......................... 11, 15

Levine, David I., et al., *Randomized Government Safety Inspections Reduce Worker Injuries with No Detectable Job Loss*, 336 Science 907 (2012) ....................................... 10

Levine, David I. & Toffel, Michael W., *Government Regulation That Actually Works*, Harvard B. Rev. (May 30, 2012), https://hbr.org/2012/05/government-regulation-that-act ...................................................................... 9, 10, 11

Michaels, David, *OSHA Does Not Kill Jobs; It Helps Prevent Jobs From Killing Workers*, 55 Am. J. of Indus.trial Med. 961 (2012) .......................................................... 9, 11, 12, 13

NSC, *Work Injury Costs*, https://injuryfacts.nsc.org/work/costs/work-injury-costs/ (last visited Jan. 26, 2023)............................................................ 7, 8

iv

OSHA, *Business Case for Safety and Health: Benefits*,
   https://www.osha.gov/businesscase/benefits (last visited
   Jan. 26, 2023) ................................................................................ 13

OSHA, *Business Case for Safety and Health: Costs*,
   https://www.osha.gov/businesscase/costs (last visited Jan.
   26, 2023) ........................................................................................ 8

OSHA, *Commonly Used Statistics*,
   https://www.osha.gov/data/commonstats (last visited Jan.
   26, 2023) .................................................................................. 6, 15

OSHA, *State Plans*, https://www.osha.gov/stateplans/ (last
   visited Jan. 26, 2023) .................................................... 10, 11

OSHA, *Top 10 Most Frequently Cited Standards for Fiscal
   Year 2021*, https://www.osha.gov/top10citedstandards
   (last visited Jan. 26, 2023)............................................ 2, 15

S. Rep. 91-1282 (1970).................................................. 7, 15, 16

## INTEREST OF *AMICI CURIAE*

*Amicus Curiae* Main Street Alliance ("MSA") is a national network of small businesses, which represents approximately 30,000 small businesses spread across 15 states, including those within the territorial jurisdiction of this Court. MSA helps small business owners realize their full potential as leaders for a just future that prioritizes good jobs, equity, and community through organizing, research, and policy advocacy, including around workplace safety issues.

*Amicus Curiae* the American Sustainable Business Network ("ASBN") is a multi-issue membership organization comprised of the business and investor community, which collectively represents over 250,000 businesses, more than 400 of which are in Ohio. It develops and advocates for solutions for policymakers, business leaders, and investors to support an equitable and just High Road Economy, centered on healthy, high-quality workplaces and jobs.

*Amici* have a strong interest in ensuring that the Occupational Health & Safety Administration ("OSHA") may continue to exercise its statutory authority to establish best practices through the promulgation

of permanent safety standards, compliance with which benefits the bottom line of their business and investor members.[1]

## INTRODUCTION

On the basis of a legal argument that finds no support under current law, Allstates Refractory Contractors, LLC ("Allstates") asks the Court to apply the nondelegation doctrine to invalidate every one of OSHA's permanent safety standards. The standards Allstates attacks are prudent rules that "regulate things such as hand tools, equipment, signage, and working surfaces,"[2] and address some of the most common workplace safety hazards.[3] Notably, Allstates does not challenge a particular application of OSHA's safety rules. On the contrary, its sole

---

[1] *Amici* certify that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person, other than *amici*, their members, and their counsel, contributed money intended to fund this brief.

[2] *Allstates Refractory Contractors, LLC v. Walsh*, No. 3:21-cv-1864, 2022 WL 4017451, at *3 (N.D. Ohio Sept. 2, 2022).

[3] *See* Pl.-Appellant Br. 10, ECF No. 19 ("Allstates Br."); *see also* U.S. Dep't of Lab., OSHA, *Top 10 Most Frequently Cited Standards for Fiscal Year 2021*, https://www.osha.gov/top10citedstandards (last visited Jan. 26, 2023).

experience with an OSHA enforcement action shows reasonable enforcement by OSHA of a sensible safety rule.[4]

Nevertheless, Allstates seeks to support its nondelegation argument by making the general claim that OSHA exercises its authority under the Occupational Safety and Health Act of 1970 ("OSH Act")[5] irresponsibly and that the permanent safety rules promulgated under that statute are "burdensome," punitive, "aggressively enforce[d],"[6] and, at best, duplicative of safety measures businesses would voluntarily take in the absence of federal regulation.[7] Thus, in Allstates' view, OSHA's permanent safety standards impose a substantial burden on America's businesses, while providing little value to either employers or employees.

