No. 22-3772

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

ALLSTATES REFRACTORY CONTRACTORS, LLC,

Plaintiff-Appellant,

v.

MARTIN J. WALSH, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF LABOR, et al.,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Northern District of Ohio, Western Division

No. 3:21-cv-1864
The Honorable Jack Zouhary

## BRIEF OF AMICI CURIAE ILLINOIS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAII, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, AND WASHINGTON IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

KWAME RAOUL
Attorney General
State of Illinois

ALEX HEMMER
Deputy Solicitor General
IVAN PARFENOFF                    JANE ELINOR NOTZ
Assistant Attorney General       Solicitor General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5526
Alex.Hemmer@ilag.gov             Attorneys for Amici States

*(Additional counsel on signature page)*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................ii

IDENTITY AND INTEREST OF AMICI STATES ................................1

ARGUMENT ...................................................................................3

I.    OSHA's Permanent Safety Standards Ensure Workplace Safety
      Throughout The United States And Are Critical To Amici States'
      Own Efforts To Protect Workers....................................................3

      A.    The permanent safety standards protect workers
            throughout the United States.................................................4

      B.    Amici States rely on the permanent safety standards and
            OSHA's enforcement efforts................................................15

II.   OSHA's Authority To Promulgate Permanent Safety Standards
      Does Not Violate The Nondelegation Doctrine............................21

CONCLUSION ...........................................................................27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*American Power & Light v. Securities & Exchange Commission*,
329 U.S. 90 (1946)...................................................................22

*Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977)......................................................4, 5

*Blocksom & Co. v. Marshall*,
582 F.2d 1122 (7th Cir. 1978)...........................................................25

*Gundy v. United States*,
139 S. Ct. 2116 (2019)..........................................................22, 23, 25

*In re MCP No. 165*,
21 F.4th 357 (6th Cir. 2021) .......................................................6, 23

*International Union, United Automobile, Aerospace & Agriculture Implement Workers of America, UAW v. Occupational Safety & Health Administration*, 37 F.3d 665 (D.C. Cir. 1994)..................25, 26

*Mistretta v. United States*,
488 U.S. 361 (1989)...........................................................22, 23, 24

*National Broadcasting Co. v. United States*,
319 U.S. 190 (1943)...................................................................23, 24

*National Maritime Safety Ass'n v. Occupational Safety & Health Administration*,
649 F.3d 743 (D.C. Cir. 2011) ..................................................24, 25

*National Federation of Independent Business v. Department of Labor*,
142 S. Ct. 661 (2020) (per curiam) ...........................................6

*Tessier's, Inc. v. Secretary of Labor,*
   6 F.4th 777 (8th Cir. 2021) ............................................................. 8, 9

*Tessier's, Inc. & Its Successors,*
   2020 O.S.H.D. (CCH) ¶ 33787, 2020 WL 2507772 (OSH Rev.
   Comm'n Mar. 30, 2020)............................................................. 9

*Whitman v. American Trucking Ass'ns,*
   531 U.S. 457 (2001) ............................................................. 22, 23, 24

*Yakus v. United States,*
   321 U.S. 414 (1944)............................................................. 23, 24

## STATUTES AND REGULATIONS

Cal. Code Regs. tit. 8, § 4885 ............................................................. 17

29 C.F.R.
   Part 1904............................................................. 17
   § 1910.132 ............................................................. 9
   § 1910.147 ............................................................. 12
   § 1910.307 ............................................................. 17
   § 1910.7 ............................................................. 17
   § 1910.1200 ............................................................. 18
   § 1926.1 ............................................................. 17
   § 1926.501 ............................................................. 7, 8

Federal Rule of Appellate Procedure 29(a)(2) ............................................................. 1

Iowa Admin. Code r. 875-3.22(88,89B) ............................................................. 17, 18

Nev. Admin. Code 618.5247 ............................................................. 17

N.M. Admin. Code § 11.5.1.16............................................................. 17

Or. Admin. R. 437-003-0001............................................................. 17

29 U.S.C.
   § 651 ................................................................. 3, 15, 24
   § 652 ................................................................. *passim*
   § 655 ................................................... 2, 3, 19, 20, 25
   § 658 ................................................................. 6
   § 667 ................................................................. 15, 16, 17
   § 672 ................................................................. 16

## OTHER AUTHORITIES

Cal. Div. of Occupational Safety & Health, *Worker Safety and Health in Wildfire Regions*, https://www.dir.ca.gov/dosh/Worker-Health-and-Safety-in-Wildfire-Regions.html ................................................................. 17

116 Cong. Rec. 38,370 (1970) ................................................................. 4

Johnson, Matthew S. et al., *Improving Regulatory Effectiveness Through Better Targeting: Evidence from OSHA*, Harv. Bus. Sch. Tech.. & Operations Mgt. Unit Working Paper No. 20-019 (2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3443052 ......... 13

