No. 22-3772

_____

## IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

_____

ALLSTATES REFRACTORY CONTRACTORS, LLC,

*Plaintiff-Appellant,*

v.

MARTIN WALSH, et al.,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the Northern District of Ohio, Western Division (Zouhary, J.), District Court Case No. 3:21-cv-1864

_____

## BRIEF OF NATURAL RESOURCES DEFENSE COUNCIL, ENVIRONMENTAL DEFENSE FUND, AND SIERRA CLUB AS AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE

_____

SEAN H. DONAHUE
  Donahue & Goldberg, LLP
  1008 Pennsylvania Avenue, SE
  Washington, DC 20003
  (202) 277-7085
  sean@donahuegoldberg.com

GRACE SMITH
VICKIE L. PATTON
  Environmental Defense Fund
  2060 Broadway St., Suite 300
  Boulder, CO 80302
  (303) 447-3001
  gsmith@edf.org

*Counsel for Environmental Defense Fund*

IAN FEIN
CECILIA SEGAL
  Natural Resources Defense Council
  111 Sutter Street, 21st Floor
  San Francisco, CA 94104
  (415) 875-6100
  ifein@nrdc.org

*Counsel for Natural Resources Defense Council*

SANJAY NARAYAN
  Sierra Club Environmental Law Program
  201 Webster Street, Suite 1300
  Oakland, CA 94612
  (415) 977-5769
  sanjay.narayan@sierraclub.org

*Counsel for Sierra Club*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 22-3772 _____          Case Name: Allstates Refractory Contractors v. Walsh

Name of counsel: Ian Fein _____

Pursuant to 6th Cir. R. 26.1, Natural Res. Def. Council; Sierra Club; Env't Def. Fund _____
                              *Name of Party*
makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
     identity of the parent corporation or affiliate and the relationship between it and the named
     party:

> No

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
     in the outcome?  If yes, list the identity of such corporation and the nature of the financial
     interest:

> No

---

### CERTIFICATE OF SERVICE

I certify that on _____ January 30, 2023 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Ian Fein _____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................iii

IDENTITY AND INTEREST OF AMICI CURIAE .....................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .............................2

ARGUMENT ................................................................................................4

I.      Congress addresses complex and pervasive problems by enacting statutes that declare national policies—and establish regulatory frameworks—to protect public health, safety, and the environment..................4

II.     The Constitution permits Congress to enlist the help of expert federal agencies to implement the regulatory programs in these statutes.........................7

III.    Implementing standards to protect public health, safety, and the environment necessarily requires the exercise of some policy discretion...........14

IV.    The OSH Act provides limits that guide the agency's setting of safety standards and enable meaningful judicial review.........................................16

CONCLUSION ...........................................................................................26

CERTIFICATE OF COMPLIANCE............................................................28

CERTIFICATE OF SERVICE .....................................................................29

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935) ................................................................7, 12, 18

*Am. Med. Ass'n v. Reno*,
    57 F.3d 1129 (D.C. Cir. 1995) ...............................................13

*Am. Petroleum Inst. v. EPA*,
    684 F.3d 1342 (D.C. Cir. 2012) ..............................................10

*Am. Power & Light Co. v. SEC*,
    329 U.S. 90 (1946) ......................................2, 4, 7, 8, 13, 14, 20

*Am. Textile Mfrs. Inst., Inc. v. Donovan* (*Cotton Dust*),
    452 U.S. 490 (1981) ............................................................ 9, 21

*Am. Trucking Ass'ns v. United States*,
    344 U.S. 298 (1953) ...............................................................8

*Babbitt v. Sweet Home Chapter of Communities for a Great Or.*,
    515 U.S. 687 (1995) ......................................................... 11, 17

*Blocksom & Co. v. Marshall*,
    582 F.2d 1122 (7th Cir. 1978) ...............................................26

*Buckley v. Valeo*,
    424 U.S. 1 (1976)..................................................................12

*Christy v. Hodel*,
    857 F.2d 1324 (9th Cir. 1988) ...............................................24

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
    320 U.S. 591 (1944) ...............................................................4

*Fed. Power Comm'n v. Texaco*,
    417 U.S. 380 (1974) ..............................................................25

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ..............................................................19

*Gen. Motors Corp. v. United States*,
    496 U.S. 530 (1990) ...............................................................4

*Gulf Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
    968 F.3d 454 (5th Cir. 2020) ...................................................24

*Gundy v. United States*,
    139 S. Ct. 2116 (2019) ...................................................18, 19, 21

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst. (Benzene)*,
    448 U.S. 607 (1980) .................................................8, 9, 15, 21

*Int'l Union, UAW v. OSHA*,
    37 F.3d 665 (D.C. Cir. 1994) ...........................................22

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) ...........................................18

*J.W. Hampton, Jr., & Co. v. United States*,
    276 U.S. 394 (1928) .......................................................18

*Kelly Springfield Tire Co. v. Donovan*,
    729 F.2d 317 (5th Cir. 1984) ...........................................21

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ...................................................16

*Loving v. United States*,
    517 U.S. 748 (1996) ..............................................2, 8, 11, 12

*Michigan v. EPA*,
    576 U.S. 743 (2015) ....................................................16, 23

*Mistretta v. United States*,
    488 U.S. 361 (1989) .................................2, 3, 8, 9, 12, 14, 18, 19, 20

*Mobil Oil Corp. v. Fed. Power Comm'n*,
    483 F.2d 1238 (D.C. Cir. 1973) .......................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .........................................................15

*Murray Energy Corp. v. EPA*,
    936 F.3d 597 (D.C. Cir. 2019) .........................................10

*Nat'l Archives & Recs. Admin. v. Favish*,
    541 U.S. 157 (2004) .......................................................13

iv

*Nat'l Ass'n for Surface Finishing v. EPA*,
    795 F.3d 1 (D.C. Cir. 2015) ................................................................17

*Nat'l Broad. Co. v. United States*,
    319 U.S. 190 (1943) ................................................................... 4, 22

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*,
    142 S. Ct. 661 (2022) ..........................................................................21

