No. 22-3772

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

---

ALLSTATES REFRACTORY CONTRACTORS, LLC,

*Plaintiff-Appellant,*

v.

MARTIN WALSH, et al.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of Ohio (Western Division) District Court
(Case No. 3:21-cv-1864, Hon. Jack Zouhary)

---

## JOINT BRIEF OF *AMICI CURIAE* AMERICAN FEDERATION OF LABOR & CONGRESS OF INDUSTRIAL ORGANIZATIONS AND NORTH AMERICA'S BUILDING TRADES UNIONS IN SUPPORT OF THE APPELLEES

---

Jon Newman
Esmerelda Aguilar
Sherman Dunn, P.C.
900 Seventh Street, NW
Suite 1000
Washington, DC 20001
(202) 785-9300
newman@shermandunn.com

*Counsel for NABTU*

Matthew Ginsburg
Craig Becker
AFL-CIO
815 Black Lives Matter Plaza
N.W. Washington, DC 20006
(202) 637-5397
mginsburg@aflcio.org

Randy Rabinowitz
OSH Law Project, LLC
PO Box 3769
Washington, DC 20027
(202) 256-4080
randy@oshlaw.org

*Counsel for AFL-CIO*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 22-3772          Case Name: Allstate Refinery Contractors v. Walsh

Name of counsel:  Matthew Ginsburg

Pursuant to 6th Cir. R. 26.1, AFL-CIO
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
      identity of the parent corporation or affiliate and the relationship between it and the named
      party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
      in the outcome?  If yes, list the identity of such corporation and the nature of the financial
      interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ January 30, 2023 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Matthew Ginsburg
815 Black Lives Matter Plaza, NW
Washington, DC 20006

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENT

Identity and Interests of the Amici............................................................... 1

Introduction ................................................................................................... 2

Argument........................................................................................................ 5

I.   OSHA's Authority to Set Safety Standards Rests On a Constitutional
     Delegation ............................................................................................... 5

     A.   The OSH Act Provides Sufficient Constraints on OSHA's Safety
          Standards Setting Authority............................................................ 5

          1.  Congress Placed a Clear Floor Under the Safety Standards
              OSHA Was Authorized to Adopt................................................. 8
          2.  The Text of the OSH Act and Judicial Decisions Place
              Sufficient Constraints on OSHA's Authority to Set
              Standards Above the Statutory Floor ........................................ 10
          3.  The Statutory Constraints on OSHA's Standard Setting
              Authority Are Sufficient Under the Constitution........................ 17

II.  The Major Questions Doctrine Does Not Apply and Its Underlying Premise
     Undermines Allstates' Position ......................................................... 19

III. The Remedy Allstates Seeks Is Unjustified and Would Subject U.S.
     Workers to Grave Danger.................................................................... 24

Conclusion ................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*AFL-CIO v. OSHA*,
    965 F.2d 962 (11th Cir. 1992) .............................................................12

*Agricultural Retailers Ass'n v. OSHA*,
    837 F.3d 60 (D.C. Cir. 2016)................................................................11

*Alabama Power Co. v. OSHA*,
    89 F.3d 740 (11th Cir. 1996) ................................................. 12, 14, 23

*Am. Iron & Steel Inst. v. OSHA*,
    939 F.2d 975 (D.C. Cir. 1991)..............................................................14

*Am. Textile Mfrs. Inst. v. Donovan*,
    452 U.S. 490 (1981) (*Cotton Dust*) ......................................... 12, 14

*Am. Dental Ass'n v. Martin*,
    984 F.2d 823 (7th Cir. 1993) ...............................................................16

*Am. Trucking Ass'n v. EPA*,
    175 F3d 1027 (D.C. Cir. 1999).............................................................18

*Anthony Crane Rental v. Reich*,
    70 F.3d 1298 (D.C. Cir. 1995)..............................................................27

*ASARCO, Inc. v. OSHA*,
    647 F.2d 1 (9th Cir. 1981) ....................................................................13

*Blocksom Co. v. Marshall*,
    582 F.2d 1122 (7th Cir. 1978) .............................................................18

*Frank Diehl Farms v. Sec'y of Labor*,
    696 F.2d 1325 (11th Cir. 1983) ...........................................................17

*Gade v. Nat'l Solid Wastes Mgmt Ass'n*,
    505 U.S. 88 (1992)..................................................................................9

*Gundy v. U.S.*,
    139 S.Ct. 2116 (2019) ................................................................... *passim*

*Indus. Union Dep't AFL-CIO v. Am. Petroleum Inst.*,
    448 U.S. 607 (1980) (*Benzene*) ................................................... *passim*

*Indus. Union Dep't, AFL-CIO. v. Hodgson*,
    499 F.2d 467 (D.C. Cir. 1974) ........................................................ 6, 15

*International Union, UAW v. OSHA*,
    37 F.3d 665 (D.C. Cir. 1994) .................................................. 14, 17, 18

*J.W. Hampton, Jr., & Co. v. U.S.*,
    276 U.S. 394 (1928) .............................................................................. 7

*Kiewit Power Const. v. Sec'y of Labor*,
    959 F.3d 381 (D.C. Cir. 2020) ............................................................. 21

*In re MCP No. 165*,
     21 F.4th 357 (6th Cir., 2021) ............................................................ 11

*Mistretta v. U.S.*,
    488 U.S. 361 (1989) ......................................................................... 6, 7

*Nat'l Constructors Ass'n v. Marshall*,
    581 F.2d 960 (D.C. Cir. 1978) ............................................................ 16

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
    142 S.Ct. 661, 665 (2022) ........................................................ *passim*

*Nat'l Maritime Safety Inst. v. OSHA*,
    649 F.3d 743 (D.C. Cir. 2011) ..................................................... 17, 23

*Nat'l Grain & Feed Ass'n v. OSHA*,
    866 F.2d 717 (5th Cir. 1988) ........................................... 4, 12, 14, 23

*PBR, Inc. v. Sec'y of Labor*,
    643 F.2d 890 (1st Cir. 1981) ............................................................. 25

*Steel Joist Inst. v. OSHA,*
    287 F.3d 1165 (D.C. Cir. 2002) ........................................................................... 11

*Taylor Diving & Salvage Co. v. DOL,*
    599 F.2d 622 (5th Cir. 1979 ................................................................................. 17

*Teal v. E.I. Dupont de Nemours & Co.,*
    728 F.2d 799 (6th Cir. 1984) ......................................................................... 15, 28

*Texas Indep. Ginners Ass'n v. Marshall,*
    630 F.2d 398 (5th Cir. 1980) ......................................................................... 12, 13

*Touby v. U.S.,*
    500 U.S. 160 (1991) ....................................................................................... 78, 19

*Towne Const. Co. v. OSHRC,*
    847 F.2d 1187 (6th Cir. 1988) ............................................................................. 25

*United Steelworkers v. Auchter,*
    763 F.2d 728 (3rd Cir. 1985) .............................................................................. 15

*United Steelworkers v. Marshall,*
    647 F.2d 1189 (D.C. Cir. 1980) ..................................................................... 12, 14

*West Virginia v. EPA,*
    142 S.Ct. 2587 (2022) ............................................................................ 19, 21, 22

*Whitman v. Am. Trucking Ass'n,*
    531 U.S. 457 (2001) ................................................................................. 6, 18, 19

*Yakus v. United States,*
    321 U.S. 414 (1944) ............................................................................................. 6

**Statutes and Regulations**

Regulatory Flexibility Act. 5 U.S.C.

