No. 22-3772
_____

## IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

_____

ALLSTATES REFRACTORY CONTRACTORS, LLC,
*Plaintiff-Appellant*,

v.

JULIE A. SU, et al.,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of Ohio (Western Division) (Zouhary, J.)
District Court Case No. 3:21-cv-1864

_____

## APPELLANT'S PETITION FOR REHEARING EN BANC
_____

Christopher M. McLaughlin
JONES DAY
North Point, 901 Lakeside Ave.
Cleveland, OH 44114
(216) 586-3939
cmmclaughlin@jonesday.com

J. Benjamin Aguiñaga
JONES DAY
2727 N. Harwood St.
Dallas, TX 75201
(214) 220-3939
jbaguinaga@jonesday.com

Donald F. McGahn II
Brett A. Shumate
John M. Gore
Anthony J. Dick
Brinton Lucas
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
(202) 879-3939
bshumate@jonesday.com

*Counsel for Appellant Allstates Refractory Contractors, LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND RULE 35(B)(1) STATEMENT ........................ 1

BACKGROUND ................................................................................. 4

ARGUMENT ..................................................................................... 6

I.  THE PANEL'S DECISION CONFLICTS WITH THE
SUPREME COURT'S NONDELEGATION PRECEDENTS ......... 7

    A.  "Appropriate" Is Not an Intelligible Principle ......................... 9

    B.  The Panel Majority's Reasoning Is Unavailing ...................... 11

II.  THE QUESTION HERE IS EXCEPTIONALLY
IMPORTANT ............................................................................. 19

CONCLUSION ................................................................................ 21

CERTIFICATE OF COMPLIANCE .................................................. 22

CERTIFICATE OF SERVICE .......................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935) ........................................................... 10

*Free Enter. Fund v. PCAOB*,
   561 U.S. 477 (2010) ........................................................... 20

*In re MCP No. 165*,
   20 F.4th 264 (6th Cir. 2021) ............................................... 5

*In re Nat'l Nurses United*,
   47 F.4th 746 (D.C. Cir. 2022) ............................................ 16

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
   448 U.S. 607 (1980) ........................................................... 4

*Int'l Union v. Chao*,
   361 F.3d 249 (3d Cir. 2004) ............................................... 16

*Int'l Union v. OSHA*,
   37 F.3d 665 (D.C. Cir. 1994) ............................................. 17

*Int'l Union v. OSHA*,
   938 F.2d 1310 (D.C. Cir. 1991) ...................................... 16, 17

*Michigan v. EPA*,
   576 U.S. 743 (2015) ........................................................... 10

*Panama Refining Co. v. Ryan*,
   293 U.S. 388 (1935) ........................................................... 10

*Tiger Lily, LLC v. HUD*,
   5 F.4th 666 (6th Cir. 2021) ..................................... *passim*

*Touby v. United States*,
   500 U.S. 160 (1991) ........................................................... 8

*Whitman v. Am. Trucking Ass'n,*
    531 U.S. 457 (2001) .......................................................................... 17

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

U.S. Const. art. I, § 1 ......................................................................... 7

29 U.S.C. § 651 .................................................................................. 12

29 U.S.C. § 652 .......................................................................... *passim*

29 U.S.C. § 654 .................................................................................... 5

29 U.S.C. § 655 .......................................................................... *passim*

29 U.S.C. § 666 .................................................................................... 5

29 U.S.C. § 668 .................................................................................... 5

## OTHER AUTHORITIES

Cass. R. Sunstein, *Is OSHA Unconstitutional?,*
    94 VA. L. REV. 1407 (2008) ............................................................ 1

## INTRODUCTION AND RULE 35(B)(1) STATEMENT

This case presents a question of exceptional importance: whether Congress's "nearly unfettered" delegation of legislative power to the Occupational Safety and Health Administration (OSHA) violates Article I. Dissent 16. As even the most ardent defenders of the administrative state have admitted, the statute here represents the most extreme delegation of legislative power that currently exists in the United States Code. "No other federal regulatory statute confers so much discretion on federal administrators, at least in any area with such broad scope, and it is not difficult to distinguish OSHA from statutes that the Court has upheld." Cass. R. Sunstein, *Is OSHA Unconstitutional?*, 94 Va. L. Rev. 1407, 1448 (2008). If there is any case where courts should stand up for the idea that laws must be written by the legislature, this is it.

Under the statute at issue, Congress gave OSHA discretionary power to write "any occupational safety or health standard" governing "practically every business in the United States." Dissent 41; *see* 29 U.S.C. § 655(b). For safety standards, the *only* nominal limit is that they must be "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8).

In other words, OSHA has free rein to make whatever workplace safety rules it wants for virtually every business in America, with no guiding standard other than the agency's own unilateral view of what is "appropriate." That supposed limit is no limit at all. As Judge Nalbandian noted in dissent, the term "appropriate" does not "require anything but the Secretary [of Labor] asking: 'What seems appropriate in workplaces around the nation?'" Dissent 37.

To avoid confronting this unconstitutional delegation, the Panel Majority rewrote the statute. It held that whenever OSHA perceives a "significant risk" to worker safety, it "*must*" enact safety standards that are "needed to ameliorate the[] unsafe conditions." Op. 12-13. But that is not what the statute says. It says that the agency "may" enact standards that are necessary "or appropriate," 29 U.S.C. §§ 652(8), 655(b), *and* that OSHA may decide "that a rule should not be issued," *id*. § 655(b)(4).

The Majority's novel and atextual reading creates a glaring split with the Third and D.C. Circuits, which have held that OSHA does *not* have a mandatory duty to regulate every time it perceives a significant workplace-safety risk. There are countless such risks that could be identified, and it would be both impossible and economically ruinous for

OSHA to try to regulate all of them. Accordingly, if the Majority's decision is allowed to stand, it threatens to spark a massive explosion of mandatory rulemaking based on an endless supply of petitions flagging potential occupational dangers. This Circuit will become a magnet for every union and employee-advocacy group to demand ever more regulation of the workplace.

This Court should not countenance that result. As Judge Nalbandian demonstrated, the Majority's reading of the Act was wrong. The statute gives OSHA unbounded and purely discretionary power to promulgate "appropriate" workplace safety standards, with no constraining principle supplied by Congress. That delegation of power is as unconstitutional as it is unparalleled among modern regulatory agencies. And it was adopted precisely so that Congress could avoid making the hard choices in balancing worker safety with industry costs.

That sort of "clever dodge" "didn't work" at the Founding, and it should not work today. *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring). No doubt, "successful nondelegation cases are few and far between." Dissent 44. But if the punting of major policy choices here does not violate the nondelegation doctrine, then none

ever would. Indeed, leaving the Majority's decision in place would provide a roadmap for Congress to authorize any federal agency—from the FTC to the IRS—to regulate in whatever way it deems "appropriate." Armed with such standardless discretion, agencies could make whatever rules they want to bind private conduct, leaving regulated parties without a statutory foothold to fight back. And in the rare case where a party mounts a facial challenge, courts could then contrive phantom statutory limits to ward off a constitutional challenge. This Court should grant en banc review and reverse.

## BACKGROUND

**1.** Under the Occupational Safety and Health Act, OSHA—to which the Secretary of Labor has delegated his authority—"may by rule promulgate, modify, or revoke any occupational safety or health standard." 29 U.S.C. § 655(b). This case involves a subset of standards called "permanent" safety standards—*i.e.*, "standards other than those dealing with toxic materials and harmful physical agents." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 640 n.45 (1980) (plurality). For these standards, the "only substantive criteria" bearing on OSHA's discretion comes from the Act's "definitions" section. *Id.* In

particular, the Act defines "an occupational safety and health standard" as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, *reasonably necessary or appropriate* to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8) (emphasis added).

OSHA's regulatory authority extends to "practically every business in the United States." Dissent 41. That is because the Act requires every "employer" to comply with OSHA's standards, and an "employer" is any "person engaged in a business affecting commerce who has employees." 29 U.S.C. §§ 654(a)(2), 652(5). And that includes not only private employers, but also virtually all federal agencies, plus state and local governments who accept federal funding in exchange for adopting OSHA-compliant plans. *See id.* § 668(a); *In re MCP No. 165*, 20 F.4th 264, 270-71 (6th Cir. 2021) (Sutton, C.J., dissenting from denial of initial hearing en banc). Violations of OSHA's regulations, moreover, are punishable by steep penalties and even imprisonment. 29 U.S.C. § 666(a), (c), (e). Accordingly, all agree that "Congress has allowed OSHA to regulate much of the economy." Op. 14.

**2.** Plaintiff Allstates Refractory Contractors, LLC—a general contractor subject to OSHA's regulations—brought this facial challenge to OSHA's authority to promulgate "reasonably necessary or appropriate" permanent safety standards. Op. 3. The district court granted summary judgment in OSHA's favor. *Id.*

The Majority affirmed, holding that "the Act comfortably falls within the ambit of delegations previously upheld by the Supreme Court." *Id.* Judge Nalbandian dissented, "emphasiz[ing] that—even under the minimal requirements needed to find an 'intelligible principle'—OSHA's permanent standards provision does not pass muster." Dissent 44. Instead, this grant of authority to OSHA "violates Article I as an unconstitutional delegation of legislative power." *Id.*

## ARGUMENT

En banc review is warranted. First and foremost, as Judge Nalbandian explained, the Panel's decision conflicts with the Supreme Court's seminal nondelegation precedents. *See, e.g.*, Dissent 16, 27. These precedents require Congress to articulate an "intelligible principle" to guide an agency's rulemaking authority. Yet empowering OSHA to make "appropriate" rules comes nowhere close to meeting that standard.

Second, this issue is exceptionally important not only for virtually every American business, but also for our constitutional system itself. Since every other circuit to have addressed the question has followed the text and held that OSHA does *not* have a mandatory duty to regulate, the Panel's outlier reading threatens massive regulatory upheaval affecting a wide swath of the American economy. Moreover, the Majority's decision upholding OSHA's unbounded authority to make "appropriate" rules invites Congress to cede even more of its sovereign lawmaking function to unelected bureaucrats instead of the people's elected representatives. The en banc Court should correct course and reverse.

## I. THE PANEL'S DECISION CONFLICTS WITH THE SUPREME COURT'S NONDELEGATION PRECEDENTS.

Article I provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. "The Framers understood that lawmaking involved 'hard choices.'" Dissent 17. "So they placed the legislative power into the hands of the branch that was most accountable to the people. And if any problems arose, 'the people could respond, and respond swiftly' to remedy any 'misuse[]' of power." *Id.*

"The constitutional design is frustrated," however, "if 'Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals.'" *Tiger Lily*, 5 F.4th at 674 (Thapar, J., concurring). Indeed, "[b]y shifting responsibility to a less accountable branch, Congress protects itself from political censure—and deprives the people of the say the framers intended them to have." *Id.* A congressman who sponsored an agency's enabling statute may claim the credit for popular rules, while disclaiming responsibility for any that are disliked because "the agency did it, not me."

To ensure accountability, "the Supreme Court, over two centuries worth of caselaw, has developed a test"—the intelligible-principle test—"to determine whether a congressional delegation of power is constitutional." Dissent 27. To supply an intelligible principle, Congress must "meaningfully constrain[]" the relevant executive officer through "specific restrictions" on his "discretion." *Touby v. United States*, 500 U.S. 160, 166-67 (1991). Put differently, a statute must provide either "(1) a fact-finding or situation that provokes Executive action or (2) standards that sufficiently guide Executive discretion—keeping in mind that the amount of detail governing Executive discretion must correspond to the

8

breadth of delegated power." Dissent 27 (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).

In these respects, Congress—not the agency—must make the "hard choices" in the first instance so that Congress may remain accountable and "responsive to the will of the people." *Tiger Lily*, 5 F.4th at 674 (Thapar, J., concurring). No such intelligible principle exists here, however, and the Majority was mistaken in concluding otherwise.

### A.    "Appropriate" Is Not an Intelligible Principle.

This case turns on two straightforward statutory provisions. The first provides that "[t]he Secretary may by rule promulgate, modify, or revoke any occupational safety or health standard." 29 U.S.C. § 655(b). The second defines "occupational safety or health standard" as a standard that is "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." *Id.* § 652(8).

"The word 'or' in the phrase, 'reasonably necessary *or* appropriate,' creates two alternatives for the Secretary." Dissent 35. He can adopt "'reasonably necessary'" standards, or "he can set standards if he believes them to be 'appropriate.'" Dissent 36. The problem with this disjunctive

9

delegation is it "doesn't seem to require anything but the Secretary asking: 'What seems appropriate in workplaces around the nation?'" Dissent 37. And "[a]ppropriate" just means "'[s]uitable for a particular person, condition, occasion or place; proper; fitting.'" Dissent 36. It is an "'all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." *Michigan v. EPA*, 576 U.S. 743, 752 (2015). So "there is no telling what the Secretary might deem 'appropriate' to do—especially in a post-COVID world where the 'place[] of employment' might include your house." Dissent 43.

That is the telltale sign of an unconstitutional delegation. Through the term "appropriate," Congress has "'merely announce[d] vague aspirations and then assign[ed] [OSHA] the responsibility of adopting legislation to realize its goals.'" *Tiger Lily*, 5 F.4th at 674 (Thapar, J., concurring). But Congress cannot be held accountable for OSHA's subsequent policy choices in enacting "appropriate" standards because Congress made it anybody's guess what "appropriate" means.

Moreover, as Judge Nalbandian reasoned, this delegation lacks both of the features required by *Panama Refining* and *Schechter Poultry*. *First*, "[n]o fact-finding is required." Dissent 33. *Second*, "the 'absence of

standards' [to guide OSHA's discretion] makes it 'impossible … to ascertain whether the will of Congress has been obeyed.'" Dissent 40. "How can we test what is appropriate given the broad field of delegated power? The simple answer: We can't." *Id.* Indeed, that defect is especially pronounced because "the amount of guidance Congress must provide to carry out its legislation varies by how much power it delegates to a federal agency." Dissent 41. "[W]hen the grant of power is big[], such that it can 'affect the entire national economy,' Congress 'must provide substantial guidance.'" *Id.* And "[s]urely OSHA—a statute affecting practically every business in the United States—falls" within that description. *Id.* Yet "OSHA's very few requirements do not constrain the Secretary's broad power." Dissent 43. So "even under the minimal requirements needed to find an 'intelligible principle,'" "OSHA's permanent standards provision does not pass muster." Dissent 44.

## B.    The Panel Majority's Reasoning Is Unavailing.

Rather than grapple with the statute as enacted, the Panel Majority created unwritten limitations on OSHA's authority. It also cast the delegation here as in the mainstream of those upheld by the Supreme Court. The Majority was mistaken on both fronts.

11

**1.**     Starting with the Act itself, the Majority's attempt to read in limiting language is contrary to the statutory text, and would not solve the nondelegation problem in any event.

**a.**     *First*, according to the Majority, the Act "sets forth a host of principles, purposes, and goals that the agency must consider or fulfill" and "directs OSHA to set standards to further these purposes—the agency 'shall' establish standards and modify them as necessary to serve the needs of the Act." Op. 9 (citing 29 U.S.C. §§ 651(b)), 655(a), (b)(1)).

But while the Act generally indicates that OSHA should work toward the broad purpose of improving workplace safety, that is not an intelligible principle. Section 651(b) simply sets out broad purpose statements, and Section 655(b) provides OSHA "may by rule promulgate, modify, or revoke any occupational safety or health standard."

Thus, the Act just authorizes OSHA to make "appropriate" safety standards, without giving any clue as to what makes a standard appropriate. It does not even provide any rough guidance, for example, on how matters of cost and economic efficiency should be balanced against considerations of safety. As Judge Nalbandian recognized, "[e]ven though the general purposes of OSHA give the Secretary a few

possible considerations, nothing requires him to consider them in determining what's appropriate given any situation." Dissent 37. And such "purpose statements 'in no way limit the authority which [the Act] undertakes to vest in the [Secretary] with no other conditions than those there specified.'" *Id.*

It makes no difference, moreover, that Congress gave free rein to OSHA only with regard to "workplace safety" and not "public health policy." Op. 9. Regulating the safety of every workplace in the country is an enormous domain of regulatory authority in and of itself, even if it does not include broader areas such as public health. And OSHA's authority within that sweeping domain is still unconstitutionally boundless—limited only by what the agency deems "appropriate," with no guidance from Congress.

