No. 22-3772

————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

————————————

ALLSTATES REFRACTORY CONTRACTORS, LLC,
*Plaintiff-Appellant*,

v.

JULIE A. SU, et al.,
*Defendants-Appellees.*

————————————

On Appeal from the United States District Court
for the Northern District of Ohio, Western Division (Zouhary, J.)
No. 3:21-cv-1864

————————————

## BRIEF OF THE NATIONAL ASSOCIATION OF HOME BUILDERS
## AND THE NATIONAL FEDERATION OF INDEPENDENT BUSINESS
## SMALL BUSINESS LEGAL CENTER, INC. AS AMICI CURIAE IN
## SUPPORT OF APPELLANT'S PETITION FOR REHEARING

————————————

Timothy S. Bishop
Brett E. Legner
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606
(312) 782-0600
tbishop@mayerbrown.com

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 22-3772 _____          Case Name: Allstates Refractory Contractors v. Su _____

Name of counsel:  Timothy S. Bishop _____

Pursuant to 6th Cir. R. 26.1, Nat'l. Fed. of Indep. Business Small Bus. Legal Servs. Ctr., Inc. _____
                                              *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
       identity of the parent corporation or affiliate and the relationship between it and the named
       party:

> No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
       in the outcome?  If yes, list the identity of such corporation and the nature of the financial
       interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on _____ October 13, 2023 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Timothy S. Bishop _____
Mayer Brown LLP _____
71 S. Wacker Dr., Chicago, IL 60606 _____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 22-3772                    Case Name: Allstates Refractory Contractors v. Su

Name of counsel:  Timothy S. Bishop

Pursuant to 6th Cir. R. 26.1, The National Association of Home Builders
                                                   *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
       identity of the parent corporation or affiliate and the relationship between it and the named
       party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
       in the outcome?  If yes, list the identity of such corporation and the nature of the financial
       interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ October 13, 2023 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Timothy S. Bishop
Mayer Brown LLP
71 S. Wacker Dr., Chicago, IL 60606

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

STATEMENT OF THE AMICI CURIAE ...........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .....................................3

ARGUMENT ...................................................................................................7

    I.    Core constitutional attributes require the application of a strong
        nondelegation rule. .......................................................................7

        A.    The Constitutional text.........................................................8

        B.    The separation of powers principle.......................................10

        C.    Invocation of the nondelegation rule by founding era
                Congress...............................................................................12

        D.    The long-acknowledged need for judicial intervention...........13

        E.    A strong nondelegation analysis does not unduly impede
                government...........................................................................15

    II.    OSHA's workplace safety rules are an unconstitutional
        delegation of the legislative powers. ...............................................18

CONCLUSION ...............................................................................................21

CERTIFICATE OF COMPLIANCE...................................................................22

CERTIFICATE OF FILING AND SERVICE .....................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935)..................................................................8, 18, 21

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023)......................................................................10

*Buckley v. Valeo*,
   424 U.S. 1 (1976)...............................................................................11

*Clinton v. City of New York*,
   524 U.S. 417 (1998)...........................................................................11

*Dep't of Transp. v. Ass'n of Am. Railroads*,
   575 U.S. 43 (2015)...............................................................................9

*Field v. Clark*,
   143 U.S. 649 (1892)...........................................................................13

*Guedes v. Bureau of Alcohol*,
   66 F.4th 1018 (D.C. Cir. 2023) ...........................................................3

*Gundy v. United States*,
   139 S. Ct. 2116 (2019)..........................................5, 6, 9, 14, 20, 21

*I.N.S. v. Chadha*,
   462 U.S. 919 (1983)...........................................................................11

*J.W. Hampton, Jr. & Co. v. United States*,
   276 U.S. 394 (1928).................................................................8, 15, 19

*Mistretta v. United States*,
   488 U.S. 361 (1989).....................................................................12, 18

*Myers v. United States*,
   272 U.S. 52 (1926).............................................................................11

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*National Cable Television Ass'n v. United States*,
  415 U.S. 336 (1974)....................................................................8

*NFIB v. Dep't of Lab.*,
  142 S. Ct. 661 (2022)...................................................................7

*Paul v. United States*,
  140 S. Ct. 342 (2019)...................................................................6