The reality is glaringly different. In the fifty years since the OSH Act was passed, OSHA has used targeted enforcement of evidence-based

---

[4] *See Allstates Refractory Contractors, LLC*, 2022 WL 4017451, at *1 (noting that Allstates was cited in 2019 "for standards violations, including a 'serious violation after a catwalk brace fell and injured a worker below,'" which Allstates did not contest and settled by paying a $5,967 fine) (citation omitted).

[5] 29 U.S.C. §§ 651-678.

[6] *See* Allstates Br. 2.

[7] *Id.* at 2, 11-12.

safety rules to carry out the specific task it was assigned by Congress: "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources."[8] Study after study has shown that OSHA's enforcement of its workplace safety standards significantly reduces the number of workplace injuries and that businesses (and employees) realize substantial benefits from the safer workplaces that result.

The experiences of *amici*'s members confirm the findings of these studies and further rebut Allstates' claim that OSHA's permanent safety standards impose burdensome compliance costs on businesses that could better ensure workplace safety, if left to their own devices. *Amici*'s members know well that the benefits of OSHA's regulatory scheme cannot be fully replicated by the voluntary conduct of private businesses and that, even if they could, many small businesses would struggle to develop and implement their own workplace safety standards.

Allstates asks the Court to turn the clock back many decades on occupational safety, to a time before the OSH Act, when "workplace

---

[8] 29 U.S.C. § 651(b).

safety was addressed in a patchwork manner" that was "largely ineffective."[9] The Court should decline to do so and should affirm the district court.

## ARGUMENT

The Court should reject Allstates' arguments regarding OSHA's legal authority for the reasons set forth in the brief of Defendants-Appellees. *Amici* MSA and ASBN write separately to rebut the assertion—advanced by Allstates in support of its nondelegation argument—that OSHA's permanent safety standards unduly burden businesses and that those businesses would do better to protect their employees without regulatory oversight. As set forth below, that view is neither supported by the many studies that have examined the effect that OSHA's enforcement of workplace safety rules has had on business operations, nor is it reflected in the experiences of small business owners, like *amici*'s members.

---

[9] *Kiewit Power Constructors Co. v. Sec'y of Lab.*, 959 F.3d 381, 385 (D.C. Cir. 2020) (citing S. Rep. No. 91-1282, at 3-4 (1970)).

## I.    OSHA's Permanent Safety Standards Provide Financial Benefits to Small Businesses.

Healthy employees are a core part of any business's bottom line.[10] And yet, "[i]n the four years preceding the [OSH] Act's adoption, more Americans were killed at work than in the Vietnam War."[11] The apparent "increasing human and economic cost of industrial hazards became a matter of serious national concern," which ultimately led to the passage of the OSH Act.[12] Happily, in the fifty years since the OSH Act became law, workplace fatalities have decreased, "on average, from about 38 worker deaths a day in 1970 to 13 a day in 2020."[13] Workplace injuries have also dramatically decreased "from 10.9 incidents per 100 workers in 1972 to 2.7 per 100 [workers] in 2020."[14] This success has

---

[10] *See, e.g.*, Raymond Fabius et al., *The Link Between Workforce Health and Safety and the Health of the Bottom Line*, 55 J. of Occupational & Env't Med. 993, 993 (2013).

[11] *Kiewit Power Constructors Co.*, 959 F.3d at 385 (citing S. Rep. No. 91-1282, at 3-4 (1970)).

[12] *Id.*

[13] OSHA, *Commonly Used Statistics*, https://www.osha.gov/data/commonstats (last visited Jan. 26, 2023).