McPhaul, Kathleen M., *OSHA and NIOSH Turn 50*, 69 Workplace Health & Safety 236 (2021) ................................................................. 5

McQuiston, Thomas H. et al., *The Case for Stronger OSHA Enforcement—Evidence from Evaluation Research*, 88 Am. J. Pub. Health 1022 (1998) ................................................................. 14

Michaels, David & Jordan Barab, *The Occupational Safety and Health Administration at 50: Protecting Workers in a Changing Economy*, 110 Am. J. Pub. Health 631 (2020) ................................................................. 13

Nat'l Safety Council, *Make Fall Safety a Top Priority*, https://www.nsc.org/work-safety/safety-topics/slips-trips-falls ........... 7

Nat'l Safety Council, *Top Work-Related Injury Causes*, https://injuryfacts.nsc.org/work/work-overview/top-work-related-injury-causes/data-details ................................................................. 7

Nat'l Safety Council, *Work Safety Introduction*,
  https://injuryfacts.nsc.org/work/work-overview/work-safety-
  introduction/ ..................................................................................... 14

Or. Occupational Safety & Health Div., *Local Emphasis Program:
  Struck-by Hazards in the Logging Industry* (2016),
  https://osha.oregon.gov/OSHARules/pd/pd-245.pdf .......................... 17

OSHA, *Control of Hazardous Energy*, https://www.osha.gov/control-
  hazardous-energy ............................................................................... 12

OSHA, *FAQ: State Plans*, https://www.osha.gov/stateplans/faqs .......... 18

OSHA, *Industry Profile*,
  https://www.osha.gov/ords/imis/industryprofile.stand?p_esize=
  &p_state=FEFederal&p_type=2&p_stand=1910.147 ....................... 12

OSHA, *Personal Protective Equipment: Fact Sheet*,
  https://www.osha.gov/sites/default/files/publications/ppe-
  factsheet.pdf ................................................................................... 9, 10

OSHA, Press Release, *Federal Court Orders Tampa Electric Co. to Make
  Significant Workplace Safety Changes, Pay $500K Fine, Face 36
  Months Probation for Fatal Plant Failures* (Aug. 23, 2022),
  https://www.osha.gov/news/newsreleases/region4/08232022 ............ 10

OSHA, *The OSHA Rulemaking Process*,
  https://www.osha.gov/sites/default/files/OSHA_FlowChart.pdf .. 19, 20

OSHA, *Top 10 Most Frequently Cited Standards*,
  https://www.osha.gov/top10citedstandards ......................................... 6

Rosner, David & Gerald Markowitz, *A Short History of Occupational
  Safety and Health in the United States*, 110 Am. J. Pub. Health 622
  (2020) ................................................................................................... 4

Rothstein, Mark A., *The Occupational Health and Safety Act at 50: Introduction to the Special Edition*, 110 Am. J. Pub. Health 613 (2020)...................................................................................................5

Walter, Laura, EHS Today, *Survey: Workers Risk Injury By Not Wearing PPE* (Nov. 18, 2008), https://www.ehstoday.com/ppe/article/21907194/survey-workers-risk-injury-by-not-wearing-ppe ................................................................ 11

U.S. Bureau of Labor Stats., *A Look at Falls, Slips, and Trips in the Construction Industry*, https://www.bls.gov/opub/ted/2022/a-look-at-falls-slips-and-trips-in-the-construction-industry.htm ....................... 7

U.S. Bureau of Labor Stats., *Injuries, Illnesses, and Fatalities*, https://www.bls.gov/iif/latest-numbers.htm ..................................... 14

U.S. Dep't of Labor, Press Release, *U.S. Department of Labor Cites Massachusetts Manufacturer For Safety Violations After Hot Liquid Plastic Burns Worker* (Mar. 21, 2022), https://www.dol.gov/newsroom/releases/osha/osha20220321 ...... 10, 11

**IDENTITY AND INTEREST OF AMICI STATES**

Illinois, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, and Washington ("amici States") submit this brief in support of Defendants-Appellees Martin J. Walsh, in his official capacity as Secretary of Labor; the U.S. Department of Labor; James Frederick, in his official capacity as Acting Assistant Secretary of Labor for Occupational Safety and Health; and the U.S. Occupational Safety and Health Administration ("OSHA"), pursuant to Federal Rule of Appellate Procedure 29(a)(2).

Amici States have a substantial interest in protecting the safety of their residents, including from workplace hazards. That interest is implicated by this case, which addresses whether OSHA may lawfully regulate workplace safety by promulgating permanent safety standards under the Occupational Safety and Health Act ("OSH Act" or "Act"). Although amici States play a significant role in ensuring that workers in their jurisdictions are safe from workplace hazards, their efforts are fortified by having a strong federal partner in OSHA, which Congress

has given primary responsibility for protecting workers across the United States from occupational dangers.