*Nat'l Mar. Safety Ass'n v. OSHA*,
    649 F.3d 743 (D.C. Cir. 2011) ...........................................................26

*NRDC v. EPA*,
    749 F.3d 1055 (D.C. Cir. 2014) .........................................................23

*N.Y. Cent. Sec. Corp. v. United States*,
    287 U.S. 12 (1932) .............................................................................22

*N. Nat. Gas Co., Div. of InterNorth v. FERC*,
    785 F.2d 338 (D.C. Cir. 1986) ...........................................................25

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935) ...........................................................................18

*Pub. Serv. Comm'n v. FERC*,
    866 F.2d 487 (D.C. Cir. 1989) ...........................................................25

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    140 S. Ct. 2183 (2020) .......................................................................12

*Sierra Club v. Clark*,
    755 F.2d 608 (8th Cir. 1985) .............................................................24

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) .............................................................................5

*Touby v. United States*,
    500 U.S. 160 (1991) ..................................................................... 12, 14

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ....................................................... 2, 15, 16, 18

*Yakus v. United States*,
    321 U.S. 414 (1944) .......................................................... 14, 19, 20

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..............................................................................11

## Statutes

5 U.S.C. § 702 .......................................................................................13

5 U.S.C. § 704 .......................................................................................13

5 U.S.C § 706 ........................................................................................13

5 U.S.C. §§ 801-808 ..............................................................................13

15 U.S.C. § 717c ....................................................................................25

15 U.S.C. § 717d ....................................................................................25

15 U.S.C. § 717o ....................................................................................25

15 U.S.C. § 2601 ......................................................................................6

16 U.S.C. § 1531 ......................................................................................5

16 U.S.C. § 1533 ................................................................6, 11, 17, 24

16 U.S.C. § 1540 ....................................................................................17

16 U.S.C. § 1600 ......................................................................................6

16 U.S.C. § 1801 ......................................................................................6

16 U.S.C. § 1855 ....................................................................................24

29 U.S.C. § 651 ......................................................5, 6, 9, 19, 20, 22

29 U.S.C. § 652 ..............................................................................3, 6, 22

29 U.S.C. § 654 ......................................................................................21

29 U.S.C. § 655 ..................................................................6, 20, 21, 22

29 U.S.C. § 666 ......................................................................................21

33 U.S.C. § 1251 ......................................................................................5

42 U.S.C. § 6311 ....................................................................................10

42 U.S.C. § 6902 ......................................................................................6

42 U.S.C. § 7401 ..................................................................................... 5

42 U.S.C. § 7408 .................................................................................. 6, 10

42 U.S.C. § 7409 ............................................................................. 6, 10, 16

42 U.S.C. § 7412 .......................................................................6, 16, 17, 23

42 U.S.C. § 7521 ..................................................................................... 6

42 U.S.C. § 7601 ....................................................................................23

42 U.S.C. § 7607 ....................................................................................13

## Regulations

59 Fed. Reg. 51,672 (Oct. 12, 1994) ........................................................ 9

62 Fed. Reg. 40,142 (July 25, 1997) ........................................................ 9

66 Fed. Reg. 5196 (Jan. 18, 2001) ........................................................... 9

74 Fed. Reg. 36,312 (July 22, 2009) .......................................................10

79 Fed. Reg. 20,316 (Apr. 11, 2014) ................................................... 9, 10

## Other Authorities

Antonin Scalia, *Responsibilities of Regulatory Agencies Under Environmental Laws*,
     24 Hous. L. Rev. 97 (1987) ...........................................................16

Brett Kavanaugh, *Fixing Statutory Interpretation*,
     129 Harv. L. Rev. 2118 (2016) ......................................................15

Cong. Rsch. Serv., R43992,
     *The Congressional Review Act (CRA): Frequently Asked Questions* (2021)..................13

Cong. Rsch. Serv., R46677,
     *The Endangered Species Act: Overview and Implementation* (2021)................................11

N.Y. Times, *Los Angeles Smog Persists 9th Day* (Oct. 16, 1954) ........... 5

Noah Greenwald et al., *Extinction and the U.S. Endangered Species Act*,
     PeerJ (Apr. 22, 2019)......................................................................6

S. Rep. No. 91-1282 (1970).......................................................................5

Time, *America's Sewage System and the Price of Optimism* (Aug. 1, 1969) ...............................5

U.S. Dep't of Labor, Commonly Used Statistics.................................................................6

U.S. EPA, The Clean Air Act and the Economy (Jan. 20, 2023).......................................7

U.S. EPA, 50th Anniversary of the Clean Air Act (Dec. 16, 2022)................................7

## IDENTITY AND INTEREST OF AMICI CURIAE

Amici Natural Resources Defense Council, Environmental Defense Fund, and Sierra Club are nonprofit environmental organizations with a strong interest in ensuring that Congress retains its ability to delegate regulatory authority to federal agencies to protect public health, safety, and the environment.[1]

Amici have decades of experience working with federal agencies acting pursuant to delegations of statutory authority. They know that Congress could not protect the public from pervasive and complex problems without the ability to delegate regulatory authority to these agencies—particularly public health and safety regulations, which often require technical expertise and context-dependent judgments. Amici also have litigated hundreds of cases addressing whether an agency has stayed within its delegated statutory authority. And they litigate these questions on both sides: Amici intervene to help defend agency action as properly authorized by Congress, but also challenge agency actions as exceeding an agency's delegated authority. Through this experience, Amici know that statutory delegations like the one challenged in this case have meaningful, judicially enforceable limits and are neither wholly open-ended nor constitutionally problematic.

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part. No person contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Supreme Court has long recognized that it is often necessary for Congress to delegate "broad" regulatory authority to federal agencies to address "complex economic and social problems." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). Such delegations ensure a "workable National Government" and are consistent with "the Framers' design." *Loving v. United States*, 517 U.S. 748, 758 (1996). Delegations to federal agencies are therefore "constitutionally sufficient" so long as Congress "clearly delineates the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989) (quoting *Am. Power & Light*, 329 U.S. at 105).