    § 609(b), (d) ........................................................................................................ 16
    § 610 ...................................................................................................................... 3

Occupational Safety and Health Act, 29 U.S.C.

§ 651(b) .................................................................. 2
§ 652(8) ................................................................ 11
§ 651(b)(3) ................................................... *passim*
§ 653(9) ................................................................. 9
§ 653(10) .............................................................. 9
§ 654(a)(1) ........................................................... 9
§ 655(a) ..................................................... *passim*
§ 655(b) ..................................................... *passim*
§ 655(b)(5) ......................................................... 12
§ 655(b)(8) ......................................................... 13
§ 655(c) ............................................................... 26
§ 655(d)(1) ......................................................... 25
§ 655(f) ............................................................... 15
§ 655(g) .............................................................. 15

Information Quality Act, , 44 U.S.C.
§ 3504(d)(1) ....................................................... 16
§ 3516 ................................................................. 16

Pub. L. No. 101-549 ........................................... 22

Pub. L. No. 107-5 ............................................... 22

CLEAN AIR ACT, AMENDMENTS,
Pub. L. No. 101-549, 104 Stat. 2399 (1990) .......................... 22

KY. Rev. Stat. Ann. 342.165(1) ............................... 27

29 C.F.R.

§1910 Subpart E, ................................................ 23
§1910 Subpart Q .................................................. 23
§1910.123-126, .................................................... 23
§1910.217 ............................................................. 23
§1910.272 ....................................................... 3, 23
§1917.71 ............................................................... 23
§1926, Subpart P. ................................................. 4
§1926 Subpart CC ................................................ 23

**Regulatory Materials**

64 Fed. Reg. 13897 (March 23, 1999) ........................................................... 23

67 Fed. Reg. 67949 (Nov. 7, 2002) ............................................................... 23

69 Fed. Reg. 68283-84 (Nov. 24, 2004) ........................................................26

70 Fed. Reg. 2664 (Jan. 14, 2005) ................................................................ 16

81 Fed. Reg. 82494 (Nov. 18, 2016) .............................................................24

OSHA,

Regulatory Review of OSHA's Grain Handling Facilities Standard (February, 2003), https://www.osha.gov/sites/default/files/grainhandling_final2003.pdf ......4

Regulatory Review of 29 CFR 1926, Subpart P (March 2007), https://www.osha.gov/sites/default/files/excavation_lookback.pdf .................. 4-5

**Other Authorities**

AFL-CIO, Death on the Job:  The Toll of Neglect (2022), https://aflcio.org/sites/default/files/2022-04/2214_DOTJ_Final_42622_nobug.pdf ..............................................................................................................2

Burea of Labor Statistics,

Fatality rates by industry, occupation, and selected demographic characteristics, 1992, https://www.bls.gov/iif/fatal-injuries-tables/archive/fatal-occupational-injuries-employment-based-rates-1992.pdf ....................................3

Hours-based fatal injury rates by industry, occupation, and selected demographic characteristics, https://www.bls.gov/iif/fatal-injuries-tables/archive/fatal-occupational-injuries-hours-based-rates-2019.xlsx ..............3

CPWR--Center for Construction Research and Training, Recent Trenching Fatalities: Causes and Ways to Reduce, Table 2 (May 2019), available at https://www.cpwr.com/wp-content/uploads/2020/06/SS2019-Trenching Fatalities-Causes-and-Reduction.pdf. .......................................................................5

Legislative History of the Occupational Safety & Health Act of 1970
(S.2193, P.L. 91-596, 92d Cong. Committee Print (1971))............................ 2, 9, 10

Cass R. Sunstein, "Is OSHA Constitutional," 94 Va. L. Rev. 1407 (2008)............. 8

U.S. Gov't Accountability Office, GAO-12-330, Workplace Safety and Health:
Multiple Challenges Lengthen OSHA's Standard Setting (2012)...........................16

## IDENTITY AND INTERESTS OF THE AMICI

The American Federation of Labor & Congress of Industrial Organizations

(AFL-CIO) is a federation of 58 national and international labor organizations with

membership of over 12.5 million working men and women.[1]  North America's

Building Trades Unions (NABTU) is a labor organization composed of 14 national

and international unions that together represent over three million construction

workers.

The AFL-CIO and NABTU advocated for enactment of the Occupational

Safety and Health Act of 1970 (OSH Act), 29 U.S.C. §§ 651 *et seq*., and often

assist in the enforcement of the Act on behalf of employees in a wide variety of

industries.

This case involves a challenge to the Occupational Safety and Health

Administration's (OSHA's)[2] authority to promulgate standards that ensure

workplace safety. The outcome of this case will have implications not only for the

two standards that were applied to Allstates, but for all the standards OSHA has

adopted and enforced over five decades to protect the nation's workers. The AFL-

CIO and NABTU have a strong interest in this case and bring an important

---

[1] Counsel for all parties have consented to the filing of this amicus brief. No
counsel for a party authored this brief in whole or in part, and no person or entity,
other than the amici curiae, made a monetary contribution to the preparation or
submission of this brief.

[2] In this brief, the terms "OSHA," "the Secretary" and "the agency" are used
interchangeably.

perspective to the Court.

## INTRODUCTION

Congress enacted the OSH Act and President Richard M. Nixon signed it into law in 1970 for the express purpose of "assur[ing] so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § §651(b); Legislative History of the Occupational Safety & Health Act of 1970 at 1229 (S.2193, P.L. 91-596, 92d Cong. Committee Print (1971)) (Leg. Hist.). Congress explained in unambiguous terms that it intended to achieve that objective not through detailed legislation that would address all serious risks that existed at that time and thereafter through continuous amendment as new risks arose or were discovered, but rather "by authorizing the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." 29 U.S.C. § §651(b)(3).