    **b.** *Second*, the Majority misread the statute to say that "OSHA cannot merely issue any standard it likes; rather, a safety risk must be one that 'requires' some action for a safe workplace." Op. 9 (quoting 29 U.S.C. § 652(8)). According to the Panel, the term "'requires' substantially limits the agency's discretion," such that a "standard" must be one "that is genuinely needed to protect the safety of workers." *Id.*

Even if this reading were correct, it would not supply an intelligible principle because it would give no clue as to when a standard is "genuinely" needed. But regardless, this reading is clearly wrong. The Panel's interpretation is based on the statutory definition of "occupational safety and health standard" as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide a safe or healthful employment and places of employment." 29 U.S.C. § 652(8). As Judge Nalbandian pointed out, this language doesn't require anything *of the government*; it just defines a standard as one that requires "appropriate" conditions to be adopted *by employers*. *See* Dissent 34 n.8. And it says nothing about what counts as "appropriate."

**c.** *Third*, the Majority stated that OSHA's discretion is constrained because it "*must* take action and issue standards in response to safety issues." Op. 9-10. Even if this mandatory duty existed, it still would not solve the nondelegation problem because it would not supply any intelligible principle for what counts as an "appropriate" mandatory standard. But regardless, no such mandatory duty exists at all. The Majority acknowledged that "the Act states that OSHA 'may' promulgate

14

standards," but concluded that the term "'may' is obligatory, not discretionary—in this context, it means 'must' or 'shall.'" *Id.* Accordingly, in the Panel's view, OSHA "has no discretion in determining *whether* to set . . . permanent safety standards—it must do so" whenever there are "significant risks" to safety in the workplace. Op. 10.

But the Majority's conclusion was *ipse dixit*. The Panel never identified what "context" purportedly turns "may" into "must" or "shall." And in fact, the statutory context cuts the other way. As Judge Nalbandian explained, Congress used mandatory language ("shall") in an adjoining provision governing health standards. Dissent 32 (citing 29 U.S.C. § 655(b)(5)). Given that "Congress knew how to use obligatory language when it wanted to in [the Act]," it makes no sense to treat "may" as obligatory. *Id.* And in all events, Congress dispelled any doubt about the discretionary nature of OSHA's rulemaking authority by expressly stating that OSHA could "make a determination that a rule should not be issued." 29 U.S.C. § 655(b)(4).

Moreover, the Majority's misreading of the text squarely conflicts with decisions of the only two other Circuits to address this issue. The Third Circuit has made clear that OSHA has no mandatory duty to issue

15

standards to address significant risks in the workplace. As that Circuit explained, the workplace is filled with "likely thousands" of hazards "that may pose a significant risk of harm to workers,'" and "'OSHA could not possibly be required to undertake rulemaking on all of them simultaneously.'" *Int'l Union v. Chao*, 361 F.3d 249, 254 (3d Cir. 2004).

Likewise, the D.C. Circuit has recognized that "the Act imposes no requirement to promulgate a permanent standard." *In re Nat'l Nurses United*, 47 F.4th 746, 754 (D.C. Cir. 2022). Aside from the discretionary "may issue" language, the Act also directs—in a provision never addressed by the Panel—"that OSHA may conclude [any rulemaking] process either by promulgating a permanent standard or by 'mak[ing] a determination that a [standard] should not be issued.'" *Id.* (quoting 29 U.S.C. § 655(b)(4)). Thus, "part of OSHA's discretion with respect to the content of these standards includes the discretion to decide that no permanent standard should issue at all." *Id.* at 755.

Indeed, the D.C. Circuit has made this point in the context of recognizing that the Act poses "a serious nondelegation issue." *Int'l Union v. OSHA*, 938 F.2d 1310, 1317 (D.C. Cir. 1991). As it observed, "once significant risk is found," OSHA can "require precautions that take

the industry to the verge of economic ruin" or simply "do nothing at all." *Id.* OSHA tried to solve that constitutional problem by adopting a discretionary construction precluding it from doing "'nothing at all'" when faced with "a 'significant' safety risk," and that satisfied the D.C. Circuit that the nondelegation defect had been cured. *Int'l Union v. OSHA*, 37 F.3d 665, 669 (D.C. Cir. 1994). In the time since, however, the Supreme Court has made clear that an agency cannot "cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001).

**d.** *Finally*, the Majority relied upon dictionary definitions for "reasonable" and "necessary" to conclude that the "standards adopted should be needed to improve safety but not to the exclusion of all else." Op. 10-11. But the statute says that the agency has discretion to issue safety standards that are "reasonably necessary *or* appropriate," and that language is unambiguously disjunctive, not conjunctive. *Supra* Pt. I.A. The Majority's "improve safety but not to the exclusion of all else" test thus has no basis in the text. And even if it did, that still would not provide an intelligible principle because it would not provide any hint about what "else" should be allowed to override safety concerns.

17

In sum, nothing in the statute solves the nondelegation problem.[1]

**2.**    The Majority's brief references to prior Supreme Court cases upholding broad delegations do not change that fact. Specifically, the Majority cited several cases in support of its view that the delegation here "is materially similar to those previously considered by the Supreme Court." Op. 11. Both Allstates and Judge Nalbandian addressed those decisions—case-by-case—in great detail, explaining that this delegation is unprecedented. *See* Appellant's Br. 52-60; Reply 3-7; Dissent 23-27. The Majority never grappled with that analysis.

The Majority also briefly noted that the Seventh and D.C. Circuits "have concluded that the OSH Act satisfies the nondelegation doctrine." Op. 12. But as Judge Nalbandian observed (Dissent 31 n.6), neither court issued a reasoned decision wrestling with the textual problems highlighted above. This case "matters so much" because no other court has seriously "addressed the issue" by engaging with "the *text*" here, *id.*

---

[1] The Majority also claimed OSHA is limited to regulating "significant risks" via "feasible" standards. Majority 8-9, 11. But those two purported limits have no basis in text or precedent. Dissent 29-31 & nn.4-5, 35 n.9. And even if they did, those meager limits still would not supply an intelligible principle. Allstates Br. 42-49.

## II.    THE QUESTION HERE IS EXCEPTIONALLY IMPORTANT.

The Majority's blessing of this unconstitutional delegation is exceptionally important on multiple levels.

*First*, as both the Majority and Judge Nalbandian agreed, OSHA's authority to set permanent safety standards virtually blankets the American economy. Op. 14; Dissent 42. It is thus difficult to overstate how important this case is to businesses like Allstates. And importance is only underscored by the Majority's groundbreaking holding, that under the Act, OSHA *must* promulgate safety standards whenever it identifies a significant risk. *See supra* Pt. I.B.1.c. That holding threatens this Circuit with a flurry of mandamus petitions demanding OSHA regulation over every conceivable "significant risk."

*Second*, and more broadly, this case carries serious consequences for our constitutional design. If the delegation here does not flunk the Constitution, then virtually no delegation will. Going forward, Congress therefore need only cite the Panel's decision to authorize any federal agency to regulate as it deems "appropriate"—and voilà: no nondelegation problem. Congress, for example, could simply scrap the Internal Revenue Code and tell the IRS to issue tax regulations as

"appropriate." It could give "the CDC director near-dictatorial power" to adopt any measure she thinks "appropriate" to check the spread of disease. *Cf. Tiger Lily*, 5 F.4th at 672 (majority). And so on. In short, the Panel's opinion "'provides a blueprint'" for leveling our "system of checks and balances." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 500 (2010).

*Finally*, in its attempt to read some limiting principle into the statute, the Panel created a square circuit split by interpreting the Act to impose a mandatory duty on OSHA to regulate employers whenever there is a "significant risk" to workplace safety. The Third Circuit and D.C. Circuit have held the opposite. *See supra* Pt. I.B.1.c. If that outlier interpretation stands, then this Circuit will become the destination venue for petitions seeking to mandate federal workplace regulation that no other circuit would require. That alone warrants en banc review.

## CONCLUSION

The Court should rehear this case en banc.

Date: October 6, 2023                              Respectfully submitted,

|  |  |
|---|---|
| Christopher M. McLaughlin | /s/ Brett A. Shumate |
| JONES DAY | Donald F. McGahn II |
| North Point, 901 Lakeside Ave. | Brett A. Shumate |
| Cleveland, OH 44114 | John M. Gore |
| (216) 586-3939 | Anthony J. Dick |
| cmmclaughlin@jonesday.com | Brinton Lucas |
|  | JONES DAY |
| J. Benjamin Aguiñaga | 51 Louisiana Ave., N.W. |
| JONES DAY | Washington, DC 20001 |
| 2727 N. Harwood St. | (202) 879-3939 |
| Dallas, TX 75201 | bshumate@jonesday.com |
| (214) 220-3939 |  |
| jbaguinaga@jonesday.com |  |

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 3,889 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1), as counted using the word-count function on Microsoft Word 2016 software.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016, in Century Schoolbook Standard style, 14 point font.

October 6, 2023                              /s/ Brett A. Shumate
                                             Brett A. Shumate

**CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2023, I electronically filed the original of the foregoing brief with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

/s/ Brett A. Shumate
Brett A. Shumate

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>Deborah S. Hunt<br>Clerk</td><td>100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988</td><td>Tel. (513) 564-7000<br>www.ca6.uscourts.gov</td></tr>
</table>

Filed:  August 23, 2023

Mr. J. Benjamin Aguinaga
Jones Day
2727 N. Harwood Street
Suite 600
Dallas, TX 75201-1515

Mr. Craig Becker
AFL-CIO Legal Department
815 16th Street, N.W.
Washington, DC 20006

Mr. Timothy S. Bishop
Mayer Brown
71 S. Wacker Drive
Chicago, IL 60606

Mr. Anthony J Dick
Jones Day
51 Louisiana Avenue, N.W., 20001-2113
Washington, DC 20001

Ms. Courtney L. Dixon
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Sean H. Donahue
Donahue, Goldberg & Littleton
1008 Pennsylvania Avenue, S.E.
Washington, DC 20003

Mr. Oliver James Dunford
Pacific Legal Foundation
4440 PGA Boulevard, Suite 307
Palm Beach Gardens, FL 33410

Mr. Ian Fein
Natural Resources Defense Council
111 Sutter Street
21st Floor
San Francisco, CA 94104

Mr. Matthew James Ginsburg
AFL-CIO Legal Department
815 16th Street, N.W.
Washington, DC 20006

Mr. John Matthew Gore
Jones Day
51 Louisiana Avenue, N.W.
20001-2113
Washington, DC 20001

Ms. Brianne Jenna Gorod
Constitutional Accountability Center
1200 18th Street, N.W.
Suite 501
Washington, DC 20036

Mr. Alex Hemmer
Office of the Attorney General
of Illinois
100 W. Randolph Street
12th Floor
Chicago, IL 60601

Ms. Alisa B. Klein
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Brett E. Legner
Mayer Brown
71 S. Wacker Drive
Chicago, IL 60606

Mr. Sheng Tao Li
New Civil Liberties Alliance
1225 19th Street, N.W.
Suite 450
Washington, DC 20036

Mr. Brinton Lucas
Jones Day
51 Louisiana Avenue, N.W., 20001-2113
Washington, DC 20001

Mr. Christopher M. McLaughlin
Jones Day
901 Lakeside Avenue, E.
Cleveland, OH 44114

Mr. Sanjay Narayan
Sierra Club
Environmental Law Program
2101 Webster Street
Suite 1300
Oakland, CA 94612

Ms. Pamela Marie Newport
Herzfeld, Suetholz, Gastel, Leniski and Wall
600 Vine Street, Suite 2720
Cincinnati, OH 45202

Mr. Michael David Pepson
Americans for Prosperity Foundation
1310 N. Courthouse Road, Suite 700
Arlington, VA 22201

Ms. Randy Sue Rabinowitz
P.O. Box 3769
Washington, DC 20027

Mr. Nicolas Sansone
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, DC 20009

Mr. Benjamin M. Seel
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

Mr. Brett Shumate
Jones Day
51 Louisiana Avenue, N.W.
20001-2113
Washington, DC 20001

Mr. David Christian Tryon
The Buckeye Institute
88 E. Broad Street
Suite 1300
Columbus, OH 43215

Mr. Luke A. Wake
Pacific Legal Foundation
555 Capitol Mall
Suite 1290
Sacramento, CA 95814

Ms. Allison M. Zieve
Public Citizen Litigation Group
1600 Twentieth Street, N.W.
Washington, DC 20009

       Re:  Case No. 22-3772, *Allstates Refractory Contractors, LLC v. Julie A. Su, et al*
              Originating Case No. : 3:21-cv-01864

Dear Counsel,

   The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                      Yours very truly,

                      Deborah S. Hunt, Clerk

                      Cathryn Lovely
                      Deputy Clerk

cc:  Ms. Sandy Opacich

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0194p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ALLSTATES REFRACTORY CONTRACTORS, LLC,

*Plaintiff-Appellant*,

*v.*

JULIE A. SU, in her official capacity as Acting Secretary of Labor, U.S. Department of Labor; DOUGLAS L. PARKER, in his official capacity as Assistant Secretary of Labor for Occupational Safety and Health; OCCUPATIONAL SAFETY & HEALTH ADMINISTRATION, U.S. DEPARTMENT OF LABOR; UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF OHIO,

*Defendants-Appellees*.

> No. 22-3772

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:21-cv-01864—Jack Zouhary, District Judge.

Argued:  April 27, 2023

Decided and Filed:  August 23, 2023

Before:  COOK, GRIFFIN, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Brett A. Shumate, JONES DAY, Washington, D.C., for Appellant.  Courtney L. Dixon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:**  Brett A. Shumate, John M. Gore, Anthony J. Dick, Brinton Lucas, JONES DAY, Washington, D.C., Christopher M. McLaughlin, JONES DAY, Cleveland, Ohio, J. Benjamin Aguiñaga, JONES DAY, Dallas, Texas, for Appellant.  Courtney L. Dixon, Alisa B. Klein, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  Michael Pepson, AMERICANS FOR PROSPERITY FOUNDATION, Arlington, Virginia, Timothy S. Bishop, Brett E. Legner, MAYER BROWN LLP, Chicago, Illinois, Jeffrey D. Jennings, LIBERTY JUSTICE CENTER, Chicago, Illinois, Sheng Li, NEW CIVIL LIBERTIES ALLIANCE, Washington, D.C., David C. Tryon, THE BUCKEYE INSTITUTE, Columbus,

Ohio, Oliver J. Dunford, PACIFIC LEGAL FOUNDATION, Palm Beach Gardens, Florida, Luke A. Wake, PACIFIC LEGAL FOUNDATION, Sacramento, California, Nicolas A. Sansone, Allison M. Zieve, PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., Pamela M. Newport, BRANSTETTER, STRANCH & JENNINGS, PLLC, Cincinnati, Ohio, Brianne J. Gorod, CONSTITUTIONAL ACCONTABILITY CENTER, Washington, D.C., Ben Seel, DEMOCRACY FORWARD FOUNDATION, Washington, D.C., Alex Hemmer, OFFICE OF THE ILLINOIS ATTORNEY GENERAL, Chicago, Illinois, Sean H. Donahue, DONAHUE & GOLDBERG, LLP, Washington, D.C., Ian Fein, NATURAL RESOURCES DEFENSE COUNCIL, San Francisco, California, Sanjay Narayan, SIERRA CLUB ENVIRONMENTAL LAW PROGRAM, Oakland, California, Craig Becker, AFL-CIO, Washington, D.C., Randy Rabinowitz, OSH LAW PROJECT, LLC, Washington, D.C., for Amici Curiae.

GRIFFIN, J., delivered the opinion of the court in which COOK, J., joined. NALBANDIAN, J. (pp. 16–44), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

GRIFFIN, Circuit Judge.