*Rucho v. Common Cause*,
  139 S. Ct. 2484 (2019).................................................................4

*Seila Law LLC v. CFPB*,
  140 S. Ct. 2183 (2020)...............................................................10

*Tiger Lilly, LLC v. U.S. Dep't of Hous. & Urb. Dev.*,
  5 F.4th 666 (6th Cir. 2021) .....................................................6, 10

*Wayman v. Southard*,
  23 U.S. 1 (1825).........................................................................13

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022).........................................................6, 7, 15

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001).............................................................8, 9, 14

## Constitutional Provisions and Statutes

U.S. Const. art. I, § 1...............................................................3, 8, 10

U.S. Const. art. I, § 8....................................................................9

U.S. Const. art. I, § 8, cl. 3...........................................................18

U.S. Const. art. I, § 8, cl. 7...........................................................12

U.S. Const. art. IV, § 4..................................................................4

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

29 U.S.C.
  § 652(8) ................................................................................................5, 19
  § 652(9) ..............................................................................................19, 20
  § 655(a) .....................................................................................................19
  § 655(b) .......................................................................................................2

42 U.S.C.
  § 3604 ........................................................................................................16
  § 7412 ........................................................................................................15
  § 7412(b)(1) ..............................................................................................15
  § 7412(b)(2) .........................................................................................15, 16

## Other Authorities

3 Annals of Congress (1791) (Joseph Gales ed., 1849) ..........................13

Amy Coney Barrett, *Suspension and Delegation*, 99 Cornell L. Rev.
  251 (2014) ...............................................................................................3

Brief of Eight National Business Organizations as *Amici Curiae* In
  Support of Petitioners, *Loper Bright Enters. v. Raimondo*, Supreme
  Court of the United States, No. 22-451 ..............................................13

Gabriel Clark, *The Weak Nondelegation Doctrine and American
  Trucking Associations v. EPA,*
  2000 B.Y.U.L. Rev. 627 (2000) ......................................................11

John Hart Ely, Democracy and Distrust: A Theory of Judicial Review
  132 (1980) .............................................................................................10

The Federalist No. 47 (James Madison) (Jacob E. Cooke ed., 1961) ....................11

The Federalist No. 48 (James Madison) (Jacob E. Cooke ed., 1961) ....................11

Elena Kagan, *Presidential Administration*, 114 Harvard L. Rev. 2245
  (2001) ........................................................................................................3

NAHB, *Safety 365*, https://nahb.org/advocacy/industry-issues/safety-
  and-health/safety-365 (last visited Oct. 10, 2023) ..............................1

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

Nathan Richardson, *Deference is Dead (Long Live* Chevron*)*, 73
Rutgers U.L.R. 441 (2021) ..................................................................13

Antonin Scalia, *A Note on the Benzene Case* Regul. 25 (July/Aug.
1980) ....................................................................................................13

Chad Squitieri, *Towards Nondelegation Doctrines*, 86 Mo. L. Rev.
1239 (2021)...................................................................................12, 13

## STATEMENT OF THE AMICI CURIAE[1]

Amicus curiae National Association of Home Builders (NAHB) is a trade association whose mission is to enhance the climate for housing and the building industry. NAHB seeks to provide and expand opportunities for safe, decent, and affordable housing. Founded in 1942, NAHB is a federation of more than 700 state and local associations. About one-third of NAHB's approximately 120,000 members are home builders or remodelers, who construct 80% of all homes in the United States. The remaining members are associates working in closely related fields within the housing industry, such as environmental consulting, mortgage finance and building products and services. Among other things, NAHB provides educational resources to its members, including the International Builders' Show, which is the world's largest show for the residential and light commercial construction industry and features more than 100 education sessions. Further, NAHB provides a robust array of educational resources, safety training materials, and other content to educate employers and employees about workplace safety, including the Safety 365 initiative to keep construction workers safe.[2]

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the amici curiae, their members, or their counsel made such a monetary contribution. Amici curiae have requested leave of this Court to file this brief, and the parties do not oppose amici's motion for leave.

[2] NAHB, *Safety 365*, https://nahb.org/advocacy/industry-issues/safety-and-health/safety-365 (last visited Oct. 10, 2023).