[14] *See id.*

come despite OSHA having only "about one compliance officer for every 70,000 workers."[15]

Nevertheless, workplace injuries remain a significant concern. Indeed, more than 5,000 workplace fatalities and 2.6 million nonfatal workplace injuries were reported in 2021, the most recent year for which statistics are available.[16] "In addition to the individual human tragedies involved, the economic impact of industrial deaths and disability is staggering."[17] In 2020, for instance, workplace deaths and injuries cost employers an estimated $1.3 million per death and $44,000 "per medically consulted injury," meaning that "[t]he total cost of work injuries in 2020 was $163.9 billion."[18]

---

[15] *Id.*

[16] *See* Bureau of Lab. Stat. ("BLS"), *Census of Fatal Occupational Injuries Summary, 2021* (Dec. 16, 2022), https://www.bls.gov/news.release/cfoi.nr0.htm; BLS, *Employer-Reported Workplace Injuries and Illnesses, 2021* (Nov. 9, 2022), https://www.bls.gov/news.release/osh.nr0.htm.

[17] S. Rep. 91-1282, at 2 (1970).

[18] National Safety Council ("NSC"), *Work Injury Costs*, https://injuryfacts.nsc.org/work/costs/work-injury-costs/ (last visited Jan. 26, 2023) (discussing comparable 2020 workplace fatality and injury statistics).

That sum includes direct costs, including "wage and productivity losses of $44.8 billion, medical expenses of $34.9 billion, and administrative expenses of $61.0 billion."[19] Workplace injuries impose substantial indirect costs as well, such as for "training replacement employees, accident investigation and implementation of corrective measures, lost productivity, repairs of damaged equipment and property, and costs associated with lower employee morale and absenteeism."[20] These costs likely would have been even greater if not for OSHA's ability to set and enforce uniform workplace safety standards, like those challenged by Allstates.

The cost savings that businesses can realize from compliance with OSHA regulations is not an academic concept to businesses like ASBN member, Longfellow Health Clubs ("Longfellow"), which operates health clubs in New England. Longfellow recognizes that, through its compliance with OSHA's workplace safety standards, it has had fewer

---

[19] *Id.*

[20] OSHA, *Business Case for Safety and Health: Costs*, https://www.osha.gov/businesscase/costs; *see also* NSC, *Work Injury Costs*, https://injuryfacts.nsc.org/work/costs/work-injury-costs/ (last visited Jan. 19, 2023) (estimating that, in 2020, employers incurred "uninsured costs of $12.8 billion").

injury-related employee absences and compensation claims, and less employee turnover.

Critically, study after study has also shown that the improvements in workplace safety brought about through OSHA's enforcement efforts "cause no discernible damage to employers' ability to stay in business and no reductions in sales or credit ratings."[21] On the contrary, these studies conclude that "OSHA inspections prevent workplace injuries, while saving employers money and protecting jobs,"[22] and do so without causing "disruptions leading to lost sales or solvency concerns" for the inspected businesses.[23]

Studies examining the effect of workplace safety interventions taken by OSHA, or state agencies charged with administering comparable state plans, make this plain. For instance, in a study of randomized inspections by California's Department of Occupational

---

[21] David I. Levine & Michael W. Toffel, *Government Regulation That Actually Works*, Harvard B. Rev. (May 30, 2012), https://hbr.org/2012/05/government-regulation-that-act.

[22] David Michaels, *OSHA Does Not Kill Jobs; It Helps Prevent Jobs From Killing Workers*, 55 Am. J. of Indus. Med. 961, 962 (2012) (citing *id.*).

[23] Levine & Toffel, *supra* note 21 (concluding that "OSHA inspections offer substantial value to workers, companies, and society").

Safety and Health ("Cal/OSHA"), which administers California's

OSHA-approved workplace safety plan,[24] researchers observed that

workplace inspections "reduced the number of injuries leading to

workers' compensation claims by around 9% and lowered the medical

expenses and wage replacement paid from those claims by 26%."[25] In

the five years following a workplace inspection, the resulting drop in

workplace injuries "reduced medical costs and lost earnings" for

California's employers, on average, "by roughly $355,000 (in 2011

dollars)."[26] Applying the findings from this California case study

nationally, economists have estimated that "workplace safety

---

[24] OSHA may designate state agencies that will administer an approved workplace health and safety "plan" that is "at least as effective in providing safe and healthful employment and places of employment as the standards promulgated under [29 U.S.C. § 655]." 29 U.S.C. § 667. Currently, 22 states administer plans that apply to private sector employers. *See* OSHA, *State Plans*, https://www.osha.gov/stateplans/ (last visited Jan. 26, 2023). Some state plans, like the one Cal/OSHA administers, cover private sector employers and state and local government employers. *See* 29 C.F.R. § 1952.7.