This case threatens the stability of the statutory regime under which OSHA operates, and in doing so jeopardizes amici States' ability to ensure the safety of workers in their jurisdictions. For over 50 years, the OSH Act has authorized OSHA to promulgate so-called "permanent safety standards" that protect workers across a wide range of industries from occupational hazards. *See* 29 U.S.C. §§ 652(8), 655(b). Plaintiff argues that the provisions conferring that authority on OSHA—under whose auspices OSHA has regulated for over half a century—violate the nondelegation doctrine. But the district court rejected that argument, reaffirming that OSHA may constitutionally promulgate and enforce permanent safety standards under the Act. The district court's decision was consistent with both settled legal principles and common sense: Plaintiff's position would be devastating both to workers throughout the United States and to amici States, all of which depend on OSHA to promulgate and enforce safety standards in a wide range of industries. Amici States thus urge this Court to affirm the district court's decision.

# ARGUMENT

## I.   OSHA's Permanent Safety Standards Ensure Workplace Safety Throughout The United States And Are Critical To Amici States' Own Efforts To Protect Workers.

Congress enacted the OSH Act in 1970 "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions."  29 U.S.C. § 651(b).  It accomplished that goal by conferring on OSHA a range of statutory authorities to regulate work-related safety conditions in the United States.  As relevant here, the Act authorizes OSHA to "promulgate, modify, or revoke any occupational safety or h standard" by engaging in formal notice-and-comment rulemaking.  *Id.* § 655(b).  The Act defines the term "occupational safety and health standard" to encompass any rule that requires "the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment."  *Id.* § 652(8).[1] The standards that OSHA has promulgated using this authority have, for five decades, protected American workers and buttressed amici

---

[1] The Act also authorizes OSHA to promulgate so-called "national consensus standards" and "emergency temporary standards."  *See id.* § 655(a), (c).  Plaintiff does not challenge these statutory provisions.

States' own efforts to ensure workplaces within their jurisdictions are safe.  Enjoining their promulgation and enforcement would seriously threaten Congress's stated aim in passing the Act.

### A.    The permanent safety standards protect workers throughout the United States.

The permanent safety standards have protected workers in a wide range of industries throughout the United States for over fifty years. Following the industrialization of the United States economy in the early twentieth century, workers faced "extraordinary injury rates in mining, steel manufacturing, and meat packing," and confronted "the growing number of diseases that accompanied the development of new industries and industrial processes."  David Rosner & Gerald Markowitz, *A Short History of Occupational Safety and Health in the United States*, 110 Am. J. Pub. Health 622, 623 (2020).  Workers faced these dangerous hazards without adequate protection.  In the 25 years leading up to the passage of the OSH Act, "more than 400,000 Americans were killed by work-related accidents and disease, and close to 50 million more suffered disabling injuries on the job."  116 Cong. Rec. 38,370 (1970) (statement of Rep. Steiger).  "After extensive investigation, Congress concluded, in 1970, that work-related deaths

and injuries had become a drastic national problem." *Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 444 (1977) (cleaned up). Finding the then-existing safety regime, which relied on a patchwork of state regulatory regimes and tort law, "inadequate to protect the employee population from death and injury due to unsafe working conditions," *id.* at 445, Congress enacted the OSH Act.

The OSH Act revolutionized how businesses and employers approached workplace safety and health. The Act marked the first time federal "legislation required employers to provide 'a safe and healthful workplace.'" Kathleen M. McPhaul, *OSHA and NIOSH Turn 50*, 69 Workplace Health & Safety 236, 236 (2021) (quoting Mark A. Rothstein, *The Occupational Health and Safety Act at 50: Introduction to the Special Edition*, 110 Am. J. Pub. Health 613, 614 (2020)). Significantly, for the first time in United States history, Congress had established a comprehensive "regulatory process for specific workplace hazards . . . along with an infrastructure for conducting workplace safety inspections and collaborating with employers." *Id.*

As noted, OSHA promulgates "occupational safety and health standard[s]" that are "reasonably necessary or appropriate to provide

safe or healthful employment and places of employment." 29 U.S.C.

§ 652(8). "Before going into effect, OSHA's standards must undergo a

notice-and-comment period for 30 days, during which time anyone who

objects to the standard may request a public hearing." *In re MCP No.*

*165*, 21 F.4th 357, 366 (6th Cir. 2021), *overruled on other grounds sub*

*nom. NFIB v. Dep't of Labor*, 142 S. Ct. 661 (2022) (per curiam). These

standards regulate a wide range of workplace hazards across diverse

industries, "including sanitation, air contaminants, hazardous

materials, personal protective equipment, and fire protection." *Id.*

OSHA primarily enforces its standards by conducting workplace

inspections and issuing citations and penalties when violations are

found. 29 U.S.C. § 658(a).