Congress did just that in the Occupational Safety and Health Act of 1970 (OSH Act), as the federal government succinctly explains in its answering brief. And in multiple landmark environmental statutes, Congress acted similarly: it declared national policies to protect public health and the environment; authorized regulatory standards to effectuate those policies; and enlisted expert federal agencies in the executive branch to implement the standards in particular circumstances and within designated limits. These delegations fall "well within the outer limits of the [Supreme] Court's nondelegation precedents." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001). The statutes also have proven remarkably successful, benefitting the nation with safer working conditions, cleaner air, and improved public health.

Allstates Refractory Contractors, LLC, nonetheless argues that Congress violated the Constitution when it authorized the Occupational Safety and Health Administration (OSHA) to set workplace safety standards that protect vulnerable workers. Allstates bases its argument primarily on the false premise that the Constitution forbids Congress from allowing agencies to make any "policy decisions" when promulgating regulations, and the erroneous contention that OSHA's authority to set workplace safety standards has "no limit." Supreme Court precedent rejects both assertions. Delegations of regulatory authority may permissibly (and necessarily) "carry with them the need to exercise judgment on matters of policy." *Mistretta*, 488 U.S. at 378. Such delegations—even those using broad language, e.g., authorizing "reasonably necessary or appropriate" standards, 29 U.S.C. § 652(8)—still contain meaningful limits, particularly when construed within their statutory context. Indeed, the Supreme Court has already recognized such limits on OSHA's standard-setting authority. Caselaw interpreting similar language in environmental statutes further confirms that such delegations have judicially enforceable limits.

In short, delegations like the one challenged in this case are consistent with our Constitution's structure, are necessary for Congress to protect the country from pressing national problems, and contain important limits to guide agencies' exercise of delegated authority and enable meaningful judicial review.

## ARGUMENT

**I.    Congress addresses complex and pervasive problems by enacting statutes that declare national policies—and establish regulatory frameworks—to protect public health, safety, and the environment**

Congress enacted the OSH Act and important environmental statutes to address complex and pervasive problems, such as dangerous workplaces and hazardous pollution. These statutes declared national policies to protect public health, safety, and the environment, and created regulatory programs to effectuate those goals. Since their enactment, these statutes—and the regulatory programs they established—have significantly improved workplace safety and our nation's air and water quality, with consequent health gains for both people and the environment.

In the 1930s, Congress responded to economic and social problems facing the nation by enacting a series of statutes that set national policies and authorized regulation of various industries to benefit the public. These included the Public Utility Holding Company Act to curb corporate securities abuse, *see Am. Power & Light*, 329 U.S. at 100-03; the Communications Act to regulate and license radio transmissions, *see Nat'l Broad. Co. v. United States*, 319 U.S. 190, 214 (1943); and the Natural Gas Act to protect consumers from exploitation, *see Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 610 (1944), among many others.

A few decades later, the country faced other "urgent" problems—including threats to human health from hazardous workplace conditions and widespread environmental pollution. *See Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990).

Before the 1970s, almost 15,000 people died each year in industrial workplace accidents. S. Rep. No. 91-1282 (1970), *as reprinted in* 1970 U.S.C.C.A.N. 5177, 5178. Thousands more suffered from workplace exposures to toxic substances like asbestos, lead, and mercury. *Id.* at 5178-79. Air pollution went largely unchecked; smog blanketed cities and towns across the country, halting traffic, forcing residents to miss work, and even causing death. *Los Angeles Smog Persists 9th Day*, N.Y. Times, Oct. 16, 1954, http://bit.ly/3JftgQC. Rivers and lakes reeked of raw sewage and hazardous chemicals. *America's Sewage System and the Price of Optimism*, Time, Aug. 1, 1969, http://bit.ly/ 3ZZANsM. Wildlife faced extinction at an alarming and accelerating rate, threatening an "irreplaceable loss" to "science, ecology, and the national heritage." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 176-77 (1978).

Responding to these threats, and recognizing the need for federal regulation, Congress exercised its Article I powers to enact laws that established national policies to safeguard the country's health, safety, and environment. The OSH Act declared a "purpose and policy" to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). The Clean Air Act enshrined a policy to "protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1). The Endangered Species Act declared a purpose to "conserv[e]" endangered and threatened species, as well as the ecosystems on which they depend. 16 U.S.C. § 1531(b). Additional statutes set out other important national policies, such as cleaning up the country's waterways, 33 U.S.C. § 1251(a); protecting

forests and fisheries, 16 U.S.C. §§ 1600, 1801; and identifying and regulating toxic chemicals and hazardous waste, 15 U.S.C. § 2601(b); 42 U.S.C. § 6902(b).

In these statutes, Congress also created regulatory programs to effectuate the declared policies. In the OSH Act, for example, Congress authorized "mandatory occupational safety and health standards" that would require employers to implement measures to "provide safe or healthful employment and places of employment." 29 U.S.C. §§ 651(b)(3), 652(8), 655(b). In the Clean Air Act, Congress required, among other things, national ambient air quality standards, emission standards for stationary sources of hazardous air pollutants, and emission standards for new motor vehicles—all to help prevent or control pollution that could endanger public health. *See* 42 U.S.C. §§ 7408-09, 7412(d), 7521. And in the Endangered Species Act, Congress mandated the listing of all endangered and threatened species, the designation of critical habitat for such species, and the development of regulations and recovery plans to aid in the species' conservation. 16 U.S.C. § 1533(a), (c), (d), (f).