In the past half century, the approximately fifty permanent safety standards adopted by OSHA pursuant to Congress' direction have saved thousands of lives and prevented hundreds of thousands of injuries and illnesses among U.S. workers. The rate of fatal injuries in 1970 was 18 per 100,000 workers; in 2020 it was 3.4 per 100,000.[3] The rate of injury and illness in 1974 was 10.4 per 100 workers; in

---

[3] AFL-CIO, *Death on The Job: The Toll of Neglect* 9-10 (2022), https://aflcio.org/sites/default/files/2022-04/2214_DOTJ_Final_42622_nobug.pdf (citing data from National Safety Council and Bureau of Labor Statistics (BLS)).

2020 it was 2.7 per 100 workers.[4]  The reduction in fatalities and injuries has been

particularly significant in construction and manufacturing where OSHA has

focused its efforts. During the same time period, the fatality rates in construction

and manufacturing fell by 86 and 71 percent, respectively, and the reported injury

and illness rates fell by 87 and 78 percent.[5]

In contrast, among workers who are not covered by the OSH Act, for

example, self-employed workers and independent contractors, there has been little

if any improvement in safety and health.  In 1992, when BLS first started reporting

job fatalities among self-employed workers, the job fatality rate was 11 per

100,000 workers; in 2019 it was 13.2 per 100,000 workers.[6]

OSHA has conducted "lookback" reviews of several specific safety

standards and found that they have been effective and are still necessary.[7]  OSHA's

lookback review of its grain handling facilities standard, 29 C.F.R. §1910.272,

---

[4] AFL-CIO, *Death on The Job* at 29 (citing BLS data).

[5] AFL-CIO, *Death on The Job* at 30-31 (industry level injury data is from BLS occupational injury surveys 1973 and 2021); *id. at* 13-15 (industry level fatality data is from National Safety Council and BLS).

[6] BLS, *Fatality rates by industry, occupation, and selected demographic characteristics, 1992*, https://www.bls.gov/iif/fatal-injuries-tables/archive/fatal-occupational-injuries-employment-based-rates-1992.pdf; BLS, *Hours-based fatal injury rates by industry, occupation, and selected demographic characteristics*, https://www.bls.gov/iif/fatal-injuries-tables/archive/fatal-occupational-injuries-hours-based-rates-2019.xlsx.

[7] The Regulatory Flexibility Act, 5 U.S.C. § 610, requires agencies such as OSHA to retrospectively evaluate the continuing need for their regulations.

3

illustrates how OSHA safety standards save lives.  When enough grain dust comes into contact with an ignition source, it causes an explosion.  The standard's goal is twofold: to prevent grain dust explosions and to prevent employees from suffocating if they become entrapped in grain.  It requires, among other things, that grain dust at covered facilities not exceed one-eighth inch. *See Nat'l Grain & Feed Ass'n v. OSHA,* 866 F.2d 717 (5th 1988) (affirming the standard as reasonably necessary).  Since its adoption, there has been a 70 percent decline in fatalities and a 44 percent decline in suffocations in the industry.  When the standard is followed, "grain suffocations do not occur."  OSHA, *Regulatory Review of OSHA's Grain Handling Facilities Standard* (February, 2003), https://www.osha.gov/sites/default/files/grainhandling_final2003.pdf.

Another example of an effective safety standard is OSHA's excavation standard which is designed to prevent trench cave-ins that kill workers.  29 C.F.R. § 1926, Subpart P.  When OSHA updated the standard in 1989, its goal was to simplify the regulation, eliminate duplicative requirements, and expand compliance options available to employers.  At that time, 90 workers died each year in trench cave-ins; between 1990 and 2000, the average number of worker deaths dropped to 70 despite a 20 percent increase in construction activity, meaning the standard had resulted in a 40 percent decline in trenching accidents.  *See* OSHA, *Regulatory Review of 29 CFR 1926, Subpart P* (March

2007), https://www.osha.gov/sites/default/files/excavation_lookback.pdf. Between

2007 and 2017 between 13 and 37 workers died annually in trenching accidents.

*See* CPWR—*The Center for Construction Research and Training, Recent*

*Trenching Fatalities: Causes and Ways to Reduce, Table 2* (May

2019), https://www.cpwr.com/wp-content/uploads/2020/06/SS2019-Trenching-

Fatalities-Causes-and-Reduction.pdf.

## ARGUMENT

Allstates argues that Congress' vesting of authority in OSHA to issue safety

standards under section 6(b) of the OSH Act, 29 U.S.C. §655(b), is an

unconstitutional delegation of lawmaking power.  Allstates is wrong.  The OSH

Act imposes significant and sufficient constraints on OSHA's standard setting

authority.

## I.    OSHA's Authority to Set Safety Standards Rests On a Constitutional Delegation

The OSH Act's vesting of authority in OSHA to set safety standards satisfies

both the Supreme Court's intelligible principle test and the variants of that test

proposed by all Justices.  In the OSH Act, Congress stated in plain terms its policy

objective – safe and healthful working conditions – and its chosen means for

achieving that objective – agency adoption of "mandatory occupational safety and

health standards."  29 U.S.C. § 651(b)(3).  Allstates asks this Court to deny

Congress its chosen means to achieve its stated objective.  The Supreme Court has

rejected that approach, stating "we have 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Whitman v. Am. Trucking Assn's*, 531 U.S. 457, 474-75 (2001) (quoting *Mistretta v. U.S.,* 488 U.S. 361, 416 (1989) (Scalia, J., dissenting)).

The OSH Act sets a "general framework to govern the development of regulations" and permissibly "delegated the task of formulating particular health and safety standards to the Secretary of Labor." *Indus. Union Dep't, AFL-CIO v. Hodgson,* 499 F.2d 467, 470 (D.C. Cir. 1974).   To suggest, as Allstates does (Br. at 36), that Congress itself must conduct the analysis and write the often complex, technical, and detailed safety standards necessary to protect workers in myriad industries with unique characteristics from hazardous materials, equipment and operations is to suggest that Congress cannot obtain its objective of safe workplaces.  "But," as the Supreme Court recognized in *Gundy v. U.S.*, 139 S.Ct. 2116, 2123 (2019), "the Constitution does 'not 'deny[ ] to the Congress the necessary resources of flexibility and practicality [that enable it] to perform its function[s].'" (Quoting *Yakus v. United States*, 321 U.S. 414, 425 (1944).)  Rather, Congress may "'obtain[ ] the assistance of its coordinate Branches'—and in particular, may confer substantial discretion on executive agencies to implement and enforce the laws."  *Id*. (quoting *Mistretta*, 488 U.S. at 372).