More than fifty years ago, Congress passed, and President Nixon signed into law, the Occupational Safety and Health (OSH) Act, 29 U.S.C. § 651 *et seq.* Throughout the next half century, challenges to the constitutionality of the Act have been uniformly rejected. *See Nat'l Mar. Safety Ass'n v. Occupational Safety & Health Admin.*, 649 F.3d 743 (D.C. Cir. 2011), *cert. denied*, 566 U.S. 936 (2012); *Blocksom & Co. v. Marshall*, 582 F.2d 1122 (7th Cir. 1978).

This case presents the same simple but poignant challenge: whether Congress's delegation to the Occupational Safety and Health Administration (OSHA) to set workplace-safety standards is constitutional. Plaintiff Allstates Refractory Contractors, a general contractor subject to OSHA's oversight, challenges OSHA's authority to set "reasonably necessary or appropriate" workplace-safety standards, 29 U.S.C. §§ 652(8), 655(b), as a violation of the nondelegation doctrine. The district court concluded that the delegation provided an "intelligible principle" and thus rejected Allstates's challenge. We agree and now join our sister circuits in holding OSHA's delegation to be constitutional.

## I.

Allstates is a full-service industrial general contractor that employs people throughout the country. As an employer subject to the OSH Act, it must comply with OSHA's workplace-safety standards and expend resources to ensure that it does so. It has also been the subject of enforcement actions in the past, including a $10,000 fine for a catwalk injury that occurred in 2019.

In this facial challenge to the OSH Act against the relevant governmental defendants, Allstates contends that, because the only textual constraint on setting workplace-safety standards is that they be "reasonably necessary or appropriate," 29 U.S.C. § 652(8), OSHA does not have the constitutional authority to set those standards under § 655(b) and employers do not have a duty to comply with OSHA's standards under § 654(a). In the district court, it moved for summary judgment, requesting a permanent nationwide injunction. But, instead, the district court granted the government's cross motion for summary judgment. The court concluded that the "reasonably necessary or appropriate" standard provided an "intelligible principle" to satisfy the nondelegation doctrine because the Supreme Court has repeatedly upheld similar delegations; so the court "decline[d]" Allstates's "invitation" to "disregard these precedents." *Allstates Refractory Contractors, LLC v. Walsh*, 625 F. Supp. 3d 676, 681–84 (N.D. Ohio 2022). Allstates timely appealed here.

## II.

Allstates raises the same argument on appeal that it presented to the district court—that the OSH Act violates the nondelegation doctrine. Eventually conceding that we are bound by the "intelligible principle" test,[1] Allstates argues that the OSH Act provides no such principle. On de novo review, *see United States v. Green*, 654 F.3d 637, 649 (6th Cir. 2011), we agree with the district court that the Act comfortably falls within the ambit of delegations previously upheld by the Supreme Court.

---

[1]It first presents threshold arguments that the "intelligible principle" test violates the original meaning of the Constitution, asserting that members of the Supreme Court have suggested reconsidering this approach. *See, e.g.*, *Gundy v. United States*, 139 S. Ct. 2116, 2138–42 (2019) (Gorsuch, J., dissenting). But we are bound by that test as long as it is good law. *See Worldwide Equip. of TN, Inc. v. United States*, 876 F.3d 172, 181 (6th Cir. 2017).

A.

Our Constitution vests "[a]ll legislative Powers . . . in a Congress of the United States." U.S. Const. art. I, § 1. The nondelegation doctrine, therefore, is "rooted in the principle of separation of powers that underlies our tripartite system of Government," the maintenance of which "mandate[s] that Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989). But while the Constitution permits no delegation of *legislative* powers, it does "not prevent Congress from obtaining the assistance of its coordinate Branches." *Id*. at 372. For nearly a century, this inquiry has been determined according to the "intelligible principle" test: "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

This test balances Congress's need for flexibility with the Constitution's prohibition on legislative delegation. On one hand, it enforces the underlying principle of the nondelegation doctrine "that Congress may not delegate the power to make laws and so may delegate no more than the authority to make policies and rules that implement its statutes." *Loving v. United States*, 517 U.S. 748, 771 (1996); *see also Marshall Field & Co. v. Clark*, 143 U.S. 649, 693–94 (1892). But it has also long been grounded in the practical notion that, "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372. "The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function." *Id*. (citation omitted). For this reason, in determining what Congress must do to constitutionally obtain help from another branch, "the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination." *J.W. Hampton, Jr.*, 276 U.S. at 406.

Accordingly, the intelligible-principle test is satisfied and the statute is constitutional "if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta*, 488 U.S. at 372–73 (quoting *Am. Power &*

*Light Co. v. S.E.C.*, 329 U.S. 90, 105 (1946)).  This inquiry is one of statutory interpretation in which we consider the act's delegated "task," the "instructions it provides," and whether it "sufficiently guides" the agency's discretion.  *Consumers' Rsch. v. F.C.C.*, 67 F.4th 773, 788 (6th Cir. 2023) (quoting *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion)).  In these inquiries, we must interpret the standard, not in "isolation," but with regards to "the purpose of the Act, its factual background and the statutory context in which [it] appear[s]."  *Am. Power & Light*, 329 U.S. at 104.  Further, while the "'degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred,'" we nonetheless "apply one universal intelligible-principle test regardless of the type of statute at issue."  *Consumers' Rsch.*, 67 F.4th at 788 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001)).  However, this inquiry does not consider any limiting construction the agency has adopted—"[w]hether the statute delegates legislative power is a question for the courts, and an agency's voluntary self-denial has no bearing upon the answer." *Whitman*, 531 U.S. at 473.

The Supreme Court, in examining non-delegation challenges, has almost uniformly upheld "delegations under standards phrased in sweeping terms."  *See Loving*, 517 U.S. at 771; *see also* 32 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 8122 (2d ed. 1995).  Historically, the Court upheld broad delegations.  *See, e.g.*, *Marshall Field & Co.*, 143 U.S. at 692–93 (finding proper a delegation to the President to impose retaliatory tariffs if he "deemed" that American business was being treated unequally); *United States v. Grimaud*, 220 U.S. 506, 517, 521 (1911) (holding a delegation constitutional because Congress had established the "penalties" and the agency could properly "fill up the details" through administrative rules).  This acceptance laid the foundation for the intelligible-principle test, such that the Court has continued to permit broad delegations.  For example, the Supreme Court upheld delegations to the President to adjust tariff prices if he, "so far as he finds it practicable . . . [took] into consideration" various economic factors, *J.W. Hampton, Jr.*, 276 U.S. at 401–02, to a commission to consider the "public interest" in authorizing railroad acquisitions, *N. Y. Cent. Secs. Corp. v. United States*, 287 U.S. 12, 24–25 (1932), to a national coal commission to set "just and equitable" prices that were in the "public interest," *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 387, 397 (1940), to the Federal Communications Commission to regulate

radio stations when the "public convenience, interest, or necessity requires," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 214 (1943), and to the President to set "fair and equitable" prices under the Emergency Price Control Act, *Yakus v. United States*, 321 U.S. 414, 427 (1944).

This trend has persisted, even in more recent years. For one, the Court in *Mistretta* considered and found constitutional the delegation of authority to the Sentencing Commission. 488 U.S. at 374. While Congress granted the Commission ample discretion in making the Sentencing Guidelines, that did not mean the act was unconstitutional: "our cases do not at all suggest that delegations of this type may not carry with them the need to exercise judgment on matters of policy." *Id.* at 377–78. A later delegation to the Attorney General to set temporary schedules of controlled substances "necessary to avoid an imminent hazard to the public safety" was proper. *Touby v. United States*, 500 U.S. 160, 165–67 (1991). And the Court upheld a delegation of authority to the EPA to establish national air standards that were "requisite to protect public health." *Whitman*, 531 U.S. at 473. "Requisite" meant "sufficient, but not more than necessary," and, because similar standards had been considered and upheld, the delegation fit "comfortably within the scope of discretion permitted by our precedent." *Id.* at 473, 475–76.[2]

On only two occasions—both in 1935 as part of its resistance to New Deal legislation—has the Court found a violation of the nondelegation doctrine. In one, the delegation was to the President to prohibit the transportation of petroleum. *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 406 (1935). But that statute gave no limitation or guidance on how the President was to regulate oil transportation: "So far as this section is concerned, it gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit." *Id.* at 415. And in the other, the President had the ability to regulate nearly the whole economy by merely promoting "fair competition." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 530 (1935). Such a "sweeping delegation" had no support in

---

[2]Indeed, one of the "precedents" considered in *Whitman* was a challenge to another provision of the OSH Act in *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 (1980): the "requisite" limitations "also resemble the [OSH Act] provision requiring the agency to 'set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer any impairment of health'—which the Court upheld in [*Industrial Union*], and which even then-Justice Rehnquist, who alone in that case thought the statute violated the nondelegation doctrine, would have upheld if, like the statute here, it did not permit economic costs to be considered." *Whitman*, 531 U.S. at 473–74 (internal citations omitted). *See also* 29 U.S.C. § 655(b)(5); *Indus. Union*, 448 U.S. at 646 (plurality opinion); *id.* at 671 (Rehnquist, J., concurring in the judgment).

caselaw:  the act's delegation was "without precedent" as it authorized the President to create rules of conduct, meaning his discretion to essentially enact laws was "virtually unfettered."  *Id.* at 539, 541–42.

B.

Before applying the "intelligible principle" test to the OSH Act, we must consider the context of the Act, as it sets the stage for our analysis.  *See Am. Power & Light*, 329 U.S. at 104–05.  Congress passed the OSH Act in 1970, *see* Pub. L. 91-596, 84 Stat. 1590 (1970), finding that "personal injuries and illnesses arising out of work situations" imposed a substantial burden on the economy, 29 U.S.C. § 651(a).  The overarching goal of the Act is therefore "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources."  *Id.* § 651(b).  It then lays out several specific purposes for the Act, including reducing workplace-safety hazards, increasing research into better safety standards, encouraging states to improve their own safety standards, and providing appropriate reporting procedures.  *Id.*

To accomplish these purposes, the Act authorizes the Secretary of Labor to set occupational safety and health standards, *id.* § 651(b)(3), a "standard which *requires* conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, *reasonably necessary or appropriate* to provide safe or healthful employment and places of employment," *id.* § 652(8) (emphasis added).  This definition is the main "statutory criteria" providing "direction" to OSHA's promulgation of permanent safety standards and national consensus standards under § 655(a) and (b).  *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 640 n.45 (1980) (plurality opinion).  OSHA "may" promulgate and modify those standards via the prescribed process when it determines a rule is needed "in order to serve the objectives of this chapter," 29 U.S.C. § 655(b), (b)(1), and it may grant variances only under specific circumstances, *id.* § 655(b)(6).  Then there are specific procedures described in the Act, with checks and balances, for adopting these standards—"a rigorous process that includes notice, comment, and an opportunity for a public hearing."  *See Nat'l Fed. of Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661, 663 (2022) (*NFIB*).  For example, interested persons have 30 days post-

promulgation to submit comment, OSHA must adopt the rule within 60 days, and then parties may again file written objections and obtain a hearing.  29 U.S.C. § 655(b)(1)–(3).

Individuals subject to these standards must comply with them.  Employers must provide a workplace free from recognized hazards, and they must comply with the agency's occupational safety and health standards.  *Id*. § 654.  Employees are similarly obligated to comply with standards applicable to them.  *Id*.  If a violation occurs, the agency has the authority to issue citations.  *Id*. § 658.  The Act also sets out specific civil penalties or fines for violations.  *See id*. § 666.  But certain serious infringements, including those causing death to an employee, can lead to imprisonment.  *Id*. § 666(e)–(g).

We also do not perform our review of the Act's provisions on a blank slate, for the Supreme Court has previously considered, and construed, the "reasonably necessary or appropriate" language.  Prior to *Industrial Union*, OSHA interpreted that language as having "no legal significance or at best merely requir[ing] that a standard not be totally irrational."  *Indus. Union*, 448 U.S. at 639 (plurality opinion).  But *Industrial Union* changed the calculus.  There, a plurality of the Court interpreted the OSH Act as requiring the agency, before issuing any permanent safety standard, "to make a threshold finding that a place of employment is unsafe—in the sense that significant risks are present and can be eliminated or lessened by a change in practices."  *Id*. at 642.  Because the agency did not make such findings and "did not even attempt to carry its burden of proof" when promulgating a standard that lowered the permissible level of benzene exposure, a plurality of the Court rejected the permanent safety standard at issue.  *Id*. at 653–59.  Justice Rehnquist concurred in the judgment but opined that the "to the extent feasible" language of a separate provision, § 655(b)(5), violated the nondelegation doctrine.  *Id*. at 682–88.  In his opinion, this "feasibility" requirement did nothing "other than render what had been a clear, if somewhat unrealistic, standard largely, if not entirely, precatory."  *Id*. at 681–82.

Following *Industrial Union*, the Court cited approvingly OSHA's attempts to make that threshold determination that a particular safety issue carried a significant risk of harm.  *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 505–06 & n.25 (1981) (*Cotton Dust*); *see also id.* at 513 n.32 ("[A]ll [§ 655(b)(5)] standards must be addressed to 'significant risks' of material health impairment.").  While we have not yet done so, other circuits have held that *Cotton Dust*

"adopted the significant risk requirement." *See, e.g.*, *Nat'l Mar. Safety Ass'n*, 649 F.3d at 750 n.8. Finally, the Court has limited the "reasonably necessary or appropriate" standard to those that are "economically or technologically feasible." *See Cotton Dust*, 452 U.S. at 513 n.31 ("[A]ny standard that was not economically or technologically feasible would *a fortiori* not be 'reasonably necessary or appropriate' under the Act.").

C.

Considering this statutory context and Supreme Court caselaw, we hold that the OSH Act's "reasonably necessary or appropriate" standard passes the "intelligible principle" test and is therefore constitutional. To begin, the OSH Act sets forth a host of principles, purposes, and goals that the agency must consider or fulfill. *See* 29 U.S.C. § 651(b). Then, the Act directs OSHA to set standards to further these purposes—the agency "shall" establish standards and modify them as necessary to serve the needs of the Act. *Id.* § 655(a), (b)(1). These goals guide the agency's decision-making in setting its standards, and they provide "overarching constraints" on its discretion. *Mistretta*, 488 U.S. at 376. In particular, these guidelines limit OSHA's oversight to the workplace and restrict its standards to those that facilitate workplace safety, not, for example, public health policy in general. *See NFIB*, 142 S. Ct. at 665 ("The Act empowers the Secretary to set *workplace* safety standards, not broad public health measures.").

Next, the Act significantly limits OSHA's discretion in deciding whether it may issue a particular occupational safety and health standard. OSHA cannot merely issue any standard it likes; rather, a safety risk must be one that "requires" some action for a safe workplace. 29 U.S.C. § 652(8). In this context, "requires" substantially limits the agency's discretion. *See Whitman*, 531 U.S. at 475–76 (noting that a standard that is "'requisite,' that is, not lower or higher than is necessary . . . fits comfortably within the scope of discretion permitted"). The risk involved must be sufficient to warrant OSHA's involvement. Thus, any occupational safety and health standard that the agency issues is one that is genuinely needed to protect the safety of workers.

Further, OSHA *must* take action and issue standards in response to safety issues. Look to § 655(b), the section at issue here. While the Act states that OSHA "may" promulgate standards

in the prescribed manner, this "may" is obligatory, not discretionary—in this context, it means "must" or "shall." *See The American Heritage Dictionary of the English Language* 808 (1969) (defining "may" as pertinent here as "[o]bligation or function, with the force of *must* or *shall*, in statutes, deeds, and other legal documents: '*Congress may determine the time of choosing the electors*.'"); *see also Keen v. Helson*, 930 F.3d 799, 802 (6th Cir. 2019) ("When interpreting the words of a statute, contemporaneous dictionaries are the best place to start."). That is a substantial and twofold limitation on OSHA's discretion: OSHA *must* act when a particular hazard "requires" its action, and it *cannot* issue any standard when the risk does not rise to that level. This easily comports with the Supreme Court's interpretation of the statute as requiring OSHA to "make a threshold finding that a place of employment is unsafe—in the sense that significant risks are present and can be eliminated or lessened by a change in practices." *Indus. Union*, 448 U.S. at 642 (plurality opinion); *see also Cotton Dust*, 452 U.S. at 505–06 & n.25. The agency has no discretion in determining *whether* to set these permanent safety standards—it must do so.