Amicus curiae the National Federation of Independent Business Small Business Legal Center, Inc. (NFIB Legal Center) is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the Nation's courts through representation on issues of public interest affecting small businesses. It is an affiliate of the National Federation of Independent Business, Inc. (NFIB), which is the Nation's leading small business association. NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. To fulfill its role as the voice for small business, NFIB Legal Center frequently files *amicus curiae* briefs in cases that will impact small businesses.

Thousands of NAHB's and NFIB's members are employers who are subject to workplace-safety standards issued by the Occupational Safety and Health Administration (OSHA) under the Occupational Safety and Health Act (the Act), 29 U.S.C. § 655(b). This Court's decision affirming the district court's judgment rejecting Allstates' challenge to OSHA's authority to issue workplace-safety standards directly impacts NAHB's and NFIB's members' interests in ensuring that the workplace-safety rules to which they are subject are validly enacted.

NAHB and NFIB each proactively participate as a party litigant and amicus where litigation involves issues that impact their members' interests. To that end, amici offer insights to aid this Court's consideration of Plaintiff's petition for

rehearing *en banc* and resolution of the Plaintiff's challenge to OSHA's workplace-safety rules.

## INTRODUCTION AND SUMMARY OF ARGUMENT

NAHB and NFIB Legal Center submit this brief to explain the importance of applying a strong nondelegation doctrine and the need for *en banc* consideration of this important issue. The nondelegation doctrine is a "fundamental, founding principle" of our Constitution. Dkt. 76-2 ("*Slip op.*") at 18 (Nalbandian, J, dissenting). Nevertheless, the doctrine has seemingly evolved to a point where it is a virtual dead letter, as then-Professor Kagan wrote. Elena Kagan, *Presidential Administration*, 114 Harvard L. Rev. 2245, 2364 (2001) ("It is … a commonplace that the nondelegation doctrine is no doctrine at all"); *see also* Amy Coney Barrett, *Suspension and Delegation*, 99 Cornell L. Rev. 251, 318 & n.285 (2014) (discussing the "notoriously lax 'intelligible principle' test"); *Guedes v. Bureau of Alcohol*, 66 F.4th 1018, 1031 (D.C. Cir. 2023) (Walker, J., dissenting from denial of rehearing) (describing the "light-touch nondelegation doctrine"). Serious application of the nondelegation doctrine, however, is necessary to safeguard multiple aspects of the Framers' constitutional design.

First, the text of the Constitution vests the "legislative powers" *exclusively* in the legislature. U.S. Const. art. I, § 1. Accordingly, the Framers' plain language

requires meaningful scrutiny to determine whether another branch of government is improperly undertaking legislative tasks.

Second, protection of the broader separation of powers principle, which does not appear explicitly in the constitutional text but unquestionably defines the shape of our government, similarly necessitates a meaningful look at whether Congress has impermissibly authorized another branch of government to exercise legislative powers.

Third, the Constitution embodies the Framers' understanding of the social compact and their intention to create a republican form of government that vests all power in the people, who may delegate that power to the legislative branch. But this form of American government does not authorize the people's agent—Congress—to then sub-delegate that power to another branch of government. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2511 (2019) (Kagan, J., dissenting) ("Republican liberty demands not only, that all power should be derived from the people; but that those entrusted with it should be kept in dependence on the people") (cleaned up). Congressional delegation of the legislative power thus threatens the republican form of government guaranteed by the Constitution. *See* U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government").

The Supreme Court's jurisprudence currently requires Congress to provide an "intelligible principle" to govern an agency's exercise of discretion in performing its delegated duties. As the dissent concluded, 29 U.S.C. § 652(8) does not supply an intelligible principle to guide OSHA in its promulgation of safety standards. *Slip op.* at 27-44. Far from it: the unbounded and sweeping delegation to OSHA of the powers both to create workplace-safety standards—a legislative function—and then to enforce those rules against countless employers cannot be tolerated under existing precedent. As the dissent properly concluded, OSHA's permanent-standards provision falls far short of supplying an "intelligible principle" because it "requires no fact-finding or situation to arise before agency actions tak[e] place" and "provides no standard that sufficiently guides the exercise of the broad authority vested in the Secretary" of Labor. *Slip op.* at 43-44.