[25] Levine & Toffel, *supra* note 21.

[26] David I. Levine et al., *Randomized Government Safety Inspections Reduce Worker Injuries with No Detectable Job Loss*, 336 Science 907, 910 (2012).

inspections lower the cost of injuries by roughly $20 billion a year" in 2011 dollars.[27]

Similar results were observed in studies considering the impact of workplace safety inspections in Pennsylvania and Washington State.[28] In the Pennsylvania study, researchers found that "[i]nspections with penalties reduced injuries by an average of 19-24% annually in the 2 years following the inspection."[29] Likewise, since 2002, Washington State has studied the connection between workplace safety inspections and compensation claims for workplace injuries.[30] Over this time, it has

---

[27] *See* Levine & Toffel, *supra* note 21.

[28] *See* Michaels, *supra* note 22, at 961 (discussing Amelia M. Haviland et al., *A New Estimate of the Impact of OSHA Inspections on Manufacturing Injury Rates, 1998-2005*, 55 Am. J. of Indus. Med. 964 (2012), and M. Foley et al., *The Impact of Regulatory Enforcement and Consultation Visits on Workers' Compensation Claims Incidence Rates and Costs, 1999-2008*, 55 Am. J. Ind. Med. 976 (2012)). The Washington Department of Labor and Industries administers Washington State's OSHA-approved plan, which "covers all private-sector employers and employees, with several notable exceptions, as well as State and local government employers and employees, within the State." 29 C.F.R. § 1952.4(c). OSHA has jurisdiction to administer occupational health and safety rules with respect to private sector employers in Pennsylvania. *See State Plans*, supra note 24 (map).

[29] Haviland et al., *supra* note 28, at 964.

[30] *See* Michael Foley, *DOSH Compliance Effectiveness in Washington State, 2019-2020*, Wash. State Dep't of Lab. & Indus., 4

repeatedly found "a substantial decline" in the number of worker compensation claims following an enforcement action or other intervention by the regulator, which suggests that "interventions trigger broad improvements in safety practices at visited workplaces that result in preventing serious and costly injuries."[31]

Other studies have also observed the proliferating benefits that occur within a business following an inspection. For example, one study observed that "[w]orkers at facilities cited for [personal protective equipment] standard violations showed reductions in all types of injuries: those associated with the standard cited, as well as injuries unrelated to the specific standard."[32] Additionally, "[a]n organization-wide focus on safety" has been shown to produce "higher worker productivity, which drives short-term revenue growth and supports long-term sustainability."[33] That means that "changes made to improve workplace safety and health can result in significant

---

(Dec. 2022), https://www.lni.wa.gov/safety-health/safety-research/files/2022/70_12_2022_CNE_TechReport_2021_Final.pdf.

[31] *Id.* at 15.

[32] Michaels, *supra* note 22, at 962.

[33] Am. Soc. Safety Professionals, *Why Safety Is Good Business*, https://www.assp.org/advocacy/roi-of-safety (last visited Jan. 26, 2023).

improvements to their organization's productivity and financial performance," too.[34]

Finally, especially when labor markets are tight and unemployment is low, employers can gain a competitive advantage in hiring and retaining quality employees by pointing to a history of workplace safety,[35] which one survey found to be "among the top criteria employees consider when evaluating a new job offer."[36]

In sum, study after study, as well as the experiences of *amici*'s members, has dispelled "the myth that OSHA inspections make running a business more expensive without adding value," concluding instead that "OSHA inspections prevent workplace injuries, while saving employers money and protecting jobs."[37]

---

[34] *See* OSHA, *Business Case for Safety and Health: Benefits*, https://www.osha.gov/businesscase/benefits (last visited Jan. 26, 2023).

[35] Am. Soc. Safety Professionals, *supra* note 33 ("Recruiting and retaining top talent is easier for organizations that provide safe and comfortable workplaces, care for employee well-being and protect the environment.").