OSHA's permanent safety standards run the gamut, protecting

workers across all industries from workplace hazards ranging from falls

from scaffolding to intrinsically dangerous industrial machines. Take

falls, which remain one of the most common workplace hazards. *See*

OSHA, *Top 10 Most Frequently Cited Standards*.[2] In 2020, falls were

---

[2] https://www.osha.gov/top10citedstandards. All websites last visited
January 30, 2023.

6

the second leading cause of fatalities in the workplace and the third leading cause of injuries. Nat'l Safety Council, *Top Work-Related Injury Causes*.[3] That year, "805 workers died in falls, and 211,640 were injured badly enough to require days off of work." Nat'l Safety Council, *Make Fall Safety a Top Priority*.[4] Such injuries are particularly common in the construction industry, where "nonfatal injuries . . . from falls, slips, and trips occurred at a rate of 31.4 per 10,000 full-time workers in 2020," almost 50% higher than the average across industries. U.S. Bureau of Labor Stats., *A Look at Falls, Slips, and Trips in the Construction Industry*.[5]

Given the risks associated with falls, OSHA promulgated and has for decades enforced a safety standard setting out procedures employers must take in order to protect workers from falling. *See* 29 C.F.R. § 1926.501. That standard, like all OSHA safety standards, balances the important goal of protecting workers against employers' need for

---

[3] https://injuryfacts.nsc.org/work/work-overview/top-work-related-injury-causes/data-details.

[4] https://www.nsc.org/work-safety/safety-topics/slips-trips-falls.

[5] https://www.bls.gov/opub/ted/2022/a-look-at-falls-slips-and-trips-in-the-construction-industry.htm.

flexibility.  The standard regulates a wide range of possible fall hazards, including falling objects, hazardous building structures, and more.  *Id.* §§ 1926.501(b)(4)(iii); 1926.501(b)(1); 1926.501(b)(4)(i).  At the same time, it provides exceptions for employers where certain fall protections would be impractical to implement.  For instance, an employer need not provide certain fall protections when "the employer can demonstrate that it is infeasible or creates a greater hazard to use these systems." 29 C.F.R. §§ 1926.501(b)(2)(i); 1926.501(b)(12)-(13).  Thus, employers operating within different industries and confronting unique hazards may approach the problem of fall protection from angles appropriate to the particular hazards posed.

Safety standards of this sort—the very standards plaintiff would have the Court enjoin OSHA from promulgating and enforcing—are critical to worker safety, as OSHA's enforcement actions illustrate.  In one such action, an employee installing an HVAC system fell "twenty-two feet . . . suffer[ing] serious injuries including skull fractures, broken bones, and a fractured pelvis."  *Tessier's, Inc. v. Sec'y of Lab.*, 6 F.4th 777, 778-79 (8th Cir. 2021).  The employee fell through a hole after cutting the edges of a plywood floor that, unbeknownst to him, had been

8

placed as a cover to a hole leading to the floor below.  *Id.*  The employer

failed to communicate the hazards to the employee, "perform an

inspection of the covers," or offer the worker a fall harness, as required

by the relevant safety standard.  *Tessier's, Inc., & Its Successors*, 2020

O.S.H.D. (CCH) ¶ 33787, 2020 WL 2507772, at *3, 13, 17 (OSH Rev.

Comm'n Mar. 30, 2020).  Without the ability to promulgate and enforce

safety standards like the fall standard, OSHA would be unable to take

any meaningful action to either prevent such tragedies from occurring

or to investigate and penalize employers that fail to take the basic

safeguards necessary to protect their workers.

OSHA has likewise promulgated a safety standard governing the

use of personal protective equipment ("PPE"), which can serve as the

last line of defense for employees against a range of workplace hazards,

including falling objects, dangerous electrified material, flying hot

sparks, and toxic chemicals.  29 C.F.R. § 1910.132; OSHA, *Personal

Protective Equipment: Fact Sheet*.[6]  The PPE required by the OSHA

standard can include hardhats, puncture-resistant gloves, masks, and

---

[6] https://www.osha.gov/sites/default/files/publications/ppe-factsheet.pdf.

steel-toed boots.  OSHA, *Personal Protective Equipment: Fact Sheet*.[7]
The standard requires "employers [to] conduct a hazard assessment of
their workplaces to determine what hazards are present that require
the use of protective equipment, provide workers with appropriate
protective equipment, and require them to use and maintain it in
sanitary and reliable condition."  *Id.*

Notwithstanding OSHA's work promulgating and enforcing this
safety standard, employees are often left without critical PPE.  In 2017,
five workers at a Florida electrical company were fatally burned by
molten slag because their employer "fail[ed] to provide appropriate
personal protective equipment to safeguard employees from burns."
OSHA, Press Release, *Federal Court Orders Tampa Electric Co. to Make
Significant Workplace Safety Changes, Pay $500K Fine, Face 36 Months
Probation for Fatal Plant Failures* (Aug. 23, 2022).[8]  And in 2021, a
plastic packaging manufacturer in Massachusetts failed to provide PPE
to an employee who was severely burned after he was "sprayed with hot
liquid plastic" while operating a machine that makes plastic bags.  U.S.