By and large, these statutes have proved successful. The rate of non-fatal injuries and illness in workplaces has fallen dramatically, from 10.9 per 100 workers in 1972 to just 2.7 per 100 in 2020. U.S. Dep't of Labor, Commonly Used Statistics, http://bit.ly/3HtDWJX (last visited Jan. 27, 2023). Hundreds of species, including the bald eagle and gray whale, have avoided extinction. *See* Noah Greenwald et al., *Extinction and the U.S. Endangered Species Act*, PeerJ, Apr. 22, 2019, at 1, 3, https://bit.ly/3j3prmR. The combined emissions of six key air pollutants, including

ozone and lead, decreased by 77 percent over 50 years, while emissions of hazardous air pollutants decreased by more than 74 percent over 25 years. *See* U.S. EPA, 50th Anniversary of the Clean Air Act (Dec. 16, 2022), http://bit.ly/ 3H7pXYV. In all, air quality gains over the past half-century have prevented more than two million deaths, 200,000 heart attacks, and 135,000 hospital admissions. U.S. EPA, The Clean Air Act and the Economy (Jan. 20, 2023), http://bit.ly/3j3vmse.

The statutes have achieved these significant benefits for public health, safety, and the environment without significantly straining the national economy: over the last 50 years, during these statutes' existence, private sector jobs have more than doubled and the gross domestic product has nearly tripled in value. *Id.*

## II.   The Constitution permits Congress to enlist the help of expert federal agencies to implement the regulatory programs in these statutes

To meet the "complex economic and social problems" facing the nation, Congress of "[n]ecessity" enlists the help of federal agencies to carry out its statutory policies and regulatory programs—as the Constitution plainly allows. *Am. Power & Light.*, 329 U.S. at 105.

**A.**  Even almost a century ago, the Supreme Court had "repeatedly recognized" the "necessity" of applying statutes to "complex conditions involving a host of details with which the national Legislature cannot deal directly." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529-30 (1935). The Court—and Congress—realized that the legislative process would "bog down" to the point of dysfunction if Congress

itself had to "formulate specific rules for each" of the "myriad situations to which it wishes a particular policy to be applied." *Am. Power & Light*, 329 U.S. at 105. Such a result would be both "unreasonable and impracticable," *id.*, and "defeat the Framers' design of a workable National Government," *Loving*, 517 U.S. at 758. That is especially so when Congress legislates in areas that are "sufficiently technical, the ground to be covered sufficiently large, and the Members of Congress themselves not necessarily expert in the area." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.* (*Benzene*), 448 U.S. 607, 673 (1980) (Rehnquist, J., concurring in the judgment).

Congress realized that agencies, by contrast—with their focused missions and specialized staff—possess the technical expertise and resources needed to "apply the standards [set out in these statutes] to particular cases" and "refine" them over time. *Id.* Developing safety standards, pollution controls, and habitat recovery plans applicable to a wide range of industries and regions are "precisely the sort of intricate, labor-intensive task[s] for which delegation to an expert body is especially appropriate." *Mistretta*, 488 U.S. at 379. Indeed, Congress created federal agencies specifically to "bring to their work the expert's familiarity with industry conditions which members of the delegating legislatures cannot be expected to possess." *Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 310 (1953). Agencies are also better suited to revise individual standards over time, based on newly emerging facts and evolving threats and technology. Congress also knows that, "as a practical and realistic matter," it cannot anticipate "every evil sought to be corrected" when it legislates. *Id.* at 309-10.

Thus, "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job"—and our federal government cannot function—"absent an ability to delegate power [to federal agencies] under broad general directives." *Mistretta*, 488 U.S. at 372.

**B.** The standards that Congress authorized in the OSH Act and environmental statutes discussed above tackle detailed and complex problems, illustrating why delegation to expert agencies is necessary. Under the OSH Act, health and safety standards must apply to many different industries and workplaces, *see* 29 U.S.C. § 651(b)(3); identify a significant risk that can be eliminated or reduced, *see Benzene*, 448 U.S. at 639 (plurality opinion); and make determinations of economic and technological feasibility, *see Am. Textile Mfrs. Inst., Inc. v. Donovan* (*Cotton Dust*), 452 U.S. 490, 513 n.31 (1981). Such findings typically entail—among other things—analyzing multiple data sources to calculate accident rates and characterize the risk of injury and death, *see* 59 Fed. Reg. 51,672, 51,673-80 (Oct. 12, 1994), as well as determining compliance costs based on wage rates, existing technology and equipment, and differing practices across companies and regions, *see* 79 Fed. Reg. 20,316, 20,583-609 (Apr. 11, 2014). The standards must also be amended over time to reflect evolving industry practices, developing workplace conditions, and new technologies. *See, e.g.*, *id.* at 20,321; 62 Fed. Reg. 40,142, 40,143 (July 25, 1997). Pursuant to this statutory scheme, OSHA has set new or amended workplace safety standards for such varied contexts as logging operations, 59 Fed. Reg. at 51,672; steel erection, 66 Fed. Reg.

5196 (Jan. 18, 2001); and electric infrastructure construction and maintenance, 79 Fed. Reg. at 20,316. Congress, recognizing that it lacked the resources, expertise, and time to fashion and revise such fact-specific standards across so many industries, reasonably opted to delegate that task to a dedicated agency instead.

Similarly, under the Clean Air Act, Congress instructed the Environmental Protection Agency (EPA) to develop a list of air pollutants "reasonably . . . anticipated to endanger public health or welfare" and establish "air quality criteria" for each, considering "the latest scientific knowledge" and "variable factors," such as atmospheric conditions and the interaction of pollutants. 42 U.S.C. § 7408(a)(1)-(2). EPA must then set primary and secondary ambient air quality standards for those pollutants, *id.* § 7409(a)-(b), and "complete a thorough review" of them every five years, *id.* § 7409(d)(1)—a lengthy process involving development of an Integrated Review Plan to lay out the appropriate methodologies and relevant scientific issues; publication of an Integrated Science Assessment and Risk and Exposure Assessment; consultation with the Clean Air Scientific Advisory Committee; and multiple rounds of public notice and comment, *see id.* § 7409(d)(2); *Am. Petroleum Inst. v. EPA*, 684 F.3d 1342, 1345-47 (D.C. Cir. 2012). EPA's 2015 update of the standards for ozone, for example, spanned several years, reflected data from hundreds of clinical and epidemiological studies, and considered nearly half a million public comments. *Murray Energy Corp. v. EPA*, 936 F.3d 597, 606, 609 (D.C. Cir. 2019) (per curiam). Congress

had good reasons to conclude that EPA is better equipped than the legislature itself to carry out these technical, resource-intensive tasks.