6

That is particularly true in ensuring health and safety when there are innumerable risks that are constantly changing as well as evolving knowledge of both risks and remedies.  As the Supreme Court has recognized, "'in our increasingly complex society, replete with ever changing and more technical problems,' . . . 'Congress simply cannot do its job absent an ability to delegate power under broad general directives.'"  *Id.*  (quoting *Mistretta*, 488 U.S. at 362).  The task of setting safety standards to govern different industries, hazards, equipment, and operations is similar to, but even more complex than, the task of adopting sentencing guidelines in relation to which the Supreme Court has recognized that "[d]eveloping proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders is precisely the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate."  *Mistretta*, 488 U.S. at 379.  Particularly in ensuring worker health and safety, "'[i]n determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the government co-ordination.'"  *Id.* at 372 (quoting *J.W. Hampton, Jr., & Co. v. U.S.,* 276 U.S. 394, 406 (1928)).

For these reasons, the Supreme Court has long recognized that "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive . . . actors."  *Touby v. U.S.*, 500

7

U.S. 160, 165 (1991). Congress must establish an "intelligible principle" to guide an agency's exercise of discretion. As we explain below, the OSH Act meets the "intelligible principle" test.

### A.  The OSH Act Provides Sufficient Constraints on OSHA's Safety Standard Setting Authority

Allstates' argument that OSHA's safety standard setting authority represents an unconstitutional delegation is based on a crimped reading of the Act's text. This Court must read the language of section 6(b), 29 U.S.C. § 655(b), together with related sections of the OSH Act, binding Court decisions interpreting that section,[8] and the OSH Act's legislative history to determine what the OSH Act requires. Relying on these traditional tools of statutory construction to determine what the law means demonstrates that the OSH Act places sufficient constraints on OSHA's safety standard setting.

### 1.  Congress Placed a Clear Floor Under the Safety Standards OSHA Was Authorized to Adopt

The statute establishes a minimum level of safety and health protections for workers, setting a floor beneath the safety standards OSHA is authorized to adopt. Both section 6(a) of the Act, 29 U.S.C. § 655(a), which authorized OSHA to adopt

---

[8] While Allstates suggests that OSHA cannot interpret away an overly broad delegation from Congress, Br. at 43-44, "a narrowing construction from federal courts can rescue a statute from a nondelegation challenge." Cass R. Sunstein, "Is OSHA Constitutional," 94 Va. L. Rev. 1407, 1409 (2008). *See Indus. Union Dep't*, AFL-CIO v. *Am. Petroleum Inst.,* 448 U.S. 607, 646-51 (1980) (*Benzene*).

national consensus and established federal standards without notice and comment within the first two years after the Act's adoption,[9] and the general duty clause, 29 U.S.C. § 654(a)(1), establish a minimum level of safety and health protection for workers.  Congress recognized that national consensus standards "may not be as effective or as up-to-date as is desirable" and "many represent merely the lowest common denominator of acceptance by interested private groups." Leg Hist. 147 (S. Rpt. No. 91-1282 at 6).  Congress nevertheless directed OSHA to quickly adopt these "consensus" standards as OSHA rules.  29 U.S.C. § 655(a).  Where two consensus standards conflicted, Congress directed OSHA to adopt the standard "assur[ing] the greatest protection" for employees.  *Id.*  Congress did so to "establish[] a system of uniform[, minimum] federal occupational health and safety standards," *Gade v. Nat'l Solid Wastes Mgmt Ass'n,* 505 U.S. 88, 96, 102 (1992), but expected "that such standards [would] be constantly improved and replaced." Leg. Hist. at 146 (S. Rpt. No. 91-1282 at 6); *see also id.* (referring to consensus standards as a "sound foundation for a national safety and health program").

The minimum safety protections established by these consensus standards are supplemented by section 5(a)(1) of the Act, 29 U.S.C. § 654(a)(1), the general duty clause, which incorporates "principles of common law" that impose on

---

[9] Section 6(a) directs OSHA to adopt "national consensus standards," 29 U.S.C. § 653(9), and "established federal standards," *id*. § 653(10), as mandatory OSHA standards.  We refer to these early standards collectively as "consensus" standards.

employers a "general and common duty to bring no adverse effects to the life and health of their employees." Leg. Hist. at 149 (S. Rpt. No. 91-1282 at 9). The general duty clause was not intended to serve as a "general substitute for reliance on standards;" it was to apply when "no standard has yet been adopted." Leg Hist at 150 (S. Rpt. No. 91-1282 at 10). Contrary to Allstates' contention, Br. at 35, Congress' explicit reference to "pre-existing common law" when passing the OSH Act, supplies, when combined with the constrains described in subpart 2 *infra*, the guidance Justice Gorsuch found missing in his dissent in *Gundy.* 139 S.Ct. at 2137. Thus, Congress placed a clear floor below the standards OSHA was to promulgate under section 6(b).

### 2. The Text of the OSH Act and Judicial Decisions Place Sufficient Constraints on OSHA's Authority to Set Standards Above the Statutory Floor

Congress provided OSHA with authority to update and raise the safety floor established under section 6(a) and the general duty clause through the procedures set forth in section 6(b) of the Act. When OSHA initiates rulemaking to adopt such permanent safety standards under section 6(b), binding interpretations of the OSH Act by the Supreme Court and federal courts of appeals further constrain OSHA's discretion in several respects.

First, an OSHA standard must be directed at an "occupational risk." The OSH Act "empowers the Secretary to set workplace safety standards, not broad

public health measures." *Nat'l. Fed'n of Indep. Bus. v. OSHA*, 142 S.Ct. 661, 665

(2022) (emphasis in original) (NFIB). OSHA cannot regulate "the hazards of daily

life." *Id.* And even if "a risk . . . occurs in many workplaces," OSHA cannot

regulate it unless it is "an *occupational* hazard." *Id.* (emphasis in original). In

other words, a standard must address "workplace hazards with workplace

solutions." *In re MCP No. 165,* 21 F.4th 357, 397 (6th Cir., 2021) (citations

omitted) *(*Larsen, J., dissenting*)*.

Second, the definition of an "occupational safety and health standard" in

section 3(8), 29 U.S.C. §652(8), further constrains OSHA's discretion. That

section defines such a standard as "a standard which requires conditions, or the

adoption or use of one or more practices, means, methods, operations, or processes,

reasonably necessary or appropriate to provide safe or healthful employment and

places of employment." As construed by the courts, such a standard must correct a

particular hazard. *Agricultural Retailers Ass'n v. DOL*, 837 F.3d 60, 64 (D.C. Cir.