As for the standards themselves, OSHA may adopt only those conditions that are "reasonably necessary or appropriate" to improve workplace safety. These standards do not need to *completely* resolve the issue, for "'safe' is not the equivalent of 'risk-free.'" *Indus. Union*, 448 U.S. at 642 (plurality opinion). Thus, a condition is "reasonably necessary or appropriate" in the context of the OSH Act if it is something that OSHA can do to ameliorate or mitigate, but not necessarily eliminate, an unsafe condition. *See id*. Contemporaneous dictionaries also demonstrate the contours of the three terms: "Reasonable" is "[w]ithin the bounds of common sense"; "necessary" is "[n]eeded for the continuing existence or function of something; essential; indispensable"; and "appropriate" is "[s]uitable for a particular person, condition, occasion, or place; proper; fitting." *The American Heritage Dictionary of the English Language* 64, 877, 1086 (1969). So standards that are "necessary or appropriate to provide safe or healthful employment" are those that are needed for or suited to the purpose of keeping workers safe in their employment. That they be "reasonabl[e]" means that they need to be largely feasible or within the bounds of common sense. *Cf. Anderson v. Messinger*, 146 F. 929, 943 (6th Cir. 1906) (noting the difference between "reasonably necessary" and "absolutely necessary"). This comports with other language in the Act requiring OSHA to consider the economic or

technological feasibility of standards. *See Cotton Dust*, 452 U.S. at 513 n.31 ("[A]ny standard that was not economically or technologically feasible would *a fortiori* not be 'reasonably necessary or appropriate' under the Act."). So while we agree with our sister circuits that *Cotton Dust* adopted the limitations espoused in *Industrial Union*, *see Nat'l Mar. Safety Ass'n*, 649 F.3d at 750 n.8, we note that there was good reason for it to have done so: the "feasibility" and "significant risk" constructions are rooted in the language of the Act itself, not, for example, in any agency-imposed limitation. *Whitman*, 531 U.S. at 472–73. In short, "reasonably necessary or appropriate," in context, means that the standards adopted should be needed to improve safety but not to the exclusion of all else. This is not a broad, discretionary purpose statement but a real standard to guide the agency's actions.

This limit on Congress's delegation is materially similar to those previously considered by the Supreme Court. And the Court has upheld those delegations time and again. *See, e.g.*, *Sunshine Anthracite*, 310 U.S. at 387 ("just and equitable"); *Nat'l Broad. Co.*, 319 U.S. at 215–16 ("public interest"); *Yakus*, 321 U.S. at 420–23 ("fair and equitable"); *Touby*, 500 U.S. at 163 ("necessary to avoid an imminent hazard to the public safety"); *Whitman*, 531 U.S. at 472–76 ("requisite to protect the public health"). All these standards provided ample discretion to an agency or coordinate branch to deal with the issue as it saw fit—but each also set reasonable guidelines as to how the entity must respond to the problem.

So too here. Congress has directed that OSHA *must* set standards to provide for public health in the workplace when its action is required. OSHA, as the entity with greater experience in health and safety, then has discretion to determine those standards. In this "complex" area with "ever changing and more technical problems," Congress may seek OSHA's assistance. *Mistretta*, 488 U.S. at 372. But while Congress gave OSHA significant discretion, that does not render the delegation unconstitutional. The agency's standards must still be reasonably needed—that is, not more or less stringent than is needed to respond to, but not eliminate, a safety risk in the workplace. *Id*. at 377; *Whitman*, 531 U.S. at 472–76. These standards do not exist in a vacuum: they must further the policy objectives of the Act, thereby fitting within the "hierarchy" developed by Congress. *Mistretta*, 488 U.S. at 377. And Congress, not OSHA, has detailed the penalties that apply to violations—a crucial factor in the nondelegation analysis.

*See Grimaud*, 220 U.S. at 517 ("[Congress] could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress, or measured by the injury done."). Therefore, Congress has indeed laid out the general policy (a safe working environment), the agency to apply it (OSHA), and the boundaries of that authority (necessary standards to mitigate significant risks of harm). *Mistretta*, 488 U.S. at 372–73. The Act describes the agency's task (protecting workers from unsafe conditions), provides instructions (requiring standards reasonably necessary and appropriate to respond to those risks), and guides the agency's discretion in doing so. *See Consumers' Rsch. v.* 67 F.4th at 788; *Gundy*, 139 S. Ct. at 2123 (plurality opinion). In short, the agency's discretion is not unbridled. Rather, because the delegation of power in the OSH Act fits within the delegations previously upheld by the Court, the delegation is constitutional.

Finally, as previously noted, our holding finds support in the caselaw of our sister circuits, two of which have concluded that the OSH Act satisfies the nondelegation doctrine. In *Blocksom & Co. v. Marshall*, the Seventh Circuit rejected such a challenge, concluding that the plaintiff's arguments were "without persuasive merit." 582 F.2d at 1125–26. It was not necessary for the Act to prescribe the exact regulations OSHA could promulgate; instead, it was sufficient that "Congress has chosen a policy and announced general standards which guide the Secretary in establishing specific standards to assure the safest and healthiest possible working environments, and which enable the courts and the public to test the Secretary's faithful performance of that command." *Id.* at 1126. The D.C. Circuit similarly rejected this challenge in *National Maritime*, as the delegation of power to OSHA was "no broader" than other delegations upheld by the Supreme Court. 649 F.3d at 755–56. "In light of these precedents, one cannot plausibly argue that [the OSH Act's] standard is not an intelligible principle." *Id.* at 756 (citation omitted).

## D.

Allstates and the dissent resist this, contending that the delegation here is similar to the two cases in which the Supreme Court held an act violated the nondelegation doctrine. But *Panama Refining* and *A.L.A. Schechter Poultry* do not alter our conclusion. While these two

cases are binding on us, we must not read them in isolation, overlooking the many times that the Court upheld delegations of authority. Instead, we must *also* follow the "broad leeway" that Congress has under the Court's entire nondelegation jurisprudence. *See Consumers' Rsch.*, 67 F.4th at 788 (citing *Whitman*, 531 U.S. at 474–75). Even so, the OSH Act satisfies the analysis in these cases, for Congress *has* required OSHA to make a "finding" and *has* "set up a standard" governing the agency's action. *Panama Refin.*, 293 U.S. at 415; *accord Shechter Poultry*, 295 U.S. at 534–35. OSHA must set standards when certain unsafe "conditions" exist that "require[]" action, and those standards must be "reasonably necessary or appropriate"—that is, needed to ameliorate those unsafe conditions but not to the exclusion of all else. 29 U.S.C. §§ 652(8), 655(b)(1). This standard passes muster when considering the sum of the Supreme Court's jurisprudence.

Moreover, these two cases are readily distinguishable from the present case. For one, this case does not involve a delegation with *no* standards, as in *Panama Refining*. Congress aptly declared what purposes OSHA must consider and how the agency's standards must be reasonably needed to respond to Congress's concerns. Thus, Congress *has* declared a policy, established a standard, and laid down a rule. *Cf. Mistretta*, 488 U.S. at 372–73. And this is distinguishable from the "virtually unfettered" delegation in *Schechter Poultry*. There, the President could regulate essentially the entire economy and make whatever law he desired so long as it promoted "fair competition"—a term that was not defined in the act and that incorporated essentially all the act's purposes. The breadth of the delegation needed a corresponding level of guidance that was missing in the act. By contrast, the OSH Act is cabined to workplace-safety standards—it does not allow OSHA to go beyond that. *See NFIB*, 142 S. Ct. at 665. Further, the "reasonably necessary or appropriate" guidance is far more restrictive than simply promoting "fair competition." In short, OSHA does not have "virtually unfettered" discretion, *cf. Schechter Poultry*, 295 U.S. at 542, for its discretion is limited to the "hierarchy" established by Congress, *Mistretta*, 488 U.S. at 377. For that reason, it instead resembles other constitutional delegations, not *Panama Refining* and *Schechter Poultry*. These two cases—the

*only* times the Supreme Court has determined a nondelegation violation has occurred—do not control here.[3]

Further, while it is "true enough that the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred," *Whitman*, 531 U.S. at 475, and Congress has allowed OSHA to regulate much of the economy, we cannot conclude that the OSH Act confers too much discretion. For one, the Act substantially limits OSHA's discretion, meaning that the "degree of agency discretion" here is not so great. *Id.* The text and overall purposes of the Act substantially limit OSHA's playing field to the "workplace." *Cf. NFIB*, 142 S. Ct. at 665. And the threshold limitations discussed in *Industrial Union* and adopted in *Cotton Dust* are rooted in the language of the Act. When accepting those limitations (as we should) and reading them in context with the rest of the OSH Act, the Act clearly delineates *when* and *how* the agency must act. *See, e.g.*, 29 U.S.C. § 655. A health risk must require a standard which should be both reasonably feasible and no more than necessary to mitigate a safety risk. *See id.* at §§ 652(8), 655(a), (b)(1); *cf. Whitman*, 531 U.S. at 475–76. This falls comfortably within the limitations accepted by the Supreme Court. *See Yakus*, 321 U.S. at 427 (collecting cases).

In addition, the Supreme Court has consistently upheld analogous delegations even when the "scope of the power congressionally conferred" is similarly large. *Whitman*, 531 U.S. at 475. Many prior cases addressed broad delegations implicating large and important areas of American life. For example, railroad, coal, and radio were ubiquitous in American society in the 1930s and 1940s, yet the Court permitted broad regulatory delegations over those industries. *See N. Y.*

---

[3]Allstates also argues that this case implicates the "major questions" doctrine, but this is not a major-questions case. That doctrine applies in "'extraordinary cases' . . . in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2608 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000) (second alteration in original)). In short, it applies when the question presented is "whether Congress in fact meant to confer the power the agency has asserted." *Id.* But Allstates does not contend that OSHA has taken a specific action that exceeds the power that Congress delegated to OSHA. *Cf. id.* at 2610–16 (holding that Congress did not give the EPA the authority to devise emissions caps because the statute never gave "clear congressional authorization" to do so); *NFIB*, 142 S. Ct. at 665 (holding that OSHA's vaccine mandate exceeded its delegated authority). Rather, its argument is that the OSH Act itself is unconstitutional because Congress's delegation is improper—in other words, that Congress was not specific enough in its delegation, rather than was silent about whether it delegated a particular power.

*Cent. Secs. Corp.*, 287 U.S. at 24–25; *Nat'l Broad. Co.*, 319 U.S. at 214; *Sunshine Anthracite*, 310 U.S. at 387.  And it is impossible to say that OSHA's sphere of regulation is greater than, or even equal to, the delegation of authority upheld in *Yakus*—to allow the President to set "fair and equitable" prices for any product in the national economy.  *See* 321 U.S. at 427.  So while Congress has conferred significant power to OSHA to oversee large sections of our economy, the discretion conferred by the OSH Act nowhere near approaches the line where the scope of its power is too great for the standard imposed.  *See Whitman*, 531 U.S. at 475.  The mere fact that the Act applies to a large portion of the American economy does not transform this constitutional limitation into an unconstitutional one.

### III.

In sum, the OSH Act provides an overarching framework to guide OSHA's discretion, and the Act's standards comfortably fall within those limits previously upheld by the Supreme Court.  So the Act passes constitutional muster.  We therefore hold the standard prescribed by the OSH Act to be a constitutional delegation of authority.  "To require more would be to insist on a degree of exactitude which not only lacks legal necessity but which does not comport with the requirements of the administrative process."  *Sunshine Anthracite*, 310 U.S. at 398.

We affirm the judgment of the district court.

—————————————

## DISSENT

—————————————

NALBANDIAN, Circuit Judge, dissenting.  For 88 years, federal courts have tiptoed around the idea that an act of Congress could be invalidated as an unconstitutional delegation of legislative power.  The majority continues the trend.  But, in my view, that streak should end today.  In the Occupational Safety and Health Act ("OSHA"), Congress granted the Secretary of Labor nearly unfettered discretion in fashioning permanent occupational health and safety standards.  Because OSHA's permanent standards provision (1) does not require any preliminary factfinding or a particular situation to arise to trigger agency action and (2) does not contain a standard that sufficiently guides the exercise of the broad discretion OSHA delegates to the Secretary, the provision does not have an intelligible principle.  So, under Supreme Court precedent, it violates the nondelegation doctrine.

## I.

"[I]t is always important in a case of this sort to begin with the constitutional text and the original understanding, which are essential to proper interpretation of our enduring Constitution."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 688 (D.C. Cir. 2008), (Kavanaugh, J., dissenting), *aff'd in part, rev'd in part and remanded*, 561 U.S. 477 (2010).  Fourteen words start us off: "All legislative Powers herein granted shall be vested in a Congress of the United States[.]"  U.S. Const. art. I, § I.

Article I vests the "Senate and House of Representatives" (and them alone) with "[a]ll legislative powers."  *Id.*  That means that Congress, not some official in the Executive Branch, creates laws.  And only after, does the Executive come in and do its job—it may enforce the laws, not create them.  As James Madison and the public originally understood, any attempt at "*alienating* the powers of the House . . . would be a violation of the Constitution."  Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490, 1506 (2021) (quoting 3 *Annals of Congress* 238–39 (1791) (James Madison)).  Indeed, proceeding otherwise would defy the constitutional separation of powers.

Of all "principle[s] in our Constitution," none is "more sacred than . . . that which separates the legislative, executive and judicial powers." *Myers v. United States*, 272 U.S. 52, 116 (1926) (quoting 1 *Annals of Congress* 581 (1791) (James Madison)); *see Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892) ("That [C]ongress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the [C]onstitution."). And perhaps that's because of the democratic values it protects.

The Framers understood that lawmaking involved "hard choices." *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring). So they placed the legislative power into the hands of the branch that was most accountable to the people. And if any problems arose, "the people could respond, and respond swiftly" to remedy any "misuse[]" of power. *Id.*

Along with accountability was "the bedrock principle that dividing power among multiple entities and persons helps protect individual liberty." *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 187 (D.C. Cir. 2018) (Kavanaugh, J., dissenting), *abrogated by Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020); *see* The Federalist No. 51 (James Madison) (C. Rossiter ed. 1961) ("[The] separate and distinct exercise of the different powers of government . . . is admitted on all hands to be essential to the preservation of liberty[.]"). And it does so by slowing down the ability to legislate. "Bicameralism and presentment make lawmaking difficult *by design*." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 61 (2015) (Alito, J., concurring) (cleaned up). The Framers thought that these drawn-out processes not only limited the government's ability to restrict fundamental freedoms, but also promoted deliberation and safeguarded unpopular minorities from the tyranny of the majority. *See* The Federalist No. 73 (Alexander Hamilton), No. 51 (James Madison). In all, the separation of powers shields the public's interests in accountability and individual liberty. And Article I is one way to ensure that separation.

### A.

Born out of Article I was what courts call the nondelegation doctrine.  It stands for a simple proposition—Congress alone has legislative powers, and it cannot delegate them away.  With that in mind, the Supreme Court has applied the doctrine to clarify how courts can determine whether a power delegated to the executive is actually legislative (and thus a violation of Article I).

Keeping in mind the fundamental, Founding principle that "the legislature makes, the executive executes, and the judiciary construes the law," courts have adjudicated Congress's ability to delegate power.  *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46, 50 (1825) (upholding a delegation of power to federal courts to regulate their own procedures and holding that state legislatures could not interfere with that delegation).  That said, within a few decades after ratification, Congress did "commit something to the discretion of the other [Branches]."  *Id.* at 46 (noting that court determinations of "the precise boundary of this power is a subject of delicate and difficult inquiry").  But Chief Justice Marshall and the Court understood that Congress could not delegate "powers which are strictly and exclusively legislative."  *Id.* at 42.  Still, they allowed Congress to delegate other "powers which the legislature may rightfully exercise itself."  *Id.* at 43.  As Chief Justice Marshall went on to say, the "line" separating "important subjects, which must be entirely regulated by the legislature itself," and "those of less interest," which allow others to "fill up the details" in a "general provision," was not "exactly drawn."  *Id.*  So the Court began to try to clarify where that line fell.