In any event, the malleable and often laxly applied "intelligible principle" approach to assessing the constitutionality of a delegation by Congress has proved to be inadequate protection for core constitutional values, such that a majority of the Supreme Court has recognized that it is ripe for reconsideration. *See Gundy v. United States*, 139 S. Ct. 2116, 2140 (2019) (Gorsuch, J., dissenting) (joined by Roberts, C.J., and Thomas, J.) (discussing "the abused 'intelligible principle' doctrine"); *id.* at 2031 (Alito, J., concurring) ("If a majority of this Court were willing to reconsider the approach we have taken [with regard to the nondelegation doctrine] for the past

5

84 years, I would support that effort"); *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (statement of Kavanaugh, J., respecting denial of certiorari) ("Justice Gorsuch's scholarly analysis of the Constitution's nondelegation doctrine in his *Gundy* dissent may warrant further consideration in future cases"). Even if this Court considers itself bound to apply the intelligible principle test, *see Slip op.* at 3 n.1, it should nonetheless apply a version of the test that serves the purpose of the nondelegation doctrine and takes a hard look at the nature of the legislative declaration, as Judge Nalbandian did, *id*. at 27-43 (Nalbandian, J., dissenting).

The common defense of the lax approach to delegation is that the much greater complexity of modern society compared to the United States of the late Eighteenth Century means that Congress must have latitude to alienate its legislative powers to specialist agencies because it lacks the knowledge itself to legislate clear standards for agencies to follow. But the Framers intended the passage of legislation to be a difficult task carefully undertaken by the branch of government most directly responsive to the will of the people. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2618 (2022) (Alito, J., concurring) ("[T]he framers deliberately sought to make lawmaking difficult by insisting that two houses of Congress must agree to any new law and the President must concur or a legislative supermajority must override his veto"). Indeed, "[t]he Framers understood that lawmaking involved 'hard choices.'" *Slip op.* at 17 (quoting *Tiger Lilly, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th

666, 674 (6th Cir. 2021) (Thapar, J., concurring)). And Congress has been able to enact many complex statutes that confer specific enough guidance to agencies, along with a permissible amount of executive discretion to implement that guidance, without violating the nondelegation principle of Article I. In short, Congress is certainly up to the tough tasks the Constitution assigns it of being the sole source of federal legislation.

## ARGUMENT

### I.     Core constitutional attributes require the application of a strong nondelegation rule.

A strong nondelegation standard is necessary to safeguard multiple keystone features of our Constitution. The decades-long judicial path towards the application of a watered-down version of the nondelegation test—perpetuated here by the Panel decision reading the intelligible principle test "to permit broad delegations," *Slip op*. at 6-7—is inconsistent with the exclusive reservation of the legislative power to Congress and with the role of the people as the ultimate source of that legislative power.

In the absence of a rigorous nondelegation doctrine, the courts have developed substitutes that seek to narrow ambiguous statutory delegations or more directly curtail agency discretion. Doctrines like "void for vagueness," the rule of lenity, and a host of clear statement rules, including the "major questions" doctrine (*see NFIB v. Dep't of Lab.*, 142 S. Ct. 661 (2022); *West Virginia v. EPA*, 142 S. Ct. 2587

(2022)), fill in for some of the functions of the nondelegation principle. So does the principle that statutes will be read narrowly to avoid constitutional problems. E.g., *National Cable Television Ass'n v. United States*, 415 U.S. 336, 342 (1974) ("Whether the present Act meets the [nondelegation] requirement of *Schechter* and *Hampton* is a question we do not reach. But the hurdles revealed in those decisions lead us to read the Act narrowly to avoid constitutional questions"). None of these approaches, however, fully serve the constitutional principles we now discuss.[3]

## A.    The Constitutional text

The Vesting Clause of Article I provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1. Elsewhere, Article I enumerates some of the specific powers of Congress, including the authority to present legislation to the President (but only after the bill has passed both houses), to override the President's veto, and to regulate commerce. *Id.*, §§ 7-8.