[36] Employers, *Workplace Safety Can Give Small Business Owners A Recruiting Edge, Employers Survey Finds* (Sept. 6, 2017), https://www.employers.com/news/2017/workplace-safety-can-give-small-business-owners-a-recruiting-edge/.

[37] Michaels, *supra* note 22, at 962.

## II.    The Benefits of OSHA's Ability to Make and Enforce Permanent Safety Standards Cannot be Replaced by Private Employers.

The Court should further reject Allstates' speculative suggestion that invalidating OSHA's permanent safety standards in their entirety would not imperil workplace safety because employers would voluntarily adopt safety measures that are "just as effective as the ones mandated by OSHA, if not more so."[38] That is a dubious assertion. But, even if some businesses would dedicate resources to develop and implement their own workplace safety standards, the result would be, at best, a "patchwork" of voluntary safety guidelines that would necessarily lack many of the compliance-forcing benefits of one administered by OSHA. It would, accordingly, be "largely ineffective," much like the system that existed prior to the OSH Act.[39]

OSHA cannot enforce safety rules that are held unconstitutional. Thus, if Allstates succeeds in abrogating the entire catalogue of permanent safety rules—which are among the rules OSHA most

---

[38] *See* Allstates Br. 11-12.

[39] *See Kiewit Power Constructors Co.*, 959 F.3d at 385 (citing S. Rep. No. 91-1282, at 3-4 (1970)).

frequently enforces[40]—employees will be left reporting violations of voluntarily adopted safety standards to their employer, which may not be as well-incentivized under this model to mitigate workplace hazards.[41] Employees might also be reluctant to report workplace safety violations in the first place out of concern that their employer will respond with inaction or even retaliation.

OSHA's inability to take enforcement actions will also result in far less information being publicly available about workplace hazards because employers are unlikely to voluntarily publicize their own violations, as OSHA now does. That could make it difficult to develop evidence-based best practices because industry-wide trends will be

---

[40] *Top 10 Most Frequently Cited Standards for Fiscal Year 2021*, *supra* note 3.

[41] *See* Haviland et al., *supra* note 28, at 974 (observing that "complaint inspections can play an important deterrent role even if they were to have less impact at the inspected facility" because "[a] complaint makes the probability of an inspection jump close to 100%," and "[i]f employers perceive that employees may complain to OSHA, they have a greater incentive to comply."); *see also Commonly Used Statistics*, *supra* note 13 (noting the "dramatic" improvement in workplace safety since the passage of the OSH Act); S. Rep. 91-1282 at 2 (finding "the knowledge that the industrial accident situation [wa]s deteriorating, rather than improving," to "underscore[] the need for" passage of the OSH Act).

harder to discern.[42] Likewise, employers will be less able to learn from the mistakes of their competitors unless those competitors publicly announce that an accident has occurred at their workplace. And responsible employers will have a harder time distinguishing themselves to job candidates based on their safety record, as they will be able to provide data concerning their own record, but *industry-wide* comparisons will be difficult to make or trust. The flip side will also be true: job applicants will lack information about a prospective employer's safety record in comparison to others that might have informed their decision to accept or reject a job offer.[43] Finally, the lack of information could lead to a drop in the compliance that OSHA is currently able to engender by naming and shaming egregious violators.[44]

---

[42] *See* S. Rep. 91-1282 at 16 ("Full and accurate information is a fundamental precondition for meaningful administration of an occupational safety and health program.").

[43] Matthew S. Johnson, *Regulation by Shaming: Deterrence Effects of Publicizing Violations of Workplace Safety and Health Laws*, 110 Am. Econ. Rev. 1866, 1870 (June 2020) (noting that "publicity about OSHA violations could mitigate a market imperfection and lead current workers to update their beliefs about their job risks and in turn to quit, or lead potential new workers to be more informed at the outset of a job and in turn demand higher wages").