---

[7] https://www.osha.gov/sites/default/files/publications/ppe-factsheet.pdf.

[8] https://www.osha.gov/news/newsreleases/region4/08232022.

Dep't of Labor, Press Release, *U.S. Department of Labor Cites Massachusetts Manufacturer For Safety Violations After Hot Liquid Plastic Burns Worker* (Mar. 21, 2022).[9]  Plaintiff's amici thus err in asserting that "[i]ndustry organizations are likely more effective in addressing worker safety than any government agency," Buckeye Amicus Br. 11; in fact, industry-wide and individual data points show that employers often fail to enforce even basic safety precautions, like ensuring their employees are wearing PPE.  Laura Walter, EHS Today, *Survey: Workers Risk Injury By Not Wearing PPE* (Nov. 18, 2008).[10] These employers' failure to take even the most basic safety precautions illustrates the importance of OSHA's work developing and enforcing the safety standards, insofar as those standards both encourage employers to protect employee safety and permit the agency to take action when employers fail to do so.

Finally, OSHA also protects worker safety in industries and at worksites that pose complex hazards.  It has, for instance, issued a

---

[9]  https://www.dol.gov/newsroom/releases/osha/osha20220321.

[10]  https://www.ehstoday.com/ppe/article/21907194/survey-workers-risk-injury-by-not-wearing-ppe.

safety standard governing the repair of dangerous machinery and electrical equipment. *See* 29 C.F.R. § 1910.147. Across industries, workers often repair hazardous machines and equipment, including in the plastics manufacturing, animal processing, metalworking, millwork, and printing industries. OSHA, *Control of Hazardous Energy*;[11] OSHA, *Industry Profile*.[12] OSHA has developed a comprehensive and flexible standard regarding the repair of dangerous machinery, one that addresses a wide range of hazards and applies to machines with vastly different functions—from machines that can, if used improperly, "electrically short[], shocking [a] worker who is repairing the equipment," to "jammed conveyor system[s]" that can "crush[] a worker who is trying to clear the jam." OSHA, *Control of Hazardous Energy*, *supra*. OSHA has generally promoted worker safety by tasking employers with developing their own robust repair safety regimes, training their employees on those procedures, and conducting periodic inspections, *see* 29 C.F.R. § 1910.147(c)(1), (c)(2)(ii), an approach

---

[11] https://www.osha.gov/control-hazardous-energy.

[12] https://www.osha.gov/ords/imis/industryprofile.stand?p_esize= &p_state=FEFederal&p_type=2&p_stand=1910.147.

developed after a lengthy rulemaking process conducted with input

from stakeholders across the Nation, *infra* pp. 18-20.

These examples are just a few of the many safety standards OSHA

has promulgated over the last five decades and that it enforces every

day.  That work has proven broadly successful in achieving Congress's

goal of improving the safety of American workplaces.  "In the first year

of OSHA's existence, 38 workers were killed on the job every day; now,

with a workforce more than twice as large, that figure has dropped" by

almost two-thirds.  David Michaels & Jordan Barab, *The Occupational*

*Safety and Health Administration at 50: Protecting Workers in a*

*Changing Economy*, 110 Am. J. Pub. Health 631, 631 (2020).  OSHA's

regulatory approach, which relies in part on worksite inspections, has

contributed to this success.  Studies have found that worksite

inspections lead to fewer injuries at any given worksite over the

subsequent five-year period.  Matthew S. Johnson et al., *Improving*

*Regulatory Effectiveness Through Better Targeting: Evidence from*

*OSHA*, Harv. Bus. Sch. Tech. & Operations Mgt. Unit Working Paper

No. 20-019 (2019) (manuscript at 3).[13]  Indeed, inspections not only curb

---

[13] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3443052.

dangerous hazards at the job sites OSHA actually visits; evidence also indicates that "the injury-reducing effects of inspections with citations and penalties extend *beyond* areas subject to the citations," insofar as employers reform their policies and practices more broadly in the wake of an inspection. Thomas H. McQuiston et al., *The Case for Stronger OSHA Enforcement—Evidence from Evaluation Research*, 88 Am. J. Pub. Health 1022, 1023 (1998) (emphasis added).

OSHA's safety standards have produced significant improvements in workplace safety, and continued enforcement of those standards is critical. In 2021, American workers suffered over 2 million job-related injuries, including over 5,000 fatal injuries. *See* U.S. Bureau of Labor Stats., *Injuries, Illnesses, and Fatalities*.[14] A large majority of those injuries—nine in ten, by some estimates[15]—could have been prevented through compliance with workplace safety precautions, of the kind that OSHA's enforcement of its standards promotes. It is therefore vital that OSHA be able to continue to promulgate, refine, and enforce the safety

---

[14] https://www.bls.gov/iif/latest-numbers.htm.