The Endangered Species Act provides a third example. It requires the Fish and Wildlife Service and National Marine Fisheries Service (collectively, the Services) to determine whether a species is endangered or threatened with extinction based on an evaluation of various factors, including disease, predation, and overexploitation, and "the best scientific and commercial data available." 16 U.S.C. § 1533(a)(1), (b)(1)(A). The Services must review this list of species every five years. *Id.* § 1533(c)(2). The Services must also designate critical habitat for each listed species, again considering the "best scientific data available" and other factors. *Id.* § 1533(b)(2). Recovery plans must incorporate "site-specific management actions"; "objective, measurable criteria" for gauging the species' recovery status; and "estimates of the time required and the cost to carry out those measures." *Id.* § 1533(f)(1). To date, more than 2,400 species have been listed. *See* Cong. Rsch. Serv., R46677, *The Endangered Species Act: Overview and Implementation* 52 (2021), https://bit.ly/3R2QyuM. These tasks manifestly "require[] an expertise and attention to detail that exceeds the normal province of Congress." *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 708 (1995).

**C.**  The Supreme Court has long held that delegations like those in the above statutes are not just necessary for a "workable government," but are also consistent with our constitutional structure. *Loving*, 517 U.S. at 756, 758 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). "[T]he

11

Framers did not require—and indeed rejected—the notion that the three Branches must be entirely separate and distinct." *Mistretta*, 488 U.S. at 380. Instead, they envisioned a "carefully crafted system of checked and balanced power" that would still leave the country "capable of governing itself effectively." *Id.* at 381 (quoting *Buckley v. Valeo*, 424 U.S. 1, 121 (1976)). The "separation-of-powers principle, and the nondelegation doctrine in particular, [thus] do not prevent Congress from obtaining the assistance" of coordinate branches. *Id.* at 372; *accord Touby v. United States*, 500 U.S. 160, 165 (1991). Even in the rare instances where the Supreme Court has found a nondelegation violation, it acknowledged that the Constitution has "never been regarded" as denying Congress the ability "to perform its function [by] laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits." *Schechter*, 295 U.S. at 530.

Congress has also created numerous checks and balances, and other accountability measures, to help ensure that "[s]eparation-of-powers principles are vindicated, not disserved, by measured cooperation between the two political branches." *Loving*, 517 U.S. at 773. For one thing, Congress typically delegates regulatory authority to agency officials whose nominations require advice and consent of the Senate and who are appointed by the President—"the most democratic and politically accountable official in Government." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2203 (2020). Congress also has ensured that agencies remain accountable to the public through other means, such as notice-and-comment

requirements of the Administrative Procedure Act, *see Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132-33 (D.C. Cir. 1995), and open-government mandates of the Freedom of Information Act, *see Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171-72 (2004). And Congress maintains ongoing oversight of agencies' exercise of delegated authority through a variety of tools, including appropriations, the Congressional Review Act, 5 U.S.C. §§ 801-808, Senate confirmation of other important agency officials, statutory amendments, and oversight hearings. These tools have real teeth. Congress has used its "power of the purse" to delay issuance of an OSHA ergonomics rule, for example, and later overturned it under the Congressional Review Act. *See* Cong. Rsch. Serv., R43992, *The Congressional Review Act (CRA): Frequently Asked Questions* 26 & n.153 (2021), https://bit.ly/3WQzV7b.

Finally, recognizing that agencies may still overstep on occasion, Congress also made agency actions subject to review by the courts. *See, e.g.*, 5 U.S.C. §§ 702, 704; 42 U.S.C. § 7607(b). Judicial review allows affected parties to "test the [agency's] application" of congressionally declared policy and regulatory programs against the governing statute's requirements. *Am. Power & Light*, 329 U.S. at 105. This helps ensure that agencies carry out Congress's directives, engage in reasoned decisionmaking, follow proper procedures, and—as discussed in Part IV below—stay within the limits of their delegated authority. *See* 5 U.S.C. § 706(1), (2)(A), (C), (D).

III.    **Implementing standards to protect public health, safety, and the environment necessarily requires the exercise of some policy discretion**

While accepting that some delegation of regulatory authority to federal agencies is constitutional, Allstates suggests a legally dispositive distinction between authority to "fill up the details" of statutory standards (which may be delegated) and authority to make "policy decisions" when implementing such standards (which may not). Allstates Br. 18-19. That distinction is illusory and contradicted by precedent.

**A.**  Congress, of course, must declare the controlling "*general* policy" before delegating any regulatory authority to agencies. *Mistretta*, 488 U.S. at 372-73 (emphasis added) (quoting *Am. Power & Light*, 329 U.S. at 105). But after that, Congress "does not violate the Constitution" by leaving agencies a "certain degree of discretion" in fashioning appropriate regulatory standards applicable to a particular situation. *Touby*, 500 U.S. at 165. Rather, such delegations may permissibly (and necessarily) "carry with them the need to exercise judgment on matters of policy." *Mistretta*, 488 U.S. at 378.

Indeed, even when Congress delegates "fact-finding" authority to an agency, *see* Allstates Br. 18-19, the "determination of facts and the inferences to be drawn from them" may "call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework." *Yakus v. United States*, 321 U.S. 414, 425 (1944). As Justice Scalia observed, "no statute can be entirely precise," and "some judgments, even some judgments involving policy considerations, must be left to the officers executing the law." *Mistretta*, 488 U.S. at 415 (Scalia, J.,

dissenting); *see also* Brett Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2152 (2016) (observing that it "makes a great deal of sense" that Congress might authorize an agency to "issue rules to prevent companies from dumping 'unreasonable' levels of certain pollutants," even though "what rises to the level of 'unreasonable' is a policy decision"). The Supreme Court has thus rejected nondelegation challenges to statutes that authorize agencies to determine what regulations are "fair and equitable" or in the "public interest"—determinations that necessarily afford the agency some degree of "policy judgment." *Whitman*, 531 U.S. at 474 (quotations omitted).