2016). Thus, a standard must be "a remedial measure addressed to a specific and

already identified hazard," rather than a "purely administrative effort designed to

uncover violations, *id. at* 64, or an effort to regulate the design or manufacture of a

product, for example. *Steel Joist Inst. v. OSHA,* 287 F.3d 1165, 1167 (D.C. Cir.

2002).

Third, section 3(8) "requires the Secretary to find, as a threshold matter, that

11

the [hazard] in question poses a significant health risk in the workplace and that a

new, lower standard is therefore 'reasonably necessary or appropriate to provide

safe or healthful employment and places of employment.'" *Indus. Union Dep't v.*

*Am. Petroleum Inst.,* 448 U.S. 607, 614-15 (1980) (*Benzene*).[10]  "[B]oth the

language and structure of the Act, as well as its legislative history, indicate that it

was intended to require the elimination, as far as feasible, of significant risks of

harm." *Id*. at 641.  The significant risk requirement "applies to permanent

standards promulgated under section 6(b)(5), as well as to other types of permanent

standards," *i.e.* safety standards. *Id.* at 642.[11]

　　If OSHA fails to demonstrate significant risk, courts have invalidated its

standard.  *See, e.g., AFL-CIO v. OSHA*, 965 F.2d 962, 980 (11th Cir. 1992)

(invalidating OSHA's standard setting permissible exposure levels for air

contaminants because agency had not found significant risk for each regulated,

---

[10] Allstates implies that the plurality decision in *Benzene* is not binding, but the holding in *Benzene* was affirmed by a 6-3 decision in *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 505-06 & n. 25 (1981) (*Cotton Dust*)*,* and the decision has been viewed as binding by every court of appeals to review an OSHA standard since it was issued.  *See, e.g., United Steelworkers v. Marshall,* 647 F.2d 1189, 1248 (D.C. Cir. 1980); *Nat'l Grain & Feed Ass'n v. OSHA* 866 F.2d 717, 727 (5th Cir. 1988)*.*
[11] While the *Benzene* decision involved a standard issued under section 6(b)(5) of the OSH Act, 29 U.S.C. §655(b)(5), relating to toxic substances, since 1980 both OSHA and the courts have held that the significant risk requirement applies to safety standards as well because it is derived from the definition of occupational and health standards generally.  *See, e.g., Alabama Power v. OSHA,* 89 F.3d 740,745 (11th Cir. 1996) *(*reviewing OSHA's significant risk finding for the electric power generation standard).

toxic substance); *Texas Indep. Ginners Ass'n v. Marshall,* 630 F.2d 398, 407-09

(5th Cir. 1980) (invalidating the cotton dust standard's application to the ginning

industry because OSHA failed to demonstrate significant risk).  *Cf. ASARCO, Inc.

v. OSHA,* 647 F.2d 1 (9th Cir. 1981) (OSHA conceded *Benzene* required remand of

arsenic standard to OSHA for significant risk finding).  Indeed, the *Benzene* Court

itself made clear that the agency's "obligation to find that a significant risk is

present before it can characterize a place of employment as 'unsafe,'" is sufficient

to confine the agency's discretion.  488 U.S. at 655.  The threshold requirement

that OSHA find a significant risk in the workplace is the mirror image of a

requirement that the Attorney General recognize exceptions to the Sex Offenders

Registration and Notification Act for offenders who do not present an "imminent

hazard to the public safety," which Justice Gorsuch would have found

constitutional in *Gundy*.  *See* 139 S.Ct. at 2143 (Gorsuch, J., dissenting).

Fourth, OSHA must find that a significant risk "can be eliminated or

lessened by a change in practices" before issuing a standard.  *Benzene*, 448 U.S. at

642. "The reasonably necessary or appropriate limitation requires that OSHA

regulations must be reasonably essential or at least reasonably efficacious in

reducing a significant risk of material harm." *Texas Ind. Ginners*, 630 F.2d at

410.[12]

---

[12] The Supreme Court further concluded that the Act's requirements that OSHA

Fifth, OSHA must demonstrate that its standard is technologically and economically feasible for each regulated industry. *Am. Iron & Steel Inst. v. OSHA,* 939 F.2d 975, 982-1010 (D.C. Cir. 1991); *United Steelworkers v. Marshall*, 647 F.2d 1189, 1301 (D.C. Cir. 1980) ("the undisputed principle that feasibility is to be tested industry-by-industry demands that OSHA examine the technological feasibility of each industry individually.")  Although the feasibility requirement expressly appears in section 6(b)(5)'s reference to health standards, the Supreme Court has explained that no standard is "reasonably necessary or appropriate," if it is not feasible. *Am. Textile Mfrs. Inst. v. Donovan,* 452 U.S. 490, 513 n. 31 (1981) (Cotton Dust). A standard must also be cost-effective. *Id.* at  n. 32.[13]  "Although the agency does not have to conduct an elaborate cost-benefit analysis, it does have to determine whether the benefits expected from [a safety] standard bear a reasonable relationship to the costs imposed by the standard." *Alabama Power Co. v. OSHA,* 89 F.3d 740, 746 (11th Cir. 1996) (citations omitted). *See also Nat'l Grain & Feed Ass'n,* 866 F.2d at 733; *International Union, UAW v. OSHA,* 37

---

find both that a significant risk exists and that a standard would significantly reduce that risk were bolstered by section 6(b)(8), 29 U.S.C. §655(b)(8), which requires that a permanent standard 'better effectuate the purposes" of the Act than an existing national consensus standard. *Benzene*, 448 U.S. at 644-45.

[13] For health standards, OSHA must set the standard that eliminates significant risk limited only by feasibility. *Cotton Dust,* 452 U.S. at 509.  For safety standards, OSHA is not required to set the standard at the limits of feasibility but must adopt a standard that provides "a high degree of worker protection." *International Union, UAW,* 37 F.3d at 669.

14

F.3d 665, 669 (D.C. Cir. 1994).

In addition, through section 6(g), Congress required OSHA to consider specific factors in setting "the priority for establishing standards:" OSHA "shall give due regard to the urgency of the need for mandatory safety and health standards," 29 U.S.C. § 655(g). The Supreme Court concluded that section 6(g) "require[s] elimination of the most serious hazards first." *Benzene,* 448 U.S. at 644. *See also United Steelworkers v. Auchter,* 763 F.2d 728, 738 (3rd Cir. 1985) (the language of section 6(g) "suggests to us a statutory standard by which to measure the exercise of the Secretary's priority setting").