At first, the Supreme Court focused on the "extent" or "character of the power" that Congress conferred.  *Id.*  Delegating "the making of law" itself was off limits.  *Marshall Field & Co.*, 143 U.S. at 693; *see Buttfield v. Stranahan*, 192 U.S. 470, 496 (1904) (denying that Congress may "invest administrative officials with the power of legislation").  But the Supreme Court still permitted Congress to vest others with the "authority or discretion as to [a law's] execution."  *Marshall Field & Co.*, 143 U.S. at 693–94 (citation omitted).  Indeed, for over a century after the Founding, courts allowed "Congress . . . to use officers of the [E]xecutive branch *within defined limits*, to secure the *exact effect* intended by its acts of legislation."  *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928) (emphases added) (collecting

cases).    And importantly, those "defined limits" were what courts called "intelligible principle[s]."  *Id.* at 406, 409.

Indeed, Congress fashioned laws that included various constraints to guide the Executive on what it could and couldn't do.  For instance, some laws required Executive officials to find facts before taking action, and others limited Executive responses to specific situations.  *See id.* at 405 (noting that a statute "provided [the President] with a body of investigators who were to assist him in obtaining needed data and ascertaining the facts justifying readjustments" of foreign trade); *Marshall Field & Co.*, 143 U.S. at 693–94 (conditioning the President's "duty to issue a proclamation" on a fact-finding inquiry into whether exports from a country were "reciprocally unequal and unreasonable").   Other laws required the officials to consider specified criteria before doing something.  *See N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24–25 (1932) (requiring the Interstate Commerce Commission to consider criteria before permitting acquisition of a railroad in the "public interest," including the "adequacy of transportation service," "economy and efficiency," and the "best use of transportation facilities").  And others concerned grants of power so discrete in themselves that no more direction from Congress was necessary. *See Union Bridge Co. v. United States*, 204 U.S. 364, 366, 387 (1907) (granting the Secretary of War the authority to provide bridge owners with notice and a reasonable amount of time to make structural changes to their bridges); *see also Tagg Bros. & Moorhead v. United States*, 280 U.S. 420, 435 n.3 (1930) (requiring the Secretary of Agriculture to go through a "full hearing" before establishing "just and reasonable rates and charges" for "the furnishing of stockyard services" (citation omitted)).

Long story short, "in every case in which the question [of delegation was] raised, the Court . . . recognized that there are limits of delegation which there is no constitutional authority to transcend."  *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 430 (1935).  And what confined those delegations in each case was some sort of limitation that someone outside the Legislative Branch had to abide by.  *Id.*   Those constraints became known as a law's "intelligible principle." *J.W. Hampton, Jr., & Co.*, 276 U.S. at 409.

**B.**

But it wasn't until 1935 that the Court found that Congress had pushed its limits. In *Panama Refining v. Ryan*, the Court held for the first time that a congressional grant of power was an unconstitutional delegation. 293 U.S. at 430, 433. Congress had delegated regulatory authority over the transportation of petroleum and petroleum products to the President. *Id.* at 414–15. In evaluating whether this delegation was constitutional, the Court "look[ed] to the statute" to test whether Congress violated Article I when delegating powers to the Executive Branch. *Id.* at 415. Importantly, the Court provided some considerations to determine whether a congressional act "shall be prohibited by law [a]s obviously one of legislative policy":

> Accordingly, we look to the statute to see whether the Congress has declared a policy with respect to that subject; whether the Congress has set up a standard for the President's action; whether the Congress has required any finding by the President in the exercise of the authority to enact the prohibition.

*Id.*

Keeping these considerations in mind, the *Panama Refining* Court found that the law had no "intelligible principle" by which the President was "directed to conform." *Id.* at 430 (citation omitted). Although Congress provided a "general outline of policy" on the "transportation of petroleum or petroleum products," *id.* at 417, Congress did not "lay[] down [a] policy of limitation" or "policy for the achievement" of the "conservation of natural resources," *id.* at 418. Instead, in "general terms," it seemed as if the "broad outline [wa]s simply an introduction of the act, leaving the legislative policy as to particular subjects to be declared and defined . . . by . . . subsequent sections." *Id.* But the law didn't further define the general policy. *Id.* at 430.

Indeed, the law "laid down no rule" on what actions the President had to make if certain situations arose, *id.*, and "nothing as to the circumstances or conditions" that would prompt him to prohibit transportation, *id.* at 417. No "determination as to any facts or circumstances" had to be made, and no situation had to come about before the President could exercise discretion under the law. *Id.* at 418.

Instead, Congress vested the President with the discretion to make petroleum-transportation standards and enforce accordingly. *Id.* at 420–21. And Congress didn't provide

him with a standard to guide his discretion.  *Id.*  Said otherwise, Congress did not require the President to consider a "primary standard"—some set of criteria or considerations—that would limit his discretion in "'fill[ing] up the details' under . . . general provisions." *Id.* at 426 (quoting *Wayman*, 23 U.S. (10 Wheat.) at 43).  Contrary to other acts of legislation, the law did not "legislate[] on the subject as far as was reasonably practicable." *Id.* at 427 (quoting *Buttfield*, 192 U.S. at 496).  Rather, Congress's wide grant of discretion allowed the President to *choose* "[a]mong the numerous and diverse objectives broadly stated." *Id.* at 418.  And so, with no factual prerequisite or standard guiding his authority, he could act "as he pleased" in regulating petroleum transportation.  *Id.*  As a result, the Court held that Congress unconstitutionally delegated its legislative power.

Soon after came *A.L.A. Schechter Poultry Corp. v. United States*.  295 U.S. 495 (1935). In *Schechter Poultry*, Congress delegated regulatory authority to the President to set "codes of fair competition" in certain trades and industries—in this case, the poultry industry.  *Id.* at 521–22.  Before getting into the analysis, the Court pointed out that the Constitution gives "Congress the necessary resources of flexibility and practicality . . . in laying down policies and establishing standards." *Id.* at 530.  But the Court explained that Congress could only delegate to "selected instrumentalities" if Congress also "prescribed limits and the determination of facts to which [a] policy as declared by the Legislature [wa]s to apply." *Id.*

Relying on *Panama Refining*, the Supreme Court "look[ed] to the statute to see whether Congress . . . overstepped these limitations"—that is, the Court determined whether Congress provided an intelligible principle by "establish[ing] the standards of legal obligation" or whether it didn't "by . . . fail[ing] to enact such standards" and thereby "attempt[ing] to transfer that [legislative] function to others." *Id.*  In the end, the Court held that Congress didn't provide an intelligible principle.  *See id.* at 534, 537–38 ("Congress [could not] delegate legislative power to the President to exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable for" a "broad range of objectives," including "rehabilitation and expansion of trade or industry.").

In finding an Article I violation, the Court turned to two considerations also identified in *Panama Refining*.  The Court held that the law didn't (1) list "rules of conduct to be applied to

particular states of fact determined by appropriate administrative procedure." *Id.* at 541. Nor did the law (2) contain "standards [that could guide Executive discretion], aside from the statement of the [law's] general aims of rehabilitation, correction, and expansion." *Id.*

Besides some general goals, no considerations limited what the President could do. And the *Schechter Poultry* Court spelled out a few reasons why the law didn't have an adequate standard. First, the Court found that the law's general "statement of the authorized objectives," *id.* at 534, was a "broad declaration" that still left the President's discretion "virtually unfettered," *id.* at 541–42. Next, it found that the two procedural "condition[s]" the President had to meet before promulgating did not limit "the permissible scope" of his regulatory authority because they still allowed him to act "as he may see fit." *Id.* at 538. And last, the Court recognized that the broad grant of power to the President required Congress to be more specific in how it guided the President's discretion. *Id.* at 541.

The Court noted the difference between laws concerning smaller grants of discretion (like those dealing with "rules of miners as to mining claims" and "the standard height of drawbars"), and the law in *Schechter Poultry* (which granted "a sweeping delegation of legislative power" over codes affecting the "rehabilitation and expansion of . . . trades or industries"). *Id.* at 537; *see id.* at 539 (noting that the delegated "authority relate[d] to a host of different trades and industries, thus extending the President's discretion to all the varieties of laws which he may deem to be beneficial in dealing with the vast array of commercial and industrial activities throughout the country"). The Court concluded that a delegation of that magnitude, with no intelligible principle to limit Executive discretion, was "unknown to our law, and . . . utterly inconsistent with the constitutional prerogatives and duties of Congress." *Id.* at 537. Taken together, the law in "no way limit[ed]" the "breadth of the President's discretion." *Id.* at 538–39. So as in *Panama Refining*, the law in *Schechter Poultry* had no "intelligible principle" limiting the President's discretion. *J.W. Hampton, Jr., & Co.*, 276 U.S. at 409; *Schechter Poultry*, 295 U.S. at 551.

After *Panama Refining* and *Schechter Poultry*, at least one thing became clear: Congress's "general outline of policy," *Panama Refin.*, 293 U.S. at 417, or "statement of . . . general aims," *Schechter Poultry*, 295 U.S. at 541, was not enough to form an intelligible

principle.  Knowing that, the Supreme Court began to focus its nondelegation analysis on two considerations: (1) "whether the Congress has required any finding by the President in the exercise of the authority," and (2) "whether the Congress has set up a standard for the President's action."  *Panama Refin.*, 293 U.S. at 415; *see Schechter Poultry*, 295 U.S. at 530.  As I'll explain, the intelligible principles identified throughout later Supreme Court precedent fall into one of these two buckets.

## C.

With *Panama Refining* and *Schechter Poultry* remaining good law, the Court has further refined the "intelligible principle" framework.[1]  Since 1935, most (if not all) nondelegation cases have involved legislation that has granted the Executive some form of policy-making power.  And each time that's happened, the Supreme Court has upheld the legislation by finding an intelligible principle in two ways—two ways that track the two considerations present in *Panama Refining* and *Schechter Poultry*.

First, a "finding by the President in the exercise of the authority to enact the prohibition."  *Panama Refin.*, 293 U.S. at 415.  The Supreme Court has upheld laws that require certain

---

[1] The Supreme Court has not held that any act of Congress unconstitutionally delegates legislative power since those two cases.  Rather, the Court has upheld each law before it while developing what we call the intelligible-principle test.  *See generally* Amy Coney Barrett, *Suspension and Delegation*, 99 Cornell L. Rev. 251, 318 & n.285 (2014) (describing the test as "notoriously lax").  And at least from 1940 to 2015, it appears that only one nondelegation challenge has been successful in lower federal courts without being reversed on appeal.  Jason Iuliano & Keith E. Whittington, *The Nondelegation Doctrine: Alive and Well*, 93 Notre Dame L. Rev. 619, 636 (2018).

Some jurists have pointed out that the test actually allows Congress to delegate "legislative power"—but only if the delegation is "adequately limited by the terms of the authorizing statute."  *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 488 (2001) (Stevens, J., concurring in part and concurring in the judgment); *see Dep't of Transp.*, 575 U.S. at 86 (Thomas, J., concurring in the judgment) ("Our reluctance to second-guess Congress on the *degree* of policy judgment is understandable; our mistake lies in assuming that *any* degree of policy judgment is permissible when it comes to establishing generally applicable rules governing private conduct.").  And others have noted that "the Constitution does not speak of 'intelligible principles'" in the first place, which prompts the question of when the Supreme Court will revisit the nondelegation doctrine again.  *Whitman*, 531 U.S. at 488 (Thomas, J., concurring) ("On a future day, however, I would be willing to address the question whether our delegation jurisprudence has strayed too far from our Founders' understanding of separation of powers."); *see, e.g.*, *Gundy v. United States*, 139 S. Ct. 2116, 2139 (2019) (Gorsuch, J., dissenting) ("Th[e] mutated version of the 'intelligible principle' remark has no basis in the original meaning of the Constitution, in history, or even in the decision from which it was plucked."); *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Mem.) (Kavanaugh, J., statement respecting the denial of certiorari) ("Justice Gorsuch's thoughtful *Gundy* opinion raised important points that may warrant further consideration in future cases."); *Michigan v. EPA*, 576 U.S. 743, 763 (2015) (Thomas, J., concurring) ("[W]e seem to be straying further and further from the Constitution without so much as pausing to ask why.").

situations or fact-finding to occur before the Executive can act under a statute.  *See Opp Cotton Mills v. Adm'r of Wage & Hour Div. of Dep't of Lab.*, 312 U.S. 126, 143–45 (1941) (upholding a law that allowed the Executive to fix the minimum wages contingent on "basic facts to be ascertained administratively" while considering a list of "prerequisites" and "further requirements"); *Radio Corp. of Am. v. United States*, 341 U.S. 412, 416 & n.5 (1951) (involving a law that required a commission "to promulgate standards for transmission of color television that result in rejecting all but one of the several proposed systems" "as public convenience, interest, or necessity required]" but only "given a justifiable fact situation").

Second, "a standard."  *Panama Refin.*, 293 U.S. at 416.  When a law does not condition the Executive's grant of regulatory authority on a set of facts, the Supreme Court has looked for a standard.  Indeed, a law would be unconstitutional if "an absence of standards" makes it "impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus v. United States*, 321 U.S. 414, 426 (1944).  With that in mind, any standard must be "sufficiently definite and precise" so as "to enable Congress, the courts and the public to ascertain whether the [Executive official] . . . has conformed to those standards."  *Id.*; *Opp Cotton Mills*, 312 U.S. at 144; *see Gundy*, 139 S. Ct. at 2129 (plurality) ("The Court has stated that a delegation is permissible if Congress has made clear to the delegee the general policy he must pursue and the boundaries of his authority." (cleaned up)).  And in making an assessment, "standards need not be tested in isolation."  *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946).  Courts can "derive much meaningful content from the purpose of the [legislation], [the] factual background and the statutory context in which the[] [standards] appear."  *Id.*

After *Schechter Poultry*, broad purpose statements that granted wide discretion and general phrases in a law were not enough to satisfy the Court's intelligible-principle test.  But the Court has favored standards that specify what the Executive "must conform to," such as a list of "standards" and "criteria" that guide regulation.  *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 397–98 (1940) (upholding a law that allowed the Executive to "fix maximum prices" on bituminous coal "when . . . the public interest . . . deem[ed] it necessary in order to protect the consumer against unreasonably high prices" while being bound by "standards" and "criteria"); *see Am. Power & Light Co.*, 329 U.S. at 105 (upholding a law that allowed the Executive to help

preserve corporate structures, but only if it complied with "a veritable code of rules" within the law's "express recital of evils," "general policy declarations," "standards for new security issues," and "conditions for acquisitions of properties and securities," and its specification of the "nature of the inquiries contemplated"); *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 204, 225–26 (1943) (upholding a law allowing for the rejection of a broadcasting network program for the "public interest, convenience, and necessity" because "[t]he purpose of the Act, *the requirements it imposes*, and the context of the provision in question" provided an intelligible principle (citation omitted) (emphasis added)).

From mandatory "factors" that the Executive *must* consider to "prohibited" factors that the Executive *cannot* consider, the Court has upheld delegations that give specific guidance— guidance that the Executive cannot disregard. *Mistretta v. United States*, 488 U.S. 361, 375–76 (1989) (requiring the Sentencing Commission to form guidelines while considering, among many things, "seven factors" of the offenses, the "specific tool" of the "guidelines system," "three goals," "four 'purposes,'" and "prohibited" factors (citation omitted)).