By its plain text, Article I's Vesting Clause contains an *exclusive* grant of authority to Congress to exercise the "legislative powers" of government. *Whitman*

---

[3] Indeed, the Panel majority rejected Allstates' argument that the major questions doctrine applies to this case. *Slip op.* at 14 n.3 ("[T]his is not a major-questions case" because the claim is that "Congress's delegation is improper—in other words, that Congress was not specific enough in its delegation, rather than was silent about whether it delegated a particular power"). *Amici* do not agree with this conclusion, but the majority's discussion serves to highlight the separate role in the constitutional system that the nondelegation doctrine plays.

*v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). Indeed, the text "permits no delegation of those powers." *Id*. Simply, "[w]hen the Government is called upon to perform a function that requires an exercise of legislative … power, only the vested recipient of that power can perform it." *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 68 (2015) (Thomas, J., concurring). And "[n]o one, not even Congress, ha[s] the right to alter that arrangement." *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting). Accordingly, the sometimes-floated idea that an agency can correct an insufficiently specific delegation by adopting its own narrowing set of operating constraints is wrong: as the Supreme Court said in *Whitman*, "[w]e have never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute." 531 U.S. at 472.

Article I also provides Congress with the power to "make all Laws which shall be necessary and proper for carrying into execution the foregoing Powers" and all other powers vested in the government by the Constitution. U.S. Const. art. I, § 8. This Necessary and Proper Clause reinforces that legislative power lies with Congress alone, because it authorizes Congress to enact provisions that task another branch of government to assist with the *execution* of the law. In that way the plain text of Article I's Vesting and Necessary and Proper Clauses draws a jurisdictional distinction between legislative and executive powers.

As Judge Nalbandian recognized, the Framers "placed the legislative powers into the hands of the branch that was most accountable to the people" and "'the people could respond, and respond swiftly' to remedy any 'misus[e] of power.'" *Slip op.* at 17 (quoting *Tiger Lily*, 5 F.4th at 674 (Thapar, J., concurring). But "by refusing to legislate" in favor of passing the buck to unelected agencies, "our legislators are escaping the sort of accountability that is crucial to the intelligible functioning of a democratic republic." John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 132 (1980). The lax version of the intelligible principle test allows Congress to refuse to legislate and instead pass the buck to unelected executive officials: as so applied, the doctrine "largely leaves Congress to self-police." *Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring).

## B.    The separation of powers principle

Article I, § 1 parallels separate executive and judicial Vesting Clauses in Article II, § 1 ("The executive Power shall be vested in a President of the United States of America") and Article III, § 1 ("The judicial power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish"). Together, those clauses articulate the separation of powers principle embedded in the Constitution. *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2229 (2020) (Kagan, J., concurring in part) (the separation

of powers principle is "carved into the Constitution's text" in the "first three articles").

Thus, separation of powers "'[is] not simply an abstract generalization in the minds of the Framers: it was woven into the documents that they drafted in Philadelphia in the summer of 1787.'" *I.N.S. v. Chadha*, 462 U.S. 919, 946 (1983) (quoting *Buckley v. Valeo*, 424 U.S. 1, 124 (1976)). "Of all 'principles in our Constitution,' none is 'more sacred than that which separates the legislative, executive and judicial powers.'" *Slip op.* at 17 (Nalbandian, J., dissenting) (quoting *Myers v. United States*, 272 U.S. 52, 116 (1926) (cleaned up). As James Madison wrote, the necessity of separating the three branches of government prevents concentration of too much power in the hands of any one branch. The Federalist No. 47, at 324-31 (Madison) (Jacob E. Cooke ed., 1961). And the system of checks and balances—illustrated for instance in the Presentment Clause of Article I, § 7, requiring all laws to be presented by Congress to the President for signature or veto—"reinforces the principle that one branch should not exercise another branch's powers." Gabriel Clark, *The Weak Nondelegation Doctrine and American Trucking Associations v. EPA*, 2000 B.Y.U.L. Rev. 627, 631 (2000) (citing The Federalist No. 48 (Madison) (Jacob E. Cooke ed., 1961)); *see Clinton v. City of New York*, 524 U.S. 417, 448 (1998) (striking down the Line Item Veto Act because it delegated legislative power to the President, circumventing the Presentment Clause).