[44] *See id.* at 1867, 1888 (estimating that "OSHA would have to conduct 210 . . . inspections to elicit the same level of deterrence as a

In any event, even if the deficiencies of a privatized workplace safety system were not so glaring, it is fanciful to assume that all businesses will develop their own best practices. To be sure, some businesses will, but—as the evidence of much greater numbers of workplace injuries and deaths before the OSH Act demonstrates—many others likely will decline to do so. That may be the case when a business—especially a well-capitalized one whose viability would not immediately be jeopardized by injury-related costs—cuts out safety measures in order to generate short-term savings and then strategically uses those savings to underbid or undersell competitors that are unwilling to compromise employee safety or unable to bear additional injury-related costs.[45] Success in that gambit by some businesses might,

---

single press release about severe violations”); *see also id.* at 1899 (drawing inference “that one reason facilities comply more following press releases about a peer is that employers seek to avoid costly responses from workers”).

[45] Despite the economic benefits of avoiding workplace injuries discussed above, an employer might nevertheless believe that it can gain a competitive advantage by declining to voluntarily mitigate workplace hazards, at least in the short term. An employer might take this view because, for example, “imperfections in workers’ compensation mean that employers only partially internalize the costs of workplace injuries and illnesses.” *See id.* at 1870 n. 7.

in turn, encourage other unscrupulous employers to follow suit. In effect, removing the occupational safety floor that OSHA currently preserves could both increase the number of workplace injuries and punish responsible employers, who will face unfair competition from firms that cut corners on workplace safety.

This scenario is not hypothetical for *amici*'s members. Indeed, Sustainability Systems, LLC—an ASBN member based in Michigan—has observed through its environmental, health, and safety consulting work that some employers will cut corners on workplace safety in a short-sighted effort to gain a business advantage. M&E Engineers, a New Jersey-based ASBN member, has similarly encountered employers through its consulting work that would have been willing to take risks with employee safety, but for the threat of OSHA enforcement. And ASBN member, Keap Candles, a New York-based candle manufacturer, has seen in its own business how OSHA's enforcement of transparent and uniform safety standards keeps the playing field level by allowing businesses to compete on quality, service, and innovation, rather than on cutting costs by risking employee safety. Fair competition ultimately benefits employers, employees, and consumers.

But for other businesses, especially small businesses, internalizing the costs of establishing a bespoke safety regime will, in fact, be prohibitively expensive. That is because replicating the system OSHA now oversees requires more than simply understanding the risks of a particular workplace. Employers will also need to develop an understanding of the rules, procedures, and available technology that might mitigate those risks. Small businesses, like those represented by *amici*, are less likely than their large competitors to either already possess the requisite technical knowledge or to be able to afford to acquire it.

For instance, MSA member and Minnesota-based cleaning service, 1st Class Cleaning Services, does not have the resources to develop its own safety protocols. Nor does Keap Candles, which relies on OSHA's expertise in workplace safety and is ill-equipped to wear the additional hat of workplace safety expert. The same is true for Naturepedic Organic Mattresses & Bedding ("Naturepedic"), an ASBN member based in Ohio that manufactures organic mattresses. Naturepedic looks to OSHA's permanent safety standards for guidance on best practices to mitigate workplace hazards and is concerned about the costs it would

incur, if it were forced to navigate occupational safety issues without OSHA's guidance and oversight. And for ASBN member, Pingree Detroit, a worker-owned manufacturer of handstitched leather goods, the cost and difficulty of creating its own workplace safety standards would be a virtual impossibility.

In a world where OSHA cannot set and enforce permanent safety standards, small businesses, like those represented by *amici*, are left with the choice of either diverting scarce resources away from their core business operation to develop bespoke safety protocols, or risk incurring the exorbitant costs of a workplace injury to one of their valued employees. The Court should decline Allstates' invitation to force small businesses into such an untenable position.

## CONCLUSION

For the reasons stated above, and those given in Defendants-Appellees' brief, *amici* urge the Court to affirm the well-reasoned opinion of the district court.

Respectfully submitted,

*/s/ Ben Seel*
Ben Seel
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34554
Washington, D.C. 20043
bseel@democracyforward.org

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b), this document contains 3,746 words according to the word count function of Microsoft Word 365.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and 6th Cir. R. 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

*/s/ Ben Seel*

Date: January 30, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2023, a true and accurate copy of the foregoing proposed brief was electronically filed with the Court using the CM/ECF system. Service on counsel for all parties will be accomplished through the Court's electronic filing system.

*/s/ Ben Seel*

Date: January 30, 2023