[15] *E.g.*, Nat'l Safety Council, *Work Safety Introduction*, https://injuryfacts.nsc.org/work/work-overview/work-safety-introduction/.

standards, which serve as the main regulatory backstop ensuring that Americans are safe at work.

As all this makes clear, plaintiff's request to strip OSHA of its longstanding regulatory authority would be extraordinarily disruptive to American workers.  Plaintiff contends that the statute authorizing OSHA to promulgate the safety standards violates nondelegation principles, and seeks an injunction preventing OSHA from issuing or enforcing them.  Allstates Br. 2-4; Compl., R. 1, Page ID #31.  But workers in industries and worksites across the Nation rely on those standards—and on OSHA's work enforcing them—to ensure that basic workplace safety precautions are taken.  Granting plaintiff the relief it requests would upend the regulatory regime that has successfully protected our Nation's workers for over half a century.

### B.    Amici States rely on the permanent safety standards and OSHA's enforcement efforts.

OSHA's safety standards are also critical to the States, including amici States.  The OSH Act grants primary authority for promulgating and enforcing workplace safety standards to OSHA, 29 U.S.C. § 651(b)(3), but it also encourages the States "to assume responsibility for development and enforcement therein of occupational safety," *id.*

§ 667(b).  Pursuant to that authority, many States—including many amici States—have assumed substantial responsibility for ensuring workplace safety within their jurisdictions.  But the States work closely with OSHA to protect workers, most obviously by relying on—and, in many cases, enforcing directly—the safety standards that the federal agency has promulgated.  Enjoining the development and enforcement of those standards would thus have serious repercussions for amici States' ability to protect workers.

The principal way in which OSHA and the States collaborate to protect workers is by the development and enforcement of "State plans." *See* 29 U.S.C. § 667.  Under the Act, a State may propose such a plan to OSHA, which shall approve the plan if the proposed standards "are or will be at least as effective [as OSHA's standards] in providing safe and healthful employment and places of employment," among other criteria. *Id.* § 667(c)(2).  Such a State then assumes responsibility for enforcing its plan, subject to federal oversight.  *Id.* § 667(c), (f).  If a State plan is approved, OSHA also provides the State with funding for enforcement, in an amount up to 50 percent of the State's total enforcement costs.  *Id.* § 672(g).

16

Importantly, States that opt to take responsibility for enforcing workplace safety rules may choose to incorporate OSHA's standards or create state-specific rules that are at least as effective as the federal standards. *See* 29 U.S.C. § 667(c). Many amici States have chosen to draft their own rules governing industries or risks that are specific to those States: California, for instance, has adopted a series of workplace safety rules regarding "expos[ure] to wildfire smoke," Cal. Div. of Occupational Safety & Health, *Worker Safety and Health in Wildfire Regions*,[16] and Oregon has developed and enforces workplace safety rules unique to the State's logging industry, Or. Occupational Safety & Health Div., *Local Emphasis Program: Struck-by Hazards in the Logging Industry* (2016).[17] But *all* States that have developed and enforce their own State safety plans incorporate OSHA's permanent safety standards at least in part.[18] Today, 21 States operate OSHA-

---

[16] https://www.dir.ca.gov/dosh/Worker-Health-and-Safety-in-Wildfire-Regions.html.

[17] https://osha.oregon.gov/OSHARules/pd/pd-245.pdf.

[18] *E.g.*, Or. Admin. R. 437-003-0001 (incorporating 29 C.F.R. § 1926.1); Cal. Code Regs. tit. 8, § 4885 (incorporating 29 C.F.R. § 1910.7); Nev. Admin. Code 618.5247 (incorporating 29 C.F.R. § 1910.307); N.M. Admin. Code § 11.5.1.16 (incorporating 29 C.F.R. pt. 1904); Iowa

approved State plans that cover both private and public employers, and six other States operate plans that cover public employers only; each of these States enforces OSHA's standards, in addition to their own. OSHA, *FAQ: State Plans*.[19]

Enjoining the promulgation and enforcement of the permanent safety standards, as plaintiff requests, would seriously impair worker safety in all States. Those 23 States (and the District of Columbia) that do not currently enforce their own workplace safety standards pursuant to a State plan depend on OSHA to develop and enforce its own safety standards in their States. In the wake of a ruling for plaintiff, workers in these States would proceed without any meaningful workplace protections at all for a potentially significant period of time, until new standards could be established. Those States that have promulgated their own safety standards, for their part, could also find their efforts to protect workers stymied: As discussed, *supra* p. 17, all of these States have incorporated the federal safety standards at least in part in their

---

Admin. Code r. 875-3.22(88,89B) (incorporating 29 C.F.R. § 1910.1200(h)).