**B.** The OSH Act's constitutionality therefore cannot depend on whether OSHA's setting of workplace safety standards sometimes "requires hard policy choices," such as balancing workers' lives against industry costs. Allstates Br. 36-37. In fact, a Supreme Court plurality recognized that OSHA's requisite threshold determination that a particular workplace health risk is "significant" would necessarily rest "largely on policy considerations," *Benzene*, 448 U.S. at 655 n.62 (plurality opinion), but nonetheless held that this determination helped resolve any nondelegation concerns, *id.* at 646. And such policy choices necessarily arise in promulgating regulations to protect public health and safety, where an agency must often weigh competing considerations and "exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

15

The environmental statutes described above are again illustrative, underscoring the practical and legal failings of Allstates' emphasis on "policy decisions." Under the Clean Air Act, EPA must set national standards specifying levels of air quality that, "in [its] judgment," allow an "adequate margin of safety" and "are requisite to protect the public health." 42 U.S.C. § 7409(b)(1). The Supreme Court—in affirming the constitutionality of this provision as "well within the outer limits of [its] nondelegation precedents"—recognized that the delegation requires EPA to make "judgments of degree," and that such discretionary policy judgments "inhere[] in *most* executive or judicial action." *Whitman*, 531 U.S. at 474-75 (quotation omitted) (emphasis added); *see also* Antonin Scalia, *Responsibilities of Regulatory Agencies Under Environmental Laws*, 24 Hous. L. Rev. 97, 103 (1987) (whether public health is "'protected' involves considerable fact-related policy discretion as to how much illness is acceptable").

The Clean Air Act's hazardous air pollution provisions likewise require EPA to make important policy judgments. For instance, EPA must regulate hazardous emissions from certain power plants when it "finds such regulation is appropriate and necessary," 42 U.S.C. § 7412(n)(1)(A)—a finding that requires the agency to consider both the costs of adopting pollution controls as well as the health benefits of doing so. *See Michigan v. EPA*, 576 U.S. 743, 752, 759 (2015); *cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2448-49 (2019) (Kavanaugh, J., concurring in the judgment) (recognizing that "terms like 'reasonable,' 'appropriate,' 'feasible,' or 'practicable' . . . . afford

16

agencies broad policy discretion"). EPA must also set risk-based standards for multiple industries that provide an "ample margin of safety to protect public health." 42 U.S.C. § 7412(f)(2)(A). This provision, which uses language similar to the statutory delegation at issue in *Whitman*, demands a "context-based determination" of the health risk reductions that can be achieved "cost effectively and in light of other statutorily relevant standards." *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 16-17 (D.C. Cir. 2015). That determination inherently implicates policy, together with epidemiological, technological, and economic, considerations.

The Endangered Species Act similarly requires the Services to confront "complex policy choice[s]" and "difficult questions of proximity and degree." *Babbitt*, 515 U.S. at 708. In designating critical habitat, the agencies must consider not only the best scientific data available but also the economic impact, national security impact, and "any other relevant impact." 16 U.S.C. § 1533(b)(2). In developing recovery plans, the agencies must prioritize those species "most likely to benefit." *Id.* § 1533(f)(1)(A). The Act also directs the Services to "issue such regulations as [they] deem[] necessary and advisable to provide for the conservation" of threatened species. *Id.* § 1533(d); *see also id.* § 1540(f) (similar for purposes of enforcement). "Fashioning appropriate standards" under these provisions "necessarily requires the exercise of broad discretion." *Babbitt*, 515 U.S. at 708.

**C.** Put simply, Congress—and a workable federal government that can meet the complex problems facing the nation—depends "on the need to give discretion

17

to executive officials to implement its programs." *Gundy v. United States*, 139 S. Ct. 2116, 2130 (2019) (plurality opinion). These "inherent necessities" of governmental cooperation help justify the assistance that Congress may enlist from federal agencies. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928). Thus, for reasons of both "wisdom and humility alike," *Gundy*, 139 S. Ct. at 2130 (plurality opinion), the Supreme Court has "almost never" seen fit to "second-guess Congress regarding the permissible degree of policy judgment" that can be left to agencies. *Whitman*, 531 U.S. at 474 (quotation omitted). Even in "sweeping regulatory schemes" that affect the "entire national economy" and carry the threat of significant penalties, the Court has "never demanded" that Congress provide a "determinate criterion" of "how much of the regulated harm is too much," or "how 'necessary' [i]s necessary enough." *Id.* at 475 (quotation and alteration omitted).

Only where Congress "fail[s] to articulate *any* policy or standard" to confine an agency's discretion would a constitutional violation arise. *Gundy*, 139 S. Ct. at 2129 (plurality opinion) (emphasis in *Gundy*) (quoting *Mistretta*, 488 U.S. at 373 n.7). Accordingly, the Supreme Court found nondelegation violations in the National Industrial Recovery Act of 1933 because Congress had "declared no policy, . . . established no standard, [and] laid down no rule." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935); *Schechter*, 295 U.S. at 541 (explaining the Act "supplies no standards for any trade, industry, or activity," nor "undertake[s] to prescribe rules of conduct to be applied"); *see also Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022)

(finding nondelegation violation where a statute "offered *no guidance* whatsoever"). In those rare instances—where there is an "absence of standards" to guide the agency, and it becomes "impossible" for a reviewing court to determine whether the agency has "obeyed" the "will of Congress"—a court may be justified in finding a constitutional violation. *Mistretta*, 488 U.S. at 379 (quoting *Yakus*, 321 U.S. at 426).

As explained in the next Part, the OSH Act easily survives the Supreme Court's nondelegation precedents because it provides sufficient guideposts for the agency to follow and for the courts to enforce limits on OSHA's delegated authority.

## IV.    The OSH Act provides limits that guide the agency's setting of safety standards and enable meaningful judicial review

Allstates contends that the OSH Act provides "no guidance" and "no limit at all" on OSHA's duty to set workplace safety standards. Allstates Br. 1. That contention is false, and it ignores the cardinal rule that "words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotation omitted); *see also Gundy*, 139 S. Ct. at 2126 (plurality opinion) (explaining that the Court looks to both "context" and "purpose" when construing statutory delegations).