Moreover, the OSH Act and subsequent laws impose rigorous procedural requirements on OSHA that ensure compliance with those substantive constraints. The OSH Act requires that standards be adopted through "a rigorous process that includes notice, comment, and an opportunity for a public hearing." *NFIB*, 142 S.Ct. at 663 (citing 29 U.S.C. § 655(b)). Section 6(f) of the Act requires that any standard must be supported by substantial evidence. 29 U.S.C. § 655(f). The hybrid rulemaking procedures required under the OSH Act, as well as the heightened standard of review, ensures that OSHA safety standards are based on a strong factual record. *Hodgson,* 499 F.2d at 472-3.[14]

---

[14] In addition, before OSHA proposes a standard that applies to the construction industry, it must consult with the Advisory Committee on Construction Safety and Health, a panel of construction safety experts with equal representation of labor

And since the OSH Act's passage, subsequent congresses have layered on additional requirements for adopting standards.  For example, depending on its projected impact on small businesses, the agency must conduct an analysis of the economic impact of the standard on small business under the Regulatory Flexibility Act, 5 U.S.C. §§601 *et seq.,* and convene a small business panel under the Small Business Regulatory Enforcement Fairness Act. 5 U.S.C. § 609(b), (d). If a standard is based on scientific information disseminated to the public, OSHA must subject it to peer review and, if the information could have an economic impact exceeding $500 million or is "novel, controversial, or precedent-setting," a "more rigorous form of peer review" is required.  Information Quality Bulletin for Peer Review, 70 Fed. Reg. 2664 (Jan. 14, 2005).[15] *See generally*, U.S. Gov't Accountability Office, GAO-12-330, Workplace Safety and Health: Multiple Challenges Lengthen OSHA's Standard Setting 14-16, app. II (2012).

The fact that Congress provided sufficient constraints on the agency in the OSH Act is evidenced by the fact that courts, including the Supreme Court, have struck down OSHA standards as outside the agency's authority.  *See, e.g., NFIB*, 142 S.Ct. 661 (striking down vaccine-or-test standard as outside OSHA's

---

and management.  *See Nat'l Constructors Ass'n v. Marshall,* 581 F.2d 960, 967 (D.C. Cir. 1978).

[15] The Information Quality Act, 44 U.S.C. §§ 3504(d)(1) and 3516, required that the Office of Management and Budget impose this requirement on OSHA and other federal agencies.

authority); *Frank Diehl Farms v. Sec'y of Labor,* 696 F.2d 1325 (11th Cir. 1983)
(striking down OSHA's effort to regulate migrant living conditions); *Am. Dental
Ass'n v. Martin,* 984 F.2d 823, 829-30 (7th Cir. 1993) (striking down OSHA's
effort to regulate bloodborne pathogen exposures in private homes); *Taylor Diving
& Salvage Co. v. DOL,* 599 F.2d 622, 624-26 (5th Cir. 1979) (striking down
OSHA's effort to regulate procedures for medical examination of workers).
Justice Gorsuch stated in *Gundy* that "Congress must set forth standards
'sufficiently definite and precise to enable Congress, the courts, and the public to
ascertain' whether Congress's guidance has been followed." 139 S.Ct at 2136
(Gorsuch, J., dissenting). That is the case here.

### 3. The Statutory Constraints on OSHA's Standard Setting Authority Are Sufficient Under the Constitution

The Supreme Court and every other court that has addressed the question
has held that the authority Congress vested in OSHA to set occupational safety and
health standards does not constitute an unconstitutional delegation of authority.
*Benzene*, 448 U.S. 609 (upholding OSHA's authority to issue health standards).
*See also Nat'l Maritime Safety Inst. v. OSHA*, 649 F.3d 743, 755-56 (D.C. Cir.
2011) (upholding OSHA's authority to issue safety standards under section 6(b));
*International Union, UAW*, 37 F.3d at 668 (same). As the Seventh Circuit
recognized in rejecting a similar constitutional challenge to OSHA's authority to
set permanent safety standards:

> It is true that no one could necessarily predict from the statutory scheme exactly what regulations would be promulgated in any given industry, but that is not necessary. What is perfectly clear is that the Congress has chosen a policy and announced general standards which guide the Secretary in establishing specific standards to assure the safest and healthiest possible working environments, and which enable the courts and the public to test the Secretary's faithful performance of that command. Nothing more is required.

*Blocksom Co. v. Marshall*, 582 F.2d 1122, 1126 (7th Cir. 1978).

The Supreme Court's decision in *Whitman*, upholding Congress' delegation of authority to the Environmental Protection Agency (EPA) "to set primary ambient air quality standards 'the attainment and maintenance of which . . . are requisite to protect the public health' with 'an adequate margin of safety,'" also makes clear that Allstates' constitutional challenge to the OSH Act lacks merit. 531 U.S. at 465 (quoting 42 U.S.C. § 7409(b)(1)). There, the Court noted that the "limits on EPA's discretion . . . resemble" those in the OSH Act's provisions regarding permanent health standards "which the Court upheld" in *Benzene. Id.* at 473. Indeed, the D.C. Circuit in *Whitman* explained that "the latitude EPA claims here [is] even broader than that OSHA asserted in *UAW v. OSHA." Am. Trucking Ass'n v. EPA,* 175 F.3d 1027, 1037 (D.C. Cir. 1999). Given that the delegation to OSHA is narrower than the delegation to the EPA in *Whitman*, it follows that Congress' delegation to OSHA is constitutional.

In *Whitman,* the Supreme Court made clear that it has "never demanded . . . that statutes provide a 'determinate criterion' for saying 'how much [of the

regulated harm] is too much.'" *Id*. at 475.  The *Whitman* court explained that in *Touby*, "we did not require the statute to decree how 'imminent' was too imminent, or how 'necessary' was necessary enough, or even—most relevant here—how 'hazardous' was too hazardous" for a drug to be classified as a controlled substance.  *Whitman*, 531 U.S. at 475.

Binding precedent thus dictates affirmance here.

## II.    The Major Questions Doctrine Does Not Apply and Its Underlying Premise Undermines Allstates' Position

Allstates argues that the major questions doctrine supports its position that Congress' delegation of authority to OSHA is unconstitutional.  (Br. at 21).  The Supreme Court's decision in *West Virginia v. EPA*, 142 S.Ct. 2587 (2022), makes clear that the opposite is true.