Some of those required considerations might take the form of "the latest scientific knowledge." *Whitman*, 531 U.S. at 473 (requiring the Executive to set air quality standards "[f]or a discrete set of pollutants . . . based on published air quality criteria that reflect the latest scientific knowledge" and "at a level that is . . . sufficient, but not more than necessary" to "protect public health from the adverse effects of the pollutant in the ambient air" (citation omitted)). Whereas others might be specific considerations or restrictions relating to the power vested. *See Touby v. United States*, 500 U.S. 160, 166–67 (1991) (allowing the Attorney General to schedule a drug if it is "necessary to avoid an imminent hazard to the public safety" while also "requir[ing] [the Attorney General] to consider . . . multiple specific restrictions," including "three factors" related to drug abuse, the risk to public health, and "criteria for adding a substance to each of the five schedules"); *Yakus*, 321 U.S. at 419, 427 (noting that the law provided "directions" for the Executive, to fix prices as a "temporary wartime measure," but only when "consideration [is] given to prices prevailing in a stated base period" and the prices be "fair and equitable").

Importantly, one other trend permeated the development of Article I's nondelegation requirement: Laws that vest more power require more constraints. To be clear, regardless of the breadth of delegation, standards must still be "sufficiently definite and precise," *Yakus*, 321 U.S. at 426, and Congress must still express "the boundaries of . . . delegated authority" even when "delineat[ing] [a] general policy," *Am. Power & Light Co.*, 329 U.S. at 105, 113 (blessing a statutory provision vesting a narrow scope of power to the SEC to "ensure that the corporate structure or continued existence of any company in a particular holding-company system" conformed to enumerated standards).

But the body of Supreme Court cases we have requires more detail when Congress confers more power. "It is true enough that the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475 (comparing the minimal "direction" needed to delegate the task of defining "country elevators" to the "substantial guidance [needed to] set[] air standards that affect the entire national economy"); *see Touby*, 500 U.S. at 166 (explaining that "greater congressional specificity" may be needed in certain contexts).

Indeed, the Court has identified some statutes that were so narrow that they required less detail. *See Gundy*, 139 S. Ct. at 2125, 2128, 2130 (explaining that the delegation was narrow because it (1) granted "only temporary authority," which was "distinctly small-bore" when compared to other delegations; (2) allowed discretion in the form of "time-limited latitude" of an "implementation delay," "[b]ut no more than that" "to address . . . various implementation issues"; and (3) "enabled the Attorney General *only* to address (as appropriate) the 'practical problems' involving pre-Act offenders before requiring them to register . . . [which] was a *stopgap, and nothing more*" (citation omitted) (emphases added)); *Nat'l Broad. Co.*, 319 U.S. at 216 (interpreting "'public interest, convenience, or necessity' . . . by its context, by the nature of radio transmission and reception, by the scope, character, and quality of services" because the criterion was only "as concrete as the . . . field of delegated authority permi[tted]" (citation omitted)); *see also Yakus*, 321 U.S. at 419, 426 (noting that a "temporary wartime" law's "authority to fix prices . . . to prevent inflation [wa]s no broader than the authority" vested by other laws).

In sum, the Supreme Court, over two centuries worth of caselaw, has developed a test to determine whether a congressional delegation of power is constitutional under Article I. That test is aimed at an "intelligible principle." *J.W. Hampton, Jr., & Co.*, 276 U.S. at 409. And that in turn requires a court to analyze a statute for two things: (1) a fact-finding or situation that provokes Executive action or (2) standards that sufficiently guide Executive discretion—keeping in mind that the amount of detail governing Executive discretion must correspond to the breadth of delegated power. *See Schechter Poultry*, 295 U.S. at 541–42; *Panama Refin.*, 293 U.S. at 430; *Whitman*, 531 U.S. at 475. If neither of these exist, under Supreme Court precedent, there is no intelligible principle. Rather, that law would be an unconstitutional grant of legislative power under Article I.

## II.

Never have we or the Supreme Court decided whether the permanent standards provision under OSHA constitutes an unconstitutional delegation of power.[2] OSHA vests the Secretary of Labor with the power to "set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." 29 U.S.C. § 651(b)(3). And under OSHA's permanent standards provision, the Secretary "may by rule promulgate, modify, or revoke any occupational safety or health standard." *Id.* § 655(b). If that delegation sounds like a lot of power—it is. It gives the Secretary broad discretion to create mandatory safe and healthy working conditions for "every working man and woman in the Nation." *Id.* § 651(b). And the only thing binding his discretion is that he must believe that a standard is "reasonably necessary *or appropriate* to provide safe or healthful employment and places of employment." *Id.* §§ 651(b)(3), 652(8) (emphasis added).

Bound by the Supreme Court's development of the "intelligible principle" test, I believe the delegation of power under these provisions violates Article I. That's because the provisions

---

[2]As I later explain, the Supreme Court has only dealt with OSHA's "toxic materials or harmful physical agents" provision under 29 U.S.C. § 655(b)(5). *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 611 (1980). Importantly, this was a different provision. And it didn't take long for the Supreme Court to note that its holding on § 655(b)(5) does not affect how courts should interpret § 652(8)—the definition provision on which OSHA's permanent standards provision solely depends. *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 513 & n.32 (1981) (explicitly leaving open "all the applications that [§ 652(8)] might have, either alone or together with [§ 655(b)(5)]").

provide (1) no fact-finding or situation that prompts Executive action and (2) no standard that sufficiently guides discretion on what health and safety standards are appropriate. And that's even more so the case because the broad scope of delegated power here—creating permanent standards "for every working man and woman in the Nation"—demands that Congress be correspondingly detailed in how it limits agency discretion. *Id.* § 651(b). Under a faithful application of Supreme Court precedent, Congress failed to "lay down by legislative act an intelligible principle to which the person or body authorized to [act] . . . is directed to conform." *J.W. Hampton, Jr., & Co.*, 276 U.S. at 409.

Our "nondelegation inquiry" into OSHA begins and ends with statutory interpretation. *Gundy*, 139 S. Ct. at 2123 ("[I]ndeed, once a court interprets the statute, it may find that the constitutional question all but answers itself."). To determine "whether Congress has supplied an intelligible principle to guide the . . . use of discretion," we "constru[e] the challenged statute to figure out what task it delegates and what instructions it provides." *Id.* And as described above, we can find an intelligible principle from two considerations: (1) a fact-finding or situational requirement that provokes Executive action or (2) standards that sufficiently guide Executive action. At the same time, we assess "whether the law sufficiently guides executive discretion to accord with Article I," *id.*, which means that we look at whether "the degree of agency discretion . . . accord[s] to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475.

With that framework in mind, *what* I look for is an intelligible principle from the considerations set out in *Panama Refining* and *Schechter Poultry*. And *where* I look is OSHA's provisions—few as they may be.

## A.

To start, OSHA's permanent standards provision requires no (1) fact-finding or situation to occur before the Secretary acts. *See Schechter Poultry*, 295 U.S. at 541–42; *Panama Refin.*, 293 U.S. at 417–18, 430. As an initial matter, OSHA gives the Secretary the option of consulting an advisory committee before promulgating a standard, 29 U.S.C. § 655(b)(1), but it does not require him or the committee to "obtain[] needed data" or to determine "the facts

*justifying*" any changes to health and safety standards.  *J.W. Hampton, Jr., & Co.*, 276 U.S. at 405 (emphasis added).  And even if the committee gives the Secretary "recommendations and findings in relation to the making of codes," they are not binding—they "have no sanction beyond the will of the [Secretary], who may accept, modify, or reject them as he pleases." *Schechter Poultry*, 295 U.S. at 539.  So the Secretary's power to regulate permanent standards is not contingent on a fact-finding inquiry.  *Marshall Field & Co.*, 143 U.S. at 693–94.  There are no "basic facts to be ascertained administratively."  *Opp Cotton Mills*, 312 U.S. at 145.

And the act doesn't limit the Secretary's scope of power by requiring that he only respond to "a justifiable fact situation."  *Radio Corp. of Am.*, 341 U.S. at 416.  No threat or harm to health or safety must arise before the Secretary creates a standard.  And even if a threat or harm were to arise, nothing requires that the Secretary actually combat it.  *See* 29 U.S.C. § 651(b)(3) ("authorizing the Secretary of Labor to set mandatory" standards, but not requiring him to do so); *id.* § 655(b) (providing that the Secretary "*may*," not shall, "promulgate, modify, or revoke any . . . standard" (emphasis added)).

And this is *not* like other provisions in OSHA that require some sort of fact-finding.  The Secretary and other defendants point us to *Benzene*, a Supreme Court case interpreting another provision of OSHA to require a fact-finding inquiry of a "significant risk of material health impairment."  *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 639 (1980) ("*Benzene*").  Importantly, that case involved the "toxic materials or harmful physical agents" provision in OSHA, which falls under 29 U.S.C. § 655(b)(5)—a provision that is *not* at issue here.  *Id.* at 612.  A four Justice plurality assessed "the meaning of and the relationship between" OSHA's toxic materials provision and a provision that does apply in this case—§ 652(8), "which defines a health and safety standard as a standard that is 'reasonably necessary and appropriate to provide safe or healthful employment.'"  *Benzene*, 448 U.S. at 639 (quoting 29 U.S.C. § 652(8)).  The plurality said that § 652(8) "appl[ies] to all permanent standards promulgated under the Act

and that it requires the Secretary, before issuing any standard, to determine that it is reasonably necessary and appropriate to remedy a significant risk of material health impairment." *Id.*[3]

At first blush, the four-Justice plurality in *Benzene* may seem to answer the question of whether the permanent standards provision in OSHA requires fact-finding. But no majority binds our analysis. And as others have recognized, the *Benzene* case is not a model of clarity. *See, e.g.*, Antonin Scalia, *A Note on the Benzene Case*, Am. Enter. Inst., J. on Gov. & Soc., July-Aug. 1980, at 25 (stating that *Benzene* produced "a three-one-one-four split decision that literally provides no conclusive answer to any legal question").

That aside, the Supreme Court later attempted to clarify what we can take away from *Benzene*. *See Am. Textile Mfrs. Inst., Inc. v. Donovan* (*Cotton Dust*), 452 U.S. 490, 513 & n.32 (1981). *Cotton Dust* was the Court's attempt to make sense of *Benzene*. It noted that § 652(8)'s "reasonably necessary or appropriate" language "might . . . impose additional restraints" on OSHA," but *only* when combined with § 655(b)(5)'s "toxic materials" language.[4] *Id.* For example, the Court specified that only through the combination of § 652(8) and the toxic materials provision could the Court get to *Benzene*'s "significant risk" requirement.[5] *Id.* ("In addition, if the use of one respirator would achieve the same reduction in health risk as the use of five, the use of five respirators was 'technologically and economically feasible,' and OSHA thus insisted on the use of five, then the 'reasonably necessary or appropriate' limitation might come

---

[3]Ironically, the government's stance in *Benzene* is the opposite of that argued in this case. Before, the government argued that § 652(8) "*imposes no limits* on the Agency's power, and thus would not prevent it from requiring employers to do whatever would be 'reasonably necessary' to eliminate all risks of any harm from their workplaces." *Benzene*, 448 U.S. at 641. Now, the government argues that § 652(8) serves as a limiting principle to OSHA's permanent standards provision.

[4]The majority opinion also recognizes this clarification from *Cotton Dust*. (Maj. Op. at 9 ("[A]ll [§ 655(b)(5)] standards must be addressed to 'significant risks' of material health impairment." (quoting *Cotton Dust*, 452 U.S. at 513 n.32)).

[5]Almost every court to have addressed whether the "significant risk" requirement applies *only* uses the test in relation to OSHA's toxic materials standards, *not* its permanent safety standards. *See Pub. Citizen Health Rsch. Grp. v. U.S. Dep't of Lab.*, 557 F.3d 165, 176 (3d Cir. 2009); *Ala. Power Co. v. OSHA*, 89 F.3d 740, 745–46 (11th Cir. 1996); *Nat'l Grain & Feed Ass'n v. OSHA*, 866 F.2d 717, 720, 737 (5th Cir. 1988); *Forging Indus. Ass'n v. Sec'y of Lab.*, 773 F.2d 1436, 1442, 1444 (4th Cir. 1985); *ASARCO, Inc. v. OSHA*, 746 F.2d 483, 490, 495 (9th Cir. 1984). And the one case where this Court mentions "significant risk" was in dicta. *In re MCP No. 165, Occupational Safety & Health Admin., Interim Final Rule: COVID-19 Vaccination & Testing*, 21 F.4th 357, 376 (6th Cir. 2021), *stay application granted by Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 142 S. Ct. 661 (2022) (involving an emergency temporary standard, not a permanent standard).

into play as an additional restriction on OSHA to choose the one-respirator standard."). Put differently, it's the combination of those two provisions—§ 652(8) and § 655(b)(5)—not the individual provisions in themselves, that get us to a "significant risk" fact-finding.

So *Cotton Dust* made it clear that the Supreme Court has not answered what "substantive content" § 652(8) has and that *Benzene* did not answer that question. *Id.* (citation omitted). And rather than address the issue, it explicitly left open the question of "all the applications that [§ 652(8)] might have, either alone or together with [§ 655(b)(5)]." *Id.* Thus, the Supreme Court has not told us what § 652(8) means or how it works with OSHA's permanent health and safety standards.[6]

With that, we have to figure it out ourselves. To do so, we must analyze whether some sort of fact-finding requirement forms from the combination of OSHA's definition of a standard, 29 U.S.C. § 652(8), and its permanent standards provision, *id.* § 655(b). It doesn't. Start with the permanent standards provision. *See id.* Again, it provides that the Secretary "may," not shall, "promulgate, modify, or revoke any . . . standard"—it provides nothing else. *Id.* And although "may" is sometimes obligatory in a statute—and context informs that determination— the ordinary meaning of "may" is permissive. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 112 (2012) ("The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive[.]"). And a host of contemporaneous dictionary

---

[6]On that note, we have yet to address the issue, and the two decisions of our sister circuits should not control our analysis in this case. The D.C. Circuit has decided that *Benzene*'s "significant risk" requirement applies to OSHA's permanent standards provision without much explanation. *See Nat'l Mar. Safety Ass'n v. OSHA*, 649 F.3d 743, 750 n.8 (D.C. Cir. 2011). Rather than analyzing OSHA's text, the court only reasoned that OSHA's permanent standards provision requires a "significant risk" fact-finding based on a "reading of subsequent Supreme Court precedent" that dealt exclusively with OSHA's "toxic materials" provision. *Id.* (citing *Bldg. & Constr. Trades Dep't, AFL-CIO v. Brock*, 838 F.2d 1258, 1263 (D.C. Cir. 1988) (discussing the Supreme Court's approach to toxic materials under OSHA)). So its conclusion is questionable. *Cf. Panama Refin.*, 293 U.S. at 416 ("It will be observed that each of these provisions contains restrictive clauses as to their respective subjects. Neither relates to the subject of [the section that was an unconstitutional delegation].").

Next, the Seventh Circuit addressed a challenge to the "entire Act," not just the permanent standards provision. *Blocksom & Co. v. Marshall*, 582 F.2d 1122, 1125 (7th Cir. 1978). And the court found an intelligible principle under OSHA by pointing to many provisions that do not apply to the permanent standards provision. *See id.* at 1125–26. So its analysis does not help us here. All this to say, neither the Supreme Court or any circuit has answered whether the *text* of the permanent standards provision could be interpreted to also require the "significant risk" test or some other fact-finding. That's why today's case matters so much.

definitions confirm the permissive nature of "may" in ordinary usage.[7]  *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012) ("That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense."); *see also, e.g.*, *Nat'l Wildlife Fed'n v. Sec'y of U.S. Dep't of Transp.*, 960 F.3d 872, 877 (6th Cir. 2020) ("The clearest case of 'discretion' is when an agency doesn't have to act—for instance, if a statute says 'may' rather than 'must' or 'shall.'"); *Minor v. Mechanics' Bank of Alexandria*, 26 U.S. (1 Pet.) 46, 64 (1828) (exploring the difference between "may" and "must" and explaining that "[t]he ordinary meaning of the language, must be presumed to be intended, unless it would manifestly defeat the object of the provisions"); *Dawson v. Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 201 (1980) ("The statute states that a patentee may do 'one or more' of these permitted acts, and it does not state that he must do any of them.").