The Supreme Court has properly recognized the separation of powers doctrine as the root of the nondelegation doctrine. *See, e.g., Mistretta v. United States*, 488 U.S. 361, 371 (1989) ("The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government").

### C.      Invocation of the nondelegation rule by founding era Congress

These fundamental points—based on constitutional text, context, structure, and underlying framing-era political philosophy—all point to the necessity of engaging in a searching inquiry to determine whether Congress delegated its legislative powers in a particular instance. The early Congresses shared this understanding. For instance, one of the specifically enumerated legislative powers is the authority to "establish post offices and post roads." U.S. Const. art. I, § 8, cl. 7. During the Second Congress, the House considered a bill to establish the national post office that also detailed specific "post routes." Chad Squitieri, *Towards Nondelegation Doctrines*, 86 Mo. L. Rev. 1239, 1253-54 (2021). Representative Sedgwick introduced an amendment that replaced the detailed routes with a provision that allowed the President to establish the particular post roads as he saw fit. *Id*. at 1254. In rejecting the amendment, several congressmen invoked the nondelegation rule. Representative Livermore stated that Congress could not "with propriety delegate that power, which they were themselves appointed to exercise." *Id.* Representative Hartley agreed, arguing that Congress "ought not to delegate the

12

power to any other person." *Id.* And Madison stated that "there did not appear to be any necessity for alienating the powers of the House, and that if this should take place, it would be a violation of the Constitution." *Id*. (citing 3 Annals of Congress 229-39 (1791) (Joseph Gales ed., 1849)). Congress has since expressly delegated to the Postal Service the power to structure postal routes to meet its statutory universal service obligation, but the debate during the Second Congress shows how seriously the Framers' generation took the nondelegation rule.

### D.    The long-acknowledged need for judicial intervention

The Court long ago recognized the need for judicial enforcement of the nondelegation doctrine. *See Slip op.* at 18 (Nalbandian, J., dissenting); *Field v. Clark*, 143 U.S. 649, 692 (1892); *Wayman v. Southard*, 23 U.S. 1, 43 (1825). Otherwise, as then-Professor Scalia pointed out, it would ultimately be courts, not Congress, that upon reviewing agency action have to supply the legislative content that Congress failed to adopt. *See* Antonin Scalia, *A Note on the Benzene Case*, 4 Regul. 25 (July/Aug. 1980). And that constitutional difficulty is all the more severe now that the doctrine of *Chevron* deference to agency interpretations of ambiguous statutes is in decline, if not already completely dead. *See*, *e.g.*, Nathan Richardson, *Deference is Dead (Long Live* Chevron*)*, 73 Rutgers U.L.R. 441, 485 (2021) (charting the recent "total collapse of deference to agency statutory interpretations at the Supreme Court level"); Brief of Eight National Business Organizations as

13

*Amici Curiae* In Support of Petitioners at 8-18, *Loper Bright Enters. v. Raimondo*, Supreme Court of the United States, No. 22-451 (arguing *Chevron* is irreconcilable with separation of powers, the Administrative Procedure Act, and jurisprudential history). Absent deference, the buck passed by Congress falls ultimately on the courts, though they are designated by Article III to exercise only the judicial and not the legislative power. *See Whitman*, 531 U.S. at 473 (observing that for judges to supply "the prescription of the standard that Congress had omitted" is "an exercise of the forbidden legislative authority").

The best way out of this bind is for courts to dutifully enforce the nondelegation doctrine. As Justice Gorsuch has stated, "[t]he framers knew" that "the job of keeping the legislative power confined to the legislative branch couldn't be trusted to self-policing by Congress; often enough, legislators will face rational incentives to pass problems to the executive branch." *Gundy*, 139 S. Ct. at 2135 (Gorsuch, J., dissenting). Therefore, meaningful judicial enforcement of the nondelegation doctrine is necessary to "respect[] the people's sovereign choice to vest the legislative power in Congress alone. And it's about safeguarding a structure designed to protect [the people's] liberties, minority rights, fair notice, and the rule of law." *Id*. Neither executive agencies nor courts should be legislating; enforcing the nondelegation doctrine will ensure they do not do so.