[19]  https://www.osha.gov/stateplans/faqs.

own standards, which would mean that an order enjoining enforcement of the federal standards would at least raise serious questions about the validity of the state standards.

It is no answer to say that States could fill any regulatory gap themselves by simply promulgating new safety rules of their own.  *Cf.* Buckeye Amicus Br. 7, 13.  Although many amici States dedicate significant resources to protecting workers—including by developing and enforcing safety standards of their own—all rely heavily, as discussed, on OSHA in doing so, most notably by incorporating OSHA's own standards into their own plans.  OSHA invests extraordinary time and energy into developing those standards:  OSHA rulemaking is a six-stage, multi-year process designed to ensure that standards are both robust enough to protect workers and flexible enough to be used by employers.  *See* 29 U.S.C. § 655(b); *see also* OSHA, *The OSHA Rulemaking Process*.[20]  In developing permanent safety standards, OSHA spends months—and, in many cases, years—consulting with external stakeholders, holding meetings, and soliciting feedback from businesses, industry professionals, safety experts, and others before the

---

[20] https://www.osha.gov/sites/default/files/OSHA_FlowChart.pdf.

agency even begins drafting a proposed standard. *Id.* OSHA then engages in federal notice-and-comment rulemaking, soliciting even more detailed feedback from the public before promulgating a binding standard. *Id.*; 29 U.S.C. § 655(b).

Enjoining the promulgation and enforcement of OSHA's safety standards would thus shift an extraordinary burden onto the States, not all of which presently have the regulatory infrastructure to engage in the kind of robust rulemaking process that States rely on OSHA to conduct. It would also likely require States to shift their resources from matters of local concern, *see supra* p. 17, to the time-consuming and resource-intensive process of promulgating new comprehensive workplace safety codes. A ruling for plaintiff thus would significantly disadvantage the States, which rely on the unique federal-state partnership that has arisen under the OSH Act to protect against workplace hazards.

Finally, notwithstanding plaintiff and its amici's suggestion that it would somehow be preferable to return responsibility for worker safety to the States, *see* Allstates Br. 16; Buckeye Amicus Br. 7, 13, there are many reasons to question whether most employers would

genuinely benefit from such a regime. Were each State to establish its own workplace-safety standards, rather than (in those States that have enacted State plans) incorporating the bulk of OSHA's standards, the practical consequence would likely be a patchwork regime of safety rules, requiring any employer operating in multiple States to comply with not one national safety standard that sets the floor for all States, but a different safety standard for each jurisdiction. That regime would prove costly for employers by significantly increasing compliance costs and diminishing predictability.

Ultimately, OSHA's safety standards both protect workers and increase the States' capacity to ensure their residents' safety while at work. Granting plaintiff the relief it seeks would be disruptive to amici States and threaten the safety of workers within their borders.

## II. OSHA's Authority To Promulgate Permanent Safety Standards Does Not Violate The Nondelegation Doctrine.

The district court correctly rejected plaintiff's challenge to the provisions of the OSH Act authorizing the agency to promulgate safety standards that are "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8). As the district court held, *see* Op., R. 30, Page ID ## 373-376,

Congress did not exceed nondelegation principles in conferring this authority on OSHA.

As OSHA explains, OSHA Br. 10-12, Congress may lawfully confer discretion on the Executive to implement and enforce federal law so long as it supplies an "intelligible principle" defining the limits of that discretion. *Mistretta v. United States*, 488 U.S. 361, 372 (1989). Under that rule, a delegation of authority is constitutionally sufficient if it "ma[kes] clear to the delegee 'the general policy' he must pursue and the 'boundaries of [his] authority.'" *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (opinion of Kagan, J.) (quoting *American Power & Light v. Securities and Exchange Commission*, 329 U.S. 90, 105 (1946)); *see also id.* at 2130-31 (Alito, J., concurring in the judgment) (affirming the continued vitality of the "approach this Court has taken for many years").

That standard is "not demanding." *Id.* at 2129 (opinion of Kagan, J.). And the Supreme Court has repeatedly rejected efforts to expand the nondelegation doctrine, observing that it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'"

*Whitman v. American Trucking Association*, 531 U.S. 457, 474-75 (2001). Indeed, the Court has "[o]nly twice in this country's history (and that in a single year)" found that a statute violates nondelegation principles, "in each case because 'Congress had failed to articulate *any* policy or standard' to confine discretion." *Gundy*, 139 S. Ct. at 2129 (opinion of Kagan, J.) (quoting *Mistretta*, 488 U.S. at 373 n.7). And the Court "ha[s] over and over upheld even very broad delegations," *id.*, including delegations "to regulate in the 'public interest,' to set 'fair and equitable prices,' and to issue air quality standards 'requisite to protect the public health.'" *In re MCP No. 165*, 21 F.4th at 387 (quoting *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943); *Whitman*, 531 U.S. at 457, 472; and *Yakus v. United States*, 321 U.S. 414, 427 (1944)).