**A.**  First, Congress "clearly delineate[d] the general policy," *Mistretta*, 488 U.S. at 372-73 (citation omitted), that guides the agency's exercise of its authority to set workplace safety standards—i.e., to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions," 29 U.S.C. § 651(b).

Allstates dismisses this expressly stated policy as somehow meaningless and irrelevant to OSHA's safety standards. *See* Allstates Br. 49-51. But Congress made clear in several different places—including the Act's purpose provision itself—that the statutory policy was to guide the agency's exercise of its delegated authority. *See, e.g.*, 29 U.S.C. § 651(b)(3) (declaring that Congress sought to achieve the policy "by authorizing [OSHA] to set mandatory occupational safety and health standards"); *id.* § 655(a) (within Act's first two years, OSHA was to choose among existing standards the one "which assures the greatest protection of the safety or health of the affected employees"); *id.* § 655(b)(1) (OSHA may promulgate a safety standard "in order to serve the objectives of this chapter"); *id.* § 655(b)(8) (OSHA may deviate from existing consensus standard only where it "will better effectuate the purposes of this chapter"). To be sure, Congress did not direct OSHA to pursue this policy at all costs. Rather, OSHA must account for economic and technological feasibility, *see infra* 21-22, and make judgment calls inherent in rulemakings of this kind, *see supra* 14-17. But Congress's declaration of policy nonetheless serves as an important guide for (and constraint on) OSHA's authority, and also informs judicial interpretation of the scope of that authority. *See Am. Power & Light*, 329 U.S. at 104-05 (looking to statute's declared policy when interpreting scope of delegation); *Yakus*, 321 U.S. at 423 (same).

Second, Congress staked out several other "boundaries" of OSHA's "delegated authority." *Mistretta*, 488 U.S. at 373 (citation omitted). More than 40 years ago, for example, the Supreme Court held that one of OSHA's health standards exceeded the

limits of its authority because the OSH Act requires the agency to make a threshold finding of significant risk before setting standards. *See Benzene*, 448 U.S. at 642-44, 652-53 (plurality opinion).[2] And just last year, the Supreme Court again held that one of OSHA's standards exceeded the boundaries of its authority, this time because the statute authorizes OSHA to "set *workplace* safety standards, not broad public health measures." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661, 665 (2022) (per curiam) (citing, *e.g.*, 29 U.S.C. § 655(b)). These cases addressed OSHA health standards and emergency temporary standards, respectively, but the statutory limits the Court enforced apply equally to OSHA's permanent safety standards, as well.

Undeterred, Allstates focuses on the statutory requirement that OSHA's standards be "reasonably necessary or appropriate" to provide safe working conditions. Allstates Br. 38 (quoting 29 U.S.C. § 652(8)). But this phrase—read in context, within the statute "as a whole," *Gundy*, 139 S. Ct. at 2126 (plurality opinion)—imposes additional constraints on OSHA's standard-setting authority, too. The Supreme Court has observed, for example, that the phrase requires any standard to be both economically and technologically feasible. *See Cotton Dust*, 452 U.S. at 513 n.31 ("any standard that was not economically or technologically feasible would *a*

---

[2] As the federal government notes in its answering brief, OSHA Br. 16, every court of appeals to address the question has recognized this significant risk requirement as controlling. Allstates cites (at Br. 41) *Kelly Springfield Tire Co. v. Donovan*, 729 F.2d 317 (5th Cir. 1984), but that case acknowledged the significant risk finding is required for safety standards, *see id.* at 322-24, and held only that it is not required under the OSH Act's general duty clause, 29 U.S.C. §§ 654(a)(1), 666(k)—which is not at issue here.

*fortiori* not be 'reasonably necessary or appropriate' under the Act"). The phrase also must be read in context with the words that follow: "to provide safe or healthful employment and places of employment," 29 U.S.C. § 652(8). Putting these elements together, and considering the statutory policy and related provisions discussed above, *see id.* §§ 651(b)(3), 655(a), 655(b)(1), 655(b)(8), a "reasonably necessary or appropriate" safety standard must—in addition to being economically and technologically feasible—"substantially reduce" an identified significant safety risk and "provide a high degree of employee protection." *Int'l Union, UAW v. OSHA*, 37 F.3d 665, 668-69 (D.C. Cir. 1994) (quotations omitted).

**B.**  Courts construing broad delegations in other statutes have likewise found meaningful limits on agency authority by looking to statutory context and purpose. For example, Congress authorized the Interstate Commerce Commission to act based on, among other things, a finding that certain railroad actions were "reasonably necessary and appropriate" and "compatible with the public interest." *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 20 n.1 & 22 (1932) (citations omitted). The Supreme Court unanimously rejected a nondelegation challenge to this provision, however, explaining that the "purpose of the Act, the requirements it imposes, and the context of the provision in question show" that the delegation of authority is "not . . . without ascertainable criteria, but [rather] has direct relation to adequacy of transportation service [and] . . . essential conditions of economy and efficiency." *Id.* at 24-25; *see also Nat'l Broad. Co.,* 319 U.S. at 215-16 (holding that the Communications Act's

22

delegation to regulate in the "public interest, convenience, or necessity" is not "so indefinite as to confer an unlimited power," but rather—when interpreted in context, and with an eye to the statutory purpose—is limited to "the interest of the listening public in 'the larger and more effective use of radio'").