*West Virginia* involved a challenge to EPA's authority to regulate greenhouse gas emissions under the Clean Air Act.  Invoking the major questions doctrine, the Court explained that it must treat questions of "vast economic and political significance" differently from run-of-the-mill agency interpretations of statutory authority.  The Court warned that agency attempts to find previously unexercised, "extravagant statutory power" in aging statutes must be viewed with skepticism.  *Id.* at 2609.  In such cases, the courts must ask whether there is "clear congressional authorization" for the exercise of such power.  *Id.*  at 2614-16.

19

In reviewing the validity of OSHA's vaccine- or- test emergency temporary standard (ETS) under the major questions doctrine, the Supreme Court emphasized that the ETS was "strikingly unlike the workplace regulations that OSHA has typically imposed," given that "vaccination … cannot be undone at the end of the workday." *NFIB*, 142 S.Ct. at 665.  The Court found that the ETS was a "blunt instrument" that "dr[ew] no distinctions based on industry or risk of exposure to COVID-19," and represented "a significant encroachment into the lives—and health—of a vast number of employees." *Id*. at 664-65.

The Supreme Court made plain, however, that OSHA could adopt standards addressing "day-to-day" hazards, including fire and sanitation, because such requirements, unlike vaccination, may be "undone at the end of the workday."  *Id*. at 665.  The Court also noted that OSHA has statutory authority "to regulate occupation-specific risks related to COVID-19."  *Id*.  It is "plainly permissible" for OSHA to promulgate "targeted regulations" to address situations where "the virus poses a special danger because of the particular features of an employee's job or workplace."  *Id*. at 665-66.  The Court thus distinguished OSHA's ordinary standard setting authority, at issue here, from the vaccine-or-test ETS, making clear that the former did not raise a major question.

As we explain below, OSHA's safety standards are "targeted regulations" that address specific hazards of the type the Supreme Court made clear in *NFIB* are

20

permitted.  Allstates has identified no specific safety standard that raises "vast economic and political" questions that would trigger application of the major questions doctrine.

Having identified no specific regulation that falls outside OSHA's authority, Allstates claims the collective impact of *all* section 6(b) safety standards raises a major question.  But Congress clearly and expressly authorized OSHA to issue such safety standards.  It made clear that then existing state and local regulations, combined with workers' compensation laws and voluntary industry action, had not adequately protected workers from occupational illness and injuries. *Kiewit Power Const. v. Sec'y of Labor,* 959 F.3d 381, 385 (D.C. Cir. 2020) (citing legislative history).   Thus, even if the major question doctrine applied as Allstates suggests, the requisite "clear congressional authorization" exists. *West Virginia*, 142 S.Ct. at 2614.

What is more, OSHA's authority to issue standards protecting workers from occupational safety hazards is nothing new.  In its 52-year history, OSHA has issued standards addressing approximately 50 safety hazards.  When OSHA issues safety standards, it is not relying on a previously unexercised (or rarely exercised) power in an aging statute to resolve politically controversial issues that Congress has refused to resolve.  Protecting workers from fall hazards, trenching cave-ins, amputations from moving machine parts, and fire and electrical hazards is the

bread and butter of safety regulation – the kind of routine safety regulation Congress clearly had in mind when it adopted the OSH Act.

Moreover, Congress has not "conspicuously and repeatedly" tried to revoke OSHA's section 6(b) authority to issue safety standards, *West Virginia,* 142 S. Ct. at 2621. Instead, for more than 50 years, Congress has repeatedly appropriated funds for OSHA to adopt and enforce such standards. On rare occasions, Congress has objected to either specific provisions in a safety standard, *see, e.g.*, Pub. L. No 104-134 (appropriations rider bars OSHA from enforcing fall protection requirements in residential construction)*,* or to OSHA's slow pace in promulgating other standards Congress considered essential*, see, e.g*., CLEAN AIR ACT, AMENDMENTS, Pub. L. No. 101-549, 104 Stat. 2399 (1990), title III, §304, 29 U.S.C. § 655 notes (directing OSHA to complete its chemical process safety standard). Indeed, Congress has exercised its authority to invalidate a specific OSHA safety standard without in any way limiting OSHA's authority to set safety standards generally. *See* Pub. L. 107-5 (resolution of disapproval under the Congressional Review Act vacating OSHA's ergonomics standard). Congress has never sought to revoke OSHA's authority to set safety standards.

Furthermore, few if any section 6(b) safety standards affect all, or even most, employers. And, the broadest safety standards, such as those regulating exits

and requiring fire extinguishers, represent common sense safety precautions and are not controversial.

Many safety standards affect narrow segments of the economy, *e.g.*, grain handling facilities, 29 C.F.R. §1910.272, *affirmed on pre-enforcement review in Nat'l Grain & Feed Ass'n v. OSHA,* 858 F.2d 1019, *on reconsideration,* 866 F.2d 717 (5th Cir. 1988); logging operations, 29 C.F.R. §1910.266; electric power generation, and transmission, 29 C.F.R. §1910.269 and 29 C.F.R. §1926.50, *affirmed on pre-enforcement review, Alabama Power,* 89 F.3d 740; and marine terminals, 29 CFR Part 1917.  None of these standards apply to Allstates.

Other safety standards are addressed to specific hazardous operations or the operation of specific hazardous equipment, *e.g.*, cranes and derricks, 29 C.F.R. 1926 Subpart CC; scaffolding, 29 C.F.R. § 1910.27; forklifts, 29 C.F.R. §178; mechanical power presses, 29 C.F.R. §1910.217; vertical tandem lifts in the maritime industry, 29 C.F.R. §1917.71, *affirmed on pre-enforcement review Nat'l Maritime,* 649 F.3d 743; and welding, cutting and brazing, 29 C.F.R. §1910 Subpart Q.

Several 6(b) rulemakings simply rewrote existing section 6(a) consensus standards in plain language, *see, e.g.*, dipping and coating operations, 29 C.F.R. §1910.123-126, 64 Fed. Reg. 13897 (March 23, 1999); exit routes, 29 C.F.R. §1910 Subpart E, 67 Fed. Reg. 67949 (Nov. 7, 2002).

Even the standard Allstates cites (Br. at 2) as an example of OSHA's overreach imposes a more modest burden than Allstates suggests.  OSHA's standard regulating walking and working surfaces applies to most establishments in general industry.  81 Fed. Reg. 82494 (Nov. 18, 2016).  OSHA adopted the standard because slips, trips, and falls are the leading cause of workplace fatalities and injuries. *Id.* at 82495.  OSHA estimated its standard would prevent 29 fatal injuries and 5,842 other injuries annually.  *Id.* at 82496.  The standard, which applies to 6.9 million establishments and protects 112 million workers, is estimated to cost approximately $44.00 per establishment. *Id.*  OSHA found the standard's annual benefits are substantially greater than the annual costs. *Id.*

For the reasons cited above, the major question doctrine is inapposite here and, even if it were relevant, the OSH Act provides the requisite clear congressional authorization.