And context matters here.  *See Dubin v. United States*, 143 S. Ct. 1557, 1565 (2023) (explaining that where there are "various definitions" to a word, "we will look not only to the word itself, but also to the statute and the surrounding scheme, to determine the meaning Congress intended" (cleaned up)).  Congress knew how to use obligatory language when it wanted to in OSHA.

For example, comparing OSHA's permanent standards provision to its toxic materials provision (at issue in *Benzene*) shows how bare it is.  Unlike the permanent standards provision, the toxic materials provision lists considerations and requirements.  *See* 29 U.S.C. § 655(b)(5).  It specifies that the Secretary "*shall* set the standard which most adequately assures, to the extent feasible, . . . that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the

---

[7]*See May*, Random House Dictionary 886 (1967) (explaining that "may" is used "to express possibility, opportunity, or permission"); *May*, Black's Law Dictionary 1131 (1968) (defining "may" as "[a]n auxiliary verb qualifying the meaning of another verb by expressing ability, competency, liberty, permission, possibility, probability or contingency" and that "may" is construed as "shall" or "must" only "to the end that justice may not be the slave to grammar"); *May*, Webster's Third New International Dictionary 1396 (1971) (explaining that "may" means to "be in some degree likely to" but can mean "must" in some "deeds, contracts, and statutes"); *May*, The American Heritage Dictionary of the English Language 808 (1969) (listing multiple meanings, among them "Possibility," "Ability or capacity," and "Desire or fervent wish" but explaining that "may" can mean an "[o]bligation or function with the force of *must*" in some legal documents); *May*, The American College Dictionary 753 (1970) (explaining that "may" is "used as an auxiliary to express . . . possibility, opportunity or permission" but noting that it may mean "must" (when used not to confer a favor, but to impose a duty)").

period of his working life." *Id.* (emphasis added). And before getting to that decision, it requires the Secretary to base his decision on "the best available evidence," including "research, demonstrations, experiments, and such other information as may be appropriate." *Id.*

And that's not all. The toxic materials provision also lists "other considerations" that the Secretary *must* consider, including "the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws." *Id.* By contrast, the permanent standards provision contains *no* criteria or considerations that guide how the Secretary creates a standard for workplaces across the Nation. *See infra* Part II.B.

The next relevant provision is OSHA's definition of a standard. 29 U.S.C. § 652(8). OSHA broadly defines "occupational safety and health standard" as a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes" that the Secretary thinks "reasonably necessary or *appropriate* to provide safe or healthful employment and places of employment." *Id.* (emphasis added); *see infra* Part II.B. By pairing the two provisions together, the meaning is clear: OSHA authorizes the Secretary to make standards that he believes are "appropriate." But that's it. There's no more to it. No fact-finding is required. As a result, I find no intelligible principle under *Panama Refining* and *Schechter Poultry*'s fact-finding or specific-situation consideration.

One could argue that because the Secretary must provide standards that ensure "safe or healthful employment and places of employment," 29 U.S.C. § 652(8), he must first find "unsafe" or "unhealthful" employment and places of employment. Again, the text does not indicate that such a finding must take place. But even if we were to broadly read that requirement into the text, Supreme Court precedent informs us that a statute's "general outline of policy" is not enough. *Panama Refin.*, 293 U.S. at 417. We cannot just take the inverse of every general phrase in a statute to fabricate a rule that it never had. *Cf. Schechter Poultry*, 295 U.S. at 541. And even if we did, here it would still leave the Secretary's power "virtually unfettered." *Id.* at 542. Unlike *Benzene*, we are not just talking about toxic materials. Rather, permanent standards can address anything that the Secretary deems not conducive to "safe or healthful employment and places of employment." 29 U.S.C. § 652(8). Indeed, the scope of power here (general safety and health in every workplace) is broader than just toxic materials in some

workplaces (like in *Benzene*). So the constraint, if any, does not make a meaningful difference on the Secretary's power to find any standard appropriate.

## B.

Second, given the large scope of power that Congress conferred, the permanent standards provision does not contain standards that sufficiently guide the Secretary's discretion. *See Schechter Poultry*, 295 U.S. at 541–42; *Panama Refining*, 293 U.S. at 417–18, 430; *Whitman*, 531 U.S. at 475. OSHA's permanent standards provision specifies nothing that the Secretary "must conform to"—no "criterion" to guide what standards he should make. *Sunshine Anthracite Coal Co.*, 310 U.S. at 397–98. It does not require that the Secretary consider any "factors" or that he ignore "prohibited" factors while formulating a standard. *Mistretta*, 488 U.S. at 375; *see also Touby*, 500 U.S. at 167 ("It is clear that . . . Congress has placed multiple specific restrictions on the Attorney General's discretion[.]"). Unlike other provisions, even within OSHA, *see* 29 U.S.C. § 655(b)(5), the permanent standards provision does not require consideration of "the latest scientific knowledge" or the like. *Whitman*, 531 U.S. at 473. Nor does it provide "directions" or "consideration" of something like a "base" level of safety. *Yakus*, 321 U.S. at 419, 427.

The main provision that the Secretary and other defendants claim provides some sort of limit on the Secretary's discretion is OSHA's definition of an "occupational safety and health standard." 29 U.S.C. § 652(8). Read in tandem with the permanent standards provision, the Secretary "may" set mandatory standards, *see id.* § 655(b), that employers and employees must "comply with," *id.* § 654, including "conditions, or the adoption or use of one or more practices, means, methods, operations, or processes," *id.* § 652(8).[8] As the Secretary and other defendants

---

[8]The majority opinion reasons that "OSHA cannot merely issue any standard it likes; rather, a safety risk must be one that 'requires' some action for a safe workplace." (Maj. Op. at 9 (citing 29 U.S.C. § 652(8)). I read the statute differently. Again, the Secretary "may," not must, issue a standard. 29 U.S.C. § 655(b). And that standard will "*require*[] conditions, or the adoption or use of one or more practices, means, methods, operations, or processes." 29 U.S.C. § 652(8) (emphasis added). Importantly, that "require[ment]" language pertains to employees or employers, *not* the Secretary. *Id.* So this is unlike cases that have required the Executive to meet a certain set of criteria. *See Whitman*, 531 U.S. at 473 (requiring an agency—not those it regulates—to consider "the latest scientific knowledge" before promulgating standards "requisite to protect public health"). Here, the Secretary is not bound by this "requires" language. 29 U.S.C. § 652(8). Put simply: The Secretary *may* create any "conditions, . . . practices, means, methods, operations, or processes" in workplaces, and employees and employers

argue, those "conditions" or "the adoption" of means or the like must also be "*reasonably necessary or appropriate* to provide safe or healthful employment and places of employment." *Id.* (emphasis added).   And it's this phrase, "reasonably necessary or appropriate," *id.*, that supposedly limits the Secretary's power to set permanent standards.[9]

Before getting to the phrase, it's worth pointing out that no Supreme Court case has found that the phrasing of a law—i.e., the usage of the phrase "reasonably necessary or appropriate" in § 652(8)—alone creates an intelligible principle.   True, the Supreme Court has "over and over upheld" what appear to be "even very broad delegations."   *Gundy*, 139 S. Ct. at 2129 (plurality).   For example, it has approved delegations to various agencies to regulate in the "public interest," *Nat'l Broad. Co.*, 319 U.S. at 216, has allowed agencies to set "fair and equitable" prices and "just and reasonable" rates, *Yakus*, 321 U.S. at 420, 427 (citation omitted), and has affirmed a delegation to an agency to issue whatever air quality standards are "requisite to protect the public health," *Whitman*, 531 U.S. at 472 (citation omitted).   But in each case, other factors—whether it be fact-finding, situations, criteria, or considerations—provided an agency sufficient guidance on the "boundaries of [its] authority."   *Gundy*, 139 S. Ct. at 2129 (plurality) (citing *Am. Power & Light Co.*, 329 U.S. at 105); *see supra* Part I.B–C.   Those factors are what constituted intelligible principles—not one, isolated phrase that doesn't create a fact-finding requirement.   *See supra* Part II.A; *Cotton Dust*, 452 U.S. at 513 n.31.

Even so, if phrasing matters, it doesn't change the game here.   The word "or" in the phrase, "reasonably necessary *or* appropriate," creates two alternatives for the Secretary to choose from.   29 U.S.C. § 652(8) (emphasis added); *see* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 116 (discussing the disjunctive canon of interpretation).   That

---

*must* abide by those requirements.  *Id.*  So rather than limiting the Secretary's discretion to issue a standard, it strengthens his delegated authority by "requir[ing]" others to comply with the standards he may create.  *Id.*; *see id.* § 654.

[9]The Secretary and other defendants argue that, under *Cotton Dust*, the statutory phrase "reasonably necessary or appropriate" in 29 U.S.C. § 652(8) limits the Secretary to promulgating only permanent standards that are "economically" and "technologically feasible."  452 U.S. at 513 n.31.  But that stretches *Cotton Dust* too far. *Cotton Dust* clarified that the Court only addressed how § 652(8)'s language works together with the toxic standards provision—the provision that explicitly requires standards to ensure that no employee will suffer a "material impairment of health" "to the extent feasible."  29 U.S.C. § 655(b)(5); *see Cotton Dust*, 452 U.S. at 513 n.32; *supra* Part II.A.

disjunctive phrase allows the Secretary to set mandatory standards that are "reasonably necessary."**10**     29 U.S.C. § 652(8).     Or he can set standards if he believes them to be "appropriate"—they need not also be "reasonably necessary."  *Id.*

Seeing that OSHA provides no other definition, criterion, or consideration for what it means to be "appropriate," I turn to its definition at the time of OSHA's enactment.  *See Keen v. Helson*, 930 F.3d 799, 802 (6th Cir. 2019) ("When interpreting the words of a statute, contemporaneous dictionaries are the best place to start.").     The term "appropriate" means "[s]uitable for a particular person, condition, occasion or place; proper; fitting."  *Appropriate*, The American Heritage Dictionary of the English Language 64 (1969).**11**  And because OSHA "authoriz[es] the Secretary" (and him alone) "to set mandatory [permanent] standards," 29 U.S.C. § 651(b)(3), as well as the discretion to "by rule promulgate" them, he alone "may," *id.* § 655(b), determine what standard is "appropriate," *id.* § 652(8).

With that in mind, the term "appropriate" and its implications are far-reaching.  *See* Cass R. Sunstein, *Is OSHA Unconstitutional?*, 94 Va. L. Rev. 1407, 1431 (2008) ("[T]he 'reasonably necessary or appropriate' clause is plausibly different" from other clauses in other cases "because that phrase seems to allow (but not to require) the agency to use some form of cost-benefit analysis as a rule of decision.").     Indeed "appropriate" is "the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors."  *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (citation omitted).     Notably, "this term leaves agencies with flexibility," *id.*, because the language is "open-ended," *Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020) (citation omitted).     And its limit, if any, depends on the statutory context that Congress places the term in.  *Id.*; *see Michigan*, 576 U.S. at 752.

---

**10**The phrase, "reasonably necessary," might be narrower than the other phrase, "appropriate."  29 U.S.C. § 652(8).     But it is still broad.     The phrase offers no indication of how the Secretary can determine what is "reasonably necessary."     Because the Secretary's choice to set standards that are merely "appropriate" could be broader though, my analysis focuses on that option.

**11**Other dictionaries from around 1970 have almost identical definitions.  *See, e.g.*, *Appropriate*, The American College Dictionary 62 (1970) ("suitable or fitting for a particular purpose, person, occasion, etc."); *Appropriate*, The Random House Dictionary of the English Language 74 (1967) (same).

The problem here is that OSHA's context does not inform what "appropriate" refers to. The term, working in tandem with the permanent standards provision, doesn't seem to require anything but the Secretary asking: "What seems appropriate in workplaces around the nation?" Knowing this, the term "appropriate" could encompass almost anything in a workplace setting because the term means whatever the Secretary himself finds suitable.

Against that premise, however, the Secretary and other defendants direct us to general purpose statements in OSHA that the Secretary may—though, is not required to—consider before implementing a standard.  "As [OSHA's] name suggests," Congress tasked the Secretary "with ensuring *occupational* safety," *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 142 S. Ct. 661, 663 (2022), or in other words, ensuring "safe and healthful working conditions" "so far as possible," 29 U.S.C. § 651(b).  So to address "personal injuries and illnesses arising out of work situations," *id.* § 651(a), Congress sought "to regulate commerce among the several States and with foreign nations and to provide for the general welfare, to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources," *id.* § 651(b).

These purpose statements "in no way limit the authority which [OSHA] undertakes to vest in the [Secretary] with no other conditions than those there specified." *Schechter Poultry*, 295 U.S. at 539.  Nothing limits the "breadth of the [Secretary's] discretion" or narrows the "wide field of legislative possibilities." *Id.* at 538.  "Congress cannot delegate legislative power to the [Secretary] to exercise an unfettered discretion to make whatever laws he thinks may be" appropriate for safe and healthful working conditions across the country. *Id.* at 537–38.  Even though the general purposes of OSHA give the Secretary a few possible considerations, nothing requires him to consider them in determining what's appropriate given any situation. *See Panama Refining*, 293 U.S. at 431–32.

Congress, when enacting OSHA's permanent standards provision, did not specify *what* safe and healthful working conditions governed almost every business in the United States. Instead, OSHA vests the Secretary of Labor with that power—the discretion of whether to create a standard and of what standard to create.  OSHA "authoriz[es] the Secretary . . . to set mandatory occupational safety and health standards applicable to businesses affecting interstate

commerce." 29 U.S.C. § 651(b)(3). It does not mandate that the Secretary enforce a specific standard or even that he create one—just that he "may" create one.[12]   *Id.* § 655(b). Said differently, OSHA does not direct the Secretary to act "simply in execution of the act of [C]ongress."[13]  *Marshall Field & Co.*, 143 U.S. at 693.

"To hold that [the Secretary] is free to select as he chooses from the many and various objects generally described in [OSHA's purpose statements], and then to act without making any finding with respect to any object that he does select, and the circumstances properly related to that object, would be in effect to make the conditions inoperative and to invest him with an uncontrolled legislative power." *Panama Refin.*, 293 U.S. at 431–32.

Other than a "general outline of policy," *id.* at 417, Appellants point to three other sections in OSHA that supposedly affect the Secretary's enforcement of permanent standards.

---

[12]And OSHA doesn't *require* the Secretary to promulgate and modify permanent standards to serve the act's objectives. The only provision that requires that some standard be made, 29 U.S.C. § 655(a), is *not* the permanent standards provision, § 655(b). Looking at those two provisions, the Secretary was required to promulgate a permanent "occupational health and safety standard" under OSHA within its first two years of enactment. 29 U.S.C. § 655(a) ("[T]he Secretary shall, as soon as practicable during the period beginning with the effective date of this chapter and ending two years after such date, by rule promulgate . . . an occupational safety or health standard[.]"). Once that requirement was met—and it was—the Secretary was no longer obligated to promulgate any other permanent occupational health and safety standard.

So it's optional at this point. And what makes that clear is reading the permanent standards provision—the only provision at issue here. *Id.* § 655(b). It explains that "[t]he Secretary *may*"—not *shall*—"by rule promulgate, modify, or revoke any occupational safety or health standard." *Id.* (emphasis added). And if the Secretary chooses to do so in his discretion, he is then subject to some procedural requirements that do not limit the scope of what those standards may require. *See infra* pp. 27–28. And yes, if the Secretary wants to regulate, then he must take certain steps (i.e., he "shall" publish a rule in the Federal Register and "shall" afford interested persons time to respond). *Id.* § 655(b)(2). But again, those procedural requirements, *id.* § 655(b)(1)–(4) (including that the Secretary "shall" conform to a few procedural requirements), are all conditioned on him making the decision to promulgate in the first place, *id.* § 655(b) ("The Secretary *may* by rule promulgate . . . [a] standard *in the following manner*[.]" (emphasis added)). I would instead read § 655(b)'s clear prefacing condition to "relate[] to all [its] following . . . subparts." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 156 (discussing the scope-of-subparts canon); *see Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

[13]The majority states that "Congress has indeed laid out the general policy (a safe working environment)." (Maj. Op. at 15.) To be clear, that kind of general policy does not itself establish the required intelligible principle. *See Schechter Poultry*, 295 U.S. at 541–42. As explained, general "statement[s] of the authorized objectives," *id.* at 534, or "broad declaration[s]"—like OSHA's general purpose statements—that leave Executive discretion "virtually unfettered" do not provide a policy that fixes a nondelegation problem, *id.* at 542.