14

### E.    A strong nondelegation analysis does not unduly impede government.

Critics suggest that the imposition of restrictive bounds on Congress's ability to delegate tasks to executive agencies through strong judicial policing of legislative delegations is inconsistent with the increasingly complex demands of modern society. To be sure, the Court has recognized that "common sense and the inherent necessities of the governmental co-ordination" require Congress to delegate discretion in the implementation of its policies. *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928). But even the increasing complexities of the modern world do not permit Congress to shift its prerogative to set policy through the enactment of laws to an executive administrative apparatus. Madison acknowledged that the constitutional design—requiring bicameral support for legislation and then approval of the chief executive—makes it difficult to pass laws. *See West Virginia v. EPA*, 142 S. Ct. at 2618 (Alito, J., concurring). But that is a feature of the constitutional system, not a flaw.

Further, Congress understands how, and is able, to cabin agency discretion with regard to health and safety by providing sufficient statutory guidance even in technically complex areas. For instance, Congress in the Clean Air Act authorized the EPA to regulate certain sources of hazardous air pollutants, which are defined in 42 U.S.C. § 7412. Section 7412(b)(1) lists specific pollutants, while § 7412(b)(2) allows the EPA to add additional pollutants. But the latter provision provides

specific, detailed guidance on what pollutants may be added by the agency: "pollutants which present, or may present, through inhalation or other routes of exposure, a threat of adverse human health effects," which are defined to include "substances which are known to be, or may reasonably be anticipated to be, carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic," or pollutants that may present "adverse environmental effects whether through ambient concentrations, bioaccumulation, deposition, or otherwise." 42 U.S.C. § 7412(b)(2). "Adverse environmental effect" is further defined in the statute as "any significant and widespread adverse effect, which may reasonably be anticipated, to wildlife, aquatic life, or other natural resources," and the statute makes clear that the term includes "adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas." *Id.*, § 7412(a)(7). And Congress expressly adopted the criteria EPA had set forth in its "Guidelines for Carcinogenic Risk Assessment," permitting the agency to revise them "subject to notice and opportunity for comment." *Id.*, § 7412(a)(11).

Another example is the design and construction requirements that Congress set forth in the antidiscrimination provisions of the Fair Housing Act, 42 U.S.C. § 3604, which closely guide the Department of Housing and Urban Development's implementing regulations. Those provisions, which apply to multi-family housing,

16

require that in covered housing "the public use and common use portions" are "readily accessible to and usable by handicapped persons"; "all the doors designed to allow passage into and within all premises" are "sufficiently wide" to allow passage by wheelchairs; and that apartments contain "an accessible route into and through the dwelling," "light switches, electrical outlets, thermostats, and other environmental controls in accessible locations," "reinforcements in bathroom walls to allow later installation of grab bars," and wheelchair-maneuverable "kitchens and bathrooms." *Id.* § 3604(f)(3)(C). And it provides that "[c]ompliance with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as 'ANSI A117.1')" satisfies the requirements for accessible dwellings. *Id.*, § 3604(f)(4).

These are examples of how Congress may retain its policy-setting power and pass a law that allows an executive agency to make relevant fact-findings and to assist with the execution of the statute. They also illustrate that Congress is capable of availing itself of the expertise of an agency and adopting its considered recommendations (such as EPA's cancer risk guidelines) into law, and of looking to standards developed by industry experts and approved by organizations such as the American National Standards Institute. A strong nondelegation doctrine thus would

not unduly impede Congress or prevent it from carrying out its constitutionally

mandated duties in technically complicated areas.

## II.    OSHA's workplace safety rules are an unconstitutional delegation of the legislative powers.

Amici agree with the dissent's thorough analysis showing that the essentially

standardless grant of discretion to create workplace-safety rules is an

unconstitutional delegation by Congress of its legislative powers to an executive

branch agency. Amici also agree with Plaintiff's analysis that the panel majority's

decision cannot be squared with Supreme Court precedent such as *Panama Refining*

*Co.* and *A.L.A. Schechter Corp.* As discussed above, the Framers intended that *only*

Congress could make laws, including the broad authority to regulate commerce. U.S.

Const. art. I, § 8, cl. 3. Further, the Framers expressly provided Congress with the

authority to enact statutes that were necessary and property to execute those laws.

*Id*., § 8, cl. 18. But instead of passing such laws, Congress impermissibly abdicated

its duties and directed OSHA to both enact and execute workplace-safety laws.

Though the subject of recent calls from a majority of the Justices to revisit the

Supreme Court's nondelegation jurisprudence, the Court's current precedent holds

that the nondelegation doctrine "does not prevent Congress from obtaining the

assistance of its coordinate Branches" so long as it "'shall lay down by legislative

act an intelligible principle to which the person or body authorized to exercise the

delegated authority is directed to conform.'" *Mistretta*, 488 U.S. at 372 (alteration

omitted) (quoting *J.W. Hampton,* 276 U.S. at 409). For the reasons described in Part I, rehearing is required because this Court should rigorously apply that standard—not the watered-down version used by the panel majority—and hold that Congress failed to provide a sufficiently definite and discernible intelligible principle for creation of workplace safety regulations in the Act.

Rigorous application of the nondelegation principle to strike down Congress's delegation of power to OSHA to adopt any safety standard it deems "reasonably necessary or appropriate to provide safe or healthful employment and places of employment" (29 U.S.C. § 652(8)) would not result in the elimination of such standards generally. To begin with, Plaintiff here seeks only an injunction limited to the parties. Furthermore, 29 U.S.C. § 655(a) provides for safety rules based not on a vague direction to OSHA to do what it deems "appropriate," but on "any national consensus standard." And 29 U.S.C. § 652(9) defines that term in a concrete manner to mean a standard that "has been adopted and promulgated by a nationally recognized standards-producing organization under procedures whereby it can be determined by the Secretary that persons interested and affected by the scope or provisions of the standard have reached substantial agreement on its adoption" (subject to certain procedural safeguards). There is no reason to believe that any significant number of safety standards would fall as a result of following the Constitution's mandate.

19

Certainly, amici do not advocate the elimination of workplace-safety rules. To the contrary, workplace safety is a critical part of amicus NAHB's mission and NAHB devotes significant resources to providing employers and employees with training and tools to safeguard construction workers and others in the workplace. But the sources of those rules must be the subject matter experts in the industry, who unquestionably have the most knowledge about the operation of housing construction sites, as Congress recognized in § 652(9). Or the source must be Congress itself through duly enacted legislation that provides more specific direction to OSHA.

As pointed out by the dissent and Plaintiff, a broad delegation of policy-making power to an administrative agency to set such rules is not only irreconcilable with the principles upon which the American government rests but also may be contrary to the best-practices employers have developed from experience for their own industry and work sites. In any event, employers and employees alike should desire adherence to the basic principle that Congress, as the people's agent directly subject to the people's will, is the only branch of federal government that can create laws, leaving agencies like OSHA to implement them. As Justice Gorsuch observed in dissent in *Gundy*, "while Congress can enlist considerable assistance from the executive branch in filling up details and finding facts, it may never hand off to the nation's chief prosecutor the power to write his own criminal code. That 'is

delegation running riot.'" 139 S. Ct. at 2148 (quoting *A.L.A. Schechter Poultry Corp.*

*v. United States*, 295 U.S. 495, 553 (1935) (Cardozo, J., concurring)).

## CONCLUSION

For the foregoing reasons, amici curiae National Association of Home

Builders and the National Federation of Independent Business Small Business Legal

Center, Inc. request that this Court grant Plaintiff's petition for rehearing *en banc*

and reverse the judgment of the district court.

October 13, 2023                    Respectfully submitted,

                                   /s/ Timothy S. Bishop
                                   Timothy S. Bishop
                                   Brett E. Legner
                                   MAYER BROWN LLP
                                   71 S. Wacker Dr.
                                   Chicago, IL 60606
                                   (312) 782-0600
                                   tbishop@mayerbrown.com

                                   *Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(i)    complies with the type-volume limitation of Rule 32(a)(7) because it contains 4,798 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f ); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6).

Dated: October 13, 2023

/s/ *Timothy S. Bishop*

Timothy S. Bishop

*Counsel for Amici Curiae*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on October 13, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Timothy S. Bishop*
Timothy S. Bishop
*Counsel for Amici Curiae*