As the district court reasoned, Op., R. 30, Page ID ## 373-376, the statutory provision that plaintiff attacks fits squarely within the Supreme Court's cases upholding delegations to federal agencies. The statutory phrase "reasonably necessary or appropriate to provide safe or healthful employment and places of employment," 29 U.S.C. § 652(8), provides as much guidance to OSHA as, for instance, the statutory command in *Whitman*, which directed the Environmental Protection

23

Agency to issue air quality standards that were "requisite to protect the public health." 531 U.S. at 457, 472. And it is "no broader than other delegations that direct agencies to act in the 'public interest,' or in a way that is 'fair and equitable,'" *Nat'l Mar. Safety Ass'n v. OSHA*, 649 F.3d 743, 755 (D.C. Cir. 2011) (quoting *Nat'l Broad. Co.*, 319 U.S. at 216; and *Yakus*, 321 U.S. at 427)—both standards that the Supreme Court has upheld in past cases.

Indeed, reading § 652(8) in the context of the remainder of the OSH Act confirms that Congress has supplied an "intelligible principle" for the agency to follow. *Mistretta*, 488 U.S. at 372. Congress charged OSHA with addressing "personal injuries and illnesses arising out of work situations[,] [which] impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments." 29 U.S.C. § 651(a). In order to address that problem, Congress gave the agency the authority "to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." *Id.* § 651(b)(3). And it elsewhere instructed the agency to "promulgate the standard which assures the greatest protection of the safety or health of

24

the affected employees." *Id.* § 655(a).  All that easily suffices to instruct the agency as to "'the general policy' he must pursue." *Gundy*, 139 S. Ct. at 2129 (opinion of Kagan, J.).

Given all this, as multiple courts have held, "one cannot plausibly argue that 29 U.S.C. § 652(8)'s 'reasonably necessary or appropriate to provide safe or healthful employment and places of employment' standard is not an intelligible principle." *Nat'l Mar. Safety Ass'n*, 649 F.3d at 756 (cleaned up).  Indeed, every court that has considered whether § 652(8) violates nondelegation principles has agreed that it does not, and that the statute is constitutional.  *See id.*; *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. OSHA*, 37 F.3d 665, 668 (D.C. Cir. 1994); *Blocksom & Co. v. Marshall*, 582 F.2d 1122, 1126 (7th Cir. 1978).  As the Seventh Circuit has explained, "Congress has chosen a policy and announced general standards which guide the Secretary in establishing specific standards to assure the safest and healthiest possible working environments, and which enable the courts and the public to test the Secretary's faithful performance of that command." *Blocksom*, 582 F.2d at 1126.

Finally, even if there were any doubt as to whether § 652(8) violates nondelegation principles (and there is not), that doubt could easily be resolved by adopting the agency's own longstanding limiting interpretation of its authority, as OSHA explains. OSHA Br. 12-14, 16-19. Under that interpretation, the agency will not adopt a new safety standard without first making findings that the standard would materially reduce a significant risk of serious material harm, be economically and technologically feasible, and provide a high degree of protection, i.e., one that approaches (but does not exceed) the limits of feasibility. *See UAW*, 37 F.3d at 668-69. This reading permits the agency to "deviate only modestly from the stringency required by" the separate statutory provision permitting it to regulate health hazards, *id.* at 669, which plaintiff expressly states it does not challenge, Allstates Br. 6. OSHA's interpretation of its own statutory authority thus resolves any possible question about the breadth of § 652(8), while permitting the agency to continue operating in a way that promotes worker safety across a wide range of industries.

# CONCLUSION

For these reasons, this Court should affirm the judgment below.

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

/s/ Alex Hemmer
ALEX HEMMER
Deputy Solicitor General
IVAN PARFENOFF
Assistant Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5526
Alex.Hemmer@ilag.gov

ROB BONTA
*Attorney General*
*State of California*
300 South Spring St., Suite 1702
Los Angeles, CA 90013

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street, NW, Suite 8100
Washington, DC 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawaii*
425 Queen Street
Honolulu, HI 96813

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 MLK Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo St.
Santa Fe, NM 87501

LETITIA JAMES
*Attorney General*
*State of New York*
The Capitol
Albany, NY 12224

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

MICHELLE A. HENRY
*Acting Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
1125 Washington St. SE
Olympia, WA 98504

January 30, 2023

29

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,770 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirement of Rules 32(a)(4), 32(a)(5), and 32(a)(6) because the brief is double-spaced and has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

/s/ Alex Hemmer
ALEX HEMMER

January 30, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2023, I electronically filed the

foregoing Brief of Amici Curiae Illinois et al. with the Clerk of the Court

for the United States Court of Appeals for the Sixth Circuit using the

CM/ECF system.  I further certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the

CM/ECF system.


/s/ Alex Hemmer
ALEX HEMMER