Relying on statutory context, the Supreme Court also found (and enforced) meaningful constraints in the Clean Air Act provision, discussed above, which authorizes EPA to regulate hazardous emissions from certain power plants if it deems such regulation "appropriate and necessary." 42 U.S.C. § 7412(n)(1)(A). The Supreme Court held that EPA violated the statute when it made a determination under this provision without considering regulatory costs. *Michigan*, 576 U.S. at 752, 756-57. The Court recognized the "capaciousness" of the phrase "appropriate and necessary," and acknowledged there were "undoubtedly settings" in which it "does not encompass cost." *Id.* at 752. But based on the statute's structure and context, the Court held that this was not one of them—and that Congress had constrained EPA's discretion accordingly. Thus, as *Michigan* illustrates, even a "broad and all-encompassing term" like "appropriate," *id.* at 752, is not "vacuous," Allstates Br. 16, or a license to act "based on nothing more than . . . subjective judgment," *id.* at 2. Rather, "read fairly and in context," *Michigan*, 576 U.S. at 756, terms like these meaningfully constrain agency decisions. *See also, e.g.*, *NRDC v. EPA*, 749 F.3d 1055, 1063-64 (D.C. Cir. 2014) (Kavanaugh, J.) (holding that another Clean Air Act provision, authorizing EPA to prescribe "necessary" regulations to carry out its functions under the Act, 42 U.S.C.

§ 7601(a)(1), is "not open-ended," and that EPA had exceeded its authority under the provision by creating an affirmative defense for private civil suits).

Courts also have found discernible limits on the Services' authority under the Endangered Species Act to promulgate regulations that they "deem[] necessary and advisable to provide for the conservation" of threatened species. 16 U.S.C. § 1533(d). In *Sierra Club v. Clark*, 755 F.2d 608, 612-15 (8th Cir. 1985), for example, the Eighth Circuit held that the Fish and Wildlife Service exceeded its authority under this provision when it promulgated regulations that would have allowed sport hunting of threatened wolves, without first determining that population pressures could not be relieved by other means. The court reached this conclusion after considering the declared policy of the Act to "conserve" endangered and threatened species, the definition of that key term, and other relevant contextual indicators. *Id.* at 613 (explaining that the Act is a "law of limited scope whose provisions must be read together"). And in *Christy v. Hodel*, 857 F.2d 1324, 1336 (9th Cir. 1988), the Ninth Circuit relied on this same statutory context to reject a nondelegation challenge to the provision, holding that Congress had "established a standard sufficiently definite and precise to permit the courts to determine whether the [Services'] enactments comport with congressional will." *Id.*; *cf. Gulf Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465-66 (5th Cir. 2020) (holding that aquaculture regulations exceeded National Marine Fisheries Service's authority under Magnuson-Stevens Act provision that permitted the agency to promulgate "necessary" regulations, 16 U.S.C. § 1855(d)).

Broad but contextually constrained (and judicially enforceable) congressional delegations of this sort have a long history. In addition to some of the other earlier examples discussed above, the Natural Gas Act of 1938 authorized the Federal Power Commission (now the Federal Energy Regulatory Commission) to issue orders and regulations that it "may find necessary or appropriate to carry out" other provisions, 15 U.S.C. § 717o, such as those directing the Commission to ensure that rates charged for the interstate transportation and sale of natural gas are "just and reasonable," *id.* §§ 717c, 717d. The Supreme Court and D.C. Circuit have both enforced limits on the Commission's authority under these provisions. *See, e.g.*, *Fed. Power Comm'n v. Texaco*, 417 U.S. 380, 394-95 (1974) (invalidating Commission order under § 717o that exempted small producers from §§ 717c's and 717d's requirements); *Pub. Serv. Comm'n v. FERC*, 866 F.2d 487, 490-92 (D.C. Cir. 1989) (rejecting agency's "expansive view" of its "necessary or appropriate" authority under § 717o); *Mobil Oil Corp. v. Fed. Power Comm'n*, 483 F.2d 1238, 1254-57 (D.C. Cir. 1973) (similar). In doing so, the courts have held that a regulation is not "necessary or appropriate" under this statute unless it "conforms with the purposes and policies of Congress." *N. Nat. Gas Co., Div. of InterNorth v. FERC*, 785 F.2d 338, 341 (D.C. Cir. 1986) (quotation omitted). This caselaw squarely defeats Allstates' argument (at Br. 32) that the disjunctive phrase "necessary or appropriate" imposes no discernible limits on an agency's authority.

25

\*       \*       \*

In short, the OSH Act's safety-standard delegation is "no broader" than many other delegations that have been consistently upheld by the Supreme Court. *Nat'l Mar. Safety Ass'n v. OSHA*, 649 F.3d 743, 755 (D.C. Cir. 2011). As the Seventh Circuit held when considering an identical challenge to the OSH Act's safety-standard delegation more than 40 years ago, "Congress has chosen a policy and announced general standards which guide the Secretary in establishing specific standards to assure the safest and healthiest possible working environments, and which enable the courts and the public to test the Secretary's faithful performance of that command." *Blocksom & Co. v. Marshall*, 582 F.2d 1122, 1126 (7th Cir. 1978). "Nothing more is required." *Id.*

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: January 30, 2023                  Respectfully submitted,

                                          */s/ Ian Fein*
                                          IAN FEIN
                                          CECILIA SEGAL
                                          Natural Resources Defense Council
                                          111 Sutter Street, 21st Floor
                                          San Francisco, CA 94104
                                          (415) 875-6100
                                          ifein@nrdc.org

                                          *Counsel for Natural Resources Defense Council*

SEAN H. DONAHUE
  Donahue & Goldberg, LLP
  1008 Pennsylvania Avenue, SE
  Washington, DC 20003
  (202) 277-7085
  sean@donahuegoldberg.com

GRACE SMITH
VICKIE L. PATTON
  Environmental Defense Fund
  2060 Broadway St., Suite 300
  Boulder, CO 80302
  (303) 447-3001
  gsmith@edf.org

*Counsel for Environmental Defense Fund*

SANJAY NARAYAN
  Sierra Club Environmental Law Program
  201 Webster Street, Suite 1300
  Oakland, CA 94612
  (415) 977-5769
  sanjay.narayan@sierraclub.org

*Counsel for Sierra Club*

## CERTIFICATE OF COMPLIANCE

This brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) because it has been prepared in 14-point Garamond, a proportionally spaced font. The brief also complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6450 words.

*/s/ Ian Fein*
Ian Fein

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

*/s/ Ian Fein*
Ian Fein