### III.    The Remedy Allstates Seeks Is Unjustified and Would Subject U.S. Workers to Grave Danger

Allstates asks this Court to invalidate all section 6(b) safety standards although it has been cited for violations of only two standards and chose not to raise any constitutional objection to either.  Further, before this Court, Allstates highlights its commitment to employee safety and health, suggesting it complies

with or exceeds the requirements imposed by applicable OSHA safety standards.[16]

And many OSHA safety standards do not apply to Allstates. Nevertheless,

Allstates seeks an order invalidating *all* section 6(b) safety standards.

Allstates' requested remedy is not merited because the OSH Act's

delegation to set safety standards poses no constitutional problem. In addition, as

we have shown, many section 6(b) safety standards reorganize or reword safety

requirements that were imposed under section 6(a) – requirements Allstates does

not challenge and which this Court has previously held do not violate the

nondelegation doctrine. *Towne Const. Co. v. OSHRC ,*847 F.2d 1187 (6th Cir.

1988). Other safety standards expand the options available for compliance with

pre-existing section 6(a) regulatory obligations, eliminate duplicate regulatory

requirements, and adopt newer consensus standards to replace out-of-date

requirements or reword those requirements in plain language. The standards that

address hazards not covered by section 6(a) standards, such as the grain handling

---

[16] Allstates claims that in some cases compliance with the specifics of an OSHA standard would create a greater hazard than its own safety procedures. (Br. at 11-12). If that were so, and Allstates practices were "as safe and healthful as" the requirements of an OSHA standard, the company could seek a variance allowing it to continue to use its preferred procedures. *See* 29 U.S.C. § 655(d)(1). Allstates has not done so. Furthermore, the Occupational Safety & Health Review Commission recognizes a defense to an OSHA citation where compliance would create a "greater hazard" than would noncompliance. *See PBR, Inc. v. Sec'y of Labor,* 643 F.2d 890 (1st Cir. 1981).

and excavation standards discussed above, have been effective at reducing death and serious injuries.

Allstates argues that concerns about the wholesale invalidation of section 6(b) standards are "overblown."  Br. at 60.  But its contention is based on the supposition that existing consensus standards, which pre-date 1970, and emergency temporary standards would be sufficient to protect U.S. workers.  The latter contention is fatuous because an emergency temporary standard can only last six months, s*ee* 29 U.S.C. § 655(c), and OSHA has issued very few emergency standards and fewer still have been sustained.  *See NFIB,* 142 S.Ct. at 663 (noting that OSHA has issued nine ETSs and five were enjoined).  The former contention is equally baseless.  Relying on old, dated safety rules to replace more modern safety standards adopted after notice and comment rulemaking, and in some cases after tripartite negotiations, is contrary to Congress' intent and dangerous for workers.  Moreover, OSHA would lack any means to update those dated and aging requirements. *See* Notice of Project to Update OSHA Standards Based on Consensus Standards, 69 Fed. Reg. 68283-84 (Nov. 24, 2004) (explaining that many of the section 6(a) consensus standards are 30 to 60 years old, are no longer in print, "do not reflect advances in technologies that have changed workplace safety," and "have not been updated to address new equipment and machinery")

Nor is the general duty clause an effective substitute for specific safety standards (and Allstates does not suggest to the contrary).  Congress did not intend that the general duty clause substitute for specific standards.  Moreover, the general duty clause is not sufficient to protect workers because it does not provide employers with specific guidance concerning hazards or abatement methods; it imposes a heavy litigation burden on OSHA to proceed employer by employer to impose such specific duties; and it protects only an employer's direct employees and not others at the worksite, *see Anthony Crane Rental v. Reich,* 70 F.3d 1298, 1305 (D.C. Cir. 1995) (section 5(a)(1) requires an employer to protect "his employees" and not others at the site), which is a serious limitation in the construction industry where employees of numerous contractors typically work on a common site not owned by their employer.

Finally, the impact of a ruling invalidating all OSHA safety standards would extend far beyond disabling one federal agency.  OSHA standards often serve as the standard of care in other contexts.  Collective bargaining agreements often require employers to comply with OSHA standards.  Some workers' compensation programs provide an enhanced recovery for workers injured by practices that violate OSHA standards.[17]  OSHA standards also often establish the standard of care in negligence suits.  Most states permit evidence of OSHA violations to be

---

[17] *See, e.g.,* KY. Rev. Stat. Ann. 342.165(1).

introduced as evidence of negligence, while others hold that a violation of a standard establishes negligence *per se*. *See, e.g., Teal v. E.I. Dupont de Nemours & Co.*, 728 F.2d 799, 805 (6th Cir. 1984) (applying Tennessee law). A ruling in Allstates' favor would weaken the standard of care under federal and state law, statutory and common law. In short, such a ruling would subject U.S. workers to grave danger.

## CONCLUSION

For the above-stated reasons, the decision below should be affirmed.

Respectfully submitted,

Jon Newman
Esmerelda Aguilar
Sherman Dunn, P.C.
900 Seventh Street, NW
Suite 1000
Washington, DC 20001
(202) 785-9300
newman@shermandunn.com

*Counsel for NABTU*

/s/Matthew Ginsburg
Matthew Ginsburg
Craig Becker
AFL-CIO
815 Black Lives Matter Plaza
N.W. Washington, DC 20006
(202) 637-5397
mginsburg@aflcio.org

Randy Rabinowitz
OSH Law Project, LLC
PO Box 3769
Washington, DC 20027
(202) 256-4080
randy@oshlaw.org

*Counsel for AFL-CIO*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACEREQUIREMENTS AND TYPE-STYLE REQUIREMENTS**

The brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule Appellate Procedure 32(f) and the Rules of this Court, it contains 6,495 words.

This brief also complies with the typeface and type style requirements of Federal Rules of Appellate Procedures 29(a)(4), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/Matthew Ginsburg
Matthew Ginsburg

*Attorney for Amici Curiae*

Date: January 30, 2023

# CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of January, 2023, a copy of the foregoing Joint Brief of *Amici Curiae* American Federation of Labor & Congress of Industrial Organizations and North America's Building Trades Unions In Support of the Defendants-Appellees was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Matthew Ginsburg
Matthew Ginsburg

Date: January 30, 2023