By no means do the sections limit the Secretary's discretion in creating a standard. Thus, they cannot function as an intelligible principle.

First, OSHA's procedural requirements. *See* 29 U.S.C. § 655(b)(1)–(3). Like other rule makings, *see* 5 U.S.C. § 553(b), (c), the Secretary must first publish the proposed standard in the Federal Register and allow interested persons thirty days to submit comments or request a hearing. 29 U.S.C. § 655(b)(2). After that, the Secretary has the choice of consulting an advisory committee that may submit *optional* recommendations. *Id.* § 655(b)(1). At that point, it's up to the Secretary to decide whether to issue a rule, so long as he does so within a designated time frame. *Id.* § 655(b)(2). And if the rule "differs substantially" from an existing national standard, he must state the "reasons" for why the adopted rule would "better effectuate the purposes of" OSHA.[14] *Id.* § 655(b)(8). These common procedural requirements, however, relate only to *how* the Secretary must promulgate, "not to the permissible scope of such [standards]." *Schechter Poultry*, 295 U.S. at 538. So they do not require the Secretary to enforce a specific policy, nor do they limit what standard he can create.

Second, OSHA's penalties provisions get tacked on as a punishment to any standard the Secretary promulgates. Depending on how employers violate a standard, they may face a citation, civil penalties, or even imprisonment. 29 U.S.C. §§ 658, 666. True enough, the Secretary cannot alter these penalties. "But [they] leave virtually untouched the field of policy envisaged by" OSHA's permanent standards. *Schechter Poultry*, 295 U.S. at 538. Nothing in OSHA's penalties provisions constrains "that wide field of legislative possibilities." *Id.* Indeed, the Secretary "may roam at will," promulgating a standard "as he may see fit." *Id.*; *see also id.*

---

[14]The Secretary and other defendants argue that this requirement—to explain why the new standard will "better effectuate" the purposes of OSHA—serves as a limitation. 29 U.S.C. § 655(b)(8). But, as they acknowledge, the requirement only kicks in when the Secretary "regulates in an area that is addressed by national consensus standards." (Secretary's Br. at 18.) The provision doesn't apply to situations in which no national consensus standard governs already. *See* 29 U.S.C. § 655(b)(8) (only applying when the Secretary promulgates a rule that "substantially differs from an existing national consensus standard"). And more importantly, merely explaining why the Secretary is implementing a new standard does not limit the "permissible scope" of any congressional standard. *Schechter Poultry*, 295 U.S. at 538. If it did, every regulation that required some sort of explanation could fix a latent nondelegation problem. But as we know, that's not the case. *See Whitman*, 531 U.S. at 473 (rejecting the idea that an agency "can cure an unconstitutionally standardless delegation of power"). For the same reason, OSHA's requirement that the Secretary include a "statement of the reasons" when adopting "any standard" does not limit his discretion. 29 U.S.C. § 655(e).

at 523 (finding a delegation violation, even when the statute specified that violations of current or future codes could result in a misdemeanor and a daily accruing fine).  As with OSHA's procedural requirements, its penalties don't guide the Secretary on how to create a workplace standard.

Third, OSHA specifies that "[i]n the event of conflict among any such standards, the Secretary shall promulgate the standard which assures the greatest protection of the safety or health of the affected employees." 29 U.S.C. § 655(a).  The Secretary and other defendants claim that this provision serves as a limit.  But for the same reasons explained, this requirement to promulgate the provision with a greater effect on safety does not limit the "permissible scope" of what the Secretary can regulate.  *Schechter Poultry*, 295 U.S. at 538.  For any "conflict" to arise, 29 U.S.C. § 655(a), the Secretary would need to promulgate at least two standards—standards (1) that Congress did not make itself and (2) that the Secretary has wide discretion in crafting.  And if a conflict between any old and new standard were to arise, it seems that the Secretary must choose the broader of the two.  29 U.S.C. § 655(a).  So the provision doesn't limit discretion—it seems to only expand discretion by requiring the Secretary to do more than he did the last time around.  And in any case, allowing the Secretary to limit himself based on a previous standard that he also created would seem to allow him to "cure an unconstitutionally standardless delegation of power" rather than leaving that to Congress—which we cannot allow. *Whitman*, 531 U.S. at 473.

So looking at all of these provisions, I would find OSHA's permanent standards provision unconstitutional because the "absence of standards" here makes it "impossible . . . to ascertain whether the will of Congress has been obeyed." *Yakus*, 321 U.S. at 426.  How can we test what is appropriate given the broad field of delegated power?  The simple answer: We can't. That's because Congress has not "made clear" whether any "boundaries of . . . authority" exist. *Gundy*, 139 S. Ct. at 2129 (plurality) (quoting *Am. Power & Light Co.*, 329 U.S. at 105). Because Congress failed to provide the Secretary "with standards guiding its actions such that a court could 'ascertain whether the will of Congress has been obeyed,'" I would hold that a "delegation of legislative authority trenching on the principle of separation of powers has

occurred." *Skinner v. Mid- Am. Pipeline Co.*, 490 U.S. 212, 218 (1989) (quoting *Mistretta*, 488 U.S. at 379) (reaffirming this "longstanding principle"); *see Yakus*, 321 U.S. at 426.

Even if one were to derive some broad standard, it would not *sufficiently* guide the Secretary's discretion. Again, the amount of guidance Congress must provide to carry out its legislation varies by how much power it delegates to a federal agency. *Whitman*, 531 U.S. at 475 ("[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."); *Wayman*, 23 U.S. (10 Wheat.) at 43 ("To determine the character of the power given to [an entity] by the [legislation], we must inquire into its extent."); *Tiger Lily, LLC*, 5 F.4th at 672 (recognizing the same and that "unfettered power would likely require greater guidance"); *see also Synar v. United States*, 626 F. Supp. 1374, 1386 (D.D.C. 1986) ("When the scope increases to immense proportions (as in *Schechter*) the standards must be correspondingly more precise."), *aff'd sub nom. Bowsher v. Synar*, 478 U.S. 714 (1986). Sure, "Congress need not provide any direction" when the field of power is narrow in itself—such as a delegation to define "country elevators" which would be "exempt from" the new regulations. *Whitman*, 531 U.S. at 475 (citing 42 U.S.C. § 7411(i)). But when the grant of power is bigger, such that it can "affect the entire national economy," Congress "must provide substantial guidance." *Id.*

Surely OSHA—a statute affecting practically every business in the United States—falls into the latter of the two. *See* Sunstein, *supra*, at 1429 ("[B]ecause OSHA covers essentially all American workers, the existence of untrammeled discretion would be a serious problem."). This isn't a statute that only pertains to one industry. *See N.Y. Cent. Secs. Corp.*, 287 U.S. at 24–25 (railroad); *Nat'l Broad. Co.*, 319 U.S. at 214 (radio); *Sunshine Anthracite*, 310 U.S. at 387 (coal). And the power vested is not just "temporary." *Yakus*, 321 U.S. at 419 ("temporary wartime measure"). Nor does the power seem to be a traditional executive function.[15] *See id.* at 424.

---

[15]Another trend—one that does not relate to the delegation in this case—focuses on "whether the particular function" vested by a legislative act "requires the exercise of a certain type of power." *Dep't of Transp.*, 575 U.S. at 69 (Thomas, J., concurring in the judgment); *see id.* at 70 ("The function at issue here is the formulation of generally applicable rules of private conduct. Under the original understanding of the Constitution, that function requires the exercise of legislative power."). Indeed, "Congress may assign the executive and judicial branches certain non-legislative responsibilities." *Gundy*, 139 S. Ct. at 2137 (2019) (Gorsuch, J., dissenting). Many cases, for instance, granted powers that would seem to fall in the Executive's job description, such as matters dealing with war and foreign exchange. *See generally Yakus*, 321 U.S. at 420, 426–27 (vesting the inherently executive warpower to an

Instead, OSHA delegates broad power over *every* industry that has a workplace (probably all of them)—power to create *permanent* health and safety standards that would not traditionally fall within the Executive Branch's wheelhouse.[16]   In other words, OSHA allows the Secretary to regulate private conduct in workplaces by any means "appropriate."[17]   29 U.S.C. § 652(8).

---

official to control pricing of commodities if doing so was "fair and equitable" after considering a list of factors); *Marshall Field & Co.*, 143 U.S. at 692–93, 697 (enforcing foreign trade suspension under the policy established by Congress); *J.W. Hampton, Jr., & Co.*, 276 U.S. at 411 (enforcing a price-fixing policy over foreign and domestic products because the President was a "mere agent of the lawmaking department"); *see generally Gundy*, 139 S. Ct. at 2144 (Gorsuch, J., dissenting) ("Congress may assign the President broad authority regarding the conduct of foreign affairs or other matters where he enjoys his own inherent Article II powers."); *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) ("The complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches.").

[16]What should make us especially skeptical of the lack of guidance here is that the Secretary gets "authority to regulate an area—public health and safety—traditionally regulated by the States."  *In re MCP No. 165, Occupational Safety & Health Admin., Interim Final Rule: COVID-19 Vaccination & Testing*, 20 F.4th 264, 267 (6th Cir. 2021) (Sutton, C.J., dissenting from the denial of initial hearing en banc); *see id.* at 287 (Bush, J., dissenting from the denial of initial hearing en banc) ("Part and parcel of that traditional police power—and thus an authority 'reserved to the States'—is the power to regulate public health." (citing U.S. Const. amend. X; *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905))).  "There is no question that state and local authorities possess considerable power to regulate public health."  *Nat'l Fed'n of Indep. Bus.*, 142 S. Ct. at 667 (Gorsuch, J., concurring).  "[S]everal extant legal bodies possess significant authority to clamp down on unreasonable dangers:  Congress, state legislatures, state regulators, courts applying state tort law."  *SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202, 1222 (D.C. Cir. 2014) (Kavanaugh, J., dissenting).  That's because the states enjoy the "general power of governing," including all sovereign powers envisioned by the Constitution and not specifically vested in the federal government. *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012); *see* U.S. Const. amend. X.

[17]Though I believe that the Plaintiffs here ought to prevail under existing doctrine, were the Court to revisit how nondelegation under Article I operates, it ought to consider what Congress historically delegated to federal officials around the Framing.  Some scholars have recognized that early delegations to the Executive are different from the delegations we typically see today.  That's because, before, the statutes authorized the executive to create rules that were only "binding" on executive officials, not members of the public.  Philip Hamburger, *Is Administrative Law Unlawful?* 89 (2014); *see id.* at 84 (explaining that early delegation "statutes . . . assumed that executive officers could issue directions merely to lesser officers, not to the rest of the public"); *see id.* at 95 ("What was controversial was the extent to which executive interpretations and instructions could direct inferior officers and what this meant, not whether such directives bound the public."); Wurman, *supra*, at 1556 ("Private rights and conduct are undoubtedly more important than official conduct or public privileges, but that does not mean Congress could delegate unlimited discretion over the latter, and no discretion over the former."); *see also* Paul J. Larkin, *Revitalizing the Nondelegation Doctrine*, 23 Federalist Soc'y Rev. 238, 247–48 (2022) (discussing Professor Jonathan Adler and Professor John Harrison's views on how the nondelegation doctrine works with statutes delegating rulemaking authority over private conduct).

Some Justices have already noted this issue.  *See, e.g.*, *Dep't of Transp.*, 575 U.S. at 86 (Thomas, J., concurring in the judgment) ("We should return to the original meaning of the Constitution:  The Government may create generally applicable rules of private conduct only through the proper exercise of legislative power."); *West Virginia v. EPA*, 142 S. Ct. 2587, 2618 (2022) (Gorsuch, J., concurring) ("The framers believed that the power to make new laws regulating private conduct was a grave one that could, if not properly checked, pose a serious threat to individual liberty."); *see also Gundy*, 139 S. Ct. at 2144 (Gorsuch, J., dissenting) ("If the separation of powers means anything, it must mean that Congress cannot give the executive branch a blank check to write a code of

And there is no telling what the Secretary might deem "appropriate" to do—especially in a post-COVID world where the "place[] of employment" might include your house.[18]  *Id.*

Given that OSHA's permanent standards provision vests large power in the Secretary, the details limiting his discretion must be correspondingly detailed.  Yet they're not.  OSHA's very few requirements do not constrain the Secretary's broad power.

True, the standards that the Supreme Court has approved in the face of nondelegation challenges "are not demanding."  *Big Time Vapes, Inc. v. FDA.*, 963 F.3d 436, 442 (5th Cir. 2020) (Smith, J.) (quoting *Gundy*, 139 S. Ct. at 2129 (plurality)).  Even so, OSHA fails to match even these minimal standards.  Thus, I find no intelligible principle based on *Panama Refining* and *Schechter Poultry*'s second consideration—that is, there is no sufficient standard here.

*            *            *

OSHA's permanent standards provision does not have an intelligible principle.[19]  That's because it (1) requires no fact-finding or situation to arise before agency actions takes place and (2) provides no standard that sufficiently guides the exercise of the broad authority vested in the

---

conduct governing private conduct for a half-million people."); *United States v. Nichols*, 784 F.3d 666, 671 (10th Cir. 2015) (Gorsuch, J., dissenting from the denial of rehearing en banc) ("Congress can't punt to the President the job of devising a competition code for the chicken industry . . . . Such widely applicable rules governing private conduct must be enacted by the Legislature.").

[18]The Secretary and other defendants argue that OSHA's scope is limited because it "empowers the Secretary to set *workplace* safety standards, not broad public health measures."  *Nat'l Fed'n of Indep. Bus.*, 142 S. Ct. at 665 (involving a COVID-19 vaccine mandate).  That may be true.  But nothing changes OSHA's explicit vesting of broad authority that the Secretary has the power to create "safe and healthful working conditions" for "every working man and woman in the Nation."  29 U.S.C. § 651(b).  All he must do is find a standard "appropriate" for some rhyme or reason.  *Id.* § 652(8); *see Nat'l Fed'n of Indep. Bus.*, 142 S. Ct. at 665–66 ("Where [COVID-19] poses a special danger because of the particular features of an employee's job or workplace, targeted regulations are plainly permissible.").

[19]The Secretary and other defendants appeal to the canon of constitutional avoidance, arguing that this Court should avoid holding that the permanent standards provision is unconstitutional because a constitutional interpretation of the text exists.  (Secretary's Br. at 18.)  But that canon "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."  *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (citation omitted); *see* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 247 (discussing the constitutional-doubt canon).  As explained, this is *not* a time when we have "more than one plausible construction."  *Jennings*, 138 S. Ct. at 842.  So "the canon simply has no application" here.  *Id.* (cleaned up).

Secretary.  As a result, OSHA violates Article I as an unconstitutional delegation of legislative power.  So I respectfully dissent.

I recognize that successful nondelegation cases are few and far between.  But I emphasize that—even under the minimal requirements needed to find an "intelligible principle"—OSHA's permanent standards provision does not pass muster.

### III.

For these reasons, I respectfully dissent and would reverse the district court's judgment.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-3772

ALLSTATES REFRACTORY CONTRACTORS, LLC,

    Plaintiff - Appellant,

    v.

JULIE A. SU, in her official capacity as Acting Secretary of
Labor, U.S. Department of Labor; DOUGLAS L. PARKER,
in his official capacity as Assistant Secretary of Labor for
Occupational Safety and Health; OCCUPATIONAL SAFETY
& HEALTH ADMINISTRATION, U.S. DEPARTMENT OF
LABOR; UNITED STATES ATTORNEY FOR THE
NORTHERN DISTRICT OF OHIO,

    Defendants - Appellees.

**FILED**
Aug 23, 2023
DEBORAH S. HUNT, Clerk

Before:  COOK, GRIFFIN, and NALBANDIAN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Northern District of Ohio at Toledo.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